UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONSTANCE BAGLEY | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO.: |
| | : | 3:13 CV 1890 |
| vs. | : | |
| | : | |
| YALE UNIVERSITY, DOUGLAS RAE, | : | |
| EDWARD SNYDER and ANDREW | : | |
| METRICK, Individually | : | |
| | : | |
| Defendants | : | MARCH 20, 2014 |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

The defendants, Yale University ("Yale"), Douglas Rae, Edward Snyder and Andrew Metrick, hereby submit the following memorandum of law in support of their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## I.    PLAINTIFF'S ALLEGATIONS

The present action arises from the plaintiff's employment relationship with Yale. The plaintiff alleges that she accepted an employment contract with the Yale School of Management in 2008 as a Professor in the Practice. (See December 20, 2013 Complaint, ¶¶ 30 and 32.) The plaintiff's employment contract was for a five-year term with an opportunity for re-appointment. (See Complaint, ¶ 32.) It is the plaintiff's contention, however, that she accepted Yale's offer of employment based on a representation that reappointment was a certainty. (See Complaint, ¶¶ 38 and 40.) On May 7, 2012, the plaintiff alleges that she was informed that her appointment as Professor in the Practice in the Yale School of Medicine would not be renewed because of a lack

of need.  (See Complaint, ¶ 37.)  The plaintiff now claims, *inter alia*, that the decision to not renew her appointment was improperly motivated by her age and gender.  The plaintiff continues to be employed by Yale, as her contract does not expire until December 31, 2014.  (See Complaint, ¶ 108.)

The defendants in this action are Yale, Douglas Rae, Edward Snyder, and Andrew Metrick.  Douglas Rae is a professor in the Yale School of Management and co-taught the "State and Society" course with the plaintiff for five years.  (See Complaint, ¶¶ 3 and 43.)  Edward Snyder is the Dean of the Yale School of Management, and plaintiff alleges that he made the determination to not renew her contract upon the recommendation of the Board of Permanent Officers.  (See Complaint, ¶¶ 4 and 69.)  Andrew Metrick is the Deputy Dean of the Yale School of Management, and was involved in the decision to not renew the plaintiff's contract.  (See Complaint, ¶¶ 5, 65, 99, 105.)  As to Yale University, the plaintiff now alleges claims of gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA") (Counts One and Two), age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA") and the CFEPA (Counts Three and Four), Retaliation under Title VII, the ADEA and the CFEPA (Counts Five, Six and Seven), breach of contract (Count Eight), breach of the covenant of good faith and fair dealing (Count Nine), promissory estoppel (Count Ten), and negligent misrepresentation (Count Eleven).  As to the individual defendants, the plaintiff alleges claims of gender discrimination under the CFEPA (Count Two), age discrimination under the CFEPA (Count Four), retaliation under the CFEPA

(Count Seven), tortious interference with contractual relations (Counts Twelve, Thirteen and Fourteen), and aiding and abetting discrimination under the CFEPA (Counts Fifteen, Sixteen and Seventeen).  Finally, the plaintiff alleges a claim of defamation against Professor Rae (Count Eighteen).

## II.    PRIOR PROCEEDINGS

The plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) on March 4, 2013.  This complaint, attached hereto as Exhibit A, is directed against only Yale and alleges that the plaintiff was discriminated against in the terms and conditions of her employment on May 7, 2012 in that she was not reappointed.  The complaint further indicates that the plaintiff believes she was discriminated against on the basis of her age, sex, physical disability, and because she previously opposed discriminatory conduct.  (See Exhibit A.)  The affidavit attached to the plaintiff's March 4, 2013 CHRO complaint addresses only the May 7, 2012 decision to not renew her contract.  Indeed, the concluding paragraph of this affidavit sums up the plaintiff's claim as follows:

> I believe that I was not reappointed to the position for which I was clearly qualified because of my gender, my failure to conform to illegal gender stereotypes, my age (as it relates to the younger males who are teaching courses once assigned to me), my medical leave and physical disability, and false and defamatory assertions of a "meltdown."

(See Exhibit A, ¶ 16.)

Following a merit assessment review, the plaintiff's CHRO complaint was dismissed on July 15, 2013.  The CHRO explained that the plaintiff's complaint was dismissed because the plaintiff was notified of the decision to not renew her contract on May 7, 2012, and she did not

file her complaint until 301 days later, on March 4, 2013.  "Complainant's claim is not timely filed as the timeframe for filing is one hundred and eighty (180) days from the date when complainant knew or should have reasonably known of the alleged act." (See Exhibit B, CHRO's Merit Assessment Review, dated July 15, 2013.)  Thereafter, on September 30, 2013, the CHRO denied the plaintiff's request to reinstate her March 4, 2013 complaint and issued a release of jurisdiction. The U.S. Equal Employment Opportunity Commission also issued a Notice of Right to Sue on January 16, 2014, with regard to the plaintiff's dually filed charge.

The plaintiff filed a second complaint with the CHRO, dated December 20, 2013. (See Exhibit C.)  This is also the date of the plaintiff's complaint in the present action.  The plaintiff's affidavit filed in connection with her second CHRO complaint contains additional allegations regarding events that took place following the filing of the March 4, 2013 CHRO complaint. These post-March 4, 2013 allegations are also contained in the plaintiff's complaint before this Court.  Immediately upon filing the December 20, 2013 CHRO complaint, the plaintiff requested a release of jurisdiction from the CHRO.  (See Exhibit D.)  Despite the fact that the plaintiff's complaint in the present action contains allegations similar to her December 20, 2013 CHRO complaint, the plaintiff requested a release of jurisdiction so that she may consolidate the claims in her newly filed CHRO complaint with those alleged in this action.  To date, no release of jurisdiction has been issued.  (See also Complaint, ¶ 10 ("Plaintiff filed an additional Charge of Discrimination against Yale and Defendants Rae, Snyder, and Metrick on or about December 20, 2013, with a request that the CHRO immediately issue a right to sue letter so that all relevant facts

and claims can be consolidated in this single action.")) The plaintiff made an identical request for release of jurisdiction to the EEOC.

The plaintiff has therefore filed two administrative actions; the first of those actions -- which was against only Yale -- was not timely, and the second is still pending before the CHRO.

### III.   LEGAL STANDARD

#### A.   Fed. R. Civ. P. 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2nd Cir. 2000). See also Fed. R. Civ. P. 12(b)(1). The burden rests on the party invoking the court's authority to establish that the court possesses subject matter jurisdiction over the action. See Shenandoah v. Halbritter, 366 F.3d 89, 91 (2nd Cir. 2004); Sullivan v. Metro-North Railroad Co., 179 F. Supp. 2d 2, 4 (D.Conn 2002). That party must show by a preponderance of the evidence that subject matter jurisdiction exists. See Luckett v. Bure, 290 F.3d 493, 497 (2nd Cir. 2002). In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court may consider material outside the complaint. See Makarova, supra, 201 F.3d at 113; Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 121 n. 1 (2nd Cir. 1998).

#### B.   Fed. R. Civ. P. 12(b)(6)

"[D]ismissal is appropriate [pursuant to Fed. R. Civ. P. 12(b)(6)] if the plaintiff can prove no set of facts that would entitle him to relief." Cooper v. Parsky, 140 F.3d 433, 440 (2nd Cir. 1998). To avoid dismissal, a plaintiff must do more than plead mere "conclusory

allegations or legal conclusions masquerading as factual conclusions. . . . The point at which conclusory allegations become valid pleadings lies where the plaintiff has asserted sufficient facts that, when construed liberally, allow the inference of a violation." (Citations omitted; internal quotation marks omitted.) Plumey v. New York State, 389 F. Supp. 2d 491 (S.D.N.Y. 2005). See also Gregory v. Daly, 243 F.3d 687, 692 (2nd Cir.2001). In deciding a Rule 12(b)(6) motion, courts "stop well short of saying that plaintiffs bear no burden at the pleading stage," because they must allege "those facts necessary to a finding of liability." Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 343-44 (2d. Cir. 2006). An affirmative defense that a claim is barred by the statute of limitations is properly raised in a pre-answer motion to dismiss under Rule 12(b)(6). Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir.1989).

## IV.   ARGUMENT

### A.   The Plaintiff's State And Federal Discrimination Claims Should Be Dismissed.

1.   Counts Two, Four, Seven, Fifteen, Sixteen And Seventeen Should Be Dismissed As Against Professor Rae, Dean Snyder And Dean Metrick, As The Plaintiff Failed To Exhaust Her Administrative Remedies As To These Defendants.

In Counts Two, Four, Seven, Fifteen, Sixteen and Seventeen, the plaintiff alleges various violations of the CFEPA against all of the defendants. The plaintiff failed to exhaust her administrative remedies prior to instituting these causes of action against Professor Rae, Dean Snyder and Dean Metrick and, as such, they should be dismissed.

As this Court has observed, there are "two prongs required to bring a CFEPA claim in court: namely the plaintiff must (1) file a timely discrimination complaint with the CHRO and (2) obtain a release from the commission to file the suit." Anderson v. City of Derby, 718 F. Supp. 2d 258, 271 n. 31 (D.Conn. 2010) (Haight, J.). See Conn. Gen. Stat. § 46a-100 (providing that an individual who has "timely filed a complaint with the Commission on Human Rights and Opportunities" regarding an alleged discriminatory practice "and who has obtained a release from the commission . . . may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred."); Conn. Gen. Stat. § 46a-101 ("No action may be brought in accordance with section 46a-100 unless the complainant has received a release from the commission in accordance with the provisions of this section."). See also Catalano v. Bedford Assocs., 9 F. Supp. 2d 133, 135 (D. Conn. 1998) (Dorsey, J.) ("Courts have subject matter jurisdiction over employment discrimination claims under the [CFEPA], C.G.S. § 46a-60, only if (1) the plaintiff timely files a discrimination complaint with the CHRO . . .; and, (2) the plaintiff obtains a release from the commission to file suit.") (internal quotation marks omitted); Payne v. PSC Indus. Outsourcing, L.P., 2013 U.S. Dist. LEXIS 180941 (D. Conn. Dec. 30, 2013) (Bryant, J.) ("It is clearly established that before a plaintiff can file a claim for CFEPA retaliation in district court, the plaintiff must timely file[] with the [CHRO] a petition and either receive a ruling on those claims or a release by the commission of its jurisdiction.") (internal quotation marks omitted). In Anderson, supra, this Court granted defendant City of Derby's motion to dismiss the plaintiff's CFEPA claim on the ground that it had not been a party to the plaintiff's CHRO complaint and, therefore, the court lacked subject matter jurisdiction as to that particular

defendant. Id. at 276.  See also Durgin v. Town of Madison, 2011 U.S. Dist. LEXIS 16373 (D.

Conn. Feb. 18, 2011) (Bryant, J.) (dismissing plaintiff's CFEPA claim of because plaintiff did not

file an administrative complaint with the CHRO).

   The plaintiff has not satisfied either of the two requirements for the institution of a

CFEPA claim against the individual defendants.  The plaintiff's March 4, 2013 CHRO complaint,

in addition to being untimely, did not assert any claims against Professor Rae, Dean Snyder or

Dean Metrick.  While the December 20, 2013 CHRO complaint does assert a claim against these

defendants, that matter is still pending before both the CHRO and the EEOC, and no release of

jurisdiction has been issued.  As a result, the plaintiff has failed to exhaust her administrative

remedies as to Professor Rae, Dean Snyder and Dean Metrick.  Counts Two, Four, Seven,

Fifteen, Sixteen and Seventeen, should be dismissed as to these defendants.

   2.   The Plaintiff's CFEPA Claims Against Yale Were Not Timely Filed With
        The CHRO And, Therefore, Counts Two, Four, and Seven Should Be
        Dismissed.

   The plaintiff's claims against Yale under the CFEPA were initiated by her March 4, 2013

CHRO complaint.  As noted above, there are "two prongs required to bring a CFEPA claim in

court: namely the plaintiff must (1) file a timely discrimination complaint with the CHRO and (2)

obtain a release from the commission to file the suit." Anderson, supra, 718 F. Supp. 2d. at 271 n.

31.  The plaintiff has also not satisfied these two requirements as to her CFEPA claims against

Yale, as alleged in Counts Two, Four, and Seven.

   To be timely, "[a]ny complaint filed pursuant to this section must be filed within one

hundred and eighty days after the alleged act of discrimination ...." Conn. Gen. Stat. §46a-82(e).

See also State v. Commission on Human Rights & Opportunities, 211 Conn. 464, 471-73, 559 A.2d 1120 (1989) (holding that employee cannot recover for employer's acts that occurred more than 180 days prior to filing charge of discrimination with CHRO). The alleged act of discrimination at issue in the plaintiff's March 4, 2013 CHRO complaint was the decision not to reappoint her as a Professor in the Practice in the Yale School of Management. (See Exhibit A.) As alleged, this occurred on May 7, 2012. (See Exhibit A.) Therefore, in order to timely contest this decision before the CHRO, the plaintiff was required to file a complaint by November 3, 2012. The plaintiff did not file her CHRO complaint until about four months later, on March 4, 2013. As the plaintiff's March 4, 2013 CHRO complaint was not timely, she cannot now rely on that complaint as a basis for the CFEPA claims she is advancing in the present litigation. See Anderson, supra, 718 F. Supp. 2d. at 271 n. 31.[1]

The plaintiff also cannot rely on her December 20, 2013 filing with the CHRO as a basis for her CFEPA claims before this court. As the plaintiff acknowledges in her complaint in this action, (see Complaint, ¶ 10), she had not yet received a right to sue letter from the CHRO with regard to her December 20, 2013 CHRO complaint. As such, the December 20, 2013 CHRO complaint does not satisfy the second prerequisite for the filing of a CFEPA claim. See Anderson, supra, 718 F. Supp. 2d. at 271 n. 31. See also Catalano, supra, 9 F. Supp. 2d at 135 ("Subject matter jurisdiction does not exist where a plaintiff has not obtained a release from the CHRO, and has therefore failed to comply with the clear and unambiguous statutory prerequisite

---

[1] Even if calculated from May 24, 2012, the date of Dean Snyder's letter informing the plaintiff that her appointment was not being renewed, the plaintiff's discrimination charge was not timely filed with the CHRO.

embodied in General Statutes § 46a-101.") (citations omitted).  The plaintiff's CFEPA claims

against Yale, alleged in Counts Two, Four, and Seven, should therefore be dismissed.

> 3.    The Plaintiff's Federal Claims Under Title VII And The ADEA Were Not
>        Timely Charged To The EEOC.

In Counts One, Three, Five and Six, the plaintiff alleges claims of discrimination and

retaliation under Title VII and the ADEA.  In order to bring a Title VII or ADEA lawsuit in

federal district court, a plaintiff must file a *timely* charge with the EEOC.  "When a plaintiff

fails to file a timely charge with the EEOC, the claim is time-barred."  Butts v. City of New

York Department of Housing, 990 F.2d 1397, 1401 (2d Cir. 1993), citing Gomes v. Avco

Corp., 964 F.2d 1330, 1332-33 (2d Cir. 1992) and Zipes v. Trans World Airlines, Inc., 455

U.S. 385, 394 (1982).  See also Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618,

127 S. Ct. 2162, 2166-67, 167 L. Ed. 2d 982 (2007) ("[I]f the employee does not submit a

timely EEOC charge, the employee may not challenge that practice in court . . . ."); Doe v.

Odili Technologies, Inc., 1997 WL 317316, No. 3:96CV1957 (D. Conn. May 25, 1997)

(Nevas, J.); Dillman v. Combustion Engineering, Inc., 784 F.2d 57, 59 (2d Cir. 1986) ("No

civil action based on a claim of age discrimination may be brought in a federal court unless the

plaintiff has timely filed his claim with the EEOC.").

An EEOC charge, the necessary prerequisite for the plaintiff's claims under Title VII

and the ADEA, must be filed within either 180 days or 300 days of the alleged discrimination.

42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d).  The charge must be filed within 180 days after

the unlawful event unless, as here, it is initially filed with a state agency, in which case the

charge must be filed with the EEOC within 300 days of the event.  42 U.S.C. § 2000e-5(e)(1);

Odili, supra, 1997 WL 317316 at *2.

The 300-day rule is qualified in certain ways in so-called "deferral states," such as

Connecticut. Odili, 1997 WL 317316 at *2, citing Ford v. Bernard Fineson Dev. Ctr., 81 F.3d

304, 305 (2d Cir. 1996).  In Odili, Judge Nevas outlined the administrative scheme as follows:

> A deferral state is one which has its own antidiscrimination laws and administrative agency.  Connecticut is such a deferral state.  In a deferral state, a complaint must first be filed with the state agency to give it an opportunity to resolve the suit.  In the initial sixty-day period the state agency has exclusive jurisdiction to process discrimination charges.  The state agency retains exclusive jurisdiction to process discrimination charges unless one of three events occur to trigger EEOC jurisdiction: (1) the sixty-day deferral period expires; (2) the state agency proceedings are "terminated"; or (3) the state agency waives its right to exclusively process the charge. The EEOC does not have subject matter jurisdiction to proceed with its investigation and to issue a right to sue letter until the deferral period expires or the state agency proceedings are otherwise terminated.  Thus, if an EEOC charge is subject to deferral and is received by the EEOC, it is held in "suspended animation" until one of the three triggering events occur to transfer jurisdiction to the EEOC.

Id. (citations omitted). See also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122

S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("In a State that has an entity with the authority to grant

or seek relief with respect to the alleged unlawful practice, an employee who initially files a

grievance with that agency must file the charge with the EEOC within 300 days of the

employment practice; in all other States, the charge must be filed within 180 days.")  The same

rules apply under the ADEA. See 29 U.S.C. § 626(d)(1); Hodge v. N.Y. Coll. of Podiatric

Med., 157 F.3d 164, 166 (2d Cir. 1998); Riddle v. Citigroup, 449 Fed. Appx. 66, 69 (2d Cir.

2011). A claim of discrimination under either Title VII or the ADEA "is time barred if it is not

filed within these limits." <u>Richardson v. Hartford Pub. Library</u>, 404 Fed. Appx. 516, 517 (2d Cir. Conn. 2010)

Thus, in the instant action, plaintiff's charge of discrimination was not deemed to be officially filed with the EEOC until "sixty days after proceedings have been commenced under the state or local law..." 42 U.S.C. § 2000e-5(c); <u>see also</u> 29 C.F.R. § 1601.13(b); <u>Kremer v. Chemical Construction Corp.</u>, 456 U.S. 461, <u>reh. den.</u> 458 U.S. 1133 (1982) (explaining purpose of provision is to give state agencies limited opportunity to resolve discrimination complaints at local level before triggering federal involvement).   The ADEA contains an identical requirement.  <u>See</u> 29 U.S.C. 633(b); <u>Goodman v. Heublein, Inc.</u>, 645 F.2d 127, 132 (2d Cir. 1981).  This statutory requirement is analogous to a statute of limitations, <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 394 (1982), and is to be *strictly* construed.  <u>Lenox v. Unisys Corporation</u>, 32 F. Supp. 2d 44 (1999) (dismissing claim filed 321 days after notice of termination), <u>citing</u> <u>Economu v. Borg-Warner Corp.</u>, 829 F.2d 311, 315 (2d Cir. 1987) (dismissing complaint where ADEA claim filed 301 days after plaintiff received termination notice from the employer.)[2]

The present plaintiff's CHRO complaint against Yale was filed on March 4, 2013 (<u>See</u> Complaint, 7.)  It was therefore not deemed to be filed with the EEOC until sixty days thereafter on May 3, 2013.  May 3, 2013 is almost a full year after the conduct that forms the basis of the plaintiff's claim: the May 7, 2012 decision to not renew her contract.  As such, the plaintiff's

---

[2] Therefore, a claim of an untimely charge with the EEOC is to be treated as a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). <u>See</u> <u>Holowecki v. Federal Exp. Corp.</u>, 440 F.3d 558, 565 (2d Cir. 2006).

claim with the EEOC was not timely, and her Title VII and ADEA claims before this Court should be dismissed.[3]  See Mohasco Corp. v. Silver, 447 U.S. 807, 100 S. Ct. 2486, 65 L. Ed. 2d 532 (1980) (holding that employee's religious discrimination complaint against his employer was not timely filed with the EEOC because, by the time that the 60-day deferral period had passed, the 300-day limit for filing a charge with the EEOC was over.)

The plaintiff's December 20, 2013 CHRO complaint also does not provide a basis for the plaintiff's Title VII and ADEA claims in this case.  "The receipt of a right to sue letter is a statutory prerequisite to bringing a Title VII action."  Shanks v. Calvin Walker & Doctor's Assocs., 116 F. Supp. 2d 311, 313 (D. Conn. 2000) (Dorsey, J.), citing 42 U.S.C. § 2000e-5(a). Under the ADEA, on the other hand, "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission." 29 U.S.C. § 626(d).  The present lawsuit was filed the same day as the plaintiff's December 20, 2013 CHRO complaint. (See Complaint, ¶ 10.) Obviously, therefore, at the time this lawsuit was instituted, the EEOC had not issued a right to sue letter, and 60 days had not passed since the charge was deemed filed with the EEOC.  With regard to the plaintiff's December 20, 2013 CHRO complaint, therefore, she has not exhausted her administrative remedies.

Therefore, for the reasons stated above, Counts One, Three, Five and Six should be dismissed.

---

[3] Again, even if calculated from the date of Dean Snyder's May 24, 2012 letter, the plaintiff's May 3, 2013 charge with the EEOC did not occur within 300 days.

4.   <u>Counts Two and Four Should Be Dismissed as to Professor Rae, Dean
Snyder, and Dean Metrick Because Claims Against Individuals are not
Permitted under the CFEPA.</u>

In Counts Two and Four of the Complaint, the plaintiff attempts to allege claims of
discrimination against the individual defendants -- Professor Rae, Dean Snyder and Dean
Metrick -- under § 46a-60(a)(1) of the CFEPA.  However, these claims should be dismissed
because, as this Court has previously recognized, there is no individual liability under the
CFEPA.

In <u>Anderson</u>, <u>supra</u>, 718 F. Supp. 2d 258, the plaintiff alleged a claim of age
discrimination under Conn. Gen. Stat. § 46a-60(a)(1).  In addition to his employer,  the City of
Derby Board of Education, the plaintiff in <u>Anderson</u> also alleged this CFEPA claim against the
Mayor of Derby, Tony Staffieri.  Staffieri moved to dismissed this claim on the ground that the
CFEPA does not allow individual liability for age discrimination.   With respect to claims
under Conn. Gen. Stat. § 46a-60(a)(1) of the CFEPA, this Court agreed:  "This District
recognizes and defers to the Connecticut Supreme Court's holding in <u>Perodeau v. City of
Hartford</u>, 259 Conn. 729, 743-44, 792 A.2d 752 (2002), that there is no individual liability
under CFEPA § 46a-60(a)(1)."  <u>Id</u>. at 267.  Indeed, in <u>Perodeau</u>, following a review of case
law from other jurisdictions construing state statutes similar to Conn. Gen. Stat. §§ 46a-51(10),
46a-60(a)(1), a majority of which concluded that individuals may not be held liable under the
relevant state's employment discrimination statute, the Connecticut Supreme Court determined
"that § 46a-60(a)(1) does not impose liability on individual employees."  <u>Id</u>. at 744.

14

On the basis of the above, the plaintiff may not assert a claim against Professor Rae, Dean Snyder and Dean Metrick on the basis of Conn. Gen. Stat. § 46a-60(a)(1), as that provision does not impose liability on individual employees.  As such, Counts Two and Four of the Complaint fail to state a claim upon which relief can be granted, and should be dismissed.

**B.**      **This Court Should Not Exercise Supplemental Jurisdiction Over The Plaintiff's State Law Claims Contained in Counts Eight through Fourteen and Count Eighteen.**

Counts Eight through Fourteen and Count Eighteen allege various state law breach of contract and tort causes of action against Professor Rae, Dean Snyder and Dean Metrick.  The plaintiff's claims under Title VII and the ADEA provide the basis for the District Court's jurisdiction over the present matter.  However, the plaintiff's state common law causes of action involve different issues of proof and damages and are best left to the state courts.  The plaintiff's state law claims should therefore be dismissed for lack of subject matter jurisdiction because they are not so related to the federal claims as to form part of the same case or controversy.

The exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367, which provides in pertinent part that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  See also United Mine Workers v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).  28 U.S.C. § 1367 is a codification of the common law concept of supplemental

jurisdiction, which "has its origins in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in United Mine Workers v. Gibbs, [supra, 383 U.S. 715, 725-29]." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2nd Cir. 2003).

A federal court "has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" Id., citing Gibbs, supra, 383 U.S. at 725. See also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. N.Y. 2004). In deciding whether to exercise its supplemental jurisdiction, a district court "is required to consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity . . . ." (Internal quotation marks omitted.) Block v. First Blood Associates, 988 F.2d 344, 351 (2nd Cir. 1993). See also Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." (Internal quotation marks omitted.) Seabrook v. Jacobson, 153 F.3d 70, 72 (2nd Cir. 1998). Additionally, "there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial. . . . If so, jurisdiction should ordinarily be refused." Gibbs, supra, 383 U.S. at 726.

In deciding whether a state law claim arises from the same operative facts as the claim conferring jurisdiction, the federal courts generally consider "whether the claims arise from the same facts, or involve similar occurrences, witnesses or evidence." Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 455 (11th Cir. 1996). See also Smylis v. City of New York, 983 F. Supp. 478, 484 (S.D.N.Y. 1997). One example is Cormier v. Funtown/Splashtown USA, Inc., 294 F. Supp. 2d 125, 128 (D.Maine 2003), in which the plaintiff employee brought suit against her employer alleging discrimination in violation of 42 U.S.C. § 2000e and state law claims of breach of fiduciary duty, intentional misrepresentation, breach of contract and violation of a state statute. The defendants filed a counterclaim asserting state law claims of breach of fiduciary duty, violation of confidential relations, conversion, libel and slander, and failure to pay debts. Id. The plaintiff sought dismissal of the state law claims contained in her own complaint and all the counts of the counterclaim on the ground that those claims did not arise out of a nucleus of operative fact common to that of the federal discrimination claim. Id. at 129. In finding that it did not have jurisdiction over the state law claims, the court reasoned that those claims "rely significantly on facts not involved in determination of the discrimination claim. From all that appears, the witnesses may essentially be different on the state and federal claims as well." Id. at 130.

The District Court of Connecticut has previously declined to exercise pendent jurisdiction over state law claims similar to those of the present case, in the context of discrimination actions involving termination of the plaintiff's employment. See DeLoreto v. Ment, 944 F. Supp. 1023, 1035-36 (D.Conn. 1996) (Goettel, J.); Koehler v. Chesebrough-

Ponds, Inc., 705 F. Supp. 721, 722-25 (D.Conn. 1988) (Margolis, J.); Brokke v. Stauffer Chemical Co., 703 F. Supp. 215, 217-19 (D.Conn. 1988) (Smith, J.); Billings v. Stone & Webster Engineering Corp., 678 F. Supp. 984, 986-87 (D.Conn. 1988) (Dorsey, J.).

In Glasser v. Group W Satellite Communications, 1990 U.S. Dist. LEXIS 11552 (D.Conn. Jul. 11, 1990) (Eginton, J.), the plaintiff brought suit against his employer alleging that he was terminated in violation of the ADEA and that his termination constituted a breach of his employment contract. The defendant employer moved to dismiss the state law breach of contract claim on the ground that it did not arise out of the same operative facts as the ADEA claim. Id. at *1. Judge Eginton agreed with the defendant, stating: "Plaintiff's claim is based upon an alleged violation of the ADEA. If the Court were to exercise pendent jurisdiction over the breach of contract claim it would involve inquiry into facts having nothing to do with the age discrimination claim and into areas of state law which are best left to state judicial authorities." Id. at *4. The same factors favor dismissal of the present state claim.

Similarly, in Burgess v. Omar, 345 F. Supp. 2d 369, 370 (S.D.N.Y. 2004), the court dismissed state law claims alleging, inter alia, breach of fiduciary duty, misappropriation and waste, stating: "[W]hile there may be some facts that are common to both the [state and federal claims], the complaint and these counterclaims do not arise out of a common nucleus of operative fact. Put another way, while facts relevant to one claim might provide background with respect to the other, more is required." Id. at 371-72.

In Koehler, supra, 705 F. Supp. 721, the plaintiff brought a claim for an ADEA violation as well as state law claims for breach of contract, promissory estoppel, intentional

infliction of emotional distress and abusive discharge in contravention of Connecticut's Fair Employment Practices Act. In dismissing all the pendent state law claims, Judge Margolis reasoned:

> **First, the remedies available under plaintiff's state law claims differ from those available under the ADEA.** It is well settled that a plaintiff may not recover compensatory or punitive damages under the ADEA. . . . Nor is the plaintiff entitled to recover for emotional distress in an ADEA suit. . . . Thus in exercising pendent jurisdiction, plaintiff would be permitted to pursue remedies which are not available under the ADEA. . . . The possibility of inconsistent results would also not serve the interests of judicial economy or fairness to the litigants. **Second, there is a difference in the issues presented and the proof required in plaintiff's claims.** To succeed on his ADEA action, plaintiff will need to submit evidence of defendant's discriminatory conduct. However, additional evidence will be required to prove plaintiff's pendent claims, thus enlarging the scope of the trial here. . . . As to his emotional distress claim in Count IV, plaintiff would be required to submit proof of his mental state."

(Emphasis in original; citations omitted)  Id. at 723-24.  The court in Koehler also recognized that "[i]n this district, the courts have been particularly reluctant to exercise pendent jurisdiction over state law claims in ADEA suits." Id. at 722.  See also Glasser, supra, 1990 WL 128563 at *2; Douglas v. American Cyanamid Co., 472 F. Supp. 298 (D.Conn. 1979); Sperry v. Post Publishing Co., No. B-90-140, 1990 WL 128238 (D.Conn. Jul. 12, 1990) (Eginton, J.).

Courts in other jurisdictions have similarly declined to retain jurisdiction over state law claims.  See Ramos v. U.S. Department of Housing and Urban Development, No. 96Civ5552, 1997 WL 589008, *6 (S.D.N.Y. Sep. 19, 1997) (holding that breach of contract claim does not share a common nucleus of operative fact with Federal Housing Act claim, as they involve

"entirely separate questions"); Semi-Tech Litigation, LLC v. Bankers Trust Co., 234 F. Supp. 2d 297, 300 (S.D.N.Y. 2002) (motion to dismiss granted where resolution of state law claims involved issues "irrelevant" to lone federal claim); Learnard v. Inhabitants of Town of Van Buren, 182 F. Supp. 2d 115, 127 (D.Me. 2002) (plaintiff's allegations of violation of the Maine Civil Rights Act, civil conspiracy, defamation, intentional infliction of emotional distress, and invasion of privacy "all rely at least partially on facts other than" those relevant to federal due process claim); Singh v. George Washington University, 368 F. Supp. 2d 58, 72 (D.D.C. 2005) (counterclaim alleging defamation dismissed where it had "almost no factual or legal overlap" with plaintiff's discrimination claim under the Americans with Disabilities Act).

In the present case, plaintiff's state law claims rely on facts that are not relevant to her Title VII and ADEA claims. Therefore, the federal and state claims do not arise out of a common nucleus of operative fact. The plaintiff's breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation claims are all based on representations allegedly made to the plaintiff concerning the criteria for her reappointment and the likelihood of her reappointment. Similarly, the plaintiff's tortious interference with contractual relations claims involve only the alleged representations and conduct of the individual defendants, acting outside the scope of their employment, which allegedly interfered with plaintiff's relationships with "various entities, including, *inter alia*, Yale." (See Complaint, Count Twelve, ¶¶ 197 and 199; Count Thirteen ¶¶ 202 and 204; Count Fourteen, ¶¶ 207 and 209.) Finally, the plaintiff's defamation claim involves statements

allegedly made by Professor Rae regarding the plaintiff's teaching abilities. (See Complaint, Count Eighteen, ¶ 227.)

On the other hand, the focus of the plaintiff's federal discrimination claims will be on Yale's treatment of the plaintiff as it compares to other similarly situated employees. See e.g., Abrahamson v. Board of Education of Wappingers Falls Cent. School Dist., 374 F.3d 66, 71 (2nd Cir. 2004). All that is relevant to the discrimination claims is the reason behind the decision to not reappoint the plaintiff. Whether the plaintiff's termination violated an alleged express contract or promise, or whether Yale negligently misrepresented the criteria for her reappointment, are issues completely separate from the plaintiff's discrimination claims and involves distinct elements of proof. Additionally, the plaintiff's tortious interference claims and defamation claim concern only the conduct of the individual defendants. The plaintiff's state common law claims will therefore involve entirely different evidence and different witnesses from the discrimination claims, and will involve legal instructions which have nothing to do with the discrimination claims. As such, the state common law claims will significantly expand the scope of trial. See Koehler, supra, 705 F. Supp. 723. Because of these distinct elements of proof, there is a substantial risk of juror confusion if the plaintiff's state and federal claims are tried at the same time. Therefore, if this Court does not dismiss the plaintiff's discrimination causes of action for the reasons discussed above, Counts Eight through Fourteen and Count Eighteen should be dismissed for lack of subject matter jurisdiction, pursuant to 28 U.S.C. § 1367(a). Dismissal of the plaintiff's state common law claims will narrow the scope of relevant evidence and will greatly simplify the required jury

instructions. Indeed, assuming the discrimination claims against the individual defendants are dismissed, dismissal of the plaintiff's state common law claims will result in only one remaining defendant and just seven counts instead of 18 counts.

      **C.**    **<u>Counts Nine, Twelve, Thirteen, Fourteen And Eighteen Should Be Dismissed For The Additional Reason That They Fail To State A Claim Upon Which Relief Can Be Granted.</u>**

              1.    <u>Count Nine Of The Complaint Fails To Allege A Claim Of Breach Of The Covenant Of Good Faith And Fair Dealing.</u>

In Count Nine of the Complaint, the plaintiff alleges that she entered into certain unspecified "express written and oral contracts" with Yale, and that these contracts contained an implied covenant of good faith and fair dealing. (<u>See</u> Complaint, Count Nine, ¶ 178.) The plaintiff further alleges that "Yale breached its duty to act in good faith and in accordance with fair dealing through its discriminatory, retaliatory and tortious acts." (<u>See</u> Complaint, Count Nine, ¶ 180.) The plaintiff's claim of breach of the covenant of good faith and fair dealing fails because she has adequate statutory remedies through which to address her allegations.

In the employment context, a claim for breach of the covenant of good faith and fair dealing is identical to a claim for wrongful discharge. A cause of action for violation of the implied covenant of good faith and fair dealing is "coterminous with, and extends no further than, a cause of action for wrongful discharge in tort." <u>Contois v. Carmen Anthony Restaurant Group, L.L.C.</u>, No. CV 00 0160287, 2001 WL 195396 (Conn. Super. Ct. February 2, 2001) (Doherty, J.), <u>citing</u> <u>Magnan v. Anaconda Industries, Inc.</u>, 193 Conn. 558, 572, 479 A.2d 781 (1984). As with a wrongful discharge claim, a public policy violation must be alleged in order to properly state a claim for breach of the covenant of good faith and fair dealing. <u>See</u> <u>Carnemolla v. Walsh</u>, 75

Conn. App. 319, 329, 815 A.2d 1251, <u>cert</u>. <u>denied</u>, 263 Conn. 913, 821 A.2d 769 (2003). However, "[a] finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract remedy for wrongful dismissal by an employer. The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case, the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." (Internal quotation marks omitted.) <u>Atkins v. Bridgeport Hydraulic Co.</u>, 5 Conn. App. 643, 648, 501 A.2d 1223 (1985).

As with a claim for wrongful discharge, "a breach of the implied covenant of good faith and fair dealing is not available when there is an adequate statutory remedy." <u>Rothberg v. United Illuminating Co.</u>, 18 Conn. L. Rptr. 690, 1997 WL 83718 (Conn. Super. Ct. February 5, 1997) (Silbert, J.). <u>See</u> <u>also</u> <u>Balog v. Shelton Restaurant, L.L.C.</u>, 37 Conn. L. Rptr. 659, 2004 WL 1965919 (Conn. Super. Ct. August 2, 2004) (Lager, J.) ("when there is an adequate statutory remedy, plaintiffs are precluded from bringing a common-law claim of wrongful discharge based on the implied covenant of good faith and fair dealing."); <u>Cintron v. Ademco Distribution, Inc.</u>, 2003 WL 943857 (Conn. Super. Ct. February 24, 2003) (Harper, J.). In <u>Rothberg</u>, the court held that the plaintiff could not state a claim for breach of the covenant of good faith and fair dealing because a statutory remedy was available under Conn. Gen. Stat. § 31-51m. In <u>Campbell v. Plymouth</u>, 74 Conn. App. 67, 75, 811 A.2d 243 (2002), the court referred to, and expressly approved of the holding in <u>Rothberg</u>, stating: "We find that the present case is like <u>Rothberg</u> and agree with that court's decision. Given the allegations before us and pursuant to <u>Burnham</u> [v.

23

Karl & Gelb, P.C., 252 Conn. 153, 745 A.2d 178 (2000)], Conn. Gen. Stat. § 31-51m(c) provides the plaintiff's exclusive remedy for wrongful discharge."

Connecticut courts have recognized that allegations of employment discrimination are "adequately enforceable through statutory remedies and [do] not warrant judicial recognition of an independent cause of action." Atkins, supra, 5 Conn. App. at 648. See also Esdaile v. Hill Health Corp., 2001 WL 1479115 (Conn. Super. Ct. November 9, 2001) (Booth, J.). In Knight v. Southeastern Council on Alcoholism and Drug Dependency, 2001 WL 1231825 (Conn. Super. Ct. September 24, 2001) (Hurley, J.), the plaintiff brought suit against her former employer alleging that she was discriminated against, and eventually terminated, on the basis of her race. The plaintiff's complaint included a claim of violation of the covenant of good faith and fair dealing, which the defendant moved to strike.   Finding that a claim for breach of implied covenant is not available where there is an adequate statutory remedy, the court held: "Because the plaintiff has a statutory remedy to vindicate her claims of wrongful discharge, based on racial discrimination, specifically provided in the Connecticut Fair Employment Practices Act, General Statutes § 46a-60(a)(1), § 46a-60(a)(4) and § 46a-60(a)(5), the defendant's motion to strike [the plaintiff's claim of violation of the covenant of good faith and fair dealing] is granted. Id. at *2. See also Hancock v. The Stop & Shop Companies, Inc., No. CV 97 04061, 1998 WL 951019 (Conn. Super. Ct. December 29, 1998) (Zoarski, J.) ("[A] breach of implied covenant claim is not available where an adequate statutory remedy exists. As previously discussed … the plaintiff has an adequate statutory remedy through [The Connecticut Fair Employment Practices Act], and the defendant's motion to strike count three is granted.").

The District Court applying Connecticut law in the employment context has also routinely dismissed claims for violation of the covenant of good faith and fair dealing where federal anti-discrimination statutes were available to the plaintiff. In <u>Bennett v. Beiersdorf, Inc.</u>, 889 F. Supp. 46 (D.Conn. 1995), the plaintiff brought a claim against her former employer, alleging discrimination on the basis of race in violation of Title VII, as well as various state law claims. Judge Goettel dismissed the plaintiff's claim for violation of the covenant of good faith and fair dealing, reasoning: "As with age discrimination, the statutory remedies for race discrimination in employment are sufficiently well developed to preclude an independent cause of action. Indeed, plaintiff's complaint alleges violations of both state and federal statutes dealing with race discrimination in employment." <u>Id.</u> at 49. In <u>Peralta v. Cendant Corp.</u>, 123 F. Supp. 2d 65 (D. Conn. 2000), Judge Arterton held that the plaintiff had an adequate statutory remedy under Title VII for his claim of gender discrimination, and therefore granted the defendant's motion for summary judgment on plaintiff's good faith and fair dealing claim, commenting: "In such a situation, Connecticut courts have held that no contract claims are available." <u>Id.</u> at 85. Accord, <u>Armstead v. Stop & Shop Companies, Inc.</u>, No. 3:01 CV 1489, 2003 WL 1343245 (D. Conn. March 17, 2003) (Arterton, J.) (State law claims for breach of covenant of good faith and fair dealing and for wrongful discharge dismissed because plaintiff had available state and federal statutory remedies under the ADA and CFEPA, despite the fact that the statute of limitations had expired with respect to the statutory remedies); <u>Cameron v. St. Francis Hospital and Medical Center</u>, 56 F. Supp. 2d 235, 243 (D. Conn. 1999) (Goettel, J.), (dismissing a claim based on breach of the covenant of good faith and fair dealing because plaintiff had statutory remedies

available); <u>Ericson v. City of Meriden</u>, 113 F. Supp. 2d 276, 291 (D. Conn. 2000) (Goettel, J.) (dismissing implied covenant of good faith and fair dealing claim because plaintiff had adequate remedy for alleged discrimination under Title VII); <u>Brosler v. Food Automation–Service Techniques, Inc.</u>, C.A. 3:96-2345, 1997 WL 711438 (D. Conn. August 25, 1997) (Squatrito, J.) (holding that implied covenant of good faith and fair dealing claim was barred because plaintiff had adequate statutory remedies under Title VII and the CFEPA).  The above line of cases is applicable regardless of whether the plaintiff was an at-will employee or a contract employee. <u>Leichter v. Leb. Bd. of Educ.</u>, 917 F. Supp. 2d 177, 194-195 (D. Conn. 2013) (Bryant, J.).

The present plaintiff's claim for breach of the covenant of good faith and fair dealing is based on the defendants' alleged discrimination and retaliation.  As the cases cited above make clear, there are adequate state and federal statutes available to the plaintiff for vindicating the policy against discrimination in the workplace.  The plaintiff has in fact alleged discrimination and retaliation claims based on Title VII, the ADEA, and the CFEPA.  (<u>See</u> Complaint, Counts One, Two, Three, Four, Five, Six, Seven, Fifteen, Sixteen and Seventeen.)  Because the plaintiff has an adequate statutory remedy available to her, Count Nine should be dismissed.

2.   <u>Counts Twelve, Thirteen and Fourteen of the Complaint Fail to Sufficiently Allege A Claim of Tortious Interference With Contractual Relations.</u>

"[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual

loss." (Internal quotation marks omitted.) <u>Lawton v. Weiner</u>, 91 Conn. App. 698, 706, 882 A.2d 151 (2005). A claim of tortious interference with an existing or prospective relationship must be "specific to the particular business relationships of the plaintiff and its specific prospects; for example, its bidding on particular projects that may ultimately have been won by the defendant." <u>Conn. Cooling Total Air, Inc. v. Conn. Natural Gas Corp.</u>, 46 Conn. App. 82, 88 (1999). The reason for this requirement is that "[u]nlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss ... it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffers actual loss." (Internal quotation marks omitted.) <u>Appleton v. Board of Education of Town of Stonington</u>, 254 Conn. 205, 213, 757 A.2d 1059 (2000), <u>citing</u> <u>Taylor v. Sugar Hollow Park, Inc.</u>, 1 Conn. App. 38, 39, 467 A.2d 935 (1983). "[P]roof that some damage has been sustained is necessary to [support a cause of action for tortious interference]." (Internal quotation marks omitted.) <u>Hi-Ho Tower, Inc. v. Com-Tronics, Inc.</u>, 255 Conn. 20, 33-34, 761 A.2d 1268 (2000). "It does not follow from this, however, that a plaintiff may recover for an interference with a mere possibility of his making a profit. On the contrary, wherever such a cause of action as this is recognized, it is held that *the tort is not complete unless there has been actual damage suffered*." (Emphasis added; internal quotation marks omitted.) <u>Selby v. Pelletier</u>, 1 Conn. App. 320, 323, 472 A.2d 1285 (1984). See <u>Appleton</u>, <u>supra</u>, 254 Conn. at 212-14 (affirming trial court's grant of defendants' motion for summary judgment because plaintiff failed to show that she suffered any actual loss from defendants' alleged tortious interference with her employment contract).

In the present case, the plaintiff does not allege any specific loss that has resulted from the defendants' alleged interference. Rather, the Complaint merely alleges that the plaintiff enjoyed advantageous and/or contractual relationships with "various entities." (See Complaint, Count Twelve, ¶ 197; Count Thirteen, ¶ 202; Count Fourteen, ¶ 207.) This is not sufficient to demonstrate the essential element of an "actual loss." See Appleton, supra, 254 Conn. at 213. Additionally, the plaintiff's allegation that the defendants interfered with the plaintiff's relationship with Yale is also not sufficient as the plaintiff acknowledges that she is still employed by Yale. (See Complaint, ¶ 108.) Because she is still employed with Yale, she has not yet suffered an actual loss.

Because the plaintiff has not suffered an actual loss, she has failed to properly allege a claim of tortious interference with contractual relations. As such, Counts Twelve, Thirteen and Fourteen should be dismissed.

3.   Count Eighteen Fails to Sufficiently Allege a Claim of Defamation as to Professor Rae.

In Count Eighteen, the plaintiff alleges a claim of defamation against the Professor Rae. This claim is based on the allegation that Professor Rae "made disparaging statements about Professor Bagley's teaching abilities." (See Complaint, Count Eighteen, ¶ 227.) These unidentified statements were allegedly published "to third parties to students and faculty of Yale SOM." (See Complaint, Count Eighteen, ¶ 228.) For the reasons discussed below, the plaintiff's allegations do not support a cause of action for defamation because (1) it has not been pleaded with sufficient specificity, (2) the statements attributed to Professor Rae are of opinion, not fact, and (3) the statements attributed to Professor Rae are privileged, and thus immune from liability.

a.      *The Plaintiff's Defamation Claim Has Not Been Pleaded With Sufficient Specificity.*

The allegations in the Complaint do not sufficiently put Professor Rae on notice of the basic elements of the plaintiff's defamation claim. "[U]nder Connecticut law, a complaint alleging defamation must specifically state the alleged libelous statements." Lyons v. Nichols, No. CV 94 0312019, 1999 WL 329954, at * 4 (Conn. Super. Ct. May 13, 1999) (Stevens, J.). "A claim of libel must be pled with specificity, as the precise meaning and choice of words employed is a critical factor in any evaluation of falsity... [A] complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom..." Chertkova v. Connecticut General Life Insurance Co., 2002 Conn. Super. LEXIS 2348, at *1 4 (Conn. Super. Ct. July 12, 2002) (Berger, J.) aff'd per curiam, 76 Conn. App. 907, 822 A.2d 372 (2003), quoting 50 Am Jur. 2d, Libel and Slander, § 434. See also United States ex rel. Smith v. Yale Univ., 415 F. Supp. 2d 58, 108-9 (D. Conn. 2006) ("[a plaintiff] must plead, in order to provide sufficient notice, what defamatory statements were made concerning the plaintiff, when they were made, and to whom they might have been made.") (internal quotation marks omitted). "To state a claim for defamation, the allegedly defamatory statements must be set forth in the complaint substantially in the language uttered." 2500 SS Limited Partnership v. White, 1996 Conn. Super. LEXIS 2174, at *5 (Conn. Super. Ct. August 19, 1996) (Elevin, J.).

In McClain v. Pfizer, Inc., 2008 U.S. Dist. LEXIS 17757 (D. Conn. Mar. 7, 2008) (Bryant, J.), the plaintiff attempted to allege a claim of defamation against her former employer based on comments allegedly made by the plaintiff's supervisors that she was overly sensitive, that her work was substandard, and the she was demeaned in front of others at a scientific

presentation. Judge Bryant determined that these allegations were insufficient to support a defamation claim because the complaint did not identify to whom the allegedly defamatory statements were made, nor the timing of those comments. Id. at 21. The court further reasoned that "the allegations refer more to general topics of conversation rather than identifying the contents of particular defamatory statements. Inasmuch as the allegations are topical rather than particular, the notice pleading requirement is not satisfied." Id. The court therefore granted the defendant's motion to dismiss the plaintiff's defamation claim.

Count Eighteen of the Complaint makes the general allegation that Professor Rae made disparaging comments about the plaintiff's teaching abilities. The plaintiff does not identify to whom such comments were made, when such comments were made, or the exact language used. The "Background Facts" section of the Complaint also fails to provide any specificity. (See Complaint, ¶ 52 ("In or around 2012, Professor Rae began to make derogatory comments about Professor Bagley …"); and ¶ 67 (Professor Rae "falsely suggested to members of the BPO … that there were deficiencies in Professor Bagley's teaching of the State and Society course with him.").)[4] Similar to McClain, supra, these allegations are topical rather than particular. It is therefore impossible for this Court to properly analyze the plaintiff's defamation claims, and the defendant has not been sufficiently apprised of the claims against him. See Johnson v. Schmitz, 119 F. Supp. 2d 90, 101 (D. Conn. 2000) (Arterton, J.). See also Iosa v. Gentiva Health Services,

---

[4] The only specific comment alleged in the complaint is the word "meltdown," which was used in the Harte Report to describe problems with the State and Society course. (See Complaint, ¶ 80.) There is no allegation in the complaint that Professor Rae made this comment. Furthermore, it is not clear that the plaintiff is relying on this alleged comment in support of her defamation claim. However, this single term -- which was a reference to the class, not the plaintiff -- is not sufficiently specific to put the defendant on notice of the basic elements of the

299 F. Supp. 2d 29, 38 (D.Conn. 2004) (Goettel, J.) (holding that plaintiff's defamation claim based on the supervisor's attempt to discipline her in a public place failed because the plaintiff did not "identify any specific defamatory statements" made by the supervisor).  Because the plaintiff has failed to allege sufficiently specific information regarding her claim of defamation, Count Eighteen should be dismissed.

        *b.*      *The Plaintiff's Defamation Claim Is Improperly Based On Alleged Expressions Of Opinion.*

      "To prevail on a common law defamation claim, the plaintiff must prove that the defendants published false statements about her that caused the pecuniary harm." Daley v. Aetna Life and Casualty Co., 279 Conn. 766, 795, 734 A.2d 112 (1999), citing Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 27, 662 A.2d 89, 103 (1995).  To be actionable, "the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." Daley, supra, 249 Conn. at 766, citing Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, 230 (2d Cir. 1985) (No liability where restaurant review conveyed author's opinion rather than literal fact); Hotchner v. Castillo -- Puche, 551 F.2d 910, 913 (2d Cir. 1977) ("[a] writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be"). See also Cassidy v. Lawson, No. 302CV1688, 2005 WL 2508593 (D.Conn. Sept. 29, 2005) (Droney, J.) ("It is well settled that expressions of pure opinion, as opposed to factual assertions, may not be the basis of a defamation action.")

---

plaintiff's defamation claim.    Additionally, as discussed below, the plaintiff's defamation claim should nonetheless be dismissed because this statement is the expression of an opinion and is privileged.

"A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known … [S]uch statements of fact usually concern a person's conduct or character … An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact." (Citations omitted.) Goodrich v. Waterbury Republican – American, Inc., 188 Conn. 107, 111, 438 A.2d 1317 (1982). "In making this determination, a court may consider (1) the context and circumstances, (2) the language used, and (3) whether the statement is objectively capable of being proved true or false." Johnson, supra, 119 F. Supp. 2d at 101, citing Mr. Chow, supra, 759 F.2d at 226. "Expressions of opinion cannot as a matter of law be defamatory." Iosa, supra, 299 F. Supp. 2d at 38.

In Daley, the plaintiff appealed the trial court's instruction to the jury that it could not find defamation based upon statements by the plaintiff's supervisor regarding her work performance, if the statements were mere opinions. Id. at 796. Recognizing the axiom that expressions of opinion such as those related to a supervisor's evaluation of his employee's performance are not actionable as defamatory, the Supreme Court affirmed the trial court. Id.

Connecticut district courts have applied the same standards to dismiss defamation claims based on negative comments about an employee's work performance. McClain, supra, 2008 U.S. Dist. LEXIS 17757, is again instructive. Relying on the distinction between statements of fact and statements of opinion, as set forth by the Connecticut Supreme Court in Goodrich, supra, Judge Bryant held: "Statements regarding [the plaintiff's supervisor's] perception that McClain was overly sensitive, that he disagreed with her opinion in a group meeting, or that her work did

not meet expectations are expressions of opinion and not statements of fact and cannot state a claim of defamation." McClain, supra, 2008 U.S. Dist. LEXIS 17757, at * 22-23. Similarly, in Johnson v. Chesebrough – Ponds USA, Co., 918 F. Supp. 543, 551-52 (D. Conn.) (Goettel, J.), aff'd, 104 F.3d 355 (2d Cir. 1996), the plaintiff complained that he was defamed in his business or profession as a result of his former employer's allegations of poor performance. Id. at 551. Like the plaintiff in the instant action, the Johnson plaintiff did not identify specific defamatory statements in support of his defamation claim. Rather, he alleged that he had been defamed by "allegedly poor performance reviews and other statements regarding the plaintiff's performance in his business or profession, both written and oral, as made and published by the defendant through its servants, agents and/or employees [that] were false and malicious." Id. The plaintiff in Johnson also alleged that he was defamed by statements made to recruiters that he "didn't fit in" and "could not be recommended." Id. at 552. The court held that such statements were matters of opinion, not false statements, and therefore dismissed the plaintiff's defamation claim. Id. at 552, citing Perruccio v. Arseneault, 7 Conn. App. 389, 394, 508 A.2d 831 (1986) ("dictator leadership" was not defamatory because it was an opinion); Torok v. Proof, No. CV 90 0113204, 1993 WL 28878, at *2. (Conn. Super. Ct. 1993) (an assertion that plaintiff was "not a good accountant" was not defamatory). See also Iosa, supra, 299 F. Supp. 2d at 38 (statement that there were "serious concerns" about plaintiff's performance was not defamatory because it constituted an opinion); Csandura v. Friendly Ice Cream Corp., CV 93 0529109, 1994 WL 363370, at *1 (Conn. Super. Ct. July 5, 1994) (statement that plaintiff employee was "in over her head" and not "a manager of the 90s" is opinion and therefore not actionable).

Similar to the cases cited above, the present plaintiff merely alleges that Professor Rae made disparaging comments about the plaintiff's teaching abilities. (Complaint, Count Eighteen, ¶ 227.) This amounts to nothing more than an opinion as to the plaintiff's ability to perform her job, and is not capable of being proven true or false. It is no different from the statements made in Johnson, supra, that the plaintiff "didn't fit in" and "could not be recommended." Id. at 552. See also Williams v. Varig Brazilian Airlines, 169 A.D.2d 434, 438, 564 N.Y.S.2d 328, 331 (N.Y.A.D. 1 Dept., 1991) (criticism of an employee's work performance is opinion and cannot be defamatory), appeal denied, 78 N.Y.2d 854, 577 N.E.2d 1059, 573 N.Y.S.2d 467 (N.Y. 1991). Under Connecticut law, a plaintiff cannot base a defamation claim on work-related criticisms and poor performance reviews. Because the plaintiff has not alleged any false statements of fact by the defendant – rather than the alleged opinions expressed about her work performance – she has not stated a claim for defamation. Therefore, Count Eighteen should be dismissed.

      c.    *The Statements That Form The Basis Of The Plaintiff's Defamation Claim Are Privileged Intracorporate Communications.*

Finally, to the extent that the plaintiff relies on statements made to the Yale SOM's Board of Permanent Officers ("BPO") (see Complaint, ¶ 67), or statements made to the Harte Committee (see Complaint, ¶ 80), such statements constitute privileged intracorporate communications and cannot form the basis of a defamation claim. "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in

efficiently managing its business." <u>Torosyan v. Boehringer Ingelheim Pharmaceuticals</u>, 234 Conn. 1, 29, 662 A.2d 89 (Conn. 1995); <u>see also</u> <u>Kelly v. City of Meriden</u>, 120 F. Supp. 2d 191, 198 (D. Conn. 2000). The BPO consists of Yale SOM tenured faculty, and the comments that the plaintiff attributes to Professor Rae occurred in the context of the BPO's consideration of plaintiff's reappointment as a Professor in Practice. (<u>See</u> Complaint, ¶¶ 66-69.) On the other hand, the Harte Committee was appointed to investigate and draft a report concerning the decision to not reappoint the plaintiff. (<u>See</u> Complaint, ¶ 74.) Therefore, comments made to the BPO or the Harte Committee are privileged in that they concern a review of the plaintiff's job performance and are necessary to effectuate the efficient management of Yale's business. <u>See</u> <u>McClain</u>, <u>supra</u>, 2008 U.S. Dist. LEXIS 17757, *22 ("the contents of [the plaintiff's] performance reviews are protected from liability by this qualified privilege, as would be the discussion of such performance reviews amongst her supervisors.") As such, the plaintiff has failed to properly allege a claim of defamation and Count Eighteen should be dismissed.

## V.    CONCLUSION

For the reasons stated herein, the claims alleged in the plaintiff's December 20, 2013 Complaint should be dismissed.

THE DEFENDANTS
YALE UNIVERSITY, DOUGLAS RAE,
EDWARD SNYDER and ANDREW
METRICK, Individually


BY:    /s/ Patrick M. Noonan  (#ct00189)
      Patrick M. Noonan
      Donahue, Durham & Noonan, P.C.
      741 Boston Post Road
      Guilford, CT 06437
      (203) 458-9168

## **CERTIFICATION**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

_____/s/_____
Patrick M. Noonan

# EXHIBIT A

FORM 103(1)

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
West Central Regional Office
55 West Main Street, Suite 210, Waterbury, CT 06702

AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

CASE No. *1330361*                     DATE: **March 4, 2013**

EEOC No. _____

My name is Constance E. Bagley _____

My mailing address is 20 Fox Den Way , Woodbridge,CT 06525-1900 _____

My email address is _____

The respondent is Yale University _____

Whose business address is 2 Whitney Avenue, 6th Floor, New Haven, CT 06510   I was:

☒ discriminated against in terms and conditions of employment  on or about May 7, 2012

☒ terminated on or about NOT REAPPOINTED       ☐ not hired/not promoted on or about _____

☐ suspended on or about _____       ☐ not rented a dwelling on or about _____

☐ placed on probation on or about _____       ☒ harassed ☐ sexually harassed on or about ____

☐ demoted on or about _____       ☐ earning a different rate of pay on or about ____

☐ warned on or about _____       ☐ constructively discharged on or about _____

☐ given a poor evaluation on or about _____       ☐ retaliated against on or about _____

☐ denied a raise on or about _____       ☐ not hired due to a BFOQ on or about _____

☐ less trained on or about _____       ☒ not hired due to a disability on or about _____

☐ denied an office on or about _____       ☐ delegated difficult assignments on or about ____

☐ denied service (s) on or about _____       ☒ other DENIED REAPPOINTMENT, TERMINATION DATE JUNE 2013

I believe that my:

☐ race                          ☐ national origin    ☐ ancestry        ☐ color

☒ age 60  DOB: 12/18/52         ☐ alienage         ☐ religion        ☐ creed

☐ marital status                ☐ familial status    ☒ sex ☐ male ☒ female

☐ sexual orientation            ☒ physical disability ☐ pregnancy

☒ ~~mental disability/disorder (perceived)~~   ☐ learning disability  ☐ prior criminal record

☐ lawful source of income       ☒ previously opposed discriminatory conduct

JAN 07 2014

POSTED

RECA
MAR 04 2013

5.  I was recruited to Yale in July 2007 by Dean Joel Podolny for a one year appointment as a visiting Associate Professor.  In 2008, I accepted an employment contract with the Yale School of Management for an initial 5-year appointment as a Professor in the Practice ending on June 30, 2013, with the opportunity for multi-year renewals. I was advised that my performance would be reviewed before the end of the fourth year and assured that reappointment for an additional 5- or 10-year term would be based solely on my performance. "Programmatic need" was never raised as a condition for future renewal or non-renewal. Indeed, while the Yale Faculty Handbook provides that renewals of Professors in the Practice at the Yale School of Forestry and Environmental Studies are dependent upon both individual performance and programmatic need, there is no reference to programmatic need in the section dealing with renewals of Professors in the Practice at the School of Management. Additionally, at the time I was hired, I was advised that in the School of Management's history, there had never been a Professor in the Practice who was not renewed.  A copy of my initial five year contract is appended as Exhibit A.

6.  Based on these representations and others, I moved my young son and myself from Newton, Massachusetts to Woodbridge, Connecticut. In so moving, I relied on the representations by Yale and its agents, after expressly communicating to Yale and its agents my need for an employment situation that offered some level of stability and a long-term

2

commitment in order for me to forego other employment opportunities I was considering at the time of Yale's recruitment of me.

7. More than 90% of the senior faculty at the School of Management are male. While employed at the Yale School of Management, I was subjected to what has been acknowledged by Yale University as "instances of inappropriate comments and behaviors based on gender" and "a chilly atmosphere for women" riddled with sexual stereotyping and disparate treatment based on my gender.

8. Pursuant to my initial contract, a committee chaired by Professor Paul Bracken (the "Bracken Committee") was appointed in 2011 to review my performance and make a recommendation regarding the renewal of my appointment. The Bracken Committee unanimously recommended reappointment based on its positive assessment of my scholarship, teaching, and service.

8. Notwithstanding the unanimous recommendation of the Bracken Committee for renewal and the prior representations made by Yale, the new Dean of the School of Management Ted Snyder advised me on May 7, 2012, that the School of Management's Board of Permanent Officers ("BPO"), which comprises the School of Management's tenured faculty, had voted against my renewed appointment to an additional 5-year term as a Professor in the Practice with the Yale School of Management. This is notwithstanding the fact that:

3

a) I received the unanimous favorable review of the Bracken renewal review committee.

b) I have published in top management and law journals and am the author of the leading treatise in my field among my credits.

c) I won the School of Management award for Excellence in Teaching in 2008.

d) I have served on several committees within Yale and was the primary architect of Yale's new policy on reporting, investigating, and sanctioning sexual assault, sexual harassment, and other forms of sexual misconduct by faculty, staff, and students.

e) I was never advised of any shortfalls or deficiencies in my teaching, publishing, research, or commitment to the University before the vote. Indeed, Dean Snyder told me on May 7, 2012, that the review of my work was "positive."

f) The only explanation Dean Snyder gave for the BPO vote was that there are "no courses for you to teach." Yet the "State and Society" course, which I spent five years co-developing, is being taught this spring of 2013, to full-time MBA students, by two white males, and to the executive-level MBA students, by a newly hired white male in his 30's. Moreover, a course entitled "Law and Management," which utilizes my book *Managers and the Legal Environment*, is being taught this spring of 2013 by a lecturer hired to teach this course during my medical leave for a bilateral knee replacement.

9. Upon receiving the news that I would not be recommended for reappointment, I filed a complaint through Yale's internal complaint investigation process, alleging discrimination and failure to follow Yale's reappointment procedures, registering the same with the Provost (attached as Exhibit B). That complaint resulted in a report by the Special Committee (referred hereinafter as the "Harte Committee"). The Harte Committee report is appended as Exhibit C. Notwithstanding application of an improperly high standard of proof,

4

the Harte Committee concluded that a) the School of Management had violated the promises made to me when I was employed, b) that I had been subject to a hostile environment while working at Yale, and c) that the decision by the School of Management Deans to terminate my role in the State and Society course, and to announce that termination to the BPO <u>before</u> the vote on my renewal, "seems to have deprived [me] of the benefit of an unbiased and judicious process of review."

10.  On December 17, 2012, in accordance with Yale's internal review procedures, by which the Harte Committee's report went to the President-Elect of Yale for a final internal determination, I submitted a reply document (attached as **Exhibit D**). In my reply I noted numerous errors of law and of fact (including the false claim that the State and Society course had been a failure), and I reiterated my request for remedies, such as reinstatement, based now additionally on the Harte Committee's affirmative findings in my favor.

11.  As a result of the Harte Committee report, the President-Elect of Yale is currently reviewing a possible remedy for the situation, but to date, I have not been advised of it or of my course schedule for the next academic year.  It is troubling to note that the School of Management has not remedied these obvious problems notwithstanding the fact that it has been almost 300 days since the Dean and the faculty first rejected their own renewal review committee's unanimous recommendation for renewal, under the ruse that that there were "no courses for [me] to teach."

5

12.  In reviewing the Harte Committee report, I learned that one or more members of the BPO either stated or was advised that I had been responsible for a "meltdown" in the State and Society course. I believe the phrase "meltdown" is clearly a pejorative expression and was designed to impugn my character and professionalism and suggest mental instability and is an expression of a gender stereotype. On information and belief, that phrase "meltdown" was coined by my co-teacher in the class, a white male who is a full tenured professor. Additionally, if in fact the course had a "meltdown," I find it difficult to understand why that professor remains charged with co-teaching the course with another white male while, absent action by the President-Elect of Yale, my employment will be terminated on June 30, 2013.

13.  The School of Management Dean Ted Synder's other purported reason for terminating me, lack of course work, is belied by its current practice of recruiting new faculty members in my area of expertise (Exhibit E) and assigning the executive MBA section of "State and Society" to a much younger white male.

14.  During this process, I put my name in for consideration for a promotion to an endowed tenured professorship. My request was met by an angry rejection from my supervisor, Dean Ted Snyder, who threatened to bring in someone who would "dominate" me if I continued my pursuit of the chair.

15.  I believe that there is a culture within the School of Management in which confident, assertive, and professionally accomplished women are viewed negatively because

they do not meet certain sexual stereotypes. Although there are three tenured women at the School of Management, not one woman has been tenured since 2002. That conclusion is borne out by the fact that I was not reappointed to a ten-year appointment, or even a five-year reappointment; I was not assigned any classes to teach this spring, notwithstanding the positive recommendation of the reappointment review committee; my superior academic qualifications; above-average evaluations by my students; my teaching awards; my work on the University-wide Committee on Sexual Misconduct, for which I have received praise from the highest ranks of Yale's administration; and a lack of any disciplinary or other adverse employment history (in fact, in July 2012, I was awarded a 3% raise).

16. I believe that I was not reappointed to the position for which I was clearly qualified because of my gender, my failure to conform to illegal gender stereotypes, my age (as it relates to the younger males who are teaching courses once assigned to me), my medical leave and physical disability, and false and defamatory assertions of a "meltdown."

COMPLAINANT,

Professor Constance E. Bagley

_____

STATE OF CONNECTICUT )

) ss:  Hartford

COUNTY OF HARTFORD )

Subscribed and sworn to before me this 4th day of March, 2013

_____

Commissioner of Superior Court

Michael J. Rose

8

FORM 103(1)

I request the Connecticut Commission on Human Rights and Opportunities Investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Constance E. Bagley being duly sworn, on oath, states that s/he is the Complainant herein; that s/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in _Hartford   CT_____ on this _4th day of March 2013._

_____
(Complainant's Signature)

Subscribed and sworn to before me on _March 4, 2013_
                                      (Date)

_____
(Notary Public/Commissioner of the Superior Court)

My commission expires: _____

## COMPLAINANT'S CERTIFICATION OF MAILING FORM

CHRO NO.:
EEOC NO.:

      I hereby certify that I served a copy of the enclosed document by certified mail on the Respondent, named below on this 4th day of March, 2013.

Dorothy K. Robinson
Vice President and General Counsel
Yale University
2 Whitney Avenue
6th Floor
New Haven, CT  06510.

Michael J. Rose

# EXHIBIT B

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES



# MERIT ASSESSMENT REVIEW

Constance E. Bagley
COMPLAINANT

VS.

Yale University
RESPONDENT

RECEIVED

JUL 2 2 2013

OFFICE OF THE
GENERAL COUNSEL

CHRO CASE FILE NO. 1330361          DATE FILED: March 4, 2013
EEOC NO. 16A201300851               DATE FILED: March 4, 2013

CONN. GEN. STAT. § 46a-83(b) requires the Commission on Human Rights and Opportunities (CHRO) to conduct a merit assessment review (MAR) of this complaint. The purpose of the MAR review is to determine whether the complaint should be retained for a full investigation or dismissed. The Commission will retain a complaint unless dismissal is required by one of the standards below.

**MERIT ASSESSMENT STANDARD 1 – Does the complaint fail to state a claim for relief?**
This standard requires the CHRO to accept as true all of the allegations of the complaint. Accepting the allegations of the complaint as true, and reading the complaint in a light most favorably to the complainant without considering the answer, Schedule A responses, rebuttal or any other document,

1. Does the complaint claim a protected class basis for the treatment in question?
2. Does the complaint claim an injury?
3. Does the complaint claim an injury based upon the complainant's class basis?
4. Was the complaint filed in a timely manner or does the continuing violation theory, waiver, estoppel or other equitable doctrine apply?

( ) The complaint states a claim for relief.

(X) The complaint fails to state a claim for relief and should be dismissed because:

JAN 0 7 2014

Complainant was notified of the decision for non-renewal of her contract on May 7, 2012 and her complaint was filed on march 4, 2013. Complainant had been notified of the alleged act of discrimination, that being the vote for non-renewal of her contract, three hundred and one (301) days prior to the filing of her CHRO complaint. Complainant's claim is not timely filed as the timeframe for filing is one hundred and eighty (180) days from the date when complainant knew or should have reasonably known of the alleged act.

## MERIT ASSESSMENT STANDARD 2 – Is the complaint frivolous on its face?

A complaint is frivolous on its face if the complaint itself—without looking at the answer, Schedule A responses, rebuttal or any other document—lacks an arguable basis in fact or law. A complaint is not frivolous if the allegations appear unlikely to be true or if the information currently in the file does not support the complainant.

() The complaint alleges a viable claim.

() The complaint is frivolous and should be dismissed because:

## MERIT ASSESSMENT STANDARD 3 – Is the respondent exempt from the provisions of Chapter 814c of the Connecticut General Statutes?

A respondent is exempt if any of the following apply:

1. The complainant is not an "employee" as defined in CONN. GEN. STAT. § 46a-51(9).
2. The respondent is not an "employer" as defined in CONN. GEN. STAT. § 46a-51(10) because it employs less than three employees.
3. The respondent is not a "creditor" as defined in CONN. GEN. STAT. § 46a-65(2).
4. The respondent is not a "place of public accommodation" as defined in CONN. GEN. STAT. § 46a-63(1).
5. The respondent is the federal government or an agency of the federal government.
6. The respondent is a business owned and operated by a federally recognized Indian tribe.
7. This is a sexual orientation complaint and the respondent is a religious corporation exempt under CONN. GEN. STAT. § 46a-81p.
8. The Commission does not have jurisdiction over the complaint because another agency has exclusive jurisdiction.
9. There is another legal basis to exempt the Respondent from the CHRO's jurisdiction, such as is found in CONN. GEN. STAT. §§ 46a-66(b), 46a-81f(b), 46a-81q or other provision.

() Respondent is not exempt.

( ) Respondent is exempt and the complaint should be dismissed because:

**MERIT ASSESSMENT STANDARD 4 – Is there no reasonable possibility that investigating the complaint will result in a finding of reasonable cause?**

This standard requires the CHRO to examine the complaint, answer, Schedule A responses, rebuttal and other documents in the file. For a complaint to be dismissed, the complainant and respondent must agree as to each material allegation of the complaint. If the complainant and respondent disagree as to a material allegation, the complaint must be retained for investigation. Cases requiring credibility determinations <u>must not</u> be dismissed. An explanation as to why credibility determinations do not need to be made or additional comparative or other evidence sought must be provided for any complaint dismissed under this Standard.

( ) The case should be retained for investigation.

( ) There is no reasonable possibility that investigating the complaint will result in a finding of reasonable cause, as:

( ) No credibility decisions must be made. There are no material issues in dispute. No additional relevant comparative or other evidence is needed to resolve this case.

If there is no reasonable possibility, dismissal is proper under Standard 4 because:

**DISPOSITION:**

( ) The complaint is retained for investigation.

(X) The complaint is dismissed because:

(X) a. It failed to state a claim for relief; and/or

( ) b. It is frivolous on its face; and/or

( ) c. The respondent is exempt; and/or

( ) d. There is no reasonable possibility that further investigation will result in a finding of reasonable cause.

RELEASE OF JURISDICTION AND LEGAL REVIEW

If this complaint was dismissed, within 15 days of the sending of this notice of dismissal the complainant may request a release of jurisdiction allowing the complainant to bring a civil action under Conn. Gen. Stat. § 46a-100. The request for release of jurisdiction should be in writing and addressed to Pekah Wallace, Regional Manager, at CHRO, West Central Regional Office, 55 West Main Street, Suite 210, Waterbury, CT 06702.

If the complainant does not request a release of jurisdiction, commission legal counsel will conduct a legal review of the dismissal and the parties will receive notice whether the complaint is reinstated or denied reinstatement.

You may wish to consult an attorney regarding your options. The CHRO cannot provide legal advice.

Dated: July 8, 2013

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES

Sincerely,

Suzanne Westhaver, HRO Representative
Commission on Human Rights and Opportunities
55 West Main St. Suite 210
Waterbury, CT 06702

COMPLAINANT

Constance E. Bagley
20 Fox Den Way
Woodbridge, CT 06525-1900

COMPLAINANT'S REPRESENTATIVE

Michael J. Rose
Rose Kallor, Attorneys at Law
750 Main Street Suite 606
Hartford, CT 06103

# EXHIBIT C

STATE OF CONNECTICUT

COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

| | |
|---|---|
| * * * * * * * | |
| Professor Constance E. Bagley,      * | CHRO NO.: |
| Complainant      * | EEOC NO.: |
|      * | |
| v.      * | |
|      * | |
| Yale University, Douglas Rae,      * | |
| Edward Snyder, & Andrew Metrick,      * | |
| Respondents      * | December 20, 2013 |
|      * | |
| * * * * * * * | |

## AFFIDAVIT OF ILLEGAL DISCRIMINATION

1. My name is Constance E. Bagley.

2. I am over 40 years of age and believe in the obligation of an oath.

3. I currently serve as Professor in the Practice of Law and Management ("Professor in the Practice") at the Yale School of Management ("SOM") in New Haven, Connecticut. I am the only woman ever appointed to the rank of Professor in the Practice at the SOM. I am also a Senior Research Scholar at the Yale Law School.

4. Yale University ("Yale") has more than 5,000 employees.

5. I obtained my undergraduate degree from Stanford University and my law degree from Harvard Law School.

6. I have taught numerous courses in business administration, law, management, and government at several institutions, including Stanford, Harvard, and Yale.

7. Prior to becoming a full-time academic, I was a partner in the law firm of Bingham McCutchen, where I specialized in corporate governance, entrepreneurship, securities, and mergers and acquisitions.

1

JAN 0 7 2014



8.   I was recruited to Yale in 2007 by Joel Podolny ("Dean Podolny"), who at that time was the Dean of the SOM, for a one-year appointment as a visiting Associate Professor.

9.   In April 2008, I accepted an employment contract with Yale SOM as a Professor in the Practice for an initial five-year appointment, commencing on July 1, 2008, and ending on June 30, 2013, with the opportunity for multi-year renewals.  The terms of my appointment were negotiated directly with Dean Podolny.

10. At Yale SOM a Professor in the Practice is distinct from a lecturer or other adjunct faculty rank.

11. My offer letter stated that I would be reviewed in the fourth year of my appointment for continuation as a Professor in the Practice.  Although omitted in the first draft of the letter, at my request, the final draft of the letter added language drafted by Yale stating that the "review will be similar in process and use similar criteria to those of the review which lead to this current appointment."

12. At the time of my appointment, I was assured that reappointment for an additional five- or ten-year term would be based solely on my performance.  "Programmatic need" was not a condition for renewal of a Professor in the Practice at Yale SOM.  In contrast, "programmatic need" is expressly referenced in the section of the Yale Faculty Handbook concerning lecturers and other adjuncts at Yale SOM (not Professors in the Practice), as well as the sections concerning appointments as both adjuncts and Professors in the Practice at other Yale professional schools (not SOM), such as the School of Forestry and Environmental Studies.  A copy of the Yale Faculty Handbook was incorporated by reference to the revised offer letter sent to me.

13. The section of the Yale Faculty Handbook relating to Professors in the Practice at Yale

SOM—particularly when viewed in light of the sections concerning renewal of other faculty ranks at both the SOM and the other graduate and professional schools at Yale—makes clear that the SOM Dean, Dean Podolny, had actual and apparent authority to make reappointment contingent solely on individual performance.

14. Had the Yale SOM leadership ever indicated to me that reappointment was contingent on anything other than my personal performance, I would never have accepted Yale's offer for a position with only an initial five-year term.

15. At no point prior to the evening of May 7, 2012, when Dean Snyder told me that the tenured faculty had recommended that my appointment should not be renewed because there were "no courses for [me] to teach," did Yale inform me of any change in the performance standard for my renewal, or of any additional conditions for reappointment.

16. At the time I was appointed, it was represented to me that in Yale SOM's history, there had never been a Professor in the Practice whose appointment had not been renewed.

17. My employment letter also stated that I would be a "full-time voting member of the faculty on all matters except tenure appointments" and that I was "eligible for the same benefits as other full-time members of the senior faculty." I was given the rank of full professor and, in essence, nearly the same status as a tenured professor.

18. In reliance on these representations by Yale and its agents, I moved with my young son from Newton, Massachusetts, to Woodbridge, Connecticut. Before moving, I expressly communicated to Yale and its agents the requirement (both for professional and personal reasons) that I was only interested in an employment situation that offered both a long-term commitment and senior status in order for me to forego other employment opportunities I had been considering at the time I was recruited by Yale; I was so assured.

3

19. My teaching, scholarship, and service to Yale have been exemplary over the course of my employment at the SOM.

20. In 2009, I won the School of Management Award for Excellence in Teaching in the full-time MBA Program. I won the Executive MBA Excellence in Teaching Award in 2013.

21. One of my greatest accomplishments has been my leading role in developing and co-teaching a "core" course called "State and Society." I co-taught this course for five years with Professor Rae. I also developed and successfully taught "Legal Aspects of Entrepreneurship" as well as "Law for Executives" in the Executive MBA Program, for which I won the teaching award in 2013.

22. I have published in top management and law journals and am the author of the leading treatise in my field. Lund University recognized my pioneering work with an honorary doctorate in economics in 2011.

23. My book, *The Entrepreneur's Guide to Business Law*, was recently selected as one of the "25 Books Every Entrepreneur Should Read" by *Business Insider* and deemed by one leading entrepreneur as "perhaps the most useful business book you can ever read."

24. Among other service to Yale, I served as co-chair of the Yale University Women Faculty Forum Working Group on Sexual Misconduct. I was the primary architect of Yale's new policy on reporting, investigating, and sanctioning sexual assault, sexual harassment, and other forms of sexual misconduct by faculty, staff, and students and serve as a core member of the University-Wide Committee on Sexual Misconduct (UWC).

25. As part of my work on the UWC, I (and others) participate in adjudication proceedings involving women at Yale who have complained of sexual misconduct by one or more Yale employees. A finding for the complainant in any such case exposes the University to potential

4

vicarious liability, thereby creating a potential conflict of interest for the attorney from the Yale

Office of General Counsel advising an adjudicatory panel on both procedure and applicable law.

Although I suggested that outside counsel be retained in such a case, that request was denied.

26. In the spring of 2012, I raised directly with the Chair of the UWC, Michael Della Rocca,

my concern that my advocacy on behalf of women at Yale would negatively impact my re-

appointment and my belief that the gender-based animus I faced was retaliatory for my advocacy

of positions that did not conform to the wishes of the Yale Office of General Counsel. The Chair

took no action in response.

27. In June of 2012, the Office for Civil Rights ("OCR") completed a two-year investigation

into Yale's compliance with various provisions of Title IX, with a specific focus on the handling

of complaints of a hostile environment, sexual harassment, sexual assault, and other forms of

sexual misconduct. In response, Yale Vice President and General Counsel Dorothy Robinson

signed a consent decree that binds Yale University to the terms of the decree.

28. In February 2012, Dean Metrick informed me that joint teaching assignments in "core"

courses, like State and Society, would be largely eliminated. This surprising decision would put

in jeopardy the co-teaching arrangement I had with Professor Rae in the teaching of State and

Society. In this same conversation, Dean Metrick acknowledged the difficulties I had raised

about Professor Rae. Not only did Professor Rae fail to timely respond to me about important

course issues, but he also frequently publicly mocked and demeaned me as a woman, as I was

not bending sufficiently to what was expected to be stereotypical female behavior.

29. In February 2012, Dean Metrick offered to remove Professor Rae from teaching the

course, but I declined in an attempt at maintaining collegiality and respect. Dean Metrick

promised to work with "us" on helping the course run more smoothly. This did not happen,

despite Dean Metrick being on notice that Professor Rae appeared to harbor gender animus toward me.

30. In or around 2012, Professor Rae also began to make derogatory comments about me, overstate and elevate his own contributions, and work to replace my ideas and course materials with his own.

31. Over the course of co-teaching the State and Society course in spring 2012, Professor Rae made several gendered comments in my presence, including mocking a woman's voice, and he treated me (by his demeanor, tone, and words), with open hostility and disrespect both inside and outside the classroom.

32. By way of example only, notwithstanding repeated written and oral requests to provide advance copies of his slides and teaching plans so I could better coordinate co-teaching, Professor Rae would consume a class session and ignore me or block my access to the table with my copy of the teaching case and notes.  He also unilaterally changed the State and Society syllabus at the last minute.

33. In written course evaluations, a student reported that Professor Rae had stated in front of the entire first-year class that he had good hearing except when it came to the "shrill, high-pitched voice" of his wife.  The student was clearly offended, commenting, "[W]e are not in the 1950s teaching to an exclusively-male audience anymore, come on Rae."

34. On information and belief, Professor Rae was overheard in 2011 threatening to "blackball" me.

35. Professor Rae literally slammed his office door in my face in front of his assistant while I was attempting to discuss his decision to post the final examination for State and Society online before reviewing it with me, as I had considerable substantive and teaching responsibilities for

the course.

36. In April 2012, I asked Dean Snyder to consider me for a promotion to an endowed tenured professorship, the Nierenberg Chair of Corporate Governance. As part of that process, I asked to meet with Professor Rae, who chaired the search committee for the Nierenberg Chair, about my candidacy. He never responded to my requests for a meeting, and upon information and belief, blocked consideration of me as a potential candidate.

37. My request for consideration of the Nierenberg Chair was also met with angry rejection by Dean Snyder. On April 16, 2012, Dean Snyder surprisingly threatened me by telling me he would bring in someone who would "dominate" me if I continued to pursue the Chair. By this I understood the successful candidate would be male, and that my candidacy was being rejected based on my gender. To date, the Nierenberg Chair remains unfilled, and my application is dormant.

38. Professor Ruth Aguilera of the University of Illinois also applied for the Nierenberg Chair but was not selected for the position despite her excellent qualifications. Before applying for the Chair myself, I advocated for Professor Aguilera to Professor Rae and others and, when Professor Aguilera was not selected, openly questioned the search committee's decision, and the degree to which gender bias played a role.

39. Pursuant to my initial contract, and Yale SOM policies, Dean Metrick notified me on October 19, 2011, that a committee chaired by Professor Paul Bracken (the "Bracken Committee") would review my "accomplishments" and prepare a report on me case, which would then be voted on by the Yale SOM senior faculty. There was no mention, at this time, or at any time before May 7, 2012, that any factor other than my "accomplishments" would be considered in the reappointment process.

40. The Bracken Committee unanimously recommended reappointment based on its positive assessment of my scholarship, teaching, and service to Yale.

41. Prior to the initial Yale SOM faculty vote on May 7, 2012 (and after Dean Snyder threatened me if I pursued the Nierenberg Chair), I asked Dean Snyder if I could be considered for tenure. He told me that he was unwilling to create a tenure line in legal studies and that I would have to work with Dean Metrick to craft an arrangement within the confines of the rank of Professor in the Practice. Dean Snyder also told me that he was unwilling to grant me the voting rights I had secured as part of me original contract.

42. Less than three weeks before the adverse faculty vote, Dean Metrick falsely assured me that "of course" my contract would be renewed for at least five years, sufficient time for my teenage son to graduate from high school.

43. In my negotiations with Dean Metrick, I asked to be considered for a ten-year contract, as opposed to the standard five-year contract, that Dean Podolny had indicated would be an option if the first four years "went as expected." After consulting with Dean Snyder, Dean Metrick informed me on May 5, 2012, that the BPO would vote first on reappointment for five years, then, if that was vote was favorable, consider recommending a ten-year term. This was the first time anyone in the Yale leadership had ever questioned the certainty of my reappointment for at least five additional years.

44. At a meeting on May 7, 2012, the recommendation of the Bracken Committee was submitted for approval to Yale SOM's Board of Permanent Officers ("BPO"), which consists of Yale SOM tenured faculty.

45. Upon information and belief, Professor Rae participated in the discussion of the positive recommendation of the Bracken Committee, and he falsely suggested to members of the BPO

8

(before or during that meeting) that there were deficiencies in my teaching of the State and Society course with him.

46. Upon information and belief, during or before the discussion of my case at the BPO meeting, certain senior faculty expressed their belief that I had been too "aggressive" in applying for the Nierenberg Chair and for seeking tenure or a ten-year contract renewal.

47. Inexplicably, on May 24, 2012, Dean Snyder wrote to formally inform me that the BPO had voted against my renewed appointment as a Professor in the Practice and that—although the BPO vote is merely advisory and he, as Yale SOM Dean, has final authority to renew a Professor in the Practice appointment—he had decided not to renew my contract for another five-year term. This decision for non-renewal contradicted the unanimous favorable recommendation for renewal from the Bracken Committee. Moreover, I had never been advised of any deficiencies in my teaching, scholarship, or commitment to Yale before the vote. Indeed, Dean Snyder had told me on May 7, 2012 that the review of me work was "positive."

48. The pretexual explanation Dean Snyder gave me for the non-renewal of my contract was that there were "no courses for [me] to teach." Apparently, this was the result of Professor Rae soliciting a younger male, Professor Ian Shapiro ("Professor Shapiro"), to co-teach State and Society with him. Professor Shapiro was not only a younger male, but he did not have the experience and expertise that I clearly brought to the course. Subsequently, another younger male, Senior Lecturer David Bach ("Senior Lecturer Bach"), was selected to teach State and Society in the Executive MBA Program; Bach also did not have the experience and expertise that I brought to teaching the course. On information and belief, Senior Lecturer Bach was interviewing at Yale SOM the same day the BPO voted not to renew my appointment.

49. On June 19, 2012, I filed a formal complaint of discrimination pursuant to the Yale

9

University Faculty Handbook requesting a provostial review of Dean Snyder's decision not to renew my contract. The complaint was addressed to then-Provost and now-President of Yale, Peter Salovey ("President Salovey") and alleged, among other claims, gender bias, failure to follow Yale's own reappointment procedures, and violation of the terms of my contract.

50. My June 19, 2012, complaint stated, in part: "The real reason for the nonrenewal of my appointment is gender bias, including sexual stereotyping, in violation of Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and applicable Connecticut state law."

51. After I learned that Senior Lecturer Bach, who joined the Yale SOM faculty as of September 1, 2012, would be teaching State and Society in the Executive MBA Program, I amended my complaint in October 2012 to add a claim of age discrimination.

52. In response to my internal complaint, President Salovey appointed yet another committee (the "Harte Committee") to investigate and draft a report concerning the decision not to reappoint me (the "Harte Report" or "the Report"). The Yale Faculty Handbook provides that Yale is bound by the findings of facts of a provostial review committee.

53. The Harte Committee prepared two reports, dated November 28, 2012 ("Harte Report") and March 3, 2013 ("Revised Harte Report"), which were both submitted for review to President Salovey. In neither the report by the Bracken Committee, nor the Revised Harte Report, was there any hint that my non-renewal related to my performance as required by my contract. The criteria being applied to me shifted yet again, inconsistent and contradictory and struggling for justification.

54. Despite application of an improperly high standard of proof (beyond a reasonable doubt), the Harte Committee concluded, *inter alia*, that Yale SOM had violated promises made to induce

me to accept Yale SOM's offer of employment—particularly with respect to the standards by which I would be evaluated for renewal—on which I reasonably relied in accepting the five-year appointment. The Report stated: "Had Professor Bagley been able to assert her view of her contractual rights and to defend, in a systematic way, her conduct amidst the [alleged] deterioration of the State and Society course, she and the school's leaders might have come to a different and mutual understanding about the defensible contours of the rights granted by the employment agreement."

55. The Harte Committee suggested that the language drafted by Yale in my employment letter regarding standards for reappointment was "ambiguous." However, it also found that an email from Dean Podolny sent to me before that language was added suggested that "absent such a full re-evaluation of the Professor in the Practice position, Professor Bagley would be reappointed on the same quality and pace of scholarship, teaching and citizenship demonstrated at the initial appointment in 2008." The Harte Committee found that there was no "full re-evaluation of the Professor in the Practice position" before the May 7, 2012 BPO vote on my reappointment.

56. The Harte Report further found that I had been subjected to a hostile environment at Yale SOM and that there had been "inappropriate comments and behaviors based on gender," "a chilly environment for women" in contexts involving me, and comments made to the Committee during interviews characterizing me "in a manner that may be deemed offensive to women."

57. The Harte Report concluded that my non-renewal may have been "influenced by reactions to [my] gender in combination with aspects of [my] personal style and [my] requests for consideration of tenure, a chair, and for a longer-term appointment"—in other words, gender stereotyping and retaliation for having the temerity to complain about discrimination, and

11

aggressively pursuing my career options.

58. The Harte Report also indicated that one or more members of the BPO either stated or were advised that I had been responsible for a "meltdown" in the State and Society course. Upon information and belief, Professor Rae used this term, among others, to falsely convey to the SOM Deans that I was at fault for any alleged—though false—problems with the course. Professor Rae's discriminatory animus and retaliatory conduct were embedded in the BPO's consideration of my reappointment.

59. The Harte Report also stated that the "lack of transparency in appointment and reappointment criteria . . . may disadvantage faculty who face reappointment." Despite my requests, I have been denied access to any of the actual Yale SOM faculty reports reviewing the issue of my reappointment.

60. The Harte Report further concluded that the decision by the SOM Deans to terminate my role in State and Society and to announce that termination to the BPO *immediately before* they voted on my renewal "seems to have deprived [me] of the benefit of an unbiased and judicious process of review."

61. The Yale SOM Deans terminated my role teaching State and Society despite the fact that my reviews for the 2012 teaching of the course were at least as strong as the ratings and evaluations received by multiple male SOM professors teaching other "core" courses. Upon information and belief, these other male professors' teaching abilities were not challenged the way I was unfairly challenged. Although available, the spring 2012 State and Society course ratings were not presented to the BPO before the vote on my reappointment.

62. On December 17, 2012, in accordance with Yale's internal review procedures, I submitted a response to the Harte Report, raising again numerous errors of law and fact,

12

including the false claim that the State and Society course had been a failure, and indicating that I had been treated differently from my male peers.

63. After I again raised concerns about disparate and discriminatory treatment and provided the Harte Committee with a copy of the 2012 State and Society course evaluations, a revised version of the Harte Report ("Revised Harte Report") was released.  It deleted the challenged false statements from the initial report.  The Revised Harte Report further indicated that the alleged cause of the concerns about State and Society had not been considered by SOM Deans before removing me from the course or before the BPO vote, and that my course reviews had not been made available to the BPO before the vote—resulting in a "variation in SOM's procedures."

64. Although Dean Snyder had previously indicated that my appointment had not been renewed because there were "no courses for [me] to teach," the Revised Harte Report now added—in the world of ever-shifting expectations and pretextual reasons—that there had been a "curricular decision about the future of the course."  Notwithstanding my clear voting rights and status as a full professor, at no time was I made privy to such a decision or offered an opportunity to weigh in on the subject.

65. In April 2013, AACSB International, the primary accrediting body for graduate and undergraduate business schools, including Yale SOM, amended its accreditation requirements to expressly require coverage of legal and regulatory issues.

66. Contrary to the assertion that the decision not to reappoint me resulted from a curricular shift, Professors Rae and Shapiro taught State and Society in Spring 2013 to the full-time MBA students—in substantially the same form and with almost all the same topics as when I had co-developed and taught it in prior years.  Senior Lecturer Bach, a newly hired young male, taught

13

the course to the Executive MBA students. I was replaced in teaching a core course that was substantially similar to the course I co-developed and co-taught after being recruited to join the Yale SOM faculty, by younger males with no comparative experience or expertise.

67. The 2013 syllabus for State and Society added sessions back into the course on topics I had previously selected and co-authored; it also included four cases I had co-authored; and it deleted cases Professor Rae had forced me to include the previous year, thus modeling the 2013 version of the course more around my original work.

68. Professor Shapiro received substantially lower ratings from students for his teaching of State and Society in 2013 than I have ever received, to no consequence.

69. Although not permitted to teach State and Society to Yale MBA students, I was asked by the Yale SOM leadership to teach the course in Summer 2013 to prospective students in SOM's pre-MBA program. I also successfully taught in SOM executive programs for Latin American lawyers, a group of Chinese managers, and members of the American Institute for Graphic Artists.

70. My evaluations confirmed I suffer from no lack of competence, and exceed by any measure the "performance" criteria for continued employment as set forth in my original contract.

71. On April 4, 2013, I received a letter from President Salovey concluding that—based on the Revised Harte Report and input from Deans Snyder and Metrick—the standards used to review my reappointment were not made sufficiently clear to me, and that the alleged issues involved with my teaching of State and Society required further review. This would be the fourth attempt to rationalize my fate at Yale SOM, shifting yet again the pretextual criteria. Moreover, President Salovey ordered the BPO to review my case "anew" after a Yale SOM

14

faculty review committee articulated the standards for reappointment as a Professor in the Practice at the SOM and explained how they applied in my case.

72. In June 2013, Dean Metrick advised me that a review committee would, in accordance with the decision of April 4, 2013 by Peter Salovey (who assumed his new position as President of Yale University on July 1, 2013) review my reappointment decision and articulate the standards that should apply when reviewing Professors in the Practice. This represented the further introduction of criteria inconsistent with, and contrary to, the terms of my contract.

73. This three-member committee (the "Pinker Committee") was chaired by Edieal J. Pinker ("Professor Pinker"), a recently hired Professor of Operations Research at Yale SOM who had little or no background on my employment, my contract, the discriminatory and retaliatory events that had already unfolded, or the reappointment standards applied to the other (all male) Professors in the Practice. The Pinker Committee's Report (the "Pinker Report") was submitted to the BPO for consideration and another vote.

74. Despite President Salovey's decision requiring "investigation" of the Spring 2012 teaching of State and Society, I was informed on May 7, 2013, that I would not be permitted to teach State and Society in the 2013-2014 academic year. The course would again be taught by Professors Rae and by my replacements, two younger, less experienced males, Professor Shapiro and Senior Lecturer Bach. No explanation was given for my removal from the core course I had played a significant role in developing and successfully teaching.

75. At a general faculty meeting in September 2013, Dean Metrick remarked that Yale SOM "didn't get our man" for the Nierenberg Chair, a reference to a male candidate. Despite my competitive candidacy and qualifications, I was not fairly considered for the position and the position remains unfilled.

15

76. Although I have not been permitted to review the Pinker Report because it has been deemed "confidential," I was informed by Deputy Provost Stephanie Spangler, M.D., that the Pinker Committee, like the Bracken Committee, had found my teaching, scholarship, and citizenship to be exemplary.  Despite multiple efforts to conjure reasons for the refusal to renew my contract, none could be found.

77. Undeterred, and despite the findings of the Pinker Committee, on October 21, 2013, the BPO again voted against renewal of my contract as a Professor in the Practice.  Dean Metrick informed me of the negative vote that evening and the decision was communicated to me in a letter from Dean Snyder on November 7, 2013, in which he stated his decision to follow the BPO's recommendation not to renew my appointment.

78. The review process by the Pinker Committee and the BPO vote were again tainted by discriminatory animus and retaliation by Professor Rae and the Yale SOM leadership, aided and abetted by Dean Snyder and Dean Metrick, and by total disregard for my contractual rights.

79. The charge to the Pinker Committee provided by Dean Metrick was inconsistent with the terms of my employment contract from Dean Podolny.  Additionally, upon information and belief, the Yale SOM leadership intentionally did not provide the Pinker Committee or the BPO with copies of the Harte Report, the Revised Harte Report, my employment contract, or other materials that would be critical to their analysis, all in an attempt to manipulate the desired outcome.

80. The Pinker Committee devised yet again a new set of standards for renewal of Professors in the Practice: (1) teaching; (2) writing; (3) engagement and service; (4) need – defined as "experience and expertise that the school views as essential but currently lacks"; and (5) reputation.

16

81. Not only did the Pinker Committee devise new standards for renewal, but the BPO actually voted on these new standards *immediately before* they voted not to renew my appointment. Yet again, I was denied the fair application of the standards set forth in my contract and in Yale's policies and procedures.

82. Because by all measures I met even the "new" standards established by the Pinker Committee, to accomplish the goal of refusing to renew my contract, Dean Metrick asserted another pretextual reason: the BPO found that there was no "need" for me at the SOM. This was despite the fact that I has been teaching a full course load and that "programmatic need" was neither a condition for renewal as outlined by the Dean upon hiring nor a standard provided in the Yale Faculty Handbook.

83. Dean Metrick told me, however, that "need" is a discretionary factor left for consideration by the BPO. He further stated that although the Pinker Committee did not consider how the "need" factor applied to me—notwithstanding President's instruction relating thereto—he could apply such a condition in his discretionary decision-making role. This decision was in retaliation for my requests for promotions and my refusal to submit to the repeated gender based and retaliatory "reviews"—all searching for pretextual reasons to justify a foregone conclusion.

84. Along with and even aside from State and Society, there is a full complement of courses I can teach, including "Managing Legal and Regulatory Complexity," a new course I will be teaching in Spring 2014.

85. In early September 2013, Dean Snyder announced the opening of a Non-Ladder Entrepreneurship position at the SOM. Although I requested a meeting to discuss my candidacy for this position on September 28, 2013, Dean Metrick postponed this meeting to the day *after* the BPO vote on my renewal was scheduled. I was not permitted to meet with him, and the chair

17

of the entrepreneurship search committee, until October 29, 2013, at which time I was informed

that the search committee would begin reviewing applications two days later, on October 31,

2013. My ability to apply had been effectively manipulated in the hope of foreclosing my

application. Although I have applied for this position, to date, I have not been selected for this

position, and have been deprived of a fair opportunity to be considered.

86. My contract with the Yale SOM expires on December 31, 2014. Yale SOM was

obligated to extend my contact until this date due to its own delay in reviewing my

reappointment in accordance with the terms of my contract and the provisions of the Yale

Faculty Handbook.

87. A culture exists within Yale in which strong, assertive and professionally accomplished

women who are not stereotypically female in their appearance, behavior and attitudes are viewed

negatively because they do not meet certain gender expectations by the dominant male

leadership.

88. More than 90% of the tenured faculty at Yale SOM are male, and not a single woman has

been granted tenure at the SOM since 2002. According to the most recent study by the Yale

Women's Faculty Forum, no school at Yale has such a low percentage of senior women.

89. No senior female faculty members at Yale SOM sit on any SOM faculty committees.

90. I was not asked to serve on a panel as a member of the University Wide Committee on

Sexual Misconduct for a period of almost a year. I have not been asked to serve on one case

involving a Yale faculty member or employee since filing my request for provostial review of

the non-renewal decision.

91. Although my contract stated that I would be a "full-time voting member of the faculty on

all matters except tenure appointments," I have been denied a seat at meetings of full professors

18

at which critical curricular decisions have been made, including those which could have impacted my own position at Yale.

92. When, in April 2012, I reiterated to Dean Snyder my concerns and questions about Yale SOM's ongoing failure to honor my contractual voting rights, Dean Snyder commented in a sarcastic and dismissive tone, "Yes, I remember your raising your hand about that."

93. Dean Metrick then proceeded to vitiate my voting rights when, at the May 7, 2012 meeting (before I had left and they considered my case), Dean Snyder announced that, per the suggestion of Dean Metrick, they were expanding the "appointments committee," for which only BPO members are eligible, to include curriculum and strategy. I would now be excluded from voting on decisions involving SOM curriculum and strategy, contrary to the terms and conditions of my contract.

94. Upon information and belief, my Yale e-mail account and Google e-mail account were hacked by University administration in or around November 2013 and certain e-mail exchanges have been viewed by SOM administration, in potential violation of my privacy, University protocol, attorney-client privilege and patient-physician privilege. This also resulted in multiple delayed communications, making it much more difficult for me to complete my work in a timely manner.

95. I have faced ongoing discrimination and harassment by Yale because of my gender, my failure to conform to gender stereotypes, my age, and my complaints regarding discrimination.

96. I have also faced ongoing retaliation by Yale after filing my internal grievance with the University, and subsequently my Complaints with the Connecticut Commission on Human Rights and Opportunities and the EEOC.

97. I have been treated differently in the terms and conditions of my employment than

19

similarly situated males, and my performance has not been evaluated on the same basis and with the same criteria as my male colleagues, including, without limitation, male Professors in the Practice at Yale SOM.

98. My contract has not been renewed based on pretextual reasons and in direct breach of my original employment contract and Yale's own policies and procedures.

99. On November 13, 2013, Stephanie S. Spangler, M.D., the Deputy Provost for Health Affairs and Academic Integrity, confirmed that Yale offers no further means to challenge Yale SOM's decision not to reappoint me as a Professor in the Practice. Provost Ben Polack confirmed this in an email to me dated December 2, 2013.

100. I suffered and continue to suffer diminished self-esteem, humiliation and severe emotional distress as a result of the discrimination and retaliation of Respondents.

## COMPLAINANT'S CERTIFICATION OF MAILING FORM

I hereby certify that I served a copy of the enclosed document by certified mail on the Respondent, named below, on this _23_ day of December, 2013.

Dorothy K. Robinson
Vice President and General Counsel
Yale University
2 Whitney Avenue, 6th Floor
New Haven, CT 06510.

Michael J. Rose

4816-4323-6887.3

21

FORM 103(1)

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Constance E. Bagley being duly sworn, on oath, states that s/he is the Complainant herein; that s/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in Hartford on this 20th day of December, 2013.

_____
(Complainant's Signature)

Subscribed and sworn to before me on _12/20/13_
(Date)

_____
Dana R. McGee, Esq.
(Notary Public/Commissioner of the Superior Court)

My commission expires: _____

(law may out affidavit revised 10/2011)

Charge of Discrimination

This form is affected by the Privacy Act of 1974, See
Privacy Act Statement on reverse side before completing this form.

☐ FEPA
☐ EEOC

Commission on Human Rights & Opportunities, West Central Region and EEOC
(State or Local Agency, if any)

| Name (Indicate Ms, Mrs. or Miss) | Home Telephone No. (& Area Code) |
|---|---|
| Constance E. Bagley | |

| Street Address | City, State and Zip Code | County |
|---|---|---|
| 20 Fox Den Way | Woodbridge, CT  06525-1900 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR
LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below)

| Name | No of Employees/Members | Telephone Number (Include area code) |
|---|---|---|
| Yale University c/o Attorney Dorothy K. Robinson Vice President and General Counsel | | 203-432-4949 |

| Street Address | City, State and Zip Code |
|---|---|
| 2 Whitney Avenue  6th Floor | New Haven, CT 06510 |

| Name | Telephone Number (Include area code) |
|---|---|
| | |

| Street Address | City, State and Zip Code |
|---|---|
| | |

Cause of Discrimination Based on (Check appropriate box(es))

☐ Race  ☐ Color  ☒ Sex  ☐ Religion  ☐ National Origin
☒ Age  ☒ Retaliation  ☒ Other (specify)  Gender (female)

DATE MOST RECENT OR
CONTINUING DISCRIMINATION
TOOK PLACE (month, day, year) November 7, 2013

The particulars are (if additional space is needed, attach extra sheet(s))

The particulars of this charge of discrimination are set forth in my

CHRO No._____ which I filed with the Connecticut Commission on

Human Rights and Opportunities on December 20, 2013,

which is attached hereto and incorporated as if fully set forth herein.

XX I also want this charge filed with the EEOC.
will advise the agencies if I change my address or telephone
number and I will cooperate fully with them in the
processing of my charge in accordance with their procedures.

NOTARY  [When necessary to meet State and Local
Requirements]

Commissioner of Superior Court

I swear or affirm that I have read the above charge
and that it is true to the best of my knowledge,
and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

X _____  Dana R. McGee, Esq.

| Date | Charging Party (Signature) |
|---|---|

SUBSCRIBED AND SWORN TO BEFORE ME
THIS DATE (Day, Month, Year) December 20, 2013

EEOC Form 5          PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED.          FILE COPY

law mail out affidavit revised 10/2011)

## PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974, Public Law 93-579: Authority for requesting the personal data and the uses are given below):

1. FORM NUMBER/TITLE/DATE, EEOC Form 5, CHARGE OF DISCRIMINATION, March 1984.

2. AUTHORITY, 42, U.S.C. § 20005-(b), 29 U.S.C. §211, 29 U.S.C. §626.

3. PRINCIPAL PURPOSE(S). The purpose of the charge, whether recorded initially on this form or in some other way reduced to writing and later recorded on this form, is to invoke the jurisdiction of the Commission.

4. ROUTINE USES.    This form is used to determine the existence of the facts which fall within the Commission's Jurisdiction to investigate, determine, conciliate and litigate charges of unlawful employment practices.   Information provided on this form will be used by the Commission employees to guide the Commission's investigator activities.  This form may be disclosed to other State and federal agencies, as may be appropriate or necessary to carry out the Commission's functions.  A copy of this charge will ordinarily be served upon the person against whom the charge is made.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.  Charges must be in writing and should identify the parties and action or policy complained of.  Failure to have a charge which identifies the parties in writing may result in the Commission not accepting the charge.  Charges under Title VII must be sworn to or affirmed.  Charges under the ADEA should be ordinarily be signed.  Charges may be clarified or simplified later by amendment.  It is not mandatory that this form be used to provide the requested information.

5. [] Under Section 706 of Title VII of the Civil Rights Act of 1964 as amended, this charge will be deferred to and will be processed by the State of local agency indicated.  Upon completion of the agency's processing, you will be notified of its final resolution in your case.  If you wish EEOC to give Substantial Weight Review to the agency's finding, you must send us a request to do so, in writing, within fifteen (15) days of your receipt of the agency's finding.  Otherwise, we will adopt the agency's finding as EEOC's and close your case.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(e) of the Civil Rights Act of 1964, as amended, and Section 4(d) of the Age Discrimination in  Employment Act of 1967, as amended, states:

It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for memberships, because he has opposed a practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title.

The Equal Pay Act of 1968 contains similar provisions.  Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made.

(law mail out affidavit revised 10/2011)

**INFORMATION REGARDING COMPLAINTS PREVIOUSLY FILED WITH THE CONNECTICUT COMMISSION ON HUMAN RIGHTS**

CHRO No.

Please provide the following information:

[X]     I have filed a previous complaint:

        Date of filings:        3/4/13

        Regional office:      West Central Regional Office

        Case number:      1330361

        Class Basis:        gender, age, retaliation

[ ]     I have not filed a previous complaint.

    I understand that my failure to disclose this information may lead to a delay in the processing of my complaint or a dismissal of my complaint for failure to cooperate.

X _____
    Complainant Signature

X _____
    Date

lawmailoutaffidavitrevised04/12/07

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

FORM 001(7)

## COMPLAINANT'S WITNESS LIST

CHRO No. _____

Date Filed: _____

Complainant: _____

Respondent: _____

_____

If this complaint is retained following a Merit Assessment Review (MAR), I am identifying the following persons as relevant witnesses:

**Witness name, telephone # and address**                    **Specific relevant information**

☐ I have no witnesses at this time.

_____
Complainant's Signature

_____
Date

lawmailoutaffidavitrevised04/12/07

FORM 103(4)

Case No: _____

## AUTHORIZATION TO RELEASE INFORMATION FROM THE RECORDS OF:

Constance E. Bagley
(You)                                          (Name of Undersigned)

I authorize disclosure by:

Yale University
(Company)

2 Whitney Avenue, 6th Floor, New Haven, CT 06510
(Address)

To the representative of the CONNECTICUT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES of the information and record specified below that concern my complaint filed with the COMMISSION.

☐ Medical Records

☒ Personnel Records

☐ Credit Rating, or Information as listed below:

X _____              Dec. 20, 2013
(Signature of complainant)              (Date)

X  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                          12/18/52
(Social Security Number)                (Date of Birth)

X  20 Fox Den Way, Woodbridge, CT  06525 -1900
                                        (Address)

lawmalloutaffidavit/revised04/12/07

If any time the Commission is unable to contact me, the Commission will be deemed to have provided me with actual notice by mailing two letters, first class mail, to my last known address. It will be presumed that, once the letters have been mailed out that I have received the correspondence unless the letters are returned to the Commission by the Post Office.

For the purposes of the EEOC notice requirements, when the Commission is unable to contact me, a letter will be sent certified mail, return receipt requested. Once this letter has been mailed I will be deemed to have received actual notice.

By: _____  X

Dated: _____  X

[Complainant must sign the original of this form and be given a copy.]

lawmailoutaffidavitrevised04/12/07

COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

FORM 002

NOTICE TO COMPLAINANT OF DUTY TO COOPERATE

I, Constance E. Bagley, understand that it is my duty to respond timely to any information and/or assistance requested of me by the Commission and to cooperate with the Commission at all times. Further, I understand that it is my sole duty and responsibility to notify the Commission of my whereabouts at all times throughout the pendency of this complaint and, in the event my address and/or telephone number changes, it is my duty to notify the Commission immediately. In this respect, I represent that the individual named below whose address and telephone number is as stated, will always know my whereabouts and can always contact me. This individual is:

NAME Michael J, Rose, Esq. _____ ADDRESS 750 Main Street  Suite 606____

CITY Hartford, CT  06103_____ STATE  CT          ZIP CODE 06103

TELEPHONE (860 ) 748-4660

Additionally, I promise to provide the Commission, within a period of time not to exceed two working days after my receipt of its copies of the following documents : [check applicable spaces]

___✓__ yes_____ no (a) copies of any and all decisions and or determination(s) made by the Connecticut Department of Labor, Division of Unemployment Compensation, respecting my eligibility to receive Unemployment Insurance Compensation;

___✓__ yes_____ no (b) copies of any writings that my employer gives to the Connecticut Department of Labor as to its consent and/or objection to my receiving benefits;

___✓__ yes_____ no (c)  copies of any transcript (s) and/or tape recordings of testimony given by myself and my employer to the Connecticut Department of Labor;

___✓__ yes_____ no (d) copies of any union grievance filed by co-workings or myself challenging the company's behavior, the outcome of any grievance etc., and;

_____ yes ____ no (e)  other information , please describe: N/A

Date: March 4, 2013

Case No. _____

Complaint's Name    Constance E. Bagley

### REMEDY WORKSHEET

In the event of a successful resolution of your case, the Connecticut Commission on Human Rights & Opportunities (The Commission) may be able to negotiate for you, monetary and non-monetary damages. Please make check marks (✓) where applicable.

- [ ] back pay minus interim earnings (unemployment compensation, earnings from other jobs, etc.)
- [ ] reinstatement
- [ ] merit increase
- [ ] promotion
- [ ] training
- [ ] restoration of fringe benefits, including 401K, stock options, etc.
- [ ] accommodation
- [ ] cease and desist harassment
- [ ] policy change(s)
- [ ] change in performance evaluation
- [ ] expunge warnings from personnel file
- [ ] other_____

**\*\*The Commission cannot recover attorney's fees or emotional distress damages in employment cases\*\***

Information necessary to calculate your damages. (If you need more space, please attach additional sheets.)

1. Date of discharge/failure to hire/failure to promote: November 7, 2013
2. Pay rate hourly _____     weekly _____     annually _____
3. Hours worked weekly _____
4. Did you work overtime regularly? _____Yes _____No
5. If Yes, how often and how many hours per week? _____
6. Other actual out-of-pocket expenses (medical, etc.) _____
7. Do you want to go back to work for the respondent? _____Yes _____No
8. Please list other earnings since your discharge: _____

If you have been discharged from employment, it is your duty to look for other work even if you have filed a charge of discrimination. You may be required to provide The Commission a record and evidence of your attempts to find work. Please keep accurate records of all such attempts. The Commission may require you to provide copies of various employment documents which may include: W-2 forms, pay stubs or other documents showing pay history, tax returns.

(law mail out affidavit revised 10/2011)

FORM 103(1)

## NOTICE OF RIGHT TO REQUEST REVIEW

This notice is to let you know that the charge to which you are a party, filed with both the Connecticut Commission on Human Rights and Opportunities, (CCHRO) and the federal Equal Employment Opportunity Commission (EEOC), will be processed by the CCHRO.

In accordance with the Commission's Procedural Regulation, the Commission will accept the CCHRO's final finding or resolution of the charge and adopt it as its own unless a party to the charge requests the EEOC to conduct a review of the CHRO's final action To exercise this right, you must request for review, in writing, to the EEOC office at the following address: U.S. Equal Employment Opportunity Commission, Boston Area Office, John F. Kennedy Federal Building, Government Center, Room 475, Boston, MA 02203-0208 of the date on which you receive the CHRO's notice of its final findings or resolution.

If you have any questions concerning this notice or your right to request review, please contact this office.

I ACKNOWLEDGE RECEIPT OF THIS NOTICE

X _____
Signature of Complainant

X _____
Date

Yale University
Respondent's name

CCHRO NUMBER _____

EEOC NUMBER _____

(law mail out affidavit revised 10/2011)

# EXHIBIT D



**ROSE KALLOR**

ATTORNEYS AT LAW

Michael J. Rose
Robin B. Kallor*
Melinda A. Powell
Johanna G. Zelman
Nicole D. Dorman
Allison L. Pannozzo
Cindy A. Miller**
Dana R. McGee

Paralegals:
Amber M. Smith
Marla R. Palmer
Kiva T. Bynum

*Also admitted in New York and New Jersey
**Also admitted in Massachusetts

December 23, 2013

Donna M. Wilkerson Brillant, Regional Manager
State of Connecticut Commission on Human Rights & Opportunities
55 West Main St., Suite 210
Waterbury, CT 06702

Re:  Constance Bagley v. Yale University
     Our File No.: 02020

Dear Ms. Wilkerson Brillant:

This office is legal counsel to the Complainant, Constance E. Bagley in connection with the above-referenced matter. On December 23, 2013, Professor Bagley filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO), and cross-filed the same with the Equal Employment Opportunities Commission. As my client has filed a Federal Court complaint against Yale University arising from a prior matter ( CHRO No. 1330361, EEOC No. 16A201300851) in which she asserts additional causes of action, we are writing to request a release to file a lawsuit so that Professor Bagley may assert her rights by consolidating these cases.

By copy of this letter, we are asking that Yale University consent to this request through its legal counsel, Attorney Dorothy K. Robinson.

Thank you for your time and attention to this matter. If you should need any additional information, please do not hesitate to contact me.

Very truly yours,

Michael J. Rose

JAN 0 7 2014



ROSE KALLOR, LLP
December 23, 2013
Page 2
Re:  Constance Bagley v. Yale University


MJR/ktb

Cc: Laura Studen
    Connie Bagley
    Dorothy K. Robinson, Vice President and General Counsel

# UNPUBLISHED

# DECISIONS



BARRY GLASSER, Plaintiff v. GROUP W SATELLITE COMMUNICATIONS,
Defendant

Civil No. B-89-664 (WWE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*1990 U.S. Dist. LEXIS 11552*

July 11, 1990, Decided
July 11, 1990, Filed

**COUNSEL:** [*1] William Laviano, Ridgefield, Connecticut.

Barry J. Waters, MURTHA, CULLINA, RICHTER & PINNEY, New Haven, Connecticut.

**JUDGES:** Warren W. Eginton, United States District Judge.

**OPINION BY:** EGINTON

**OPINION**

*RULING ON DEFENDANT'S MOTION TO DISMISS*

Plaintiff, Barry Glasser ("Glasser"), brought this action for monetary damages against the defendant, Group W Satellite Communications, ("GWSC"), for unlawful discharge pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA") *29 U.S.C. 626 et seq.* In the Second Count of his complaint plaintiff alleges that he suffered damages and emotional distress due to the defendant's breach of his employment contract. GWSC has moved to dismiss the breach of contract claim pursuant to *Fed. R. Civ. P. 12(b)(1)* asserting that it would be inappropriate for the Court to exercise pendent jurisdiction over this claim.

For the reasons set forth below, the defendant's motion to dismiss the Second Count will be granted.

*FACTS*

From December, 1986 through January 31, 1989 Glasser was employed by GWSC as the manager of playback operations. GWSC asserts that Glasser was terminated because his department was eliminated. Glasser maintains that his termination represents a violation [*2] of the ADEA and constitutes a breach of his employment contract. [1]

1 Glasser alleges that the employment contract declares that notice would be given prior to a termination without cause.

*DISCUSSION*

Pursuant to *28 U.S.C. § 1301*, the Court is vested with original jurisdiction to entertain plaintiff's ADEA claim. The only basis for the Court to exercise jurisdiction over the claims alleged in the Second Count of the complaint is through pendent jurisdiction. Hence, the only issue to be resolved is whether the Court will exercise pendent jurisdiction over the Second Count of the complaint.

Federal Courts may exercise pendent jurisdiction over state law claims when the state and federal claims derive from a common nucleus of operative facts and are

1990 U.S. Dist. LEXIS 11552, *2

sufficiently related that a party would ordinarily expect to litigate them in one forum. *United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)*. However, a court need not exercise pendent jurisdiction over state claims since pendent jurisdiction is a doctrine of discretion, [*3] not of right. *Id. at 726*. In electing to exercise pendent jurisdiction, a court must weigh considerations of policy, convenience, judicial economy and fairness. Id.; See also *Brokke v. Stauffer Chemical Co., 703 F. Supp. 215 (D. Conn. 1988)*.

GWSC asserts that the ADEA claim and the breach of contract claim do not arise out of the same operative facts and therefore, the Court should not exercise pendent jurisdiction. In opposition the plaintiff asserts that the federal and state claims arise out of a common nucleus of operative facts and argues that *Miller v. Lovett, 879 F.2d 1066 (2d Cir. 1989)* mandates that the Court exercise pendent jurisdiction over plaintiff's state law claims. In Miller the Second Circuit, in a *42 U.S.C. § 1983* action, held that the district court should have exercised pendent jurisdiction over state law negligence and assault and battery claims. 879 F.2d 1071-1073.

The Court finds that this case is distinguishable from *Miller* and decline to exercise pendent jurisdiction over the Second Count of the complaint. Miller involved a single incident in which the defendant police officers allegedly used excessive force in making an arrest. The Second Circuit [*4] held that the exercise of pendent jurisdiction over the state law claims was appropriate because "Miller's state and federal claims derive from a common nucleus of operative fact" and because, given the "interrelationship between state law and federal policy . . . in police brutality cases, . . . resolution of [Miller's] federal claim necessarily required the court to draw on common law principles of tort doctrine." *879*

*F.2d at 1072.*

None of the facts deemed dispositive in Miller are present in this case. Plaintiff's claim is based upon an alleged violation of the ADEA. If the Court were to exercise pendent jurisdiction over the breach of contract claim it would involve inquiry into facts having nothing to do with the age discrimination claim and into areas of state law which are best left to state judicial authorities. In *Gibbs*, the Supreme Court advised that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *383 U.S. at 726*.

Courts have been reluctant to exercise pendent jurisdiction in ADEA cases over claims based upon an alleged breach of [*5] contract and claims alleging tortious conduct. *Ritter v. Colorado Interstate Gas Company, 593 F. Supp. 1279 (D. Colo. 1984)*; *Douglas v. American Cyanamid Company, 472 F. Supp. 298 (D. Conn. 1979)*; *Kurowski v. People's Bank*, Civil No. B-89-344 (WWE) (D. Conn. November 6, 1989). The Court concludes that this reluctance is well advised and declines to exercise pendent jurisdiction over the Second Count of the complaint.

*CONCLUSION*

For the foregoing reasons, the defendant's motion to dismiss the Second Count of the complaint is GRANTED.

SO ORDERED.

Date this 11th day of July, 1990, at Bridgeport, Connecticut.



BECKY McCLAIN, Plaintiff, v. PFIZER, INC., Defendant.

CIVIL ACTION NO. 3:06-cv-1795 (VLB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2008 U.S. Dist. LEXIS 17757*

March 7, 2008, Decided
March 7, 2008, Filed

**SUBSEQUENT HISTORY:** Motion to strike granted by, in part, Motion to strike denied by, in part *McClain v. Pfizer, Inc.*, 2010 U.S. Dist. LEXIS 17247 (D. Conn., Feb. 26, 2010)

**COUNSEL:** [*1] For Becky McClain, Plaintiff: Bruce E. Newman, LEAD ATTORNEY, Newman, Creed & Associates, Bristol, CT.

For Pfizer Inc, Defendant: Tanya A. Wolanic, William Joseph Anthony, LEAD ATTORNEYS, Jackson Lewis - Htfd, CT, Hartford, CT.

**JUDGES:** Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

*MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION TO DISMISS [Doc. # 32]*

The plaintiff, Becky McClain ("McClain") initiated this action against her former employer, Pfizer, Inc. ("Pfizer"), asserting eight claims for relief following Pfizer's termination of her employment: 1) breach of an oral employment contract and common law wrongful termination; 2) violation of *Connecticut General Statutes § 31-51m* (the "whistleblower statute"); 3) violation of *Connecticut General Statutes § 31-51q*; 4) promissory estoppel; 5) defamation; 6) negligent misrepresentation; 7) failure to keep a safe work environment; and 8) willful and wanton misconduct. Pfizer now moves to dismiss all eight counts of the complaint for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons hereinafter set forth, Pfizer's [*2] motion to dismiss is GRANTED as to counts one, four, five, six, and seven, and DENIED as to counts two, three, and eight.

I. Facts

McClain asserts the following facts in her amended complaint [Doc. # 30] unless noted otherwise, and are taken as true for purposes of this motion. *See* Section II, below. Pfizer employed McClain as a research scientist from August 1995 until her termination on May 26, 2005. In 2000, McClain transferred to the Human Health Embryonic Stem Cells Technologies, Genomic and Proteomic Sciences and Exploratory Medicinal Sciences Group located in Groton, CT (the "Groton Lab"), where she worked until her termination. Her job duties included research and scientific studies regarding the development of vaccines and embryonic stem cell technologies. McClain received consistently favorable performance reviews through 2002 that described her as hard working and diligent.

2008 U.S. Dist. LEXIS 17757, *2

In September 2002, McClain was working with a laminar hood in lab B313 when she noticed a noxious odor. Shortly thereafter, McClain and others in lab B313, including her supervisor John Hambor ("Hambor"), became ill. The presence of the odor and subsequent illness were reported and Pfizer assured McClain [*3] the problems with the laminar hood in lab B313 would be rectified. Hambor cautioned McClain not to make "too big an issue out of lab safety" or he would falsify her future performance reviews in a negative manner and possibly have her terminated. McClain lodged further complaints about health and safety conditions in the Groton Lab throughout the next several months. Hambor aggressively threatened McClain following her complaints about lab safety, and during a February 4, 2003, encounter, forcibly backed McClain into a wall.

On April 8, 2003, Hambor requested an investigation into the health and safety conditions in lab B313, noting the noxious odor appeared each time the laminar hood was activated, and that he suspected the causative agent now rested in lab B313 itself. In May 2003, McClain requested a transfer from lab B313 based on her safety concerns. During the summer of 2003 McClain, continuing to work in lab B313, developed symptoms of chronic fatigue and joint pain. In September 2003, McClain ceased reporting directly to Hambor. In December 2003, McClain transferred from lab B313 to an office located in room B312. In January 2004, Hambor gave McClain a 2003 performance review [*4] that characterized her work as below average.

On February 24, 2004, McClain began a medical leave of absence due to fatigue, joint pain, numbness in her face, difficulty sleeping and suspicion of multiple sclerosis. She continued to raise concerns over health and safety at the Groton Lab while on medical leave. In April 2004, Pfizer's Human Resources Department sent McClain a letter assuring her that the company would not retaliate against her for raising health and safety concerns at the Groton Lab.

In early October 2004, McClain contacted the Occupational Safety & Health Administration ("OSHA") requesting an investigation of the conditions at the Groton Lab. On October 20, 2004, dated after McClain requested the OSHA investigation, Pfizer placed McClain on unpaid leave and stated her employment would be terminated on October 26, 2004, for "job abandonment" if she did not return to work by October 26. She never

returned to work.

McClain formally filed an OSHA complaint against Pfizer on November 18, 2004. Pfizer terminated McClain's employment on May 26, 2005. On November 17, 2005, following a hearing, OSHA dismissed McClain's complaint in its entirety. She appealed OSHA's findings to [*5] an Administrative Law Judge ("ALJ"), who denied her appeal on March 2, 2006. In a September 27, 2006, letter, the Secretary of Labor confirmed the ALJ's findings. [1]

> 1   McClain referenced OSHA's investigation in her complaint but did not attach its letters as exhibits to the complaint or provide a detailed description of OSHA's processes. OSHA's letters to McClain dated November 17, 2005, March 2, 2006, and September 27, 2006, were attached as exhibits to Pfizer's memorandum of law in support of the motion to dismiss. [Doc. # 32, Ex. 2-3]

McClain filed her complaint on October 11, 2006. [Doc. # 1] She amended the complaint on February 16, 2007, asserting that Pfizer: 1) breached an oral contract and committed common law wrongful termination by terminating her employment; 2) violated the whistleblower statute; 3) violated *Connecticut General Statutes § 31-51q*; 4) was prevented from terminating her employment by promissory estoppel; 5) defamed her character; 6) committed negligent misrepresentation; 7) violated *Connecticut General Statutes § 31-49*; and 8) committed willful and wanton misconduct. [Doc. # 30] On March 12, 2007, Pfizer moved to dismiss the complaint in its entirety for failure [*6] to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. [Doc. # 32]

II. Standard

"In reviewing a *Rule 12(b)(6)* motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)* (internal quotation omitted). The pleading shall not be dismissed merely because recovery seems remote or unlikely. *Bernheim, 79 F.3d at 321.*

In deciding a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993)*. [*7] Generally, "if, on a motion under *Rule 12(b)(6)* . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under *Rule 56*." *Fed. R. Civ. P. 12(d)*. "In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under *Rule 12(b)(6)*. Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered. In addition, even if not attached or incorporated by reference, a document upon which the complaint solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)* (internal quotations and citations omitted) (consideration of documents filed with the SEC appropriate because their authenticity is not questioned and the court considers them on a 12(b)(6) motion only for their statements and not the truth of their contents). Accordingly, the court considers the OSHA letters attached as exhibits to the memoranda of law regarding this motion but not the complaint without converting this motion to [*8] one for summary judgment.

III. Discussion

A. Exclusivity of the Whistleblower Statute

McClain asserts claims of both breach of an oral contract and common law wrongful termination in count one of the operative amended complaint ("complaint"). Further, she asserts promissory estoppel in count four. All three claims stem from Pfizer's termination of her employment after she voiced her concerns over health and safety conditions at the Groton Lab. Pfizer now moves to dismiss counts one and four on the basis that the whistleblower statute is the exclusive remedy to employees terminated for reporting violations of law and McClain's breach of contract, wrongful termination, and promissory estoppel claims are preempted. McClain

failed to address this preemption argument in her response to the motion to dismiss.

It is established law in Connecticut that employment relationships are generally at will and can be terminated at any time for any reason. *Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 474, 427 A.2d 385 (Conn. 1980)*. Common law causes of action for wrongful termination based in either tort or contract only exist if the reason for dismissing the employee violates an important public policy. *Id. at 475.* [*9] However, the remedy afforded by state or federal legislation that is meant to address a violation of an important public policy that the termination offends is the exclusive remedy available to former employees and common law wrongful termination causes of action are preempted and precluded. *Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 159-60, 745 A.2d 178 (Conn. 2000).*

The whistleblower statute provides that "[n]o employer shall discharge . . . any employee because the employee . . . reports . . . a violation or a suspected violation of any state or federal law . . . to a public body." *Conn. Gen. Stat. § 31-51m(b)*. It further specifies the avenue of recourse and remedies available to employees terminated in violation of the statute. *Conn. Gen. Stat. § 31-51m(c).*

Courts in Connecticut have consistently held that the enforcement provision of the whistleblower statute is the exclusive remedy available to employees terminated in violation of that statute, and all common law claims for wrongful termination based on the same set of underlying facts are preempted. *See Campbell v. Town of Plymouth, 74 Conn. App. 67, 73-74, 811 A.2d 243 (Conn. App. 2002); Burnham 252 Conn. at 162; Parmenter v. Wal-Mart Stores, East, L.P., 2007 U.S. Dist. LEXIS 51478 at *15-16.*

The [*10] facts alleged by McClain in counts one and four of the complaint sound of a whistleblower violation. She claims Pfizer only terminated her employment after she informed OSHA of her concerns over health and safety conditions at the Groton Lab, and that her termination was an act of retaliation for those reports. The alleged promise on which McClain bases her promissory estoppel claim is that Pfizer promised in its April 2004 letter not to fire her for voicing her concerns. The allegations in counts one and four are virtually identical to the allegations in count two that assert a violation of the whistleblower statute. Accordingly,

2008 U.S. Dist. LEXIS 17757, *10

McClain's claims of breach of contract, wrongful termination and promissory estoppel are preempted and precluded.

Pfizer's motion to dismiss counts one and four of the complaint is GRANTED because the whistleblower statute preempts all contract and tort claims for wrongful termination based on whistleblowing activities.

B. Timeliness of the Whistleblower Claim

Count two of the complaint alleges a violation of the whistleblower statute. Pfizer moves to dismiss count two as untimely filed, asserting that the March 2, 2006, letter to McClain constituted OSHA's [*11] final determination of her complaint and that she did not initiate this lawsuit within ninety days thereafter.

The whistleblower statute provides that terminated employees "may, after exhausting all available administrative remedies, bring a civil action, within ninety days of the date of the final administrative determination." *Conn. Gen. Stat. §31-51m(c)*. OSHA's initial ruling on a complaint can be appealed to an ALJ. *29 C.F.R. § 1978.104(b)*. When an ALJ rules on an appeal, that ruling is stayed pending final review by the secretary of labor. *29 C.F.R. § 1978.109(b)*. The secretary of labor must then confirm the ALJ's decision in a final determination supported by a detailed explanation of the secretary's reasoning. *29 C.F.R. § 1978.109(c)*.

The March 2, 2006, letter to McClain denying her appeal is not OSHA's final determination because it only sets forth the ALJ's decision. [Doc. 32-2] The September 27, 2006, letter meets the requirements set forth in *29 C.F.R. § 1978.109(c)* for a final determination because: 1) it clearly states that it is the "SECRETARY'S FINDINGS;" 2) it supports the secretary's findings in detail based on the record of all the proceedings including the ALJ's appellate [*12] decision; 3) it is addressed to McClain, Pfizer, and the ALJ that presided over her appeal; and 4) the letter states that it was issued to provide McClain with written documentation of the reasons for OSHA dismissing her complaint against Pfizer. Therefore, OSHA's notice of final determination was the detailed letter dated September 27, 2006. McClain initiated this action on October 11, 2006, well within the ninety day period provided for in the whistleblower statute. Accordingly, Pfizer's motion to dismiss count two of the complaint as untimely filed must be DENIED.

C. *Connecticut General Statutes § 31-51q*

Count three of the complaint alleges that Pfizer's termination of McClain after she voiced her concerns over the manner in which it conducted stem cell research and the health risks that research posed to employees violated *Connecticut General Statutes § 31-51q*. That statute reads: "Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the *first amendment to the United States Constitution* or *section 3, 4* or *14* of article first of the Constitution of the state . . . shall be liable to such employee [*13] for damages." *Conn. Gen. Stat. § 31-51q*.

"*Section 31-51q* extends protection of rights of free speech under the federal and the state constitutions to employees in the private workplace. The statute is not limited to freedom of speech in the public arena." *Cotto v. United Techs. Corp., 251 Conn. 1, 16, 738 A.2d 623 (Conn. 1999)*. "The statute applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen." *Id. at 17* (citing *Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983))*. Whether the subject matter of an employee's statements is a matter of public concern is a question of law, but whether a particular statement addresses that matter of public concern depends on its contents, form and context, which are questions of fact. *See Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 777, 734 A.2d 112 (Conn. 1999)*. This application of fact hinges on the employee's motivation in speaking. *Id. at 778*.

Pfizer argues in its motion to dismiss that McClain's speech regarding the health and safety conditions surrounding the company's stem cell research was motivated only by her dissatisfaction with her employment and did not address a matter of public concern.

The court cannot at [*14] this time conclude that McClain can prove no set of facts consistent with the allegations in the complaint that could reasonably prove her speech regarding the unsafe maintenance of hazardous waste created as a byproduct of stem cell research addressed a matter of public concern. As Pfizer points out, some of her speech addressed McClain's personal employment situation and as a matter of law could not state a claim under *section 31-51q*. However, the complaint alleges that McClain continued to voice her

concerns after being transferred out of lab B313 and those concerns were eventually raised outside of Pfizer, including to OSHA. This continued speech after her employment no longer imposed a direct health risk could conceivably have been conducted as a concerned citizen. A more developed record through discovery is necessary to fully establish the content, form and context of the speech supporting McClain's *section 31-51q* claim.

Pfizer also asserts that statements made prior to October 11, 2003, cannot support McClain's claim that Pfizer violated *section 31-51q* as they are barred by the statute of limitations provided for in *Connecticut General Statutes § 52-577*. McClain did not respond [*15] to the statute of limitations argument in opposition to this motion. The court infers from her silence that McClain concedes this point. The three year statute of limitations in *section 52-577* applies to claims brought pursuant to *section 31-51q. See Holub v. Babcock, 1996 Conn. Super. LEXIS 169 at *9 (Conn. Super. Jan. 19, 1996).* Upon a further developed record, only facts occurring on or after October 11, 2003, can support McClain's claim for relief under *section 31-51q.*

Pfizer's motion to dismiss count three is DENIED as to events that occurred after October 10, 2003. Based on the allegations in the complaint, the court cannot conclude as a matter of law that McClain was motivated only by personal interests and was not speaking out as a citizen on a matter of public concern.

D. Defamation

In count five of the complaint McClain alleges that Pfizer defamed her through 1) statements made by her supervisors in her performance reviews and to other employees, and 2) in its representations to OSHA during the proceedings concerning McClain's complaint. Specifically, the allegations of statements made by McClain's supervisors read:

the slanderous words were spoken to the plaintiff and to third [*16] persons at the facility regarding her being oversensitive about Hambor's aggression in 2003. In addition, Hambor demeaned McClain in front of persons at Pfizer during a scientific presentation by dismissing her opinions. The written words included the negative review from 2003 which was disseminated to other individuals at the

facility though [sic] her actual termination or separation date which Pfizer later provided to her, in May of 2005. These included a comment in her review that her performance did not meet the Scientist level and that she only partially met performance standards, which was untrue.

[Doc. # 30, pgs. 9-10]

Initially, Pfizer moves to exclude all statements supporting McClain's claim of defamation made prior to October 11, 2004, pursuant to the statute of limitations in *Connecticut General Statutes § 52-597.* McClain failed to address the statute of limitations argument in her opposition to this motion. *Section 52-597* provides that "[n]o action for libel or slander shall be brought but within two years from the date of the act complained of." *Conn. Gen. Stat. § 52-597.* There is no dispute that this two year limitation applies to McClain's defamation claim.

Only statements [*17] made on or after October 11, 2004 will be considered in support of McClain's defamation claim. Due to the vague description of the allegedly defamatory statements received in the complaint, the court cannot discern the exact timing of the statements. However, a fair reading of the complaint would place the statements about her being oversensitive in 2003 and any statements made by Pfizer to OSHA prior to October 11, 2004, clearly outside the applicable statute of limitations. Additionally, any alleged dissemination of defamatory statements, including her performance reviews, prior to October 11, 2004, is also precluded by *section 52-597.*

Pfizer next moves to dismiss any claim of defamation based on statements made to OSHA during the course of its investigation because they are barred by an absolute privilege under Connecticut common law for statements made in the course of a quasi-judicial proceeding. McClain does not dispute that an absolute privilege exists for statements made in a quasi-judicial proceeding. Her only opposition raised is that Pfizer cites to no case law finding an OSHA investigation or its hearings to constitute a quasi-judicial proceeding, while citing to no cases [*18] herself that found OSHA proceedings are not quasi-judicial in nature.

"The effect of an absolute privilege in a defamation action is that damages cannot be recovered for a

defamatory statement even if it is published falsely and maliciously. Like the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are quasi-judicial in nature. Once it is determined that a proceeding is quasi-judicial in nature, the absolute privilege that is granted to statements made in furtherance of it extends to every step of the proceeding until final disposition." *Kelley v. Bonney, 221 Conn. 549, 565-66, 606 A.2d 693 (Conn. 1992)* (internal citations omitted).

The Connecticut Supreme Court has identified factors courts should consider when evaluating whether a proceeding is quasi-judicial in nature, including "whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal property rights of private persons; (5) examine witnesses and hear the litigation [*19] of the issues on a hearing; and (6) enforce decisions or impose penalties." *Craig v. Stafford Constr., 271 Conn. 78, 85, 856 A.2d 372 (Conn. 2004)* (quoting *Kelley, 221 Conn. at 567*).

After reviewing each of these factors the court is in a quandary to understand why the parties have referred this issue to this court for resolution. It is patently clear that OSHA's investigation and the hearings it held were quasi-judicial in nature and therefore any statements made by Pfizer during those proceedings are absolutely privileged. McClain's complaint to OSHA was investigated by the agency, appealed to an ALJ and subject to a full appellate review, and confirmed by the secretary of labor. Both McClain and Pfizer presented evidence and testimony at all phases of the proceedings. At all phases of the proceedings, OSHA, through its investigators, the ALJ or the secretary of labor, applied the law to the relevant facts presented by the parties in their discretion and had the ability to enforce those decisions in a manner that directly effected the property rights of the parties. McClain's defamation claim based on statements made to OSHA in the context of its investigation must be dismissed because those statements [*20] are subject to an absolute privilege. *See Craig, 271 Conn. 78, 856 A.2d 372* (police internal affairs investigation quasi-judicial); *Kelley, 221 Conn. 549, 606 A.2d 693* (schoolteacher license revocation proceedings quasi-judicial); *Blake-McIntosh v. Cadbury Bevs., Inc.,*

*1999 U.S. Dist. LEXIS 12801 (D. Conn. Jun. 15, 1999)* (EEOC investigation quasi-judicial); *Calderon v. Dinan & Dinan PC, 2006 U.S. Dist. LEXIS 39024 (D. Conn. Jun. 13, 2006)* (workers' compensation hearing quasi-judicial).

Pfizer finally moves to dismiss any claim for defamation based on alleged statements made by her supervisors because as pled they either fail to state a claim upon which relief can be granted or are subject to a conditional privilege. The court finds McClain's allegations regarding statements made by her supervisors must be dismissed for the three reasons stated below.

First, the allegations in the complaint do not sufficiently put Pfizer on notice of the basic elements of McClain's defamation claim. "Although *in haec verba* or verbatim pleading is not required ... [a plaintiff] must plead, in order to provide sufficient notice, what defamatory statements were made concerning the plaintiff, when they were made, and to whom they might [*21] have been made." *United States ex rel. Smith v. Yale Univ., 415 F. Supp. 2d 58, 108-9 (D. Conn. 2006)* (internal citations omitted). The complaint does not indicate to whom the allegedly defamatory statements were made about McClain being overly sensitive, her work being substandard, or her being demeaned, nor the timing of those comments. Moreover, the allegations refer more to general topics of conversation rather than identifying the contents of particular defamatory statements. In as much as the allegations are topical rather than particular the notice pleading requirement is not satisfied.

Second, comments made by or amongst McClain's supervisors regarding reviews of her performance are subject to a qualified privilege and immune from liability. 2 "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, 234 Conn. 1, 29, 662 A.2d 89 (Conn. 1995)*; *see also Kelly v. City of Meriden, 120 F. Supp. 2d 191, 198 (D. Conn. 2000)*. [*22] Accordingly, the contents of McClain's performance reviews are protected from liability by this qualified privilege, as would be the discussion of such performance

reviews amongst her supervisors.

    2   McClain chose not to respond to Pfizer's qualified privilege argument in her opposition to this motion.

Third, as pled the allegedly defamatory comments are statements of opinion as opposed to fact and thus not actionable. "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . . An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 111, 448 A.2d 1317 (Conn. 1982) (internal citations omitted). "Expressions of opinion cannot as a matter of law be defamatory." *Iosa v. Gentiva Health Servs.*, 299 F. Supp. 2d 29, 38 (D. Conn. 2004); *see also Daley*, 249 Conn. at 795. Statements regarding Hambor's perception that McClain was overly sensitive, that he disagreed with her opinion in a group meeting, or that her work did not meet expectations are expressions of opinion and [*23] not statements of fact and cannot state a claim of defamation.

Pfizer's motion to dismiss is GRANTED as to McClain's claim of defamation. Several of the allegedly defamatory comments are precluded by the applicable statute of limitations. All comments made to OSHA in the course of their investigation are protected by an absolute privilege as those proceedings are quasi-judicial in nature. The statements made by McClain's supervisors are not pled with sufficient particularity, are subject to a qualified privilege, and are expressions of opinion and not statements of fact.

E. Exclusivity of the Workers' Compensation Act

McClain asserts claims of negligent misrepresentation, failure to keep a safe work environment in violation of *Connecticut General Statutes § 31-49*, and willful and wanton misconduct in counts six, seven, and eight of the complaint, respectively. Pfizer moves to dismiss all three counts because the Connecticut Workers' Compensation Act ("WCA"), *Connecticut General Statutes § 31-275 et seq.*, is the exclusive remedy for personal injuries suffered in the course of employment.

The WCA is the exclusive remedy for personal injuries arising out of and in the course of employment.

[*24] *See Conn. Gen. Stat. § 31-284(a)*. The Connecticut Supreme Court interprets "the exclusivity provision of the act, General Statutes § 31-284(a), as a total bar to common law actions brought by employees against employers for job related injuries with one narrow exception that exists when the employer has committed an intentional tort or where the employer has engaged in wilful or serious misconduct." *Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 106, 639 A.2d 507 (Conn. 1994).

McClain's claim for negligent misrepresentation is preempted by the exclusivity provision of the WCA and fails as a matter of law. Her opposition to this motion admits that the exception to the WCA's exclusivity provision is based on intentional torts, not acts of negligence. Pfizer's motion to dismiss count six is GRANTED, as the WCA preempts all claims for relief based on personal injuries suffered in the course of employment sounding in negligence.

McClain's claim for failure to keep a safe work environment in violation of *section 31-49* is also preempted by the WCA. Courts in Connecticut have allowed claims for wrongful termination based on a violation of *section 31-49* to survive despite the exclusivity of the WCA. *See Parsons v. United Techs. Corp.*, 243 Conn. 66, 80, 700 A.2d 655 (Conn. 1997). [*25] McClain does not assert a claim for wrongful termination in count seven of the complaint. Count seven alleges only that she suffered personal injuries as a result of Pfizer's failure to keep a safe work environment. As a result, the exclusivity provision of the WCA preempts her claim and the motion to dismiss count seven is GRANTED. *See Perille v. Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 543, 494 A.2d 555 (Conn. 1985).

McClain's claim for willful and wanton misconduct is not preempted by the WCA. Count eight of the complaint alleges additional facts beyond those alleged in count six and count seven, specifically that Pfizer acted intentionally in exposing McClain to noxious materials that directly caused her personal injuries. Her claim for willful and wanton misconduct, as pled, falls squarely within the intentional tort exception to the WCA's exclusivity. *See Suarez*, 229 Conn. at 106. Pfizer's motion to dismiss count eight is DENIED.

IV. Conclusion

Based on the above reasoning, Pfizer's motion to

dismiss the complaint is GRANTED as to counts one, four, five, six, and seven, and DENIED as to counts two, three, and eight. Counts one and four are preempted by the whistleblower statute, while [*26] counts six and seven are preempted by the WCA, and fail as a matter of law. Count five fails to state a claim upon which relief granted, as the allegedly defamatory statements are privileged in part, precluded by the applicable statutes of limitations in part, not pled with sufficient particularity and are statements of opinion. Drawing all reasonable inferences in favor of the plaintiff, McClain has sufficiently stated claims for violations of *sections*

*31-51m* and *31-51q*, and wanton and willful misconduct, in counts two, three and eight of the complaint.

IT IS SO ORDERED.

/s/

Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: March 7, 2008.