## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ | |
| CONSTANCE E. BAGLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:13-cv-1890 CSH |
| v. ) | |
| ) | |
| YALE UNIVERSITY, DOUGLAS ) | |
| RAE, EDWAYD SNYDER, and ) | **AUGUST 26, 2014** |
| ANDREW METRICK, Individually, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## RULING ON DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

**HAIGHT, Senior District Judge:**

This is an action alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"),  and of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA").  Supplemental jurisdiction under 28 U.S.C. § 1367 is asserted with respect to appended Connecticut statutory and common law claims.  The case is before the Court on the motion of the Defendants to dismiss Plaintiff's complaint.

## I.  INTRODUCTION

The Plaintiff is Constance E. Bagley.  She is a professor on the faculty of the Yale School of Management ("Yale SOM" or "SOM").  In 2008 Professor Bagley and Yale SOM entered into a five-year contract of employment, commencing on July 1, 2008.  Bagley brings this action to complain of Yale SOM's decision not to rehire her for a further term.  Her present term on the

faculty, extended by circumstances, expires on December 31, 2014.

The Defendants are Yale University ("Yale"), a private degree granting institution in New Haven, Connecticut. Yale SOM is the graduate business school of Yale, which is legally responsible for SOM's conduct. Defendant Andrew Rae is a professor on the SOM faculty. Defendant Edward Snyder is a professor on the SOM faculty and the Dean of the School. Defendant Andrew Metrick is a professor on the SOM faculty and the Deputy Dean of the school.

All Defendants move [Doc. 28] to dismiss all the claims contained in Plaintiff's complaint. Plaintiff opposes that motion. The motion was extensively briefed. The Court heard oral argument on June 25, 2014, and directed supplemental briefing in respect of one issue. That briefing has been submitted. Defendants' motion to dismiss is ripe for decision. This Ruling decides it.

## II.   BACKGROUND

A number of the background facts giving rise to Professor Bagley's complaint would seem to be undisputed or indisputable. But that is not true, I note at the outset, with respect to a threshold factual issue which gave rise to the Court's direction to counsel for further briefing. That issue is presented by Defendants' contention that "Plaintiff's first CHRO complaint, filed on March 4, 2013, was not timely filed," to which Plaintiff responded that "the filing was timely, and the CHRO itself was incorrect in concluding otherwise." Order for Further Briefing [Doc. 44] at 1.

"CHRO" is a reference to the State of Connecticut Commission on Human Rights and Opportunities, with which Bagley filed two complaints: the first on March 4, 2013, and the second on December 20, 2013. The timeliness of Bagley's second charge is not disputed, but Defendants contest the timeliness of the first charge. The   resolution of that issue, and the resulting

consequences, are considered in Part III.A. *infra*.

Reverting to the factual background of the case, much of what follows in this Part is drawn principally from a careful reading of the allegations in the "Background Facts" section of Professor Bagley's Complaint [Doc. 1], which comprises pages 4-27 and ¶¶ 15-122. Care is required because these paragraphs are replete with conclusory and argumentative assertions. This part of the Complaint is vividly written, in the best "That's telling 'em!" tradition, part pleading, part polemic. At the pleading stage of a case, district judges have received recent cogent instructions about how they are to read such prose. "In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Applying those principles to the complaint at bar, I distill from the cited paragraphs the following facts that presumably are not or could not be disputed.[1]

The relevant facts begin in the year 2007, when Joel Podolny, then Dean of the Yale SOM, invited Constance Bagley to join the Yale SOM faculty. Bagley accepted, and signed an employment contract with Yale SOM as a Professor in the Practice of Law and Management for a five-year term, commencing on July 1, 2008 and ending on July 1, 2013. At the time of that appointment, Bagley was an associate professor at the Harvard Business School. She moved with her son from Massachusetts to New Haven, taking up residence in Woodbridge, Connecticut, and began teaching at Yale SOM.

---

[1]   Some facts in this Part are derived from the two claims Bagley filed with the CHRO, the first on March 4, 2013 and the second on December 20, 2013.

In 2011, the question arose as to Professor Bagley's reappointment to the Yale SOM faculty. On October 19, 2011, Dean Metrick advised Bagley that a committee chaired by Professor Paul Bracken would review her accomplishments and prepare a report on her case, which would then be voted on by the Yale SOM senior faculty.

The Bracken Committee unanimously recommended that Bagley be reappointed to the faculty. On May 7, 2012, the Bracken Committee's recommendation was submitted for approval to Yale SOM's Board of Permanent Officers ("BPO"), which consists of Yale SOM tenured faculty. The BPO met on that date, and during the meeting voted against Bagley's renewed appointment to an additional five-year term as a Professor in the Practice on the Yale SOM faculty.[2]

On May 24, 2012, Dean Snyder advised Professor Bagley by letter that the BPO had voted against her renewed appointment. While the BPO's vote was advisory and not binding on Dean Snyder, Snyder advised Bagley that he had decided not to renew Bagley's contract for another five years. The reason Snyder gave Bagley for the non-renewal of her contract was, in words or substance, that "there were no courses for her to teach."

Bagley responded on June 19, 2012 by filing an internal complaint of discrimination with Yale. Acting pursuant to the Yale University Faculty Handbook, Bagley requested a "provostial review" of Dean Snyder's decision not to review her contract. That complaint was addressed to, and came to the attention of, Professor Peter Salovey, then the Provost of the University (Salovey was subsequently elected President of Yale, taking office on July 1, 2013). Bagley's Complaint stated in part: "The real reason for the nonrenewal of my appointment is gender bias, including sexual

---

[2]    The last sentence in this paragraph in text is based upon Bagley's March 4, 2013 complaint to the CHRO, at page 3, ¶ 8.

stereotyping, in violation of Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and applicable Connecticut state law." Doc. 1, ¶ 72.   In October 2012, Bagley amended her internal complaint to add a claim of age discrimination.

Provost Salovey responded to Professor Bagley's internal complaint by appointing a committee designated "the Harte Committee" (named after the SOM professor who chaired it) to investigate and draft a report concerning the Yale SOM decision not to reappoint Bagley.  The Harte Committee produced a report dated November 28, 2012 and a revised report dated March 3, 2013 (the "Revised Harte Report").  The Revised Harte Report stated that Bagley's possible reappointment had been adversely impacted by a "curricular decision about the future of the course." The report also concluded that the events leading up to Yale SOM's decision not to reappoint Bagley demonstrated variations in SOM's announced procedures adverse to Bagley.

On April 4, 2013, Salovey sent Bagley a letter stating his conclusion, based on the Revised Harte Report and input from SOM Deans Snyder and Metrick, that the standards used to review her reappointment were not made sufficiently clear to her, and issues regarding her teaching required further review.  Salovey ordered the SOM BPO to review Bagley's case "anew," after a Yale SOM faculty review committee articulated the standards for reappointment of a Professor in the Practice at the School, and explained how they applied in Bagley's case.

In June 2013, Deputy Dean Metrick advised Bagley that, in accordance with Salovey's April 4, 2013 decision, a review committee drawn from the Yale SOM faculty would review Bagley's reappointment decision and articulate the standards that should apply when reviewing Professors in the Practice.  That three-member committee was chaired by Edieal J. Pinker, a Yale SOM professor. That additional internal process availed Bagley nothing.  The Pinker Committee submitted a report

to the BPO.  On October 21, 2013, the BPO again voted against renewal of Professor Bagley's contract.  On that day Deputy Dean Metrick advised Bagley of the negative vote.  Dean Snyder, in a letter on November 7, 2013, informed Bagley that he had decided to follow the BPO's recommendation not to renew her appointment.

Professor Bagley's five-year contract with Yale SOM, extended by these lengthy but ultimately unsuccessful review processes, expires on December 31, 2014.

On March 4, 2013, Bagley filed a complaint with the CHRO.  Ex. A to Defendants' Brief [Doc. 29].  Yale University was the only named respondent.  The complaint form included a line reciting: "discriminated against in terms and conditions of employment on or about _____."  Bagley filled in the date of May 7, 2012.  The selection of that date was explained by Bagley's accompanying affidavit, which recited that Dean Snyder "advised me on May 7, 2012" that the "BPO . . . had voted against my renewed appointment to an additional 5-year term" as a Yale SOM professor. Doc. 29 at 41 (¶ 8) (parentheses omitted).   Required by the form to indicate the manners in which she had been discriminated against, Bagley inserted the phrases "not reappointed" and "denied reappointment," and checked boxes designating "harassed" and "not hired due to a disability" (without specifying a date).  Required by the form to state her belief for the cause of the complained-of discrimination, Bagley checked boxes designating "sex," "female," "physical disability," and "previously opposed discriminatory conduct."

In a Merits Assessment Review dated July 15, 2013, Ex. B to Brief [Doc. 29], the CHRO dismissed Bagley's March 4, 2013 claim for the stated reason that:

> Complainant was notified of the decision for non-renewal of her
> contract on May 7, 2012 and her complaint was filed on [M]arch 4,
> 2013.   Complainant had been notified of the alleged act of

> discrimination, that being the vote for non-renewal of her contract, three hundred and one (301) days prior to the filing of her CHRO complaint.  Complainant's claim is not timely filed as the timeframe [sic] for filing is one hundred and eighty (180) days from the date when complainant knew or should have reasonably known of the alleged act.

Doc. 29, at 51.  Bagley protested this dismissal and requested the CHRO to reinstate her complaint.  The CHRO denied that request and by letter dated September 30, 2013 gave Bagley a Release of Jurisdiction.  That letter concluded with the formal advice that "The Complainant must bring an action in Superior Court within 90 days of the receipt of this release . . . "

Bagley filed a second claim with the CHRO on December 23, 2013.  The claim form and Bagley's accompanying affidavit appear collectively as Exhibit C to Defendants' Main Brief [Doc. 29].  Bagley signified on the claim form that she also wanted the claim to be filed with the federal Equal Employment Opportunity Commission ("EEOC"). Counsel for Bagley described this second filing: "On December 23, 2013, Professor Bagley filed a second complaint with CHRO and the EEOC that encompassed allegations contained in the earlier March 2013 filing and added these additional events, including Dean Snyder's November 2013 letter denying her reappointment." Supplemental Brief [Doc. 48] at 8.[3]  The "additional events" to which counsel referred were the reviews of Bagley's case by Yale SOM, as ordered by Salovey; the attendant delays; the BPO's reiterated vote on October 21, 2013 not to renew Bagley's contract; and Dean Snyder's November 7, 2013 letter to Bagley, informing her that he had again decided not to renew her appointment. Whereas Bagley's first CHRO complaint listed only Yale University as the respondent, her second complaint again named the University, and added Rae, Snyder and Metrick as individual

---

[3]   The stated December 23, 2013 date for this second CHRO filing is erroneous. The record shows that Bagley filed her second complaint with the CHRO on December 20, 2013.

respondents.

I am satisfied by the record that in accordance with available statutory and inter-agency contractual arrangements, Bagley's filings with the CHRO, the state agency, constituted dual filings with the EEOC, the federal agency. That was the procedure provided for in the Workingsharing Agreement between CHRO and EEOC, described more fully *infra*.

On December 20, 2013, the same date on which Bagley filed her second complaint with the CHRO, Bagley filed her complaint in this Court.

In her dual filing with the agencies on December 20, 2013, Bagley requested an early right-to-sue letter from the EEOC. That agency complied, issuing to Bagley its Notice of Right to Sue dated May 22, 2014. Ex. 3 to Plaintiff's Brief [Doc. 36]. The CHRO issued a Release of Jurisdiction with respect to Bagley's second filing by letter dated June 20, 2014.

Defendants move to dismiss Plaintiff's complaint in its entirety. Plaintiff resists the motion.

### III.   DISCUSSION

In their briefs and counsel's oral submissions at the hearing, Defendants address three principal subjects, which to certain degree constitute arguments in the alternative. Those subjects are: (a) the timeliness and form of Plaintiff's filings with the EEOC and CHRO; (b) whether the Court should exercise supplemental jurisdiction over the state law claims; and (c) whether certain of the state law claims are claims upon which relief can be granted. I discuss those subjects in that order.

### A.   Plaintiff's Filings with the EEOC and the CHRO

When in the course of human events an individual is discriminated against, during his or her

pursuit of certain forms of happiness, the individual's pain is real, and if he or she proves discrimination occurred, the rule of law furnishes relief for the pain.

When an individual perceives himself or herself as a victim of discrimination, even passionately believes that to be so, the individual's pain is no less real, but if in fact discrimination did not occur or cannot be proved, the law has no remedy to offer.

In the United States, the federal government and certain states of the Union have enacted statutes which prohibit specified kinds of discrimination, establish administrative agencies for the enforcement of those statutes, and confer jurisdiction on the courts for private rights of action claiming discrimination, upon compliance with the statutory and regulatory scheme. These statutes, agencies and regulations are intended to further public policy in various ways, including providing a remedy for victims of discrimination; deterring discrimination by others; acting as a statute of repose to bar older claims; and giving administrative agencies an initial opportunity to resolve the matter before a claimant sues in court. These are benign objectives. But legal history teaches that legislative and regulatory purposes, however benign, can become fertile grounds for litigation. This case is an example of that reality.

Professor Bagley's complaint against the Yale defendants invokes federal and Connecticut state statutes which prohibit discrimination. Bagley has filed claims with the federal administrative agency (the EEOC) and the Connecticut agency (the CHRO). Connecticut, in this context, is referred to as a "deferral state." In describing the interrelation between these two agencies in the processing of a particular claim, I cannot improve upon Judge Nevas's disquisition in *Doe v. Odili Technologies, Inc.*, No. 3:96-cv-1957, 1997 WL 317316 (D. Conn. May 25, 1997):

> A deferral state is one which has its own antidiscrimination laws and

administrative agency.  Connecticut is such a deferral state.  In a deferral state, a complaint must first be filed with the state agency to give it an opportunity to resolve the suit.  In the initial sixty-day period the state agency has exclusive jurisdiction to process discrimination charges.    The state agency retains exclusive jurisdiction unless one of three events occur to trigger EEOC jurisdiction: (1) the sixty-day deferral period expires; (2) the state agency proceedings are "terminated"; or (3) the state agency waives its right to exclusively process the charge.  The EEOC does not have subject matter jurisdiction to proceed with its investigation and to issue a right to sue letter until the deferral period expires or the state agency proceedings are otherwise terminated.  Thus, if an EEOC charge is subject to deferral and is received by the EEOC, it is held in "suspended animation" until one of the three triggering events occurs to transfer jurisdiction to the EEOC.

1997 WL 317316, at *2 (citations omitted). "As a general rule, a complainant must file a discrimination charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice.  If a complainant initially institutes proceedings with a state or local agency with authority to grant such relief from the practice alleged, the time limit for filing with the EEOC is extended to 300 days." *E.E.O.C. v. Commercial Office Prods. Co.,* 486 U.S. 107, 110 (1988) (citations omitted).  *See also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days.").

The deferral period to which Judge Nevas referred in *Odili* is found in Title VII, 42 U.S.C. § 2000e-5(c), which gives the state or local agency an exclusive opportunity to resolve the complaint and requires the EEOC to defer any action on its part.  That provision has an effect upon the filing deadline with the EEOC.  "In light of the 60-day deferral period, a complainant must file a charge

with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event in order to ensure that it may be filed with the EEOC within the 300-day limit." *Commercial Office Prods. Co.*, 486 U.S. at 111.  These complications may be ameliorated by the relatively common worksharing agreements entered into between the EEOC and a state agency.  "These worksharing agreements typically provide that the state or local agency will process certain categories of charges and that the EEOC will process others, with the state or local agency waiving the 60-day deferral period in the latter instance." *Id.* at 112.

The case for the Defendants at bar is that the combined effect of the federal and state discrimination statutes and regulations, as interpreted by the courts, is to render all Plaintiff's discrimination claims, federal and state, time-barred.  Accordingly they must be dismissed; and with them, by extension, all Plaintiffs' additional state and common law claims, since in Defendants' submission this Court should not, in the absence of a viable federal claim, exercise supplemental jurisdiction over state claims.  These contentions, if sound, would result in dismissal of Plaintiff's complaint in its entirety, which is the relief for which Defendants pray in their present motion.

### 1. *Federal Discrimination Claims*

I begin the analysis with the complaint's federal discrimination claims.  There are four of them: Counts One, Three, Five and Six.  Each is against Yale University alone.  Count One charges Yale with gender discrimination in violation of Title VII.  Count Three charges Yale with age discrimination in violation of ADEA.  Count Five charges Yale with retaliation in violation of Title VII.  Count Six charges Yale with retaliation in violation of the ADEA.

Defendants contend that the 300-day time limit for filing an EEOC complaint is fatal to

Bagley's federal claims.  Defendants specify May 7, 2012 as the date of "the conduct that forms the basis of the plaintiff's claim."  Main Brief [Doc. 29] at 12.  That is the date when the Yale SOM BPO voted to recommend to Dean Snyder that Bagley not be reappointed.  It is also the date Bagley chose in her first CHRO filing to designate when Yale discriminated against her.  Bagley's first CHRO complaint was filed on March 4, 2013.  In Defendants' view, the 60-day deferral period means that Bagley's "charge of discrimination was not *officially filed* with the EEOC" until 60 days later, on May 3, 2013, brief at 12 (emphasis added), a date more than 300 days after the complained-of conduct.  Defendants add in a footnote to their brief, at 13 n. 3, that "even if calculated from the date of Dean Snyder's May 24, 2012 letter [accepting the BPO's recommendation and notifying Bagley that he would not reappoint her], the plaintiff's *May 3, 2013* charge with the EEOC did not occur within 300 days."  (emphasis added).  Counsel for Defendants reiterated that contention during oral argument.  Mr. Noonan said that Bagley's first EEOC filing "is not *deemed filed* until 60 days after the filing with the state agency.  So, in any event, I believe they are well past the 300-day limit."  Tr. 9 (emphasis added).[4]

It is important to note that the 60-day deferral period is the only vehicle available to Defendants for positioning Bagley's first EEOC filing on a date which is past the 300-day limit.  If one takes May 7, 2012 as the date when the alleged discrimination occurred, and March 4, 2013 as the date of the EEOC filing (dually with CHRO), the EEOC filing was timely under the 300-day limit.  March 3, 2013 was a *Sunday.*  The EEOC's official publication provides under the caption "Time Limits for Filing a Charge" that "Holidays and weekends are included in the calculation, although if the deadline falls *on a weekend* or holiday, you will have *until the next business day.*"

---

[4]  "Tr." references are to the transcript of the June 25, 2014 hearing.

(emphasis added).  Courts considering the question also reach that result by applying the guidelines set forth in Rule 6(a), Fed. R. Civ. P.

Specifically, district courts that have addressed the proper calculation method for timeliness of an EEOC complaint in a federal discrimination action have employed Rule 6(a), Fed. R. Civ. P. *See, e.g., Gamas v. Anheuser-Busch, Inc.*, No. Civ. 03-89-PB, 2005 WL 419690, at *2 (D.N.H. Feb. 23, 2005) ("it is reasonable to assume that the drafters of the 300–day limitation period [for an EEOC complaint] had Rule 6(a) in mind when they enacted the limitation period" in Title VII); *Davitt v. Open MRI of Allentown, LLC,* No. Civ.A. 03–5612, 2003 WL 23162429, *4 (E.D.Pa. Oct. 8, 2003) (holding plaintiff's filing of EEOC complaint timely under Rule 6(a) because  "Fed. R. Civ. P. 6 applies to time calculations made pursuant to [Title VII] section 2000e[,] *et seq* . of Title 42"); *Bethelmie v. New York City Health and Hospitals Corp.,* No. 00 CIV. 3707(FM), 2001 WL 863424, at *2 (S.D.N.Y. July 31, 2001) (in the context of Americans with Disabilities Act ("ADA"), "pursuant to Rule 6(a), Saturdays and Sundays must be included in calculating whether Bethelmie's ADA claim was timely filed with the EEOC"); *Bonebrake v. West Burlington Ind. Sch. Dist*., No. 3–99–CV–90209, 2001 WL 901265,  *4 (S.D. Iowa Aug. 9, 2001) ("The Court holds that the ADEA is an applicable statute for purposes of Rule 6(a) and therefore the 300 day filing period may not expire on a Sunday.").[5]

---

[5]  Rule 6(a) provides general guidelines regarding the computation of filing  periods under the Federal Rules of Civil Procedure, any local rule of a district court or court order, and "any statute that does not specify a method of computing time."  Because "Title VII does not have its own time computation rule and the statute's implementing regulations are also silent on the subject," it "makes . . . sense to construe the filing requirement in light of the time computation rule set forth in the Federal Rules of Civil Procedure."  *Gamas*, 2005 WL 419690, at *2.  It thus follows that "[e]very circuit court that has addressed the issue in the context of Title VII's general statute of limitations has endorsed this view and construed the limitation period in accordance with Rule 6(a)."  *Id.* (gathering cases).

Rule 6(a)(1)(C)  explicitly provides that in computing time periods, one must "include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the *period continues to run until* the end of the *next day that is not a* Saturday, *Sunday*, or legal holiday."  Fed. R. Civ. P. 6(a)(1)(C) (emphasis added).  Courts have therefore found timely an EEOC filing on a Monday where the deadline would otherwise have been Sunday.  *See, e.g., Bonebrake*, 2001 WL 901265, *4 (holding "the 300 day filing period"  for filing an EEOC Complaint in an ADEA action "may not expire on a Sunday" so complaint filed on Monday, 301st day, was timely).  *See also Kane v. Douglas Elliman, Hollyday & Ives*, 635 F.2d 141, 142 (2d Cir.1980) (applying Rule 6(a) "in light of the purposes intended to be served by Title VII" and allowing plaintiff the "full span" of days to file Title VII complaint in federal court on Monday, where last day to file would otherwise have been a Sunday).

It is clear, therefore, that if the timeliness of Bagley's first EEOC complaint turned solely upon whether her March 4, 2013 filing fell within the 300-day limit, the filing was timely. Accordingly, in order for Defendants to succeed on their contention that Bagley's first EEOC filing was untimely, they must show that for the purpose of calculating timeliness, the dual EEOC filing on March 4, 2013 should be disregarded as a nullity.   Defendants must argue that only on May 3, 2013, at the end of the 60-day deferral period, did the statutory scheme confer upon Bagley's EEOC filing the state of grace of being "officially filed" or "deemed filed": until then, in any meaningful sense, this EEOC complaint had not been filed at all.  Bagley's initial EEOC filing was untimely, Defendants' argument concludes, because by the time the 60-day deferral period had passed, the 300-day limit for filing a charge with the EEOC had also run out.

14

Thus stated, Defendants' proposition seems almost counterintuitive.  But Defendants appropriately cite the Supreme Court's decision in *Mohasco Corp. v. Silver*, 447 U.S. 807 (1980), in which the Court held 6-3 that the word "filed" in § 706(c) (the 60-day deferral provision) and in § 706(e) (the 300-day limit provision) of Title VII, 42 U.S.C. §§ 2000e-5(c) and (e), had the same meaning.  The consequence, Justice Stevens wrote in his majority opinion, was that § 706(c), in plain terms

> prohibited the EEOC from allowing the charge to be filed on the date the letter was received. Although . . . it was proper for the EEOC to hold respondent's complaint in suspended animation, automatically filing it upon termination of the State proceedings, that means that the charge was filed on the 351st day, not the 291st.  By that time, however, the 300-day period had run and the filing was therefore untimely.

447 U.S. at 817 (citations and internal quotation marks omitted).

This ruling alerted the careful practitioner in a deferral state case to file a discrimination claim with the EEOC within 240 days of the charged conduct, so that if the state or local agency did nothing with the claim during the next 60 days, the claimant would have one day remaining in the 300-day period for his EEOC claim to become "officially filed" and take on a life of its own.  That practical consequence of *Mohasco* particularly irritated Justice Blackmun, who stated in his dissent, joined by Justices Marshall and Brennan:

> I believe that the Court's decision neither is correct as a matter of statutory construction, nor does it dispel the existing decisional conflict, in an acceptable fashion.
> . . .
> The rule the Court adopts today requires a Title VII complainant residing in a deferral State to file a charge of employment discrimination within 240 days of the allegedly unlawful act, in order to be certain that his complaint is timely. Yet the numeral "240" nowhere appears in Title VII.

> . . .
>
> . . . [I]t is important to note that the EEOC, the agency charged by
> Congress with administering Title VII, has always treated as timely
> a charge filed within the 300-day period specified in § 706(e), without
> regard to the 60-day deferral period specified in § 706(c).

447 U.S. at 826, 827, 828-29.

If the majority opinion in *Mohasco* were the last word on the subject, Defendants would win the argument on this point.  For the reasons stated, Bagley is entitled to the conclusion that the filing of her first EEOC complaint on March 4, 2013, occurred *within* Title VII's 300-day period.  But *Mohasco* held that an otherwise timely filing does not save an EEOC complaint if the 60-day deferral period kicks in and carries the effective date of the EEOC filing forward in time to the end of those 60 days, a date *outside* the 300-day period.  *Mohasco* holds that the 60-day deferral period transforms a timely EEOC filing into an untimely one.  That is what Yale says occurred in the case at bar.

Yale's argument fails because the *Mohasco* majority opinion is not the last word on this subject.  Eight years later, the Supreme Court decided *E.E.O.C. v. Commercial Office Products, Inc.*, 486 U.S. 107 (1988).  Justice Marshall's majority opinion considered § 706(c)'s 60-day deferral period in the context of a worksharing agreement between the EEOC and state or local agencies. (There was no worksharing agreement in *Mohasco*).  Section 709(b) of Title VII, 42 U.S.C. § 2000e-8(b), authorizes the EEOC to "enter into written agreements" with state and local agencies to promote "effective enforcement" of the Act.  In *Commercial Office Products* the Court noted that pursuant to that congressional authority, "EEOC has entered into worksharing agreements with approximately 81 of 109 authorized state and local agencies."  486 U.S. at 112.

The question presented in *Commercial Office Products* was:

> whether a state agency's waiver of the 60–day deferral period,

16

> pursuant to a worksharing agreement with the EEOC, constitutes a
> "termination" of its proceedings so as to permit the EEOC to deem a
> charge filed and to begin to process it immediately. This question is
> of substantial importance because the EEOC has used its statutory
> authority to enter into worksharing agreements with approximately
> three-quarters of the 109 state and local agencies authorized to
> enforce state and local employment discrimination laws.

*Id*.

The Court answered the question presented in the affirmative.  It held:

> Because we find that the extended 300-day federal limitations
> period is applicable to this case and that the CCRD's [state agency's]
> waiver of the 60-day deferral period "terminated" its proceedings
> within that 300-day limit, we conclude that Leerssen's claim was
> timely filed under Title VII.

486 U.S. at 125.

Justice Marshall's reasoning for this result applies directly to the case at bar, and

I quote it at some length.  Rejecting precisely the same argument made by Yale in this case, Justice

Marshall said:

> The most dramatic result of respondent's reading of the deferral
> provisions is the preclusion of any federal relief for an entire class of
> discrimination claims.   All claims filed with the EEOC in
> worksharing States more than 240 but less than 300 days after the
> alleged discriminatory event, like Leerssen's claim in this case, will
> be rendered untimely because the 60–day deferral period will not
> expire within the 300–day filing limit. Respondent's interpretation
> thus requires the 60–day deferral period — which was passed on
> behalf of state and local agencies — to render untimely a claim filed
> within the federal 300–day limit, despite the joint efforts of the EEOC
> and the state or local agency to avoid that result. As petitioner
> epigrammatically observes, a claim like Leerssen's that is filed with
> the EEOC within the last 60 days of the federal filing period is "too
> early until it is too late."

*Id*. at 120.  The Court refused to accept "an interpretation of the language of § 706(c) [which] leads

to absurd or futile results plainly at variance with the policy of the legislation as a whole," *id.* (citations, internal quotation marks and ellipses omitted), and further held that "other, related sections of Title VII . . . reinforce our reading of the legislative history that the 1964 Congress did not intend to preclude *the operation of the waiver provisions of the worksharing agreements now widely in force.*" *Id.* at 121 (emphasis added).

The Supreme Court's rulings and rationale in *Commercial Office Products* govern the case at bar because, like Colorado in that case, Connecticut in this case entered into a worksharing agreement with the EEOC. The EEOC - Connecticut agreement, in the record as Doc. 48-3,[6] refers to the Connecticut Commission on Human Rights and Opportunities as "the FEPA,"Article I.1., and provides in pertinent part:

II.  FILING OF CHARGES OF DISCRIMINATION

A.     In order to facilitate the assertion of employment rights, the EEOC and the FEPA each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges. . . .

. . .

D.     Within ten calendar days of receipt, each Agency agrees that it will notify both the Charging Party and the Respondent of the dual-filed nature of each such charge it receives for initial processing and explain the rights and responsibilities of the parties under the applicable Federal, State or Local statutes.

. . .

III.  DIVISION   OF   INITIAL   CHARGE-PROCESSING RESPONSIBILITIES

---

[6]  The Worksharing Agreement between the CHRO and EEOC in evidence was signed on behalf of both agencies in October 2012 to cover Fiscal Year 2013, and was extended for Fiscal Year 2014 by addendum executed in November 2013.

. . . . [T]he primary responsibility for resolving charges between the FEPA and the EEOC will be divided as follows:

A.      The EEOC and the FEPA will process all Title VII, ADA, GINA, and ADEA charges that they originally receive.

1.      For charges originally received by the EEOC and/or to be initially processed by the EEOC, the FEPA waives its right of exclusive jurisdiction to initially process such charges for a period of 60 days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day.

The last-quoted paragraph is a textbook example of the sort of worksharing agreement waiver provision the Court validated in *Commercial Office Products*. It follows that when it comes to determining the timeliness of Bagley's first EEOC complaint against Yale, the 60-day deferral provision has no office to perform. For the reasons previously stated, Bagley's first federal complaint was timely filed within the 300-day limit.[7] It asserts claims under Title VII and the ADEA.

The timeliness of Bagley's first EEOC complaint diminishes the significance of her second administrative complaint, filed on December 20, 2013. As noted, the second complaint (dual in nature, to the EEOC and CHRO) added more recently occurring SOM actions adverse to Bagley: the BPO's second vote in October 2013 not to renew Bagley's contract, Dean Snyder's second letter to Bagley in November 2013 denying her reappointment. The second EEOC complaint also added Rae, Snyder and Metrick as respondent parties. Given the Court's conclusion that Bagley's first EEOC filing was timely, Bagley need not rely on her second complaint (which even Defendants agree was

---

[7]      *Commercial Office Products* was cited and applied in *Ford v. Bernard Fineson Development Center*, 81 F.3d 304, 311 (2d Cir. 1996), where the Second Circuit said: "As Congress recognized, 'termination' of the state agency's proceedings prior to the expiration of the 60-day period would automatically signal the agency's approval of federal entry into the case. A blanket *waiver* of the state agency's 60-day priority rights gives a similar signal, and is thus consistent with the goal of allowing states a limited priority if they want to exercise it." (emphasis in original).

timely) as her only *entrée* to the jurisdiction of this federal district court.  The timeliness of the first complaint also disposes of Defendants' argument, pressed during oral argument, that Bagley's justiciable claims in this action are limited to new claims asserted for the first time in the second complaint.[8]

The Defendants also contend that Bagley's second complaint cannot serve as a predicate to her action in this Court because, at the time she filed her complaint in this action, the EEOC had not issued a right to sue letter.  That assertion is both accurate and unsurprising, the latter because Bagley filed her complaint in this case on December 20, 2013, the same day she filed her second EEOC complaint.  The EEOC issued Bagley a right to sue letter dated May 22, 2014.

Defendants filed their main brief [Doc. 29] in support of the present motion to dismiss on March 20, 2014.  The EEOC had not yet issued its right to sue letter, a circumstance which

---

[8]   Although for the reasons stated in text I need not reach the question, I think it clear that the most recent acts of the SOM faculty committee and Dean Snyder, which finally put an end at the University level to Bagley's hope of reappointment after months of internal protest and review involving the same individuals and claims of discrimination, constitute a continuing violation, as that concept is defined by Second Circuit authority.  "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims or acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Oneida County*, 375 F.3d 206, 220 (2d Cir. 2004), *quoting Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir. 1993), *cert. denied*, 511 U.S. 1052 (1994)).  *See also Lunardini v. Massachusetts Mutual Life Ins. Co.*, 696 F.Supp.2d 149, 165 (D.Conn. 2010) (collecting cases). Yale SOM's earlier acts with respect to the renewal of Bagley's employment would be cognizable as part of an alleged continuing violation, even if (contrary to the Court's conclusion stated in text) those acts were untimely standing alone. Alternatively, the Defendants' earlier actions adverse to Bagley can be considered as relevant background evidence to support actionable claims. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) ("The statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period. But, evidence of an earlier retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'") (citing and quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Defendants urged as a ground for dismissal. Brief at 13. Bagley filed her opposing brief [Doc. 36] on May 30, 2014. By that time the EEOC's right to sue letter was at hand, which permitted the argument in Bagley's brief at 6 that "Defendants' protestation that 'at the time this lawsuit was instituted, the EEOC had not issued a right to sue letter' is of no controlling effect." Defendants do not accept that proposition. They argued in their reply brief [Doc. 39] at 2 that "the plaintiff has offered no explanation for her failure to obtain a right-to-sue letter prior to instituting the instant action. As such, there is no basis for waiving this requirement, and the defendants' motion to dismiss should be granted." During oral argument, counsel for Defendants adhered to that contention during this exchange with the Court:

> MR. NOONAN: . . . . In other words, you can't file with the EEOC and the district court on the same day.
>
> THE COURT: So what's the present implication as far as this case is concerned? A right-to-sue letter has been filed now. Has that any effect? Does that make any difference to you?
>
> MR. NOONAN: I don't think it does, your Honor. It seems to me that if the prerequisites to suit, as the *Legnani* case says, are filing a timely complaint and getting a right-to-sue letter, then it seems to me that the Plaintiffs need to have done that before filing in the district court.[9]
>
> THE COURT: Isn't there authority for the proposition that an action, a federal action, which is filed before a right-to-sue letter has been made available, that some courts seem to favor, simply, all right, stay [the] proceedings . . . until the right-to-sue letter is obtained and then full speed ahead. Isn't there some authority for that proposition?
>
> MR. NOONAN: There absolutely is.
>
> THE COURT: You don't agree with that?

---

[9]     Counsel's  reference was to  *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001).

MR. NOONAN: I don't.

THE COURT: You don't think I should follow that?

MR. NOONAN: I don't. I really think that you've got a statute that, you know, frankly dictates the way things should occur. And the fact that some courts . . . have interpreted the statute in the way that's inconsistent with the language of the statute shouldn't bind your Honor.

THE COURT: So, the position then is that the federal claims, even those which are articulated only in the second filing, those claims should be dismissed, because there was not a timely –

MR. NOONAN: Right.

THE COURT:  –  right-to-sue letter.  Is that what it comes down to?

MR. NOONAN: Right.

Tr. 11-13.

Defendants' position appears to be that Bagley's failure to exhaust administrative remedies, made manifest at the time of filing this action by the absence of an EEOC right to sue letter, cannot as a matter of law be remedied by the agency's issuance of the letter after filing of the district court complaint and before any substantive steps in the litigation: a dead hand that cannot be lifted, a state of original sin incapable of redemption. The argument is forcefully stated, but I am unable to accept it. At the hearing Mr. Noonan acknowledged that there was authority for allowing a claimant to cure an initial failure to demonstrate exhaustion of administrative remedies by submitting a post-district court complaint right-to-sue letter from the EEOC. Mr. Noonan said he did not agree with those cases. I respect his constitutionally guaranteed right to do so. But I agree with the decisions in question, because they further the salutary policies of the anti-discrimination statutes, without

22

subjecting anyone to unfair prejudice.

In *Gooding v. Warner-Lambert Co.*, 744 F.2d 354 (3d Cir. 1984), the Third Circuit, reversing the district court's refusal to allow plaintiff to amend his complaint for the purpose of alleging the EEOC's post-filing issuance of a right to sue letter, held that an EEOC right-to-sue letter "is not a 'jurisdictional' requirement in the constitutional sense, but rather a statutory requirement designed to give the administrative process an opportunity to proceed before a lawsuit is filed. The requirement was fulfilled by the issuance of the second right-to-sue letter on July 30, 1980." 744 F.2d at 358 (citations omitted). The Third Circuit repeated that theme in *Molthan v. Temple University of Com. System of Higher Education*, 778 F.2d 955, 960 (3d Cir. 1985) ("[I]n any event, the EEOC had issued a right to sue letter on the retaliation claim by the time the trial began."). In *Tlush v. Manufacturers Resource Center*, 315 F.Supp.2d 650, 655 (E.D. Pa. 2002), the district court said:

> Although plaintiff filed suit before receiving a right-to-sue letter, he received such a letter on September 27, 2001, not only prior to going to trial, but also prior to filing his complaint in the court of common pleas. Tlush's receipt of a right-to-sue letter at this early stage of the lawsuit is sufficient to cure his failure to obtain such a letter before seeking relief from the courts. Therefore, defendant's motion to dismiss plaintiff's ADA claims for failure to exhaust administrative remedies is denied.

(footnotes omitted). At least one district court in this circuit has reached the same result. In *Cassells v. University Hospital at Stony Brook,* 740 F.Supp. 143, 145 (E.D.N.Y. 1990), Judge Nickerson said:

> Defendants once more raise the argument that plaintiff's Title VII action is barred because she commenced Cassells II prior to the EEOC's issuance of a right-to-sue letter on August 27, 1986. The court addressed a similar argument in its decision of December 31, 1986, which held that since there was no resulting prejudice to the defendants, plaintiff could cure her premature filing by alleging the

> subsequent issuance of a right-to-sue letter in the amended complaint.
> This she has done. See Amended Complaint, ¶ 10.

Bagley's brief [Doc. 36] at 6 cites decisions to the same effect from the Fourth, Fifth and Sixth Circuits.

The sensible and fair rule to be derived from cases such as these is that a Title VII plaintiff cannot go to trial in a federal court unless the EEOC has issued a right to sue letter, but the initial absence of the letter may be cured by its subsequent issuance, so long as the case is in its early stages and the interim does not cause unfair prejudice to the defendant. This is the rule I will apply in the case at bar.

The Defendants do not cite a Second Circuit case directly addressing this particular question, and my research has not unearthed one. In *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000), the Second Circuit cited *Gooding* as illustrating "what the overwhelming majority of other circuits have held: as a general matter, the failure to exhaust administrative remedies is a precondition to bringing a Tile VII claim in federal court, rather than a jurisdictional requirement," and that "obtaining a right-to-sue letter is a waivable precondition to suit, not a jurisdictional prerequisite." (citations and internal quotation marks omitted). The Second Circuit's opinion in *Francis* announces its adherence to those rules.

The *Francis* opinion goes on to hold that the facts and circumstances of the case demonstrated a waiver by the defendant City of any right to complain about the plaintiff's failure to exhaust administrative remedies before filing his Title VII suit. In the case at bar, the Defendants correctly argue that there is no basis for finding such a waiver. The question may therefore be posed thus: If Bagley, upon receipt of the EEOC's right to sue letter dated May 22, 2014, had moved to

amend her complaint to allege the letter's issuance, could Defendants have opposed that motion successfully, on the ground that Bagley's second Title VII claims were forever barred by her filing this action before the issuance of an EEOC letter?  I am neither cited to nor have discovered a Supreme Court or Second Circuit case supporting that conclusion, and am thus free to reject it, as I do.  This case is at its earliest stages.  Defendants do not, and could not, argue that they have been prejudiced at all (let alone unfairly, which is what counts) by Plaintiff's five-month delay (December 2013 to May 2014) in obtaining an EEOC right to sue letter.

Nor is it of any moment that Bagley has not filed a separate motion to amend her complaint to recite the EEOC's issuance of the right to sue letter.  That formality would needlessly consume resources and increase expenses, in a case which has run up significant totals to date and promises to do much more.  If a procedural package is thought necessary, in the exercise of my discretion I construe Plaintiff's references in her brief to the EEOC letter as a speaking motion to amend her complaint accordingly, and by this Ruling grant that motion.

For the foregoing reasons, the Court concludes and holds that the violations of Title VII and the ADEA alleged by Plaintiff in her complaint in this action are in no manner or degree time-barred, nor are they barred or limited by a failure to exhaust administrative remedies, attendant upon Plaintiff's first and second dual filings of administrative complaints with the EEOC.  To the extent that Defendants' motion to dismiss the complaint is based upon such perceived deficiencies, it will be denied.

### 2.  *State Discrimination Claims*

Under the compact between the two agencies, Bagley's two complaints were filed dually with

the EEOC and the CHRO: the first complaint on March 4, 2013, and the second on December 20, 2013.  As noted *supra*, on the federal side Bagley's administrative complaint alleged violations of Title VII and the ADEA.  On the state side, her complaint alleged violations of the Connecticut Fair Employment Practices Act ("CFEPA").

The complaint Bagley filed in this Court contains these charges under the CFEPA: Count Two, gender discrimination; Count Four, age discrimination; and Count Seven, retaliation.  All three counts are against all the Defendants.  During the briefing on this motion, Bagley's counsel represented that "Plaintiff voluntarily dismisses Counts Two and Four against the individual defendants only."  Doc. 36 at 23.  For the sake of clarity, I will incorporate that concession in the Order resolving this motion to dismiss.[10]

The CHRO dismissed Bagley's first administrative complaint on the ground that it was untimely under the CFEPA.  The statute provides: "Any complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination . . . ." Conn. Gen. Stat. § 46a-82(f).  In her complaint, Bagley specified May 7, 2012 as the date Yale (the sole named respondent) discriminated against her.  She filed her first complaint on March 4, 2013, a date well in excess of 180 days, and the CHRO dismissed the complaint in reliance upon that section of the CFEPA.

On this motion, Bagley contends that the CHRO's dismissal of her first complaint was contrary to governing Connecticut case law.  Bagley relies upon *Vollemans v. Town of Wallingford*, 103 Conn.App. 188 (2007), *aff'd,* 289 Conn. 57 (2008).  The plaintiff in *Vollemans*, alleging

---

[10]   The  present record does not  indicate whether Bagley's concession as to the individual defendants' non-liability under the CFEPA extends to Count Seven, a CFEPA retaliation claim pleaded against all Defendants.  Counsel for Plaintiff are directed to clarify this issue.

discriminatory termination on account of his age, was discharged on January 21, 2003.  He filed his CHRO complaint on June 3, 2003.  The CHRO concluded, and a Connecticut Superior Court agreed, that plaintiff's claim was barred by the 180-day limitations period because plaintiff received "a definite notice of his termination . . . sometime before November 13, 2002." 103 Conn.App. at 192. A divided Connecticut Appellate Court reversed.  The majority concluded that "the filing period contained in § 46a-82(e) commences upon actual cessation of employment, rather than notice thereof."[11]  *Id.* at 219 (footnote omitted).  Plaintiff's complaint was timely filed because it occurred within 180 days of the date he left work.  The Connecticut Supreme Court affirmed, saying approvingly that "the thoughtful and comprehensive opinion of the Appellate Court majority properly resolved the issues in this certified appeal," and that its own discussion "would serve no useful purpose." 289 Conn. at 61.

Bagley contends that the CHRO, in measuring the 180-day period for filing the first complaint from the date of Yale SOM's notice of the BPO action, violated the holding in *Vollemans* that the filing period "commences upon actual cessation of employment." Bagley points out that she is still employed by Yale, and will be until December 31, 2014, so her first CHRO filing cannot be untimely as a matter of law.  Yale responds[12] that precisely because Bagley has not yet been terminated, "there is no last day of employment which would mark the commencement of the 180 day time period for the filing of a complaint with the CHRO." Brief [Doc. 47] at 4.  In *Vollemans*

---

[11]   The Court notes that the Connecticut Appellate Court cited to then § 46a-82(e), which the Connecticut legislature redesignated by amendment as § 46a-82(f) in 2007.  Put simply, the former subsection (e) is the current subsection (f) in light of the addition of a subsection (c) in 2007.

[12]   Throughout this section I refer to "Yale" as the sole Defendant, given Plaintiff's voluntary dismissal of CFEPA claims against the individual defendants.  *See* text at n. 10, *supra.*

the plaintiff's employment had ceased before he filed his CHRO complaint.  Yale seems to argue that this factual difference renders the *Vollemans* decision inapplicable to the case at bar.  Bagley ripostes that "while the *Vollemans* rule tolls the statute of limitations, it does not prevent an employee from filing a claim before the last day of her employment."  Brief [Doc. 48] at 2.  That is what Bagley did; and she argues that her first CHRO filing cannot be disregarded as "too early, as *Vollemans* permits – though does not require – an employee to file *before* her last day of employment.  This affords the employee, *inter alia*, the opportunity to participate in a 'conciliation process' afer receiving notice of an adverse action."  *Id*. at 3 (emphasis in original).

This interesting debate is not resolved by the wording of the Connecticut Appellate Court in *Vollemans*.  During the court's lengthy discussion of the proper construction of the CFEPA's 180-day time limitation, it never said explicitly that an employee could file a valid claim with the CHRO before cessation of employment, or that an employee could not do so.  That particular question was not before the *Vollemans* courts.  My research has not found a subsequent case which considers it. But the rationale of the Connecticut Appellate Court indicates that it would not condemn a pre-cessation of employment claim of discrimination as premature or otherwise invalid.  The court stressed that Connecticut's "fair employment practices statutes were enacted to eliminate discrimination in employment.  They are remedial and receive a liberal construction."  103 Conn.App. at 219.  The court rejected a construction of the CFEPA that would start the 180-day clock with the giving of a notice of an employer's intent to terminate the employee at a future date as "dooming any chance at conciliation," a deplorable circumstance in view of the court's stated preference for ensuring that "the parties, and the forces of time, have had the maximum opportunity to resolve the controversy."  *Id*. at 215 (citations and internal quotation marks omitted).

Those reflections resonate in the case at bar because Bagley responded to Dean Snyder's May 2012 notice that he did not intend to renew Bagley's appointment by requesting internal reviews, including ascending the chain of hierarchy until she reached then-Provost Salovey, hoping to get Yale to change its mind.  It is something of a stretch to call these interim events an attempt at "conciliation"; it takes two to do the tango of conciliation, and Yale was clearly sitting this one out. But I think it unlikely that Connecticut appellate courts, which construe the employment practice statutes liberally and are protective of employees' rights, would condemn a pre-termination complaint as violative of the statutory scheme.

In any event, Yale cannot shelter behind the CHRO's rejection of Bagley's first complaint as "not timely" because it was filed more than 180 days after Yale notified her that her contract would not be renewed the following year.  The *Vollemans* decisions can only be read as a condemnation by Connecticut's highest courts of the time calculation CHRO used and proclaimed itself to be using. Yale's seeming effort to turn *Vollemans* to its favor, because Bagley's first CHRO filing (as well as her second) preceded the actual cessation of her employment, is not persuasive.  I conclude that there is nothing about the timing or other circumstances surrounding Bagley's first CHRO complaint that has an adverse effect upon the action in this Court or the remedies Bagley can seek to obtain during its course.

As for Bagley's second CHRO complaint, filed on December 20, 2013, Bagley is still employed by Yale, so this is another pre-cessation filing.  The discussion *supra* on that aspect of the case with respect to the filing of her first complaint would be applicable to this one.  But the question does not arise because Yale does not challenge the timeliness of Bagley's second CHRO filing.  The only argument made during the briefing and argument of this motion was that Bagley had not

received a Release of Jurisdiction letter from the CHRO.[13]  This is the same exhaustion of administrative remedies contention the Defendants made with respect to Bagley's federal claims. As did the EEOC, the CHRO has now issued to Bagley a Release of Jurisdiction letter for the second CHRO filing (the CHRO had previously given Bagley a comparable letter for her first filing).  In Part III.A.1., I concluded that the EEOC's letter cured any deficiencies with respect to Bagley's federal discrimination claims.  I apply the same reasoning, and reach the same conclusion, with respect to the CHRO's letter and Bagley's state discrimination claims.

To conclude on this aspect of the case: Plaintiff's right to assert discrimination claims and pursue remedies in this action are not barred or diminished in any manner or respect by the timing or other circumstances attendant upon her filing of administrative complaints with the EEOC and the CHRO.

**B.    Supplemental Jurisdiction over the State Law Claims**

Following the complaint's direct claims of discrimination, federal and state, there are a number of state common law or statute-derived claims which may be summarized as follows (giving the nature of the claim and the Defendant against whom it is asserted):

| | | |
|---|---|---|
| Count Eight: | breach of contract | Yale |
| Count Nine: | breach of covenant of good faith and fair dealing | Yale |
| Count Ten: | promissory estoppel | Yale |
| Count Eleven: | negligent/innocent | Yale |

---

[13]    "Release of Jurisdiction" is Connecticut *patois* for "Right to Sue," the phrase favored by the Federal anti-discrimination agency.  It is doubtful whether even a professional linguist could discern a substantive difference in their meaning and effect.

misrepresentation

| | | |
|---|---|---|
| Count Twelve: | tortious interference with advantageous and/or contractual relations | Rae |
| Count Thirteen: | tortious interference with advantageous and/or contractual relations | Snyder |
| Count Fourteen: | tortious interference with advantageous and/or contractual relations | Metrick |
| Count Fifteen: | aiding and abetting discrimination under Connecticut FEPA | Snyder |
| Count Sixteen: | aiding and abetting discrimination under Connecticut FEPA | Metrick |
| Count Seventeen: | aiding and abetting discrimination under Connecticut FEPA | Rae |
| Count Eighteen: | defamation | Rae |

The present motion reveals the Defendants' preference for a state court forum over this federal one. They make two arguments. First, because Bagley has no viable federal claim, this federal court should decline to exercise supplemental jurisdiction over the state claims. Second, even if the complaint alleges a viable federal claim, the Court should nonetheless decline to exercise supplemental jurisdiction over the state claims. The governing statute is 28 U.S.C. § 1367.

The first question does not arise because I have concluded that, at this pleading stage, Bagley's federal claims under Title VII and the ADEA will not be dismissed. After discovery is

31

completed, those claims may be subject to a motion for summary judgment in Defendants' favor. That is for the future.  There will be time then to consider what disposition should be made of Plaintiff's state law claims if her federal claims are dismissed at that later stage of the litigation.

Defendants' second argument assumes *arguendo* that Bagley's federal claims survive for a plenary trial on their merits.  Whether this Court should exercise jurisdiction over the state law claims as well depends upon the answers to two questions posed by 28 U.S.C. § 1367: (1) Does supplemental jurisdiction exist over the state law claims pursuant to § 1367(a)?  (2) If supplemental jurisdiction exists under § 1367(a), should this Court decline to exercise such jurisdiction on the basis of the factors listed in § 1367(c)?  The second question arises because "The fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so. Instead, it may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c). This decision is left to the exercise of the district court's discretion." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004).  I consider these two questions in order.

## 1.  *The Existence of Supplemental Jurisdiction*

The existence of this Court's supplemental jurisdiction over Bagley's state law claims depends upon § 1367(a), which provides in pertinent part that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

In *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003), the Second Circuit noted that "The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins

in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-29 (1966)." Under *Gibbs*, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Valencia*, 316 F.3d at 305 (citing and quoting *Gibbs*, 383 U.S. at 725). District courts apply the "common nucleus of operative fact" test in determining whether supplemental jurisdiction exists in a given case. *See, e.g., Morris v. Yale Univ. Sch. of Med.*, No. 05CV848 (JBA), 2006 WL 908155. at *3 (D.Conn. April 4, 2006). In *Briarpatch*, 373 F.3d 296 at 308, the Second Circuit said of the Article III constitutional concept: "A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative fact. That is so even if the state law claim is asserted against a party different from the one named in the federal claim." (citations and internal quotation marks omitted).

Notwithstanding Defendants' contentions to the contrary, I conclude without difficulty that Professor Bagley's state law claims derive from the same "nucleus of operative fact" as her federal Title VII and ADEA claims. All of Bagley's claims arise out of Yale's decision not to renew her contract of employment and reappoint her to the SOM faculty. That refusal to renew and reappoint is the Alpha and Omega of this case and all its ramifications: a reality revealed by revisiting the state law claims, and Bagley's contentions with respect to them:

*Breach of contract*. What contract? The express written five-year employment contract between Yale and Bagley and oral representations with respect thereto.

*Breach of covenant of good faith and fair dealing*. Where is the covenant found? In the

express and oral contracts of employment between Yale and Bagley.

*Promissory estoppel*.  Who is estopped from doing what?  Yale is estopped from changing the standards for reappointment that appeared in the employment contract with Bagley.

*Negligent/innocent misrepresentation.*  Misrepresentation by whom about what?  Yale misrepresented to Bagley, in her express employment contract and orally, that Bagley's reappointment after the five-year term would be performance-based.

*Tortious interference with advantageous and/or contractual relations.*  Interference by whom, and with what?  Interference by the individual defendants (Rae, Snyder and Metrick) with Bagley's "relationship with Yale" (*e.g.,* Complaint, ¶ 200), an obvious reference to the contract of employment between Yale and Bagley and Bagley's hope for a renewal.

*Aiding and abetting discrimination under Connecticut FEPA.*  Aiding and abetting by whom, discrimination by whom, and of what nature?  Aiding and abetting by Rae, Snyder and Metrick of discrimination by Yale in refusing to renew Bagley's employment contract.

*Defamation.*  By whom, and in what context?  Rae made disparaging remarks about Bagley's teaching abilities to SOM deans and the BPO during consideration of Bagley's reappointment (Complaint, ¶ 80).

Each of Bagley's state law claims derives from her underlying federal discrimination claims.  The complaint, while lengthy and prolix, describes the conduct of a relatively small group of individuals, over a compressed period of time, relating to a single core fact: the decision by Yale – for pure or tainted reasons, legal or illicit, defensible or indefensible – not to renew Bagley's employment to the SOM faculty.  Each state law claim charges the defendant concerned with making, influencing or furthering that core decision.  The case at bar is a quintessential example of

federal and state claims deriving from "a common nucleus of operative fact."

This case resembles *Morris v. Yale University School of Medicine*, 2006 WL 908155, decided by Judge Arterton.  The plaintiff was an African American male and former medical student who had been dismissed from the School of Medicine.  He asserted a federal claim for wrongful dismissal under the Civil Rights Act, and "common law claims for breach of contract, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and promissory estoppel."

*Id*. at *1.  Denying the defendant's motion to dismiss, Judge Arterton held:

> Notwithstanding defendant's contentions to the contrary, it appears that plaintiff's state law claims derive from the same "nucleus of operative fact" as plaintiff's Section 1981 claim, and thus that supplemental jurisdiction exists under 28 U.S.C. § 1367(a). All of plaintiff's claims arise out of his dismissal from the School's medical program, purportedly in a manner inconsistent with the policy in the student handbook . . . .

*Id*. at *3.  Judge Arterton further reasoned that since proof of plaintiff's poor performance in medical school, asserted by the School as the basis for his dismissal, was relevant to his federal civil rights claim as well as to his state law claims, "it can fairly be said that one would expect plaintiff to try all of his claims in the same proceeding." *Id*.  The same considerations apply to the case at bar. *See also Briarpatch*, 373 F.3d at 308 ("All of plaintiff's claims against Geisler Roberdeau, Inc., Phoenix, and Medavoy unquestionably derive from a common nucleus of operative fact, because they all deal with the purported sale of 'The Thin Red Line' to Phoenix.  The district court therefore has  power to hear the claims relating to breach of fiduciary duty even though these claims do not fall within the court's copyright jurisdiction.").

Supplemental jurisdiction in this Court exists over Bagley's state law claims.

## 2. *Exercise of Supplemental Jurisdiction*

Defendants' fall-back contention is that even if supplemental jurisdiction exists over Bagley's state law claims (and it does), the Court should exercise its unquestioned discretion to decline to exercise that jurisdiction. The factors relevant to that determination are found in § 1367(c). I decline to decline. Nothing in the statutory factors, alone or read in concert, provides compelling reasons to decline to exercise that supplemental jurisdiction which the justice of the cause militates in favor of the Court accepting.

Bagley's state law claims do not raise "a novel or complex issue of State law," as that phrase is used in § 1367(c)(1). The State's discrimination statute, the CFEPA, resembles the provisions of the federal Title VII and ADEA, with which the Court has some familiarity and experience. The common law claims, while important and not without their own complexities, are nonetheless creations of the *common law*; such challenges or difficulties as they present are not ascribable to *State* law. The state law claims do not predominate over the federal claims, in the manner contemplated by § 1367(c)(2); if anything, it is the reverse. The Court has not "dismissed all claims over which [it] has original jurisdiction," so § 1367(c)(3) does not apply.

Defendants appear to argue that there are "exceptional circumstances" which create "other compelling reasons for declining jurisdiction" under § 1367(c)(4). Defendants suggest that "there is a substantial risk of juror confusion if the plaintiff's state and federal claims are tried at the same time," and dismissal of the state law claims "will greatly simplify the required jury instructions." Main Brief [Doc. 29] at 21-22. There is, I confess, some appeal to counsel's professed interest in making the trial so simple that judge and jurors and judge can understand it. But that is not a justification for requiring a plaintiff to endure and pay for two rather lengthy trials when one trial,

36

albeit perhaps somewhat longer than if fewer claims were tried alone, will resolve all claims.  One

hopes the trial judge could master the complexities of appropriate jury instructions and prevent juror

confusion.[14]  In *Luongo v. Nationwide Mut. Ins. Co.*, No. 95-cv-3190, 1996 WL 445365 (S.D.N.Y.

Aug. 7, 1996), Judge Mukasey said in explaining his decision to exercise supplemental jurisdiction:

> Russo overstates the danger of confusion.  The purpose of § 1367
> is to permit the litigation of different claims together, and differences
> in damages or theories of relief are a part of every multi-defendant,
> multi-claim case.  There is no reason to believe that jurors in this case
> would not understand the explanation of relevant differences that
> would be provided in the jury charge.

1996 WL 445365, at *6.  That sensible analysis applies to the case at bar.

As for the trial evidence that would be elicited, I suspect that Defendants minimize the

amount of overlapping proof between the federal and state claims and Plaintiff maximizes it, but it

seems entirely clear that Defendants' justifications for their conduct and criticisms of Bagley's,

through their own testimony or the testimony of non-party Yale witnesses, will be in significant

---

[14]   There are ways of doing this.  The case would seem to call for a special verdict, which the trial judge would craft carefully and then read together with the jury at the end of the charge, just before jury deliberations begin.  To illustrate: "The Court: Now, members of the jury, let's look at Question 10.  Question 10 asks you: Has plaintiff proved that defendant tortiously interfered with plaintiff's contractual relations?  Answer that Question by marking the box "Yes" or the box "No."  The instructions then say: If you answered Question 10 "Yes," go on and answer Questions 11, 12 and 13.  If you answered Question 10 "No," do not answer Questions 11, 12 and 13.  Skip them and go on and answer Question 14.  Now, why did I tell you that?  Why did I say that if you answered Question 10 "No," you should skip Questions 11, 12 and 13?  It is because if you answered Question 10 "No," you are saying that plaintiff has not proved his claim of tortious interference.  Questions 11, 12 and 13 ask about the damages the tortious interference caused plaintiff.  If there was no tortious interference, there are no damages for you to award on that claim, and so you are instructed not to answer Questions 11, 12 and 13, and move on to question 14, which is about a different claim.  But if you answered Question 10 "Yes," then you have found that defendant did tortiously interfere with plaintiff's contract, and now you must find what damages that interference caused plaintiff.  You will do that by answering Questions 11, 12 and 13.  So let's look at them together.  And then we'll go on to the next page, and plaintiff's claim for defamation."  This footnote is a work of creative fiction.  It is not taken from a trial transcript.

measure the same, whether Defendants are resisting Bagley's federal claims or her state claims.  It

is the relevant *conduct* of the actors in question that counts in cases of this nature.  In *Morris*, 2006

WL 908155 at *3, Judge Arterton quoted with approval this language from *Luongo*, uttered by Judge

Mukasey in further explanation of his denial of a motion to dismiss state law claims

> where state law claims derived from the same set of facts as plaintiff's
> Title VII claim, were based on essentially the same conduct, and
> where even though the standards of individual defendant's liability
> would differ from the standards for the employer's liability, the claims
> still required many of the same witnesses, much of the same
> evidence, and determination of many of the same facts.

(internal quotation marks, brackets, italics, and ellipses omitted).  In this respect, *Luongo* holds a

mirror up to the case at bar, the resemblance is so pronounced.

As did Judge Arterton in *Morris* and Judge Mukasey in *Luongo*, I exercise my discretion in

favor of exercising supplemental jurisdiction over the state law claims in this case.  Defendants'

thorough and well-researched brief cites a number of district court cases where supplemental

jurisdiction was declined.  The determinative factors on the issue are fact-intensive.  The able and

experienced district judges who declined supplemental jurisdiction in the cases Defendants cite

exercised their discretion in that fashion on the basis of their evaluation of the particular

circumstances of those cases.  Given the circumstances of this case, it would border upon an abuse

of discretion for this Court to try Bagley's federal claims but require her to try her state claims in a

separate trial in state court.[15]

---

[15] The status of state claims in this analysis of supplemental jurisdiction extends to Bagley's
discrimination claims under the CFEPA.  In the absence of diversity of citizenship, a federal district
court does not have subject matter jurisdiction over a Connecticut CFEPA claim, which for this
jurisdictional purpose is regarded as a state law claim.  *See Rebaudo v. AT&T Services, Inc.*, No.
3:09-CV-437, 2011 WL 3475453 (D.Conn. Aug. 9, 2011); *Duncan v. Town of Brookfield*, No. 3:98-
CV- 1919, 2003 WL 22119179 (D.Conn. Aug. 22, 2003).

For the reasons stated, Defendants' motion to dismiss the state law claims without prejudice pursuant to 28 U.S.C. § 1367(c) will be denied.

**C.   Failure to State a Claim**

Defendants' first position is that this Court should not consider Plaintiff's state law claims at all.  The Court has rejected that submission.  In the alternative, Defendants move to dismiss certain of the state law claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  The claims in question are those alleged in Counts Nine, Twelve, Thirteen, Fourteen and Eighteen.

**1.   *Standard of Review***

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "On a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted).  In assessing the viability of a claim under Rule 12(b)(6), the question is whether the plaintiffs' well-pleaded factual allegations have "nudged their claims across the line from conceivable to plausible." *Id.* at 570.  "The plausibility standard is not akin to a probability requirement.  A well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d

Cir. 2014) (citations, internal quotation marks, brackets, and footnote omitted).

In this case, for the most part the Defendants do not challenge the sufficiency of Plaintiff's allegations to articulate a claim.  Rather, Defendants contend that Plaintiff does not and cannot allege facts sufficient to state a claim *upon which relief can be granted*, owing to the absence of an element essential to the claim asserted under governing Connecticut law.

I will discuss the challenged claims in order.

### 2.        *Count Nine – Breach of the Covenant of Good Faith and Fair Dealing*

Count Nine of the complaint begins by alleging in ¶ 178: "The express written and oral contracts between Professor Bagley and Yale contained an implied covenant of good faith and fair dealing by and between the parties, which prohibits them from engaging in any activity or conduct which would prevent the other party from receiving the benefits of the contract."  The "contract" to which the pleading refers is the five-year employment contract Bagley and Yale entered into in 2008.

Yale contends[16] that Bagley's claim for breach of the covenant of good faith and fair dealing is precluded by the existence of adequate statutory remedies through which to address her allegations.  Yale says that "in the employment context, a claim for breach of the covenant of good faith and fair dealing is identical to a claim for wrongful discharge."  Main Brief [Doc. 29] at 22. Its brief states that Bagley's "claim for breach of the covenant of good faith and fair dealing is based on defendants' alleged discrimination and retaliation," and "there are adequate state and federal remedies available to the plaintiff for vindicating the policy against discrimination in the workplace." *Id.* at 26.  Indeed, Bagley asserts claims for those statutory remedies in the earlier counts of her

---

[16]   In this sub-part I refer to Yale alone as the party defendant, since Count Nine of the complaint asserts this claim only against Yale.

complaint.  Yale cites a seemingly unbroken chain of Connecticut cases holding that statutory remedies preclude the existence of a private right of common law action for breach of the covenant.

 An illustrative case is Judge Arterton's decision in *Peralta v. Cendant Corp.*, 123 F.Supp.2d 65 (D.Conn. 2000), in which a former employee coupled a Title VII claim for gender discrimination with a claim for breach of the implied covenant of good faith and fair dealing.  Judge Arterton granted defendant's motion for summary judgment dismissing the latter claim, in the light of Connecticut court decisions that "have fairly consistently held that neither a wrongful discharge nor a breach of implied covenant claim are available where a plaintiff has adequate statutory remedies through which the alleged public policy violations can be enforced." *Id.* at 85 (citations and internal quotation marks omitted).

Plaintiff's brief acknowledges the existence of that rule of law, but contends that the rule is inapplicable because Yale does not understand the nature of her claim.  In her brief [Doc. 36] at 15, Bagley quotes Yale's assertion that in the employment context, a claim for breach of the covenant of good faith and fair dealing is "identical to a claim for wrongful discharge," and goes on to protest:

> In so arguing, Defendants conflate the causes of action for breach of the implied covenant of good faith and fair dealing as a type of wrongful termination based on breach of public policy (which, as Defendants point out, is not available when a more specific statutory remedy is available), and breach of implied covenant of good faith and fair dealing as it relates to one party to a contract depriving the other of the benefits of the contract for an improper purpose.  Because Plaintiff's complaint is based on the latter theory, Defendants' argument that her claim for breach of the covenant of good faith and fair dealing (Count Nine) should be dismissed fails.

*Id.* at 15-16.

Yale's reply paraphrases Bagley's argument as being that "because she had an employment

41

contract with Yale, the authority upon which the defendants rely is not applicable."  Reply Brief [Doc. 39] at 6.  Having constructed that target, the Defendant opens fire on it.  Yale's Reply Brief cites *Leichter v. Lebanon Board of Education*, 917 F.Supp.2d 177 (D.Conn. 2013) as holding that "the line of cases determining that a plaintiff is precluded from asserting a claim of breach of the covenant of good faith and fair dealing is not limited to at-will employees.  The plaintiff's claim in *Leichter* was dismissed even though he alleged the existence of an employment contract.  The same result should follow in the present case, and Count Nine should be dismissed."  Reply Brief [Doc. 39] at 6.

Judge Bryant's thoughtful opinion in *Leichter* merits a closer look.  As Judge Bryant noted, 917 F.Supp.2d at 194, "those cases that do find that claims for wrongful discharge or breach of implied covenant are precluded where the plaintiff has adequate statutory remedies evolved from cases where there was an at-will employment relationship."  The plaintiff in *Leichter* was terminable only for cause.  He asserted, *inter alia*, a claim for breach of the covenant of good faith and fair dealing.  Judge Bryant said of the plaintiff:

> Because the Plaintiff's employment was not terminable at-will, he is not limited to bringing a claim for breach of the covenant of good faith and fair dealing on the basis of a public policy violation. However, Plaintiff has chosen to expressly predicate his claim on the basis of such a public policy violation.

*Id*.  Plaintiff complained that his employer's conduct violated federal statutes (the ADA and 42 U.S.C. § 1983), as well as the state's CFEPA.  That choice, in Judge Bryant's view, brought plaintiff within the ambit of the claim-preclusion rule.  Having reviewed Connecticut cases, Judge Bryant reasoned that:

> the Plaintiff's claim for breach of the covenant of good faith and fair

> dealing based on violation of public policy embodied in CFEPA must be precluded as Plaintiff has failed to establish that CFEPA does not afford an adequate remedy to address the public policy violation. . . [B]ecause the Plaintiff's implied covenant claim is expressly based on a violation of the public policy embodied in CFEPA, CFEPA provides the exclusive relief.

> Plaintiff argues that this line of precedent is not applicable to his case because he was not an at-will employee.  However, Plaintiff fails to explain why this distinction makes a difference.  As discussed above, although the Plaintiff was not limited to asserting an implied covenant claim on the basis of a public policy violation as an at-will employee would be, he chose to assert this type of claim.  This Court sees no reason why the rationale of these cases would not apply to his claim where his claim is likewise predicated on the violation of public policy embodied by a statute upon which he asserts a claim and which statute he fails to establish provides an inadequate remedy. Accordingly, the Court grants Defendants' motion to dismiss . . .

917 F.Supp.2d at 195.

I agree with Judge Bryant's reasoning in *Leichter*, and adopt it in the case at bar.  Yale does not argue that its 2008 contract of employment with Bagley does not include the implied covenant; nor could it do so.  "It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship." *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 792 (2000).  "Every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Ramirez v. Health Net of Northeast, Inc.*, 285 Conn. 1, 16 n.18 (2008).  The question posed by *Leichter* and the Connecticut cases it cites is whether the *sole predicate* for Bagley's claim of breach of the implied covenant is Yale's alleged violation of the anti-discrimination statutes (gender, age and retaliation), asserted in earlier counts of the complaint.  If that be so, then the adequate remedies afforded to Bagley by those statutes preclude her common law claim for breach of the covenant of good faith

43

and fair dealing.

A careful reading of Bagley's complaint leads to the conclusion that her implied covenant claim is precluded by the statutory remedies. Under Connecticut law, a plaintiff asserting a breach of the covenant of good faith and fair dealing must prove three elements: "first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith." *Franco v. Yale University*, 238 F.Supp.2d 449, 455 (D.Conn. 2002). Accepting as I must on this motion to dismiss the truth of Bagley's well-pleaded factual allegations (and there are many of them), I conclude that the complaint states a plausible claim which satisfies all three elements of a breach of the implied covenant. However, I am unable to discern any difference in the facts which underlie the discrimination claims and the covenant claim.

The "Background Facts" alleged in the complaint, ¶¶ 15-123, precede each of the tortious interference counts. Each count repeats those allegations before turning to its substantive charge. In her brief on the breach of covenant claim, Doc. 36 at 17, Bagley defends the adequacy of the complaint's allegations that those acting on Yale's behalf were acting in bad faith by pointing to Dean Snyder's decision not to renew Bagley's contract despite the Bracken Committee's unanimous favorable recommendation; the falsity of Snyder's explanation for that decision ("no courses for her to teach"); Snyder's decision to terminate Bagley's role in a course called "State & Society" and announcing that prejudicial decision shortly before the BPO voted on Bagley's renewal; Snyder's refusal to grant Bagley the full faculty voting rights she had secured in her contract; and in the Spring

44

of 2013, when Bagley's renewal was purportedly being considered "anew," the intentional failure of "the Yale SOM leadership" to provide the Pinker Committee and the BPO with certain materials "that would be critical to their analysis, all in an attempt to manipulate the desired outcome."

All these transgressions are alleged by the complaint in paragraphs which precede all the counts and are incorporated by each count. The discrimination counts and the breach of covenant count are pleaded in the same general and inclusive fashion. Count One, the Title VII gender discrimination count against Yale, is typical of the discrimination counts, including those charging violations of the CFEPA. Count One complains of "Yale's adverse and disparate treatment of Plaintiff," and alleges that "as a result of Yale's discriminatory conduct, *and* discriminatory termination of Plaintiff," Bagley has been damaged. ¶ 129 (emphasis added). The manifest purpose of this discrimination count is to complain about all facets of Yale's conduct toward Bagley, not just her ultimate termination. Count Nine, charging the breach of the implied covenant, is cut from the same cloth. After repeating by reference the same preceding factual allegations, the count charges that "Yale breached its duty to act in good faith and in accordance with fair dealing through its *discriminatory*, retaliatory and tortious acts." ¶ 180 (emphasis added). To mix metaphors, in pleading Bagley's discrimination claims and breach of covenant claim the complaint paints with the same brush and utilizes the same bristles. The facts concerning the conduct of Yale SOM leaders that Bagley alleges to be probative of her breach of covenant claim are equally probative of her discrimination claims.

In sum: Bagley complains of Yale's "adverse and disparate" treatment of her. The recurring theme throughout these counts is that Yale treated Bagley in a disparate fashion because of her gender and age, which is to say, Dean Snyder and others in the SOM hierarchy *discriminated* against

45

her.  Such discrimination, if proved, would violate Title VII, the ADEA, and CFEPA.  There is no showing that these statutes would not afford Bagley adequate remedies.  Accordingly, Connecticut case law precludes Bagley's claim for breach of the implied covenant of good faith and fair dealing, and Count Nine will be dismissed.

### 2. *Counts Twelve, Thirteen and Fourteen – Tortious Interference with Contractual Relations*

Counts Twelve, Thirteen and Fourteen, in like words, charge that Professor Rae, Dean Snyder and Dean Metrick respectively "intentionally and unjustifiably, and with malice, interfered with Professor Bagley's advantageous and/or contractual relations" with "various entities, including, *inter alia*, Yale." It is further alleged that each of these three individuals, at the times of his intentional and unjustifiable interference, was "acting beyond the scope of his employment with Yale."

Wrongful interference with another's  business or contractual relations is a recognized tort under Connecticut law.  It consists of three elements: "In order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." *Lawton v. Weiner*, 91 Conn. App. 698, 706 (2005).  A "business relationship" includes a "contractual relationship," and the Supreme Court of Connecticut has considered a claim for tortious interference in the context of a plaintiff's contract of employment as a teacher at an educational institution.  *Appleton v. Board of Education of Town of Stonington*, 254 Conn. 205 (2000).

In the case at bar, none of the three individual defendants contends on this motion to dismiss

that Bagley's complaint, interpreted plausibly, fails to satisfy the first two elements.  The motion to dismiss focuses solely upon the third element: whether the alleged conduct of Rae, Snyder and Metrick caused Bagley to suffer "actual loss."  Defendants say that Bagley's allegations in that regard fail to state a claim, for two reasons: First, her reference to relations with "various entities" is too vague "to demonstrate the essential element of an 'actual loss'," Main Brief [Doc. 29] at 28; and second, "the plaintiff's allegation that the defendants interfered with the plaintiff's relationship with Yale is also not sufficient as the plaintiff acknowledges that she is still employed by Yale.  Because she is still employed with Yale [*sic*], she has not *yet* suffered an actual loss."  *Id.* (emphasis added).  Bagley's Brief [Doc. 36] argues at 18 that "she has clearly alleged that she suffered an actual loss, specifically, the non-renewal of her contract as a Professor in the Practice."  That does not persuade the Defendants,  whose Reply Brief [Doc. 39] at 6 recognizes that "Yale has determined it will not renew her contract upon termination," but renews the argument that "this does not constitute an actual loss because, as the plaintiff acknowledges, she is still employed by Yale," and adds (without specifics) that "it is entirely possible that when her contract does expire, the plaintiff will have obtained new employment at a salary equal to or greater than what she presently earns.  The plaintiff's claim is therefore entirely speculative and Counts Twelve, Thirteen and Fourteen should be dismissed for this reason."

The decisive phrase is "actual loss."  Many phrases in the language of the law require a degree in law for a reader to understand them: the words are in Latin, or while in English, so layered over with centuries of lawyers' usage and judicial and academic interpretation that they might as well be in Aramaic.  In contrast to these linguistic mysteries, "loss" is a common, every-day noun, modified by the equally humble adjective "actual."

47

One might approach the question in the case by imagining an encounter on the highway with that incorporeal icon of the common law, the reasonable man. The circumstances of the case are described to the reasonable man (or woman), who is then asked whether Professor Bagley suffered an "actual loss." Those narrated circumstances, taken from factual allegations in the complaint whose truth must be accepted, are that the former Dean of Yale SOM persuaded Bagley to leave her position on the Harvard faculty and accept appointment on the Yale faculty for an initial five-year term, with the promise of a multi-year renewal as long as her performance met professional expectations, a promise upon which Bagley relied in leaving Harvard and moving with her minor son to Connecticut. Bagley met and exceeded those expectations, only to have her Yale reappointment blocked by a new dean and hostile faculty colleagues, motivated by discriminatory biases, who concocted false reasons for refusing to recommend or renew Bagley's teaching contract. Yale has rejected all Bagley's internal appeals and is adamant that her employment with the University will cease on December 31, 2014, leaving Bagley at the present moment to face the possibility (perhaps probability) of unemployment, and the certainty of the destruction of her hope for a future at Yale, for which she left what would be regarded in some circles as an impressive but lesser institution to the north. "Has Bagley suffered an actual loss?" one asks the common law's reasonable man, who, availing himself of the reason and common sense with which legal tradition endows him, surely could respond "yes" without surprising his interlocutor. One has to have gone to law school to understand an argument that, in those particular circumstances, Bagley has *not* suffered an "actual loss."[17]

_____

[17] The careful reader will have observed that the "circumstances" described in this paragraph of text are drawn entirely from factual allegations in Plaintiff's complaint. Yale and the individual Defendants deny the truth of those allegations. The Court is required to accept them as true on

I went to law school and understand Defendants' argument, which is skillfully made, and would require dismissal of the tortious interference counts if I agreed with Defendants that under Connecticut law, Bagley has not yet suffered an "actual loss" at the hands of her erstwhile Yale SOM colleagues.  However, I do not accept Defendants' argument, which is not supported by the decisions of the Connecticut Supreme Court.  The only case Defendants cite in the employment contract context, *Appleton v. Board of Education of Town of Stonington*, 254 Conn. 205, involved Appleton, a long-serving teacher at a public school whose performance during the academic year came to be questioned by Rifenburg and Vacca, the school principal and a supervisor.  After reviews, conferences and a therapist's examination, Appleton and the school authorities agreed that she would finish the school year and then resign her teaching position.  Appleton did so, and then sued for tortious interference with her teaching contract.  The lower courts found that Appleton entered into this agreement voluntarily, a finding that was not disturbed on appeal.  The Connecticut Supreme Court, reversing the Appellate Court on the point and directing judgment for defendants, said:

> Because [the plaintiff] voluntarily resigned and was compensated fully until the effectual date of her resignation, she has failed to show any actual loss that she suffered as a result of the conduct of Rifenburg and Vacca.

254 Conn. at 214.

In the case at bar, it cannot be suggested that Professor Bagley is departing from the Yale SOM faculty "voluntarily" – precisely the reverse is true.  That being so, *Appleton* can be read as an indication by the Supreme Court that if the plaintiff's departure from the school faculty had been *involuntary*, the element of "actual loss" would be established.  To be sure, Appleton was

---

Defendants' motion to dismiss the complaint.  Whether Plaintiff can prove the allegations is for another day.

49

compensated fully under her contract until the date of her voluntary resignation, and Bagley will be compensated fully under her contract until the date of her involuntary and challenged termination, but that circumstantial similarity is not significant.  The underlying "actual loss" suffered by Bagley is the loss of her position on the Yale SOM faculty as the result of the alleged tortious interference of Rae, Snyder and Metrick.  The fact that Yale will be sending Bagley a few more salary checks does not alter the reality of an actual and present loss.  If one looks to the less-than-perfect analogy of the prize ring, it is as if a fighter has been knocked out and the referee has begun but not yet completed the final count of 10.  The Yale Treasurer or Comptroller, in the analogous role of referee, has begun the final count of salary payments; it may have reached 4 or 5; the count of 10 will fall on December 31 of this year; and Bagley will leave the SOM classroom (not the prize ring).  But it is contrary to reason and common sense to say that Bagley had not suffered an "actual loss" at the time she filed this action.  Bagley lost her position in the practical sense of "actual loss" when Dean Snyder sent his final letter of November 7, 2013 letter advising that he would not renew her appointment – even though Yale continued to pay her for a time.  The fighter in the analogy lost his bout when his opponent knocked him unconscious – even though the referee continued to count for a time.

It may be somewhat lacking in grace for Yale to argue that Bagley will not suffer an actual loss until her last salary check is paid, an argument seemingly implicated by use of the word "yet" in Defendants' brief – but no matter, the law does not decide issues of grace, the question on this motion is whether Connecticut appellate decisions compel this Court to conclude that Bagley's tortious interference claims must be dismissed because she has not yet suffered an actual loss.  I do not think that they do.  *Appleton* certainly does not; the decision may even point in the other

50

direction.  In contrast, Bagley finds some support in the Supreme Court's holding that "actual loss" is established if "except for the tortious interference of the defendant, there was a reasonable probability that the defendant would have entered into a contract or made a profit."  *Goldman v. Feinberg*, 130 Conn. 671, 675 (1944).  The contract in question in the case at bar is Bagley's sought-after renewed teaching contract, to which she alleges her superior performance entitled her, and was denied her by the individual defendants' tortious interference.  The defendants deny that, but it is well established that "[s]uch a determination is a question for the trier of fact, as is the question of whether the plaintiff has suffered an 'actual loss.'"  *American Diamond Exchange v. Alpert*, 101 Conn. App. 83, 97 (2007) (citations omitted).

For the reasons stated, I conclude that Plaintiff's claims for tortious interference survive Defendants' motion to dismiss them under Rule 12(b)(6).  That motion will accordingly be denied.

### 3.    *Count Eighteen – Defamation*

The final count that Defendants move to dismiss is Count Eighteen.  It is against Professor Rae only.  Professor Bagley charges that Defendant with the tort of defamation.  Rae is alleged to have defamed Bagley by false oral statements harmful to Bagley's reputation and tending to lower her in the estimation of the academic community these professors inhabited.  No written defamation is alleged.

Under Connecticut law, to establish a prima facie case of defamation "a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the paintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  *Iosa v. Gentiva Health Services, Inc.*, 299 F.Supp.2d 29, 37-38 (D.Conn. 2004) (citations omitted) (Goettel, J.).  In *U.S. ex*

*rel. Smith v. Yale University*, 415 F.Supp.2d 58. 109 (D.Conn. 2006), Judge Dorsey held that while a plaintiff "need not list the alleged defamatory statements verbatim," she "must at least plead the content of the alleged communications, when they were made, the context in which they were made, or by and to whom they were made."

In the instant case, Bagley's complaint against Rae for defamation does not sufficiently plead any defamatory statements by him about her. Some of the contrary assertions in Bagley's brief [Doc. 36] are puzzling. At page 20, the assertion that "Professor Bagley clearly identified the defamatory statements in this case" is followed immediately by a list of numbered paragraphs in the complaint, some of which say nothing about Rae or any statements by anyone (*e.g.*, ¶¶ 62, 66), others mention Rae but do not refer to any statements by him (*e.g.*, ¶¶ 43, 70). Presumably these allegations are intended to supply "the context in which" defamatory statements were made, one of Judge Dorsey's required elements, but they do not suffice to plead adequately the statements themselves. Other allegations are so vague or generalized that they do not pass muster as pleadings with the requisite specificity, as in ¶ 52: "In or around 2012, Professor Rae also began to make derogatory comments about Professor Bagley, overstate and elevate his own contributions, and work to replace her ideas and course materials with his own."

Plaintiff's brief, in defense of the sufficiency of her defamation pleading, lays particular stress upon use of the word "meltdown," which the brief seeks to ascribe to Rae. It is necessary to consider with some care Plaintiff's reference to this noun. The word first appears in ¶ 80 of the complaint, which reads in its entirety:

> The Harte Report also indicated that one or more members of the BPO either stated or were advised that Professor Bagley had been responsible for a "meltdown" in the State and Society course. Upon

> information and belief, Professor Rae used this term, among others, to falsely convey to the SOM Deans that she was at fault for any alleged – though false – problems with the course. Professor Rae's discriminatory animus and retaliatory conduct were embedded in the BPO's consideration of Professor Bagley.

The conclusory and argumentative final sentence adds nothing to the present analysis, which focuses on the alleged "meltdown" statement. The first sentence of the paragraph alleges that "one or more members of the BPO either stated or were advised" that Bagley was responsible for a course "meltdown," which falls short of saying that Rae *made* the statement (which is all that counts, one cannot commit defamation by being "advised" of anything). The second sentence alleges that "upon information and belief," Professor Rae used this term" in conveying a certain impression to the Deans, which falls short of saying that Rae uttered the term "meltdown" himself, instead of quoting to the Deans what someone else had said. If Bagley contends for the former construction, she must specify the source of her information and the grounds for her belief. The specifics of defamation pleading properly required by Judge Dorsey in *Smith* are not furnished by that convenient circumlocution "upon information and belief."

Accordingly, Count Eighteen will be dismissed for Plaintiff's failure to state a defamation claim against Rae with the requisite specificity. Leave is granted to Plaintiff, if so advised, to replead all aspects of this count, on or before September 26, 2014. The Court does not reach the Defendant's alternative grounds for the motion to dismiss: that the use of "meltdown, even if by Rae, is a non-actionable opinion, or in any event privileged. Those questions may be revisited if this count is adequately repleaded, in which event the issue will be whether the claim should be dismissed as a matter of law on the amended pleading, or await discovery to ascertain the full circumstances surrounding the making of the statement or statements of which Plaintiff complains.

*See Indiaweekly.com, LLC v. NehaFlix.com, Inc.,* 596 F.Supp.2d 497, 504-505 (D.Conn. 2009).

### III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint [Doc. 28] is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED in that:

1.  Counts Two and Four of the Complaint are DISMISSED AS AGAINST DEFENDANTS RAE, SNYDER AND METRICK ONLY.

2.  Count Nine of the Complaint is DISMISSED.

3. Count Eighteen of the Complaint is DISMISSED, WTH LEAVE TO REPLEAD.

In all other respects, the Motion to Dismiss is DENIED.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         August 26, 2014


     */s/ Charles S. Haight, Jr.*
     CHARLES S. HAIGHT, JR.
     Senior United States District Judge