EXHIBIT 7



1

Report of FAS Review Committee reviewing the complaint of Professor Constance E. Bagley

Review Committee members: Verity Harte, Professor of Philosophy and Classics (Chair); Anne L. Alstott, Jacquin D. Bierman Professor in Taxation; Margaret S. Clark, Professor of Psychology; William H. Sledge, M.D., George D and Esther S Gross Professor of Psychiatry; John P. Wargo, Tweedy/Ordway Professor of Environmental Health and Politics and Professor of Political Science.

The following report is adopted by unanimous consent of the committee.

*1. Committee Process*

On July 2, 2012, the Committee members received for review the complaint of Professor Constance E. Bagley concerning her non-reappointment as Professor in the Practice in the School of Management (letter to Provost Salovey, dated June 19, 2012, together with enclosures labeled exhibits A through Z and AA-FF).

On July 6, 2012, the Committee met with Caroline Hendel (Yale General Counsel's Office, Counsel to the Committee) to discuss the Review Process and met with Professor Bagley for a first interview regarding her complaint. Between July 19, 2012 and October 10, 2012, with a hiatus of about a month and a half during the summer vacation, the Committee interviewed the following people: Dean Ted Snyder, Deputy Dean Andrew Metrick, Professor Sharon Oster, Professor Paul Bracken, Deputy Dean Geert Rouwenhorst, former Dean of SOM Joel Podolny (by telephone), Ms Paula Blanchette, Professor Stanley Garstka, Professor Jim Baron, Professor Judith Chevalier, Professor Judith Resnik, and Professor Douglas Rae. In addition the Committee consulted with Valarie Stanley, the University's Title IX coordinator, and the Chair, on the Committee's behalf, consulted by telephone with Professor Frances Rosenbluth. On October 10, 2012, at the end of the Committee's series of interviews, the Committee met with Professor Bagley a second time. On each occasion Professor Bagley was accompanied by an advisor.

In addition to the material originally provided by Professor Bagley and conveyed to the Committee on July 2, 2012, the Committee reviewed supplementary material provided by Professor Bagley at our first meeting on July 6 and additional memoranda or materials sent to the Chair of the Committee by Deputy Provost Stephanie Spangler on Professor Bagley's behalf on August 3 (memo dated July 23) and August 23 and by Professor Bagley herself on October 8 and October 15. On October 18, the Chair of the Committee received a letter from Stephen M. Hudsworth, who accompanied Professor Bagley as her Advisor at the October 10 meeting. After confirming Professor Bagley's agreement for the Committee to be apprised of this letter, the letter was circulated to the remainder of the Committee.

The Committee, in addition, requested and reviewed various documents from the School of Management: the Review Committee Report concerning Professor Bagley's reappointment; documents from the BPO meeting that was convened to discuss and to vote on Professor Bagley's reappointment; email correspondence relating to the reappointment process; documents regarding SOM practices and procedures regarding Professors in the Practice; documents related to the search for a candidate for the Nierenberg Chair and director of the Millstein Center; documents relating to Professor Bagley's teaching award.

In the course of its deliberations, the Committee sought advice from Deputy Provost Stephanie Spangler regarding Provostial and General Counsel roles in the appointment process for Professors in the Practice in SOM and for comparable positions in other Schools at Yale. We did not consult with Dr. Spangler about the details of Professor Bagley's case; we consulted her only as to matters of general Yale policy and procedure.

BAGLEY001315

In her original complaint, Professor Bagley made three main formal charges. The original charges are:

1. That a university policy was not properly observed in the case of her reappointment.
2. That the reappointment was not adequately or fairly considered.
3. That she has been discriminated against in matters of reappointment on the basis of sex and of disability.

In material submitted to the process during the course of our investigative process, Professor Bagley added one additional charge. The newly added charge, expressed in Professor Bagley's memorandum dated July 23, 2012, is:

4. That she has been discriminated against on the basis of age.

*2. Committee Findings*

The committee found Professor Bagley's complaint to have a considerable level of complexity. Accordingly, we think our findings and conclusions are best organized under five main headings:

i. Were University Procedures properly observed in the case of Professor Bagley's reappointment?
ii. University Procedures aside, did the non-reappointment of Professor Bagley breach the obligations created by Professor Bagley's employment agreement?
iii. Gender discrimination.
iv. Disability discrimination.
v. Age discrimination.

*2.i Were University Procedures properly observed in the case of Professor Bagley's reappointment?*

Professor Bagley contends that the difference between the policies regarding Professors in the Practice and Lecturers, as articulated in Sections XI.C(3) and IV.K of the Faculty Handbook respectively, support her view that reappointment of a Professor in the Practice is not contingent on the continued need for the position.

The Committee's findings are:

(1) Section XI.C(3) makes explicit that there is no expectation or promise of tenure for Professors in the Practice in SOM.

(2) Section XI.C(3) does not make explicit reference to the Professor in the Practice position being contingent on the continued need for the position. However, this omission does not preclude the position being so contingent. In addition, section IV.K, to which Professor Bagley appeals, comes from the section of the Handbook describing Adjunct positions in FAS generally and cannot be used as a basis for comparison between standards for the position of Professor in the Practice in SOM and those of Adjunct Lecturers in SOM.

(3) Practice Positions in Yale Graduate Professional Schools: Many of Yale's graduate professional schools have the ability to make Professor in the Practice (Practice) appointments, including: the School of Management, the School of Forestry and Environmental Studies, the School of Architecture, the School of Divinity, and the School of Music. These are all described in the Yale University Faculty Handbook (Handbook). The Law School appoints clinical professors to teach students legal practice such as litigation or environmental management. The

BAGLEY001316

School of Medicine appoints professors at all levels to clinical faculty volunteer positions and has a faculty position known as "clinician" that is intended to provide an employment status for those who only provide clinical services under the auspices of the University.

(4) Those appointed to SOM Practice positions are not normally research scholars, although many have substantial publication records.

(5) SOM Practice appointments often occur due to long-standing associations of the appointees with existing tenured faculty or deans on an opportunistic basis, rather than as the product of an open and competitive search.

(6) Broadly, the purpose of these Practice positions is to infuse curricula with teaching by expert practitioners, often those in fields not currently covered by existing ladder faculty. Practice positions at the School of Management are "for practitioners or scholars whose appointments are based primarily on their distinction in one of the areas integral to the practice of management." (Handbook p. 46, version 10/24/12)

(7) In SOM, Practice appointments are not subject to Provostial approval, nor are letters of employment reviewed by the Provost's Office or General Counsel. This is largely consistent with the position for Practice appointments across the Schools.

(8) Those appointed to the Practice position in SOM must "show evidence of *significant accomplishment as either a practitioner or scholar* in their chosen area." Those appointed must demonstrate "*evidence of exemplary performance in teaching* the fundamental skills of that area of practice to others". (Handbook p. 46, version 10/24/12)[1]

(9) Those holding SOM Practice positions are not normally held to the same high standards of quality and pace of scholarship as are ladder faculty. The required pace and quality of scholarship for Practice appointments is not clearly defined, providing considerable discretion to the schools making such appointments. This lack of clear definition may create considerable stress among incumbent faculty facing reappointment decisions.

(10) Appointees in SOM may receive a 5-year Practice initial term. Terms may be shorter at the discretion of the Dean, but they may not be longer without the express approval of Yale's President. There is no limit on the number of reappointments possible, "without involving the University in either the expectation or promise of tenure." At least one SOM Practice professor has been appointed for a term longer than 5 years. Several Practice professors have been renewed multiple times.

(11) The performance of Practice professors in SOM is normally evaluated by a tenured faculty committee convened by the SOM Dean. Evaluations of incumbents must be completed by the end of the penultimate year of the initial appointment. These committees report to the Dean of SOM and to the Board of Permanent Officers (BPO). The BPO then votes on the reappointment and makes a recommendation to the Dean. The vote is advisory only.

(12) SOM Appointees to Practice Positions: The SOM has appointed eight individuals to Professor in the Positions during its history, as reported to this Committee. These individuals include:

---

[1] Italics added.

BAGLEY001317

4

- Stanley Garstka: July 1, 1983
- Roger Ibbotson: July 1, 1984
- Jeffrey Garten: November 1, 1995
- Jeffrey Sonnenfield: July 1, 2004
- Frank Fabozzi, September 1, 2006
- Constance Bagley: July 1, 2008
- Rakesh Mohan: July 1 2010
- Thomas Kolditz: July 1, 2012

With the exception of Professor Bagley and Professor Fabozzi, whose contract was not renewed, but was extended for two years, all the above have continued in their posts to the present.

(13) During the academic year 2011-12, a review committee was formed in SOM to review Professor Bagley's accomplishments and prepare a report on her case. The report was unanimous in recommending reappointment. On May 7, 2012, the BPO in SOM met to consider the reappointment of Professor Bagley. The vote was clearly negative. Acting on the BPO's recommendation, Dean Snyder wrote to Professor Bagley on May 24, 2012 formally informing her of his decision not to renew her appointment.

The Committee's conclusions are:

(a) There was no failure to follow University Procedures in the case of Professor Bagley's reappointment.

(b) The Practice rank is useful to SOM and has provided important teaching and administrative contributions within SOM's graduate and executive training programs.

(c) The term of appointment—normally 5 years—provides flexibility for SOM, like other Schools, to reevaluate its priorities in addition to the performance of appointees. As a professional school's mission and priorities evolve, and as student curricular interests and needs change, Practice positions allow the dean and BPO to adapt to evolving conditions in a reasonably efficient and timely manner.

(d) Considerable lack of clarity and transparency in appointment and reappointment criteria and processes exist within SOM Faculty Handbook policies. This lack of clarity may benefit the deans and tenured faculty, while it may disadvantage faculty who face reappointment. Faculty in these practice positions, given current policies, may have difficulty understanding how high the bar will be set relative to their teaching, scholarship, and service performance, and the nature of the standards and criteria for reappointment.

*2. ii Did Yale breach the obligations created by Professor Bagley's employment agreement?*

Professor Bagley's letters assert that Yale has failed to meet its obligations based on representations made to her, orally and in writing, about the terms and conditions of her employment at SOM. The basis for the complaint is that these representations provide Professor Bagley with contractual employment protections in addition to those provided to SOM Professors in the Practice under normal procedures (i.e., the procedures of SOM and of the University discussed under heading 2.i, above).

The primary basis for Professor Bagley's complaint is a paragraph contained in her letter of employment, dated April 8, 2008 and signed by then-Deputy Dean Stanley Garstka on behalf of SOM:

> As Professor in the Practice of Law and Management *you will be a full-time, voting member of the faculty on all matters except tenure appointments.* Under our rules

BAGLEY001318

> governing such appointments you will be reviewed in the fourth year of this appointment for continuation as a Professor in the Practice of Law and Management. *The review will be similar in process and use similar criteria to those of the review which led to this current appointment.*[2]

Professor Bagley has raised two issues with regard to the contents of this paragraph, which we term the "participation issue" and the "reappointment standards issue." We discuss each in turn.

A. The participation issue

The participation issue concerns Professor Bagley's right to attend faculty meetings and to vote. Professor Bagley's initial complaint makes reference to voting rights, and her memorandum of October 8, 2012 expresses her concern that

> I was denied a seat at the table at meetings of the full professors, thereby wrongfully eliminating my ability to participate in critical discussions of the curriculum, new hires, and my ongoing role as a senior faculty member... Had my rights been honored, I would have had ample opportunities to discuss with my senior colleagues the scope of my research and teaching and its clear furtherance of Dean Snyder's articulated vision for Yale SOM, thereby enhancing the likelihood of an informed and favorable BPO vote on my reappointment.

The Committee's findings on this issue are:

(1) We read the language of the appointment letter to guarantee Professor Bagley only those voting rights consistent with the Professor in the Practice position. It would be unusual, and probably beyond the scope of his or her authority, for a Deputy Dean (or even a Dean) to guarantee a faculty member voting rights superior to those of others in the same faculty rank. The Faculty Handbook has specific rules governing the composition of the BPO and the voting rights of ladder and non-ladder faculty, and we do not find that Professor Bagley's appointment letter grants her voting rights beyond those so specified.

(2) The University's bylaws (relevant portions of which were provided to us by Caroline Hendel) define the BPO as including only tenured professors and entrust to the BPO "matters relating to the educational policy and government of the school." The by-laws permit the BPO to refer to the faculty of the school "any matters except recommendations for appointments of Permanent Officers and the assignment of Permanent Officers to the school."

(3) The participation and voting rights of Professors in the Practice have evolved in SOM since the mid-2000s. Different Deans and Acting Deans configured faculty differently for meeting purposes, a practice that has continued with Dean Snyder. The result of these reconfigurations has been to include or exclude Professors in Practice as a group with respect to different types of meetings. We believe it is within the understood scope of decanal power to do so, as long as the Dean acts within the rules set by the Faculty Handbook.

(4) We do not find that Professor Bagley lacked opportunities for interaction with faculty colleagues, including BPO members. Outside faculty meetings, there are many avenues for interaction, including co-teaching, workshops, lunches and other social occasions, and so on. However, even if exclusion were the consequence of SOM rules on meeting attendance, we do not find that such exclusion violated the terms of Professor Bagley's employment agreement.

Conclusion: We conclude that Yale did not violate its obligations under the employment contract with regard to Professor Bagley's voting and participation rights.

---

[2] Italics added.

BAGLEY001319

B. *The reappointment standards issue*

Professor Bagley has communicated with us on several occasions in writing and in person. Based on both the language of the letter of reappointment and on contemporaneous discussions with then-Dean Podolny, Professor Bagley understood the reappointments standard expressed in the employment letter to mean that only her own accomplishments (scholarship, teaching, and citizenship) would be considered relevant for reappointment in the fourth year. Further, Professor Bagley understood that she would not be expected to produce the type or quality of scholarship that would be prerequisite for a tenured or tenure-track appointment. Instead, she would be expected to maintain the kind and quality of writing she had previously produced.

Accordingly, Professor Bagley's complaint is that her non-reappointment in 2012 violates these guarantees, because, she asserts, her scholarship, teaching, and citizenship were found to meet the standard that should properly have been employed.

The Committee's findings on this issue are:

(1) While we believe that Yale must honor commitments made in employment letters, the language in the employment letter regarding standards for reappointment is ambiguous. It is not clear what "similar in process" and "similar criteria to those of the review which led to this current appointment" are intended to mean. Without more, it would seem that both Professor Bagley's accomplishments and the school's need for her teaching were taken into account in her original hire (as they would be in any original hire of any faculty member). Thus, the bare language of the employment letter does not seem to support Professor Bagley's view that she would be reviewed based only on her own accomplishments. Based solely on the letter, it would seem that SOM had unrestricted freedom to consider both Professor Bagley's record as teacher, scholar, and colleague and the school's needs.

(2) Professor Bagley had several oral and written interactions with then-Dean Podolny and then-Deputy Dean Garstka in the course of negotiating the employment letter. These conversations, to the extent we have been able to reconstruct them, do not materially clarify the intent of the language but support competing inferences. In an email from Dean Podolny to Professor Bagley dated March 26, 2008, the Dean notes that "the BPO faculty have the right to decide that the standards for appointment to any rank can change, and those standards are ultimately a matter of faculty governance." That language standing alone would suggest that the Dean was, quite properly, warning Professor Bagley that a five-year contract is just that — a five-year obligation, with reappointment fully contingent on full BPO review. However, in the same email, the Dean says that "we can certainly affirm that [sic] the conditional on the criterion for a Professor in the Practice appointment not changing, then the conditions for reappointment will be identical to what they were for the initial appointment." That statement is unclear, but it seems to suggest that unless SOM undertook a general re-evaluation of the Professor in the Practice position, the standards for Professor Bagley's reappointment would be "identical" to the initial appointment. Additional language in the email supports the implication that, absent such a full re-evaluation of the Professor in the Practice position, Professor Bagley would be reappointed on the same quality and pace of scholarship, teaching and citizenship demonstrated at the initial appointment in 2008: "all this being said, we certainly don't anticipate them [the standards for Professor in the Practice appointments] changing... the faculty has been working through the various cases to try to evolve a practical standard, and it is clear that you met that standard, and I would anticipate your meeting it in the future."

(3) Former Dean Podolny recalled that he conveyed to Professor Bagley in conversation that a Professor in the Practice could fail to be reappointed due to "a lack of demonstrated need for someone teaching in the area or a lack of competence. But if we needed someone teaching in the area and she demonstrated competence in that area, she could not be dismissed." Dean Podolny

BAGLEY001320

7

gave the example of Stan Garstka, another Professor in the Practice, who could not (the Dean said) fail to be reappointed unless SOM stopped teaching accounting altogether.

(4) Professor Bagley relied on her understanding of the employment letter when she agreed to move herself and her young son to New Haven and when she ceased pursuit of potential offers of tenured positions from smaller colleges in Boston. Professor Bagley made it clear to Dean Podolny that she was especially concerned about the continuity of her son's education. She did not want to move her son after a short period in New Haven.

(5) The committee appointed to review Professor Bagley's reappointment examined only her teaching, scholarship, and service and reached a unanimous and positive recommendation for reappointment. The reappointment process did not include any systematic review (or, indeed, any clear statement) of the criteria for the Professor in the Practice position.

(6) Our interviews with faculty present at the BPO suggested that the report of the review committee was taken as a starting point for the discussion and not as binding on the BPO judgment. The decision of the BPO reflected a number of considerations somewhat orthogonal to the considerations of the review committee, including, in particular, the question of whether a person with the level of scholarship and teaching that satisfies the minimal requirement for the Professor in the Practice position was an appropriate use of school resources. Members of the BPO did not think Professor Bagley's scholarship rose above that level or constituted reason to reappoint in and of itself.

(7) In 2011-12, none of the SOM leaders involved in Professor Bagley's reappointment process (Dean Snyder, Deputy Dean Metrick and Professor Paul Bracken, the chair of Professor Bagley's reappointment evaluation committee) reviewed or were aware of Professor Bagley's employment letter.

(8) SOM did not conduct any systematic review of the State and Society course when the course suffered a very public meltdown in Spring 2012. Despite the importance of the course to Professor Bagley's record, and even when the deterioration of the State and Society course became widely known at SOM, SOM leaders did not engage in a thorough investigation of the situation or attempt to ascertain Professor Bagley's relative responsibility for the situation. Joint teaching reviews, we were told, were quite damaging, but no steps were taken to disentangle Professor Bagley's role and Professor Rae's role in the meltdown of the course. Our Committee heard some evidence that the SOM deans' understanding of the course's problems came primarily from reports provided by Professor Rae.

(9) The decision to terminate Professor Bagley's role in the State and Society course and to announce that termination to the BPO was made by the SOM deans in consultation with the General Counsel's office. We are not aware of the reasoning for the recommendation by the General Counsel. Based on our review, this decision seems to have deprived Professor Bagley of the benefit of an unbiased and judicious process of review that assured her an opportunity to give her account of her role in the course.

(10) Various SOM faculty had, at different points in the history of the State and Society course, expressed concern about the value of the course generally and about the value of practical law in the course, particularly. Some strong faculty voices in SOM had previously expressed the view that law, at least in the practical sense taught by Professor Bagley, should not be prominently featured in the SOM core (of which State and Society is part). Still, SOM had not initiated any systematic review either of the course as a whole or of the particular course taught by Professor Bagley and Professor Rae prior to the May 7, 2012, BPO meeting either in conjunction with or independent of a consideration of the causes for the meltdown mentioned earlier.

BAGLEY001321

(11) The reasons for Professor Bagley's non-reappointment are not entirely clear. Based on a number of accounts of the May 7, 2012, BPO meeting, we believe that the discussions and conclusions reflected the decision to remove Professor Bagley from the State and Society course going forward (thus removing a key reason for her continued presence at SOM); included complaints about shortcomings in Professor Bagley's scholarship (countered by others who contended that the quality of her scholarship had not declined compared to the initial appointment); may have reflected considerations of cost (i.e., the possibility of hiring a cheaper, adjunct professor to teach the electives that Professor Bagley taught outside State and Society); and the wish to open a more explicit collaboration with faculty in the Law School to staff the course.

(12) In the May 7, 2012, meeting, the Dean and Deputy Dean did not communicate to the BPO the reasons for terminating Professor Bagley's role as co-teacher in the State and Society course. Their failure to do so reflected generous motivations (to avoid introducing poor joint teaching reviews into the reappointment) but may also have undermined Professor Bagley's reappointment by eliminating her connection to State and Society, a core course and the foundation of her original appointment. The criteria for Professor Bagley's original appointment clearly included her role in the State and Society course, a role that was terminated without giving Professor Bagley or the BPO a clear account of the reasons.

(12) The BPO members' substantive decisions about the teaching of State and Society, about its quality and quantity of legal content, and about teaching priorities may well be wise ones, and we do not intend to second-guess the BPO's judgment. However, the BPO was not given a full account of the SOM's contractual obligations to Professor Bagley or the reasons for terminating Professor Bagley's role in the State and Society course. Had Professor Bagley been able to assert her view of her contractual rights and to defend, in a systematic way, her conduct amidst the deterioration of the State and Society course, she and the school's leaders might have come to a different and mutual understanding about the defensible contours of the rights granted by the employment agreement.

The Committee's conclusions are:

(a) Because the language of the employment letter of April 8, 2008, is ambiguous, we cannot conclude whether Yale met or failed to meet its contractual obligations to Professor Bagley.

(b) However, although the employment letter's language is ambiguous, there is no doubt that Professor Bagley relied, to her detriment, on then-Dean Podolny's representations that her own accomplishments would be the basis for reappointment, absent a wholesale (and, presumably, transparent) effort by the faculty to revise standards for all Professors in the Practice.

(c) Yale benefitted from Professor Bagley's reliance. She gave up alternative opportunities and devoted herself to the development of a new course, unique to SOM. Further, through her "citizenship" efforts, Yale benefited from her knowledge and leadership in developing Yale's Sexual Misconduct Policy.

(d) Yale benefitted from the ambiguity of the employment letter, which permitted representations (possibly misrepresentations) by the then-Dean to stand uncorrected and unaddressed.

(e) SOM's process failures compound the unfairness of construing the ambiguous employment letter to Professor Bagley's detriment: the reappointment process did not afford her a chance to engage with SOM decision-makers to invoke (and explain) her contract or to elucidate her role in the State and Society course and meltdown.

(f) Accordingly, we conclude that fairness requires some relief for Professor Bagley as she makes the transition to new employment.

BAGLEY001322

### 2. iii. Gender discrimination

Professor Bagley charges that the non-renewal of her Professor in the Practice position resulted from gender discrimination stating, "The real reason for nonrenewal of my appointment is gender bias, including sexual stereotyping, in violation of Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, and applicable Connecticut state law."

She charges that, as a woman, she was viewed as having been too aggressive in seeking a longer term contract, and in applying for the Nierenberg Chair, whereas a man, behaving in the same manner, would not have been judged in the same way. In this regard she cites Sandra Day O'Conner's opinion in the Price Waterhouse v Hopings (490 US 228 (1989)) Supreme Court case regarding standards for women's behavior differing from those for men. She charges that this is the true reason for the BPO's judgment that she is not a good "fit" for their program.

Professor Bagley further suspects that her forceful and extensive advocacy for gender equality and effective policies and procedures to prevent and sanction sexual misconduct at Yale might have negatively influenced decisions made about her reappointment and/or the School of Management's willingness to seriously consider her for an appointment as Professor in the Practice for more than five years, for tenure and/or for the Nierenberg Chair position.

Professor Bagley charges that the under representation of women at senior levels within SOM, the fact that she is the only female Professor in the Practice there, and a change in the structure of teaching awards the year she won a teaching award provide evidence of gender discrimination. She further cites a variety of ways that gender discrimination relevant to her was expressed at SOM including the pressure for women to be present only as "helpers," the creation of a hostile atmosphere by expression of and tolerance of rudeness towards her from a co-teacher and the use of discriminatory language, referring to the administrative break up of her co-teaching partnership as "getting a divorce," and an awkward response from the Dean in her inquiry as to her prospects for consideration for the Nierenberg Chair, who is reported to have "threatened to bring in someone who would 'dominate' [Professor Bagley]."

The Committee's findings are:

(1) Representation of women in SOM: Professor Bagley is the only woman who has been appointed to a Professor in the Practice position in SOM. More generally, women are underrepresented at the senior level in SOM both relative to men in SOM (over 90% of the senior faculty in SOM are male) and relative to the percentage of women at senior ranks in most other units of the university. The leadership of SOM noted that, in hiring, the issue of the need for more women is routinely raised. However, the Committee finds that in consideration of promotion this issue is neglected. The under-representation of women at SOM was not raised as an issue to be carefully considered in the reappointment decision process in Professor Bagley's case nor, according to reports by the leadership of SOM, does it appear to be routinely raised and considered at times of promotion.

(2) Evidence regarding a chilly climate for women in SOM: The committee's charge did not include investigating all instances of sexist comments or practices in SOM. Yet, in the course of our investigation we did hear reports of comments made to Professor Bagley, to other people involved in staffing the State and Society course, and to that class as a whole that a majority of the Committee thought may be deemed offensive to women. In addition some comments were made directly to the Committee as a whole during interviews characterizing Professor Bagley in a manner that may be deemed offensive to women. Not every Committee member viewed every comment that was discussed as offensive, but the Committee is in consensus that, overall,

BAGLEY001323

10

Professor Bagley was exposed to instances of inappropriate comments and behaviors based on gender.

(3) Did standards shift when Professor Bagley was considered for promotion as a result of her gender? Professor Bagley's credentials as a lawyer, textbook writer and teacher were clear when she was offered the position of Professor in the Practice and all testimony suggests that the nature of her publications remained constant and that her teaching was mostly well received and viewed by students and faculty alike, particularly early in her tenure and with the exception of the meltdown of State and Society in its later incarnation. There do appear to have been changes in the perceived programmatic needs of SOM between the time she was hired and the time she was denied promotion. These changes involved a move away from placing value on teaching business aspects of law towards new topics being increasingly emphasized in other business schools.

(4) The Committee cannot precisely identify the factors that drove this change in the perceived value of Professor Bagley's area of expertise. Any (and any combination) of the following factors may have contributed to the shift: a change in the leadership of SOM, a more general re-thinking of the value of business law among the members of the BPO relative to other topics (which itself may have been driven by emphases in other business programs), and reactions to Professor Bagley herself (possibly including negative reactions to her gender in combination with her behavior).

(5) The Committee recognizes that shifts in the criteria for positions as a result of a person's gender and behavior can occur, as noted in connection with the Price Waterhouse case raised by Professor Bagley and as documented in extensive work completed by Dr. Monica Biernat at the University of Kansas. Whether that occurred in this case is unclear. What is clear is that a shift in standards was not clearly articulated by the leadership of SOM or communicated to Professor Bagley prior to the decision on her reappointment.

(6) Effects of Professor Bagley's extensive work in setting up the University Wide Committee on Sexual Harassment and Assault: Many members of the BPO seem to have been unaware of the work Professor Bagley performed in support of the formation of this committee. Those who did know of the work praised it. The Committee finds no evidence that this work contributed to the negative decision on her promotion.

(7) Effects of asking to be considered for the Nierenberg chair, for tenure or for an extended (10 year) term of appointment: The Committee in our review of documents, interviews with the principles and by inference from their behavior found no support for gender discrimination in the consideration of the other candidates or Professor Bagley for these positions. In the case of Professor Bagley the prevailing evidence suggested that the decision was based on the judgment that the nature of her scholarship and achievements did not fit the standards appropriate to these opportunities. In the case of the other candidates, there is no evidence that there was a lack of consideration of qualified female candidates.

(8) SOM decision-makers expressed some exasperation at Professor Bagley's request for consideration for tenure and for consideration for the Nierenberg Chair. It is impossible to discern whether the exasperation was gender-inflected and what role, if any, this played in the BPO decision not to reappoint.

Committee conclusions: Drawing conclusions beyond a reasonable doubt regarding the presence or absence of gender discrimination has not proved possible in this case. Nevertheless, certain conclusions are clear.

(a) Women are seriously under-represented on the faculty of SOM (and more so than in other schools at Yale).

BAGLEY001324

(b) There is evidence that a chilly atmosphere for women did exist at SOM in contexts in which Professor Bagley was involved.

(c) The Committee finds no evidence that Professor Bagley's work on the University Wide Committee on Sexual Harassment and Assault provoked retaliation in SOM.

(d) The Committee finds no evidence that Professor Bagley's denial of the Nierenberg Chair or of a tenured position was the result of gender discrimination.

(e) There is no conclusive evidence of how, if at all, the evidence of a chilly environment we did find contributed to Professor Bagley's non-reappointment, or how, if at all, gender discrimination was a factor in that non-reappointment.

(f) The under-representation of women and the evidence of a chilly atmosphere make it possible that the standards for a second five-year reappointment shifted due to issues of gender and requests for consideration for other positions. This is particularly so in the absence of affirmative efforts to consider and examine this possibility and exposes the faculty and operations of SOM to the risk of charges of gender discrimination.

(g) Shifts in programmatic need will occur and it is reasonable to base new appointments and decisions about reappointments upon such shifts. Professor In the Practice positions appear to have been created with just this in mind. However, in the absence of clear elucidation of such shifts, the possibility remains open that the five-year reappointment of Professor Bagley was influenced by reactions to her gender in combination with aspects of her personal style and her requests for consideration of tenure, a chair, and for a longer-term reappointment.

(h) Under the circumstances, we consider the chilly atmosphere related to her teaching, the administrative failure to investigate the cause of the teaching failure of the course in such a manner to take into account Professor Bagley's perspective, and the lack of an affirmative effort to consider whether the decision-making was related to gender bias issues to be eligible for consideration in any overall remedy.

### 2. iv. Disability discrimination

The complaint of disability discrimination centers around the medical leave taken by Professor Bagley in Fall 2010, during which she did not teach her elective course, Legal Aspects of Entrepreneurship, and the teaching of an elective course, Law and Management, during the time of her leave and later, by SOM Lecturer Steve Latham. Professor Bagley alleges the Latham course to be responsible for a loss of a teaching opportunity on Professor Bagley's part attributable to her medical leave and temporary disability.

The Committee's findings on this question are:

(1) Professor Bagley identified herself as having a temporary disability, in relation to her medical leave, and requested an accommodation regarding her office location and parking space, which she was provided.

(2) Professor Bagley taught Legal Aspects of Entrepreneurship again in Fall 2011, in the year following her medical leave.

(3) Professor Latham taught Law and Management in Spring 2011 and also in Spring 2012. Since the latter coincides with a year in which Professor Bagley also taught Legal Aspects of Entrepreneurship, the two courses do not appear to be in competition with each other, nor does it appear that one substitutes for the other.

(4) Evidence regarding SOM practice regarding the teaching of electives is that there is no formal system for deciding on which courses are and are not taught; rather, the system is ad hoc and based on a survey of who is available and what they want to teach.

**BAGLEY001325**

12

Conclusion: The Committee does not find evidence of disability discrimination.

*2. v. Age discrimination*

The complaint of age discrimination centers on the appointment by Yale SOM of Senior Associate Dean David Bach and the allegation that, in the assignment of his teaching by SOM, SOM leaders deprived Professor Bagley of a teaching opportunity assigning it to someone considerably younger.

The Committee's findings on this question are:

(1) In general, according to the advice we were given, we understand that the replacement of an older teacher by a younger teacher does not in and of itself constitute evidence of age-discrimination.

(2) This situation does not in any case involve a replacement of teaching. Associate Dean Bach is assigned to teach the course, State and Society, to the Executive MBA class. This is not a course that Professor Bagley has previously taught.

(3) Associate Dean Bach was recruited to run the Executive MBA program and not to teach this—or any other specific—course.

(4) The process of assigning courses to Associate Dean Bach came after the fact of his successful recruitment.

(5) Nowhere in the discussion of the recruitment of Associate Dean Bach or the assignment of his teaching did the committee find any evidence of focus on age as a factor.

Conclusion: The Committee does not find evidence of age discrimination.


Signed on behalf of the Committee by the Chair

*[signature]*

Verity Harte
November 28, 2012

BAGLEY001326