## Yale SCHOOL OF MANAGEMENT

CONSTANCE E. BAGLEY
*Professor in the Practice of Law and Management*

PO Box 208200
New Haven CT 06520-8200
T 203 432-8398
F 203 432-9994
connie.bagley@yale.edu
mba.yale.edu/bagley

*courier*
135 Prospect Street
New Haven CT 06511

Provost Peter Salovey
Yale University
1 Hillhouse Avenue
New Haven, CT 06511

June 19, 2012

<u>Delivered by Hand</u>

        Constance E. Bagley:
        <u>Review of Nonreappointment as Professor in the Practice</u>

Dear Provost Salovey:

I, Constance E. Bagley, am filing this letter pursuant to Section III.L.3 of the Yale University Faculty Handbook to request a review by you, in your capacity as Provost of Yale University, of the decision by Dean Ted Snyder not to renew my appointment as Professor in the Practice of Law and Management at the Yale School of Management (SOM) (see Exhibit A for his letter of May 24, 2012). My current appointment ends on June 30, 2013. I base this request on my belief "(i) that a University policy has not been properly observed in the case of [my] reappointment . . . ; (ii) that [my] reappointment . . . has not been adequately or fairly considered; [and] (iii) that [I have] been discriminated against in matters of reappointment . . . on the basis of . . . sex . . . [and] disability."

Dean Snyder told me by telephone on May 7, 2012, that the vote of the Board of Permanent Officers (BPO) on my reappointment had been negative. Because we had been discussing the possibility of a ten-year renewal with the same voting rights specified in my initial appointment letter, I asked whether he meant that the ten-year term had been disapproved. He indicated that the BPO had voted against even a five-year renewal. Dean Snyder stated that the review of my work was "positive" but that there "were no courses" for me to teach. I told him that I found this outcome "shocking." (Professor and former Deputy Provost Judy Chevalier used the same word in her email to me of May 8, 2012 (see Exhibit B.).

As is evident from my personal statement and c.v. (attached as Exhibits C and D), I am an accomplished scholar and teacher with an international reputation for integrating the fields of law and management in an original and powerful way. Lund University recognized my achievements with an honorary doctorate in economics in 2011. I am a leader in my field and currently serve as President of the Academy of Legal Studies in Business. I took State and Society, a core course that had been faltering, and transformed it into a highly successful, dynamic, and managerially focused course that directly supported SOM's mission of training leaders of business and society. I won the Excellence in Teaching Award in my second year teaching at Yale and played a leadership role in developing and implementing Yale's new policies on sexual misconduct. The decision not to reappoint me is neither defensible on the record nor in accordance with Yale's policies and applicable law. Academic excellence and fair play have been sacrificed to accommodate biased notions about the proper place of women in academia in a professional school with a persistent underrepresentation of senior women on the faculty.

2

As I explain below, there is a full complement of courses I can teach. Even if my reappointment were subject to programmatic need, which it is not, the alleged absence of courses for me to teach is pretextual. The real reason for the nonrenewal of my appointment is gender bias, including sexual stereotyping, in violation of Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and applicable Connecticut state law. I also believe that my forceful advocacy for gender equality and effective policies and procedures to prevent and sanction sexual misconduct may have affected the analysis of my employment situation. Finally, I also believe that my taking medical leave to have bilateral knee replacements in the fall of 2010 adversely affected my reappointment prospects in violation of Yale policies, the Americans with Disabilities Act, the Family and Medical Leave Act, and applicable Connecticut state law.

Although Deputy Provost Stephanie Spangler and I have worked diligently to seek an informal resolution of this matter, our efforts have not been successful. She advised me on June 13, 2012, that Dean Snyder was only willing to extend my appointment for one year (that is, until June 30, 2013) with the clear understanding that I would then leave Yale. I would like to take this occasion to thank Dr. Spangler for her efforts in this regard.

## REPRESENTATIONS BY YALE REGARDING THE TERMS AND CONDITIONS OF MY EMPLOYMENT

I first came to Yale in July 2007 for a one-year term as a Visiting Associate Professor at SOM, having been recruited to Yale from Harvard Business School by SOM Dean Joel Podolny. I knew Dean Podolny from the time when we both taught at the Stanford Graduate School of Business then at Harvard Business School.

During my first couple weeks at Yale, Professor Doug Rae, chair of the Politics group, met with me to discuss the core course State and Society. He first taught this new course in the 2006-2007 academic year as part of the new integrated curriculum Dean Podolny spearheaded. Doug told me that he had put more time and effort into preparing this course than he had put into any other course for a long time and that the "results had been frankly disappointing." He explained that the course needed to be more managerially relevant and case-based and asked if I would be willing to go with him to talk with Dean Podolny to see whether we could work together to improve it. After Doug repeated what he had told me to Dean Podolny, he agreed that Doug and I would team teach the course. It should be noted, however, that my subsequent appointment as Professor in the Practice of Law and Management was not contingent on my continuing to teach that course.

### The Terms of My Initial Appointment as Professor in the Practice of Law and Management

In initial discussions concerning the circumstances under which I would be interested in remaining at Yale beyond the one-year visiting appointment, Dean Podolny proposed an appointment as a Professor in the Practice. Not being familiar with this rank, I asked him what it meant at Yale. Dean Podolny told me that I would be a full professor with the same rights and privileges as senior (that is, tenured) faculty except that I would not vote on tenure cases. He made it clear that this was not an adjunct position and added a provision to my appointment letter dated April 8, 2008, signed on behalf of SOM by Deputy Dean Stanley Garstka, confirming that I would "be a full-time, voting member of the faculty on all matters except tenure appointments" and that I would be eligible for all benefits provided senior faculty (see Exhibit E). He proposed an initial term of five years and stated that if the first five years went as expected, then I would then be considered for a ten-year term at my next review.

2

At no time until April 6, 2012, when Deputy Dean Andrew Metrick erroneously characterized my rank as an adjunct (a position he retracted on April 13), did Dean Podolny or anyone else at Yale state that my continued employment was dependent on anything other than my individual performance. When Dean Podolny and I were negotiating my appointment letter, I asked whether it would be possible to arrange for a term of more than five years. Dean Podolny responded that he had the power to make only a five-year appointment. Any longer term would require the approval of President Levin. Dean Podolny explained that Professor in the Practice Jeff Sonnenfeld had negotiated a term of sixteen years pursuant to an agreement signed by President Levin, but had, in the process, alienated a number of senior faculty members. Dean Podolny recommended that I not pursue that option because of the deleterious effect it could have on my relationship with my new senior colleagues. He assured me that there had never been a case when a professor in the practice had not been reappointed and cited Deputy Dean Garstka as an example of a professor in the practice who had been reappointed to multiple five-year terms (totally upwards of twenty years) after a review of his accomplishments by a reappointment committee every five years.

I told Dean Podolny that I had no concerns about reappointment as long as he was Dean but that I had been cautioned by our former Stanford colleague Professor Jeff Pfeffer that Joel might leave to become a university president so I should protect myself against that possibility. To address this very issue, Dean Podolny agreed to add a provision in the appointment letter stating that the same criteria would be used on renewal as used initially, which I understood to be the quality of my research, teaching, and University service. That provision states: "The review will be similar in process and use similar criteria to those of the review which led to this current appointment." (In fact, this latest review was not similar in process because one of the three members of the review committee was a professor at Yale Law School with only a courtesy appointment at SOM whereas the initial review was done by three SOM professors.) Since Section XI.C (2) of the Faculty Handbook provides, "For complete information on these [professor in the practice and associate professor in the practice] and other non-ladder ranks, consult the Dean," Dean Podolny had both apparent and actual authority to commit Yale to reappointment based on my performance. Had Dean Podolny or anyone else ever indicated that reappointment was contingent on anything other than my personal performance, I would never have accepted Yale's offer for a position with only an initial five-year term.

This issue was particularly important to me because I did not want to be in the same position I was in at Stanford when I was appointed Senior Lecturer in Law and Management. The Stanford policies and procedures expressly stated that a senior lecturer has an appointment for a continuing term unless the school elects to bring in someone in a tenure-track position in the same field. When Jim Baron was an Associate Dean at Stanford (he is now a professor at SOM), he told me that, at the same meeting at which the senior faculty at Stanford had approved my appointment as a senior lecturer, they also approved a tenure-line search for my replacement. He assured me that I would not have to leave right away, however, because (1) they might not find anyone and (2) even if they did, I would need to train and mentor this person because I was the only person who knew how to teach law to managers. Dean Podolny was well aware of what had happened at Stanford and that it was one of the main reasons I left Stanford to accept an appointment at Harvard Business School as an associate professor. Professor Jim Baron acknowledged the difference between my rank at Stanford and my rank at Yale when he sent me an email the day the BPO voted to appoint me a Professor in the Practice stating this this was what he had tried to secure for me at Stanford (see Exhibit F.). So I joined the Yale faculty based on assurances that my reappointment was dependent solely on my performance.

3

### Different Criteria Apply to Adjuncts and Lecturers Versus Professors in the Practice

This articulation of the criteria for reappointment as a professor in the practice tracks the clear distinctions drawn in Section XI.C of the University Faculty Handbook between adjunct faculty and lecturers on the one hand and professors in the practice on the other. Section XI.C (2) provides: "Definitions of non-ladder ranks in the School of Management include those in the Faculty of Arts and Sciences (See Section IV.K.) The School has the additional non-ladder ranks of professor in the practice and associate professor in the practice, described below. For complete information on these and other non-ladder ranks, consult the Dean."

Section XI.C (3) provides that appointments to the rank of professor in the practice or associate professor in the practice "may be made for terms of up to five years and may be renewed with no limit on the number of reappointments without involving the University in either the expectation or promise of tenure." In sharp contrast, the provisions dealing with adjunct faculty and lecturers and senior lecturers in Section IV.K of the Faculty Handbook expressly state: "Although appointments to this rank may be renewed, they carry no presumption of reappointment and no expectation of long-term employment at Yale." Thus, while professors in the practice are cautioned that Yale has made no promise of "tenure," adjunct professors and lecturers are cautioned not to assume that they will be reappointed or given long-term employment. The section on lecturer's further states, "Reappointment will depend on the continued need for the position, the availability of resources for the position, and the performance of the individual." Had Yale intended that reappointment of a professor in the practice be subject to "the continued need for the position" and "availability of resources for the position," the Faculty Handbook would have so provided. The fact that these two criteria are in one place and not in the other makes it clear that they are not applicable to professors in the practice.

### Other Representations by Yale

These provisions in the Faculty Handbook are fully consistent with other statements made to me by individuals in positions of authority since Dean Snyder assumed office. When Deputy Dean for Faculty Development Andrew Metrick send me an email dated October 19, 2011, about my upcoming review (see Exhibit G), he stated, "During this academic year, you will be considered for a renewal as a Professor in the Practice. As part of the extension process, a committee of faculty will review your accomplishments and will prepare a report on your case, which will then go before an SOM faculty vote. The chair of your committee is Paul Bracken." There was no mention at that time or at any time before my meeting with Deputy Dean Metrick on April 6, 2012, that any other factor would be considered in the reappointment process other than "my accomplishments." To the contrary, Andrew's email of October 19 referenced "the review of [my] accomplishments" as the sole criterion and stated that the "report on your case . . . will then go before an SOM faculty vote." Similarly, in a May 3, 2012 email, Deputy Dean Metrick stated that "the teaching stuff is important for you to tell Geert [Deputy Dean for the Curriculum Rouwenhorst] and me, but need not go to the BPO since they would not ordinarily be privy to the teaching negotiations with the Dean nor approve anyone's deal." (See Exhibit H.)

In his email of October 19, 2011, Deputy Dean Metrick instructed me to deliver my materials no later than November 11, 2011. I requested an extension so I could finish grading the final exams in my Legal Aspects of Entrepreneurship course and finish the eight chapters due my publisher for the seventh edition of my book *Managers and the Legal Environment: Strategies for the 21st Century*. After Deputy Dean Metrick told me to discuss the possibility of an extension with Professor Bracken, Paul stated in his email of November 7, 2011: "okay on Nov 21, but let's not let it slip as I want the whole thing wrapped

4

up before the break." (See Exhibit I.) I submitted my materials on November 18, 2011. Given Professor Bracken's stated desire not to have the review drag on for months and months, I was surprised to learn in January 2012 that the vote on my renewal was not scheduled to occur until April 30, 2012.

When I first met with Professor Bracken in October 2011 to discuss my review, he began by telling me, "There is no one out to get you. This being academia you can never be sure." Professor Bracken further stated that "to not get reappointed as a professor in the practice, you have to have really fucked up and you haven't. To the contrary, you have done well." He also stated that unlike in tenure cases, when senior faculty can vote against someone for any or no reason, they need a reason to vote against the reappointment of a professor in the practice. Because I knew the quality of my research, teaching, and University service, I left the meeting confident that I would be reappointed.

I found my conversation with Professor Bracken reassuring because when I had asked Deputy Dean Garstka in the spring of 2011 what I would need to do to prepare for my review the next year, he had commented, "I wouldn't worry about it. After all, it's not like you can bribe anyone. Maybe that's what Doug's [he was referring to Professor Doug Rae] is waiting for – a bribe" or words to that effect. As I explain further below, I have had increasing difficulties since 2010 getting Doug to respond in a timely manner to my emails concerning State and Society course content and materials. This led me to send Professor Rae an email on March 7, 2011 (a week before classes started) in which I stated:

> "I honestly don't know what to make of your radio silence. Are you OK? Did I offend you somehow? I'm working really hard on the course (and have been) but am getting pretty discouraged (and we haven't even started teaching yet). Oh well. As I mentioned in an earlier email, I'm headed to Puerto Rico with Christoph on Friday then return the Sat before classes begin. Hope you are OK taking the lead teaching Bechtel in Bolivia on the first day as you did last year. Your concerned and confused colleague and friend, Connie."

On March 10, 2011, I forwarded a copy of that email to Deputy Dean Garstka with the following note: "Dear Stan,
Doug never responded to even this one, which I sent Monday night. Is he OK? I'm really concerned. This is extreme even by his standards." He responded later that day, saying, "I saw Doug flr [sic] a minute on Monday and mentioned the need to finalize the syllabus. Guess it had no impact. He did go to the oral surgeon on Tuesday for several implants." (See email thread attached as Exhibit J.)

When I saw Deputy Dean Garstka in the hallway three or four weeks later, I explained that Doug's classroom behavior had become erratic (e.g., coming to class late, leaving in the middle of class, forgetting to turn off the ringer on his phone, and giving me less than an hour's notice that he would not be coming to class at all because he had to finish his talk for Bulldog Days). Deputy Dean Garstka had no explanation for Doug's behavior but he told me that Doug had complained about my assigning the book *The Myth of the Free Market* as background reading before our students left for their international trips. Deputy Dean Garstka told me that he had explained to Doug that "he could not complain about the show just as the curtain was rising." What Doug had failed to tell Deputy Dean Garstka was that he (Doug) had instructed me to assign that book and only realized later that he had meant a different book with a similar title. Doug also failed to mention that I had sent him a confirming email before assigning the book. I knew that Doug was not happy when I told him that it was too late to change the assignment because the students had already left for their trips, but that was the reality.

It was in this context that I asked Deputy Dean Garstka what I would need to do to prepare for my review the next year. That is when he made the comment about Doug's perhaps waiting for a bribe.

5

While Deputy Dean Garstka may well have meant this comment facetiously, his choice of words signaled that Doug might unfairly oppose my reappointment.

In an email dated February 13, 2012 (see Exhibit K), Deputy Dean for the Curriculum Geert Rouwenhorst confirmed my teaching schedule for 2012-2013: four sections of State and Society plus my Law for Executives Executive MBA course and Legal Aspects of Entrepreneurship, as well as giving guest lectures in other core classes. (For example, I co-teach the "ecomagination" case I coauthored in Competitor and the "Jim Flores" case I coauthored in Employee. Prior to 2012, I also co-taught a case on lead-tainted toys from China I coauthored in Professor Will Goetzmann's Integrated Leadership Perspective course.) Deputy Dean Rouwenhorst responded to my request to expand my elective Legal Aspects of Entrepreneurship from a half-semester course to a full semester course by stating that he preferred that I "not teach an overload." Thus, as of February 13, 2012, at least, there was more than enough for me to teach to meet to meet my teaching load of three semester courses (or the equivalent) per year.

On February 24, 2012, after I had finalized the syllabus for State and Society (having received no revisions to my previous drafts from Doug), Doug and I met with our teaching assistants to go over it. Less than two hours later, Doug sent me the following email: "I think the course needs to be rebalanced a bit. It is now a ton of your writing and about 70% you to 30% me in the case material. This may be my fault in considerable degree." He further acknowledged, "I know this is a lot up in the air," which was a bit of an understatement since classes started on March 19. (See Exhibit L.) To accommodate the new cases he proposed to prepare on Mory's, opposition to a proposed nine-mile bus lane from Hartford to New Britain, and the "King of Bain," I had to eliminate my cases on healthcare reform and intellectual property. Not content with these concessions by me, Doug changed the syllabus less than a week before classes started, at a time when he knew I was in Puerto Rico with my son, to eliminate the day on securities fraud and the financial crisis and replace it with yet another unwritten case on a failed attempt to sell mangoes from Haiti. These changes in the syllabus not only substantially weakened the course but also effectively "air brushed" out many of my contributions. Instead of treating me as a valued colleague, as I believe he would have done if I had been male, he saw my success in teaching and my prolific writing of SOM cases as a threat and became increasingly hostile to me.

At the suggestion of a senior faculty member, I met with Deputy Dean Metrick on February 27, 2012, to discuss both my concerns about State and Society and the effect my efforts to get Doug to complete his materials in a timely manner might have on the fairness of my review. Doug is chair of the Politics group, of which I am a member. At that meeting, Deputy Dean Metrick offered, as one option, to "pull Doug off the course" right away. He said that Doug would still get paid full salary that year but would need to teach something else the following year. He also told me that the plan for the next academic year was to have only one professor teach each core course unless there were compelling synergies that justified have two professors present. I told Deputy Dean Metrick that I did not want him to remove Doug from the Spring 2012 course and that I thought Doug would see that as the ultimate betrayal since he had brought me into the course. Instead, I asked for Deputy Dean Metrick's assurance that he would intervene if things became untenable and ensure the fairness of my review. He sent me an email (see Exhibit M) that same afternoon in which he stated:

> "Thanks for visiting me today to bring me up to speed on state and society. As we discussed, I will speak with Stan to get more background on the history here, and I promise to work with you and Doug after this semester to look for the best long-term solution for the course. I also stand ready to help if — once the semester begins — you need some intervention to help things work more smoothly.

> I also appreciate that this is a review year for you, and the dynamics of teaching and the review put you in difficult situation. I appreciate knowing these dynamics, and I will make sure to minimize any effects on your case."

The first time anyone mentioned the possibility that I would not continue teaching State and Society was when I met with Deputy Dean Metrick on April 6, 2012, to address concerns raised by the students and teaching assistants about Doug's failure to post the readings and correct assignments for the week of April 2 in a timely manner. After Doug demanded that I "take my hands off the steering wheel" and "take a mulligan" while he taught the Enron, Polaroid, and Mory's cases, I did not attend classes that week. The lead teaching assistant Jessica Aldridge sent me an email on April 3 describing the situation as a "disaster" (See Exhibit N), so on April 4 I asked Deputy Dean Metrick for another meeting, fully expecting him to make good on his February 27 promise to intervene as needed "to help things work more smoothly."

Instead, he told me at our April 6 meeting that Doug and I were "definitely getting a divorce" and that I might teach State and Society alone the next year or that Doug might teach it, in which case I would be asked to develop new entrepreneurship courses. This surprised me because things had only gotten worse since Deputy Dean Metrick had offered to take Doug off the course in February. When I asked Deputy Dean Metrick about the status of my review, he told me that the real question for adjuncts like me was not the quality of the individual but the school's commitment to an area of study. This also surprised me because my rank is Professor in the Practice not a mere adjunct. Deputy Dean Metrick also told me that SOM was making an effort to prune the number of adjuncts so being referred to as such was most troubling. After Deputy Dean Metrick told me that Dean Oster had used her authority to determine professors' course offerings to drive out even tenured faculty members, I grew concerned that I might be subject to a constructive discharge. These concerns were exacerbated when he made the following ominous comment about my future at Yale: "Assuming you even decide to stay."

Thus, rather than providing the intervention he had promised, Deputy Dean Metrick asked me to just finish out the last three weeks of the course. He told me to be prepared to teach each session alone in case Doug did not show up. He also said that he was prepared to have the course slip from an A to a B minus or so but to let him know if was slipping to a D. As I have for the last five years, I continued to do my best to teach collaboratively with Doug and did my best to make him look good even when he wandered in and out of class, but I found it increasingly difficult as he became overtly hostile to me in front of the students.

During our meeting on April 6, Deputy Dean Metrick also told me that Professor Ruth Aguilera, one of the four candidates for the Nierenberg Chair in Corporate Governance whom he had characterized in his email of January 26, 2012, as one of the four "top scholars" whom "it will be tough (but not impossible!) to persuade" to leave their home institutions (see Exhibit O), had not "gotten over the bar" so was no longer under consideration. Doug Rae chaired the search committee but was not even on Professor's Aguilera's original interview schedule (nor was Dean Snyder). I was successful in persuading Doug to at least have lunch with her before her job talk. Deputy Dean Metrick also told me that unlike Professor Aguilera, neither of the two remaining candidates (both male) wanted to run the Millstein Corporate Governance Center.

I then met with Professor (and former Deputy Provost) Judy Chevalier to discuss my meeting with Deputy Dean Metrick and asked her whether she thought I should apply for the Nierenberg Chair. She explained that the Chair and leadership of the Millstein Center might be separated but encouraged me

7

to apply for both. In reliance on that advice, I sent an email to Doug, Professor Bracken (my review committee chair) and Deputy Dean Metrick on April 12, 2012, tossing my hat into the ring for the Nierenberg Chair (see Exhibit P). I explained that I thought that Ruth Aguilera was a stronger candidate, but having been told that she was out of the running, I thought that I would be an excellent choice given my research profile, my status as a thought leader in this area, and my desire to run the Millstein Center. Doug acknowledged receipt of my email that same evening, stating, "Connie: Will do. We should talk. Best, Doug" (see Exhibit Q), but he never responded to my request for a meeting to discuss it.

That next morning, Deputy Dean Metrick asked me to meet with him, preferably before noon. As I was walking into his office, he told me that his job was to make sure that I left the room feeling much better than I had when I arrived. He acknowledged that he had erred when he had called me an adjunct faculty member in our meeting on April 6. He also apologized for not paying more attention to my concerns about the fairness of my review. Deputy Dean Metrick told me that the review committee report was "positive" and made no mention of any issues with Doug; he then assured me that I would be renewed for five years.

I thanked Deputy Dean Metrick for his apology and reassurances but told him that I still wanted to be considered for the Nierenberg Chair or at least tenure since (1) my portfolio of work since joining Yale warranted it and (2) the failure by both Dean Sharon Oster and Dean Snyder to honor the provisions in my contract re attending all faculty meetings but not voting on tenure cases suggested that institutionally Yale SOM was ill-equipped to honor such provisions absent tenure. Dean Oster had converted almost every faculty meeting into a meeting of the BPO, instead of inviting all full professors to attend all meetings, as had been the practice when Joel was Dean (see Professor in the Practice Jeff Sonnenfeld's email to me of April 16, 2012, attached as Exhibit R, in which he stated, "We used to be considered regular 'full professors' and attend ALL meetings during Jeff Garten and [sic] Joel Podolny's administration - but merely non-voting at the tenure meetings-where we still had voice in discussions. Then Sharon stopped inviting us to the tenure vote discussions. Now Andrew Metrick has reclassified our email addresses as a separate category in school mailings...").

I had not raised this issue with Dean Oster because I knew that she was only acting as dean until a permanent successor was appointed. I did raise this issue with Dean Snyder on January 5, 2012, when I realized that only tenured professors were being invited to attend a meeting at which the sole agenda item was discussion of the Leadership Development Program. Ted promised to look into it but never got back to me further. (See Exhibit S.) I was, however, invited to attend that one meeting. (When I mentioned the voting rights provision to Ted in our meeting on April 15, 2012, he acknowledged that I had "put up [my] hand" about that issue but stated they he was unwilling to agree to such a provision.)

I also told Deputy Dean Metrick that his comments on April 6, especially those that equated me with an adjunct whose continued appointment was contingent on the school's commitment to an area, had really shaken my trust in the institution. Deputy Dean Metrick then promised to perform due diligence over the weekend to determine whether it would be possible to get a tenure vote by June 30, 2012, the due date for my review as a Professor in the Practice.

I met with Deputy Dean Metrick and Dean Snyder on April 16, 2012, at which time Dean Snyder threatened to bring in someone who would "dominate" me if I pursued the Chair. When I asked about the Millstein Center, Dean Snyder and Deputy Dean Metrick told me that Ira Millstein had wanted Professor Lynn Stout of UCLA and Cornell Law Schools to run the center he had founded, but that Professor Millstein would now most likely move the center from Yale since Professor Stout was not selected for the Nierenberg Chair. (On June 18, 2012, Dean Snyder circulated an email to the SOM

faculty and staff notifying them that Professor Millstein was leaving Yale to join the joint programs at Columbia University's Law and Business Schools and had requested that his name be removed from the name of the corporate governance center. Dean Snyder also reported: "We continue to seek a senior faculty member for the Theodore Nierenberg Professorship." (See Exhibit T.)) As for tenure, Deputy Dean Metrick reported in the meeting with Dean Snyder on April 16 that it would be impossible to get a thumbs up or down by June 30, 2012. When I asked whether SOM had the same deadline as the Faculty of Arts and Sciences did to bring cases before the BPO (May 13 as I recall), they indicated that SOM did not. When I pointed out that SOM still needed someone to teach State and Society and explained how Doug had weakened the course with his last-minute substitutions, Dean Snyder replied: "Assume that I have State and Society taken care of." (At no time was I invited to a faculty meeting where State and Society was discussed.) He then asked me point blank whether I was willing to stay only if I taught State and Society. I responded, "No. You are my dean. I'll teach what you want me to teach." I did explain that I was concerned with being expected to do as many as six new preps (I owe SOM three full semester courses per year, or six half courses), especially given all the materials I had written for State and Society over the last five years. Dean Snyder reassured me that there would be appropriate ramp-up time to develop new courses. The meeting concluded with both Dean Snyder and me agreeing that we had a lot to think about.

I met with Dean Snyder and Deputy Dean Metrick again on April 25, at which point Dean Snyder told me that he was unwilling to create a tenure line in legal studies. He then instructed me to meet with Deputy Dean Metrick to discuss what reappointment terms at the rank of professor in the practice would be acceptable. Deputy Dean Metrick told me that the vote on the renewal of my reappointment was now scheduled for May 7, 2012, so we should try to get together soon.

Pursuant to Dean Snyder's request, I met on May 3, 2012, with Deputy Dean Metrick and Deputy Dean Rouwenhorst. Deputy Dean Metrick began the meeting by stating that he recognized that my record justified tenure at other schools so "SOM (or Yale) needed to make a competitive offer." We discussed various terms and, as requested by Deputy Dean Metrick, I sent a confirming email at 5:03 p.m. that same day, which is attached as Exhibit U, describing my proposed terms of reappointment.

At one point in the meeting, Deputy Dean Metrick told me (in the presence of Deputy Dean Rouwenhorst) that I had lost his promise of protection from unfair interference with my reappointment by Doug because I had told Doug about his (Deputy Dean Metrick's) offer to take Doug off the course back in February. At no time did Deputy Dean Metrick indicate that what he had said to me about Doug and the course was confidential. In fact, I did not initially relay this information to Doug in hopes that the Spring 2012 version of the course would proceed smoothly. Then two things happened: First, in response to my questions about my future at Yale, several senior faculty members told me that Dean Snyder planned either to merge all or parts of State and Society into the Integrated Leadership Perspective (ILP) course or to reconstitute its content and have it taught by someone other than either Doug or me. After I alerted Doug to that possibility, he told me that he had been personally assured that he would continue to teach the course in the future. It was only then that I repeated what Deputy Dean Metrick had said about taking Doug off the course. Given that Doug is head of my group and that I have successfully taught State and Society with him for five years and that I had been told by multiple senior faculty members that State and Society would either be merged into ILP or drastically changed, I felt duty bound to alert Doug that things might not proceed as he expected. (Subsequently, yet another senior faculty member told me that Dean Snyder planned to convert State and Society into a course on political economics and would ask Professor Jim Levinsohn to teach it in the 2012-2013 academic year while SOM did a search for faculty in this area.) In June 2012, the person who coordinates the

9

scheduling for SOM courses told me that the current plan is for Doug to teach State and Society with Professor Ian Shapiro next year.

As noted earlier, when I was hired and repeatedly thereafter, I was assured that there had never been a case in which a professor in the practice had not been renewed. It was not until my fateful April 6, 2012 meeting with Deputy Dean Metrick that I learned that Frank Fabozzi had not been renewed as Professor in the Practice of Finance in 2011. He was first appointed to that rank in 1993. According to Deputy Dean Metrick, Professor Fabozzi was not reappointed because of his lack of University service. Presumably the report of Frank's review committee reflected that fact. Deputy Dean Metrick assured me prior to the BPO vote on my renewal that my case was totally different. Although Yale has declined my request for even a redacted copy of my report, given the leadership role I played in the creation of the new University-Wide Committee on Sexual Misconduct, I am confident that my level of University service has been more than satisfactory.

On May 5, 2012, Deputy Dean Metrick sent me the following email:

> "After reflecting on this and consulting with Ted, we have decided that we will begin your BPO meeting with a discussion and vote on the standard 5-year appointment with no special voting or meeting attendance provisions. If that vote is positive, then Ted will solicit feedback from the BPO about a longer term and meeting attendance opportunities. Ted will then have the results of the vote and the feedback from the BPO to guide his decision."

(See Exhibit V.) This surprised me for two reasons: First, it was inconsistent with Deputy Dean Metrick's statement on May 3 that SOM had to make a competitive offer to persuade me to stay. Second, it was the first time since I came to Yale in 2007 that anyone had questioned whether my appointment would be renewed for at least five years.

## THE PURPORTED REASONS FOR MY NONRENEWAL ARE PRETEXTUAL

As I have reflected on Dean Ted Snyder's explanation for my nonreappointment, namely, that that there are no courses for me to teach, I cannot square it with the SOM strategy Dean Snyder articulated in the "Materials for Board of Advisors Meeting October 26, 2011," which he distributed to the faculty on January 4, 2012 (see Exhibit W). In those materials, Dean Snyder stated that SOM "is naturally positioned given our heritage, our student and faculty profiles, and our place at Yale to best execute a new approach to management education" that focuses not just on competition and cooperation but also on complexity (p. 16). He reasoned: "Market economies dominate, yet governments play an increasingly larger role within them." He noted that "there is nothing resembling convergence in terms of enterprise forms, economic regulations, enterprise governance; . . . the effectiveness and efficiency of laws." Further, "The world's market-oriented economies are exhibiting more complexity *within* societies, with governments exerting more influence, and *across* societies." Finally, "Hence, a third competency is needed: The world needs leaders who understand these complexities at a significantly deeper level." (pp. 14-15)

### I Am Particularly Well Qualified to Teach State and Society

As the professor who (1) developed a conceptual model for understanding how top management teams can incorporate legal issues and government relations in their decision-making (see my "Winning Legally: The Value of Legal Astuteness" article in *The Academy of Management Review* (2008), vol. 33,

pp. 378-390, and "What's Law Got to Do with It? Integrating Law and Strategy" in the *American Business Law Journal* (2010), vol. 47, pp. 587-639, (2) wrote two of the leading textbooks *Managers and the Legal Environment: Strategies for the 21st Century* (7th ed. forthcoming this summer) and *The Entrepreneur's Guide to Business Law* (4th ed. 2011), (3) coauthored literally dozens of business school cases on issues ranging from lead-tainted toys from China, BP's joint venture in Russia, and South Africa's efforts to promote economic growth in the wake of apartheid while protecting the environment, to Research in Motion's dispute with the governments of the UAE and India over disclosure of its encryption codes (and Google's recent dispute with the EU over its new privacy policies), and (4) was one of three academics chosen by the Brookings Institution to kick off their three-year project on the purpose of the firm, I have demonstrated expertise in developing and teaching this material. Indeed, when Dean Snyder presented the proposed new Masters in Advanced Management degree to the faculty for approval, he included my course Legal Aspects of Entrepreneurship in the list of courses for students seeking the new degree.

In a February 6, 2009 response to Dean Oster's questions about State and Society, Doug had staunchly defended the inclusion of law in the course, stating: "Law broadly understood is the medium by which firms, whole markets, and national societies interface with states. It fits in a very logical way, and motivates the students' to ask where law comes from and how it is transformed over time. The name for that process is of course politics. It is a natural fit, and it makes S&S a strong and cohesive course intellectually." (See Exhibit X.) Dean Oster responded on April 24: "On the law material > [sic] I completely agree that some law is essential to an MBA and I also can see that Connie does a great job teaching it and also has scarce expertise. (See Exhibit Y.) In fact, the AACSB requires coverage of "legal responsibilities in organizations and society" as a condition to accreditation.[1]

Deputy Provost Spangler told me on June 13, 2012, that Dean Snyder had justified his decision not to renew my appointment by asserting that SOM is a small school and could not afford to staff every area. As for budgetary concerns, Dean Snyder has added three senior associate deans since coming to Yale. In addition, he announced that SOM plans (1) to spend $1 million for marketing the school next year and (2) to expand the size of its student body by 70% within the next five years, contingent, among other things, on the availability of faculty resources (see his email of June 14, 2012, attached as Exhibit Z). Thus, SOM is expanding not contracting.

**There Is a Full Complement of Courses I Can Teach Even If I Do Not Teach State and Society**

Contrary to Dean Snyder's assertion that there is nothing for me to teach, Deputy Dean Rouwenhorst advised me on May 30, 2012, that my teaching schedule for 2012-2013 would be as follows: Legal Aspects of Entrepreneurship as a full semester course (one course), Law for Executives (one-half), plus the three-quarters course credit from the overload I taught in previous years, plus the guest classes I do in the core, for a total of three course credits (see Exhibit AA).

If I were permitted to teach the Law and Management course currently taught by SOM Lecturer in Management Steve Latham, who uses my book *Managers and the Legal Environment* as the course text, as a full semester course, plus Legal Aspects of Entrepreneurship, plus Law for Executives, that would be

---

[1] Standard 15 of the AACSB Accreditation Standard provides: "Normally, the curriculum management process will result in undergraduate and master's level general management degree programs that will include learning experiences in such management-specific knowledge and skills areas as Ethical and legal responsibilities in organizations and society." AACSB Accreditation Standards, available at http://www.aacsb.edu/accreditation/standards-busn-jan2012.pdf, at 71.

two and a half of the three full-semester courses I am required by my contract to teach each year. (It is my understanding that Lecturer Latham taught business law at SOM before I was appointed Professor In the Practice of Law and Management then was asked to teach it again in the 2010-2011 academic year while I was on medical leave.) When one adds in the guest classes I teach in other core courses, that equals three courses. In addition, the proposed plan for the Leadership Development Program (LDP) includes three sessions based on my materials. Even if I do not teach either State and Society or sessions in LDP, I can still satisfy my teaching obligations.

## Gender Discrimination

As the only woman ever appointed as a professor in the practice at SOM, I would happily put my record up against the record of any of the men who have been reappointed. Similarly, I question whether Professor Aguilera was ever seriously considered for the Nierenberg Chair. I believe that my applying for the Chair and asking to be considered for tenure resulted in illegal discrimination based on my gender.

More broadly, I believe that my success teaching State and Society (and other courses) and developing new cases threatened Doug and others and was inconsistent with their stereotypes of female colleagues as merely "helpers." Instead of ensuring my continued employment, I believe that my hard work put me in the same situation I was in at Stanford Graduate School of Business when I was told by Senior Associate Dean George Parker that the problem was that I was "just too good." As a result, he told me that I should stop teaching my courses on legal aspects of funding businesses and corporate governance. He compared it to a situation where the established physicians are used to having their waiting rooms overflowing then are upset when a new, and better, doctor comes in and draws their patients away.

Illegal Sexual Stereotyping. On May 21, 2012, Senior Associate Dean Stan Garstka, who served on my review committee, told me that the review committee had been asked to do just the standard professor in the practice review of research, teaching, and University service. When I asked him what I could have done differently to have achieved a different outcome, he told me that his understanding was that the discussion during the meeting of the BPO had shifted from a review of my work (which was positive) to a discussion of "fit." (Because Deputy Dean Garstka is a Professor in the Practice, he was asked to leave the room before the BPO voted on my reappointment.) Courts have acknowledged that "fit" can be a code word for "she is not one of us" or does not fit our stereotype of what a female professor should be. Deputy Dean Garstka further indicated that certain senior faculty thought that I had been "too aggressive" in asking for a ten-year contract and applying for the Nierenberg Chair. Taking the two comments together, I believe that for at least for some senior colleagues, traits that would be laudable in a man, namely, assertiveness and a desire to advance, are not deemed acceptable in a woman.

My situation at SOM is analogous to the Catch-22 the Supreme Court identified in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Ann Hopkins had sued Price Waterhouse for sex discrimination after she was not promoted to partner even though she had higher billable hours and had brought in more new business than the male counterparts who were made partner. She was told by the policy board that, to improve her chances for partnership, she should "walk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." In an opinion by Justice Sandra Day O'Connor, the Court held: "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible Catch-22: out of a job if they behave aggressively and out of a job if they don't. Title VII lifts women out of this bind." (Title IX also prohibits discrimination against employees based on gender as do Yale and the state of Connecticut.)

12

As Senior Lecturer Heidi Brooks can attest from the work she has done to ascertain why Harvard Business School has so few tenured women, many female business school faculty members fail because they are not sufficiently assertive to drive a case discussion with a group of predominately male MBA students; the few female professors who are strong teachers are often not promoted because they do not fit the stereotype of what a female colleague should be, i.e., a helper, not a force in her own right. Sometimes, they are derailed by so-called queen bees. As the literature shows, when there are few women in positions of power, certain women may be even less supportive of their female colleagues than the men are. I experienced this with Professor Cynthia Montgomery at Harvard Business School. She remarked at a faculty seminar at which I presented my construct of legal astuteness, which was subsequently published in the top conceptual journal in management, that she "could have thought of it in a morning." In contrast, esteemed University Professor Michael Porter told me that my work was interesting and suggested ways to better link it to his. Thus, one cannot assume that gender discrimination does not occur just because there are women in positions of power at a particular school. Extraordinary women, like Professor Reggie Herzlinger, the first woman to get tenure at Harvard Business School, not only successfully navigate through these shoals but then also actively mentor other women, but this does not always happen. (SOM Assistant Professor Tori Brescoll also found, in research recently published in *Administrative Science Quarterly*, that men in power in male-dominated institutions gain more power by speaking more, whereas women in power in male-dominated institutions lose power when they speak more. This had obvious implications for female professor co-teaching with male professors.)

**Air Brushing Women Out of the Program.** There is also a tendency at SOM for certain senior faculty to denigrate or ignore the contributions of female faculty members. When I won the Excellence in Teaching Award in 2008, the Dean announced at the presentation ceremony that I had received the award for excellence in teaching in an elective and that Economics Professor Nick Barberis had won the award for excellence in teaching in the core. In fact, my certificate read "excellence in teaching" while his read "excellence in teaching in the core." In past years, only one award was given. This change surprised me because I taught both core and elective courses and had been told by the students that they were able to vote for only one professor that year for the teaching award.

After minimizing my role in developing and teaching an SOM case on the lead-tainted toys by telling a senior faculty member that I had been a mere "stand-in" when I taught the case in his Integrated Leadership Perspective (ILP) course the prior year, tenured Professor Will Goetzmann then asked when he could have his assistant come to my office to pick up my notes (see Exhibit BB). While I wrote five new cases for State and Society in 2011 alone, Professor Goetzmann continued to teach many of the older cases developed years before (such as the decision whether to sell *Cosmopolitan* magazine in China). One student commented in the course evaluation for this spring's State and Society course: "This was by far the most interesting course and demonstrated the value of an integrated curriculum. ILP should be embarrassed." Another stated: "Great job. Does a better job than ILP of connecting the dots." A third stated: "Really interesting, multi-dimensional and multi-perspective class without having to force it like in ILP." Thus, by "air brushing" me out the course, Professor Goetzmann could present parts of my work as his own.

As noted earlier, Doug raised a similar issue about our relative contributions to State and Society in an email dated February 24, 2012, in which he stated: "I think the course needs to be rebalanced a bit. It is now a ton of your writing and about 70% you to 30% me in the case material. This may be my fault in considerable degree." (See Exhibit L.) Doug's solution was to delete my materials even though they related to far more significant issues than whether a nine-mile bus lane is built in Connecticut. In addition, Doug demeaned my contributions in front of the students. For example, Doug began the class

13

on corporate governance by stating, "I will talk about the theory and Connie, the practitioner, will talk about practice," when, in fact, I am an accomplished scholar and was using a chapter in my book *Managers and the Legal Environment* to address the nuances of the law of corporate governance. He also lectured me in front of the class about "how the troops do not understand what is going on in Woodbridge Hall" and the inappropriateness of someone asking for more than their due.

Notwithstanding my repeated requests of Dean Snyder and Deputy Dean Rouwenhorst, they have still not found a way to make it possible for other business schools to access and order my SOM cases. For example, my request for a link to my SOM cases for the preface of the seventh edition of my book *Managers and the Legal Environment* went unanswered. Even if SOM gave the cases away for free that would be valuable for marketing SOM's unique approach to management education. Unlike most of the so-called "raw" cases developed at SOM, which include copyrighted material that cannot legally be published outside of the Yale intranet, my cases do not have copyright problems. The Wharton School at the University of Pennsylvania, widely regarded as having the best legal studies program in the world, is slated to use my "BP in Russia" case in its new legal studies core course next year but that was possible only because I personally sent a zip file of my cases to a colleague there. At a time when Dean Snyder is slated to spend a million dollars on marketing the Yale SOM brand, one would expect more of an effort to showcase the work of SOM faculty. This strikes me as another example of "air brushing" out the accomplishments of an "uppity woman."

Similarly, even though I told Dean Snyder and his new Senior Associate Dean for the MBA Program (an attractive younger woman with just a bachelor's degree) that Judy Samuelson, head of the Aspen Institute's Business and Society Program, wanted Yale to sponsor the next colloquium on Purpose of the Firm after the one Wharton will host in November, neither of them gave me an answer. Not wanting to be unresponsive to an important alumna of the School, I finally reached out to Professor Rick Brooks at Yale Law School to see whether the Law School might be interested in being the sponsor. He responded in the affirmative.

"Getting a Divorce." In addition to sexual stereotyping and air-brushing out the accomplishments of female faculty, I believe that my efforts to ensure that the State and Society course materials (including the syllabus and cases) were prepared in a timely manner turned me, in Doug's mind at least, into something akin to a nagging wife. This explains why Deputy Dean Metrick consistently characterized the decision to end the team-teaching arrangement as, "You and Doug are getting a divorce." Like Dean Snyder's threat to bring in someone to "dominate" me, such metaphors reflect both conscious and unconscious biases. I knew that Doug had divorced his first wife and married a former student so I found this choice of words both troubling and telling, especially in light of the following comment made by a student on the Spring 2012 State and Society course evaluation: "During our initial meeting months before class began – Rae made a crack about how 'his hearing is fine except for that frequency reached only by the shrill, high-pitched voice of his wife' – we're not in the 1950s teaching to an exclusively male audience anymore, come on Rae – you are too good to slip up like that." (See Exhibit CC.) Doug had made a similar comment to the students after he played a clip from "Hillary: The Movie" (the subject of *Citizens United*, the U.S. Supreme Court case we were discussing that day): "Don't you just hate that voice?" He had also forwarded to me an email joke about a wife who destroys her husband's car after receiving a call from his girlfriend (see Exhibit DD).

On April 19, 2012, Professor Aguilera sent me an email expressing her disappointment that she had not been selected for the Nierenberg Chair. She attached a copy of an email from Deputy Dean Metrick dated April 13, 2012 (one day after I applied for the Chair and three days before Dean Snyder threatened to bring in someone who would "dominate" me if I pursued it), in which he advised her, "We

14

had four world-class scholars through for this search and we were impressed by all of them. In the end, the committee chose to go forward with a different candidate, and the Dean has accepted that recommendation." (See Exhibit EE.) Professor Aguilera asked me, "If you have a minute, would you mind to give me some feedback on whether there is anything at my end that I could have done better?" This is the same question I asked Deputy Dean Garstka after my appointment was not renewed. I believe that gender bias played a role in both decisions.

### Disability Discrimination

Professor Fiona Scott Morton, who served as a Deputy Dean when Sharon Oster was Dean, told me that her husband SOM Lecturer in Management Steve Latham was asked to teach Law and Management in Spring 2011 because I did not teach my Legal Aspects of Entrepreneurship in Fall 2010. I was on medical leave that fall recovering from bilateral knee replacements. I did teach Legal Aspects of Entrepreneurship in Fall 2011 so I was surprised to learn that Lecturer Latham had taught Law and Management again in Spring 2012. I do not know whether he is slated to teach it again in 2012-2013. If he is, then my loss of that teaching opportunity is directly attributable to my disability and medical leave in violation of University policy and federal and state law.

### REMEDY

In recognition of my accomplishments since joining the Yale faculty and as an appropriate remedy for these violations of University policy and procedures and applicable law, I am hereby requesting an appointment as Professor in the Practice of Law and Management for a term of ten years pursuant to a mutually acceptable reappointment letter signed by President Levin. This is nothing more nor less than what Dean Joel Podolny promised would be available to me if my performance during my initial term was satisfactory – as all acknowledge it has been. The reappointment letter would confirm my status as a senior faculty member entitled to all benefits available to the senior faculty, but I would be willing to forego the right to attend all meetings of the BPO so I can focus on my research and teaching. The reappointment letter would provide that my teaching load would be the functional equivalent of three full semester courses (in the core and/or as electives) in law and management and/or law and entrepreneurship with no more than three different "preps" per year (with the exact wording to be worked out between the Provost and me). The letter would permit me to use the materials I have developed since coming to Yale in my courses unless the Dean and I mutually agree otherwise. I would also receive an increase in salary so my salary is at least at parity with the salaries paid male professors in the practice at SOM.

### CONCLUSION

Process matters. That is why Yale has a detailed Faculty Handbook as well as clear policies against discrimination and other forms of misconduct and effective procedures for remedying improper behavior. It is also why appointment review committees are commissioned and charged with evaluating individual candidates for promotion and reappointment. Resting a decision on grounds not even considered in the reappointment review report deprives the voting faculty of the opportunity to carefully consider the merits of a case in advance of the vote. Changing the terms and conditions of employment years after an individual has been appointed violates both contract law and basic notions of fairness. Unchecked discretion also creates a fertile ground for both conscious and unconscious bias. I do not dispute the right (indeed the need) for a new dean to change the course of a school. But that does not mean that a new dean can elect not to honor the commitments (both express and implied)

made by his or her predecessors or ignore procedures designed to ensure that reappointment decisions are based on stated criteria and not bias.

Deputy Dean Metrick acknowledged in his April 28, 2012 email to me concerning my reappointment that Dean Snyder is "still relatively new to the school and to the history of these things" (see Exhibit FF). My hope is that when he and the other decision makers have the full record before them, the earlier decision will be reversed and Yale will reappoint me as Professor in the Practice of Law and Management for a term of ten years. I also hope that Yale will take this opportunity to affirm the commitment to demonstrated excellence, regardless of gender or disability, particularly in those professional schools (such as SOM) where the number of senior women has remained persistently low.

Respectfully submitted on June 19, 2012,

Constance E. Bagley

Attachments: Exhibits A thru FF

cc: Deputy Provost Stephanie Spangler
(w/attachments)