**Memorandum dated December 17, 2012, from Constance E. Bagley to Provost and President-Elect Peter Salovey in Response to the Review Committee Report Dated November 28, 2012, Concerning Her Non-Reappointment as Professor in the Practice of Law and Management**

I would like to begin by thanking the distinguished Review Committee chaired by Professor Harte (the "Harte Committee" or "Committee") for its work in connection with my appeal of the decision by Edward (Ted) Snyder, Dean of the Yale School of Management, not to renew my appointment as Professor in the Practice of Law and Management. In this memorandum, I would like to take the opportunity provided by Section III.L.3(b) of the Yale Faculty Handbook (the "Faculty Handbook") to provide a written response to the report by the Harte Committee dated November 28, 2012 (the "Harte Report"). Except as otherwise indicated, all references are to the Harte Report.

**Table of Contents**

I.    Overview

II.   Factual Findings by the Harte Committee Stipulated as True

III.  The Applicable Burden of Proof and Production, and the Conflicted Roles Played by the University Office of General Counsel

IV.   The Harte Committee Should Have Been Advised of its Obligation to Assess the Credibility of the SOM Deans and One or More Witnesses Against Me.

V.    SOM Engaged in Illegal Gender Discrimination.

VI.   Yale Breached My Employment Contract and the Implied Covenant of Good Faith and Fair Dealing.

VII.  Reservation of Rights

VIII. Conclusion

## I. Overview

At its core, this is a very simple case. Pursuant to my original appointment letter dated April 8, 2008 (the "Appointment Letter"), a reappointment review committee chaired by Professor Paul Bracken (the "Bracken Committee") examined my "teaching, scholarship, and service and reached a unanimous and positive recommendation for reappointment." (Para. (5), p. 7.) (My accomplishments in scholarship teaching, and service are briefly summarized in Appendix A to this memorandum.) Notwithstanding this unanimous recommendation for renewal, the BPO vote "was clearly negative" (para. (13), p. 4). Dean Snyder notified me in a letter dated May 24, 2012, that he had decided not to renew my appointment and that my position would be terminated on June 30, 2013. I appealed that decision to you in a submission dated June 19, 2012 (the "Initial Submission").

The Committee found evidence that "the report of the review committee was taken as a starting point for the discussion [of my renewal] and not as binding on the BPO judgment" (para. (6), p. 7). Since Stanley Garstka was appointed the first Professor in the Practice at SOM in 1983, only two of the eight Professors in the Practice at SOM have ever not been renewed: Professor Frank Fabozzi and me. Deputy Dean Andrew Metrick advised me in March or April 2012 that the decision not to renew Professor Fabozzi, which occurred prior to May 30, 2011, was based on his limited University service, a non-issue in my case.

### A. Clearly Untrue and Defamatory Statements Were Made, Compounded by the Conflicted Roles of the University's General Counsel's Office.

Although the Bracken Committee evaluated my teaching positively, the Harte Report stated, presumably on the basis of testimony from Professor Doug Rae and one or more of the deans, that (1) there was "a very public meltdown" of the State and Society course I co-taught with Professor Rae in Spring 2012 (para. (8), p. 7); (2) "the deterioration of the State and Society course became widely known at SOM" (id.); and (3) there was a "teaching failure" in State and Society in Spring 2012 (para. (h), p. 11).The Harte Report further stated: "Joint teaching reviews, we were told, were quite damaging, but no steps were taken to disentangle Professor Bagley's role and Professor Rae's role in the meltdown of the course." (Para. (8), p. 7.) The Committee also "heard some evidence that the SOM deans' understanding of the course's problems came primarily from reports provided by Professor Rae." (Id.)

These statements by Professor Rae and one or more of the SOM deans are clearly untrue and defamatory. As evidenced by the summary of the Spring 2012 State and Society course ratings in Exhibit 1 and the full set of evaluations in Exhibit 2 (which were available to the SOM deans prior to the BPO vote on May 7, 2012, and prior to Dean Snyder's decision on May 24, 2012 not to renew my reappointment), the mean overall rating of the course for Spring 2012 was 3.6 and the median rating was 4.0, both on a scale of 1 to 5.[1]  (Exhibits 1– 5 are appended to this memorandum.) The course had the identical ratings in Spring 2011 (see Exhibit 3). As detailed in Appendix B, four other core causes taught in the 2011-2012 academic year by full professors (including Deputy Dean Rouwenhorst and Professors Goetzmann, Sudhir, and Thomas) had

---

[1] I did not provide these ratings to the Harte Committee both because I assumed that the SOM deans had provided them and because I had no way of knowing before I received the Harte Report that the SOM deans would characterize the Spring 2012 ratings as "quite damaging."

lower course ratings, yet, to the best of my knowledge, the professors teaching those courses are still teaching in the core. (*See* Exhibit 1 for the summary ratings for all courses taught in the 2011-2012 academic year and Exhibit 3 for the summary ratings for all courses taught in the 2010-2011 academic year.[2])

Based on advice from the very same University Office of General Counsel that acted as counsel to the Harte Committee, the SOM deans announced to the BPO *prior* to the vote on my renewal that I would no longer be teaching State and Society *without explaining the reasons therefor*.[3] This deprived me "of the benefit of an unbiased and judicious process of review" (para. (9), p.7), thereby violating the University's policies, my employment contract, and the implied covenant of good faith and fair dealing under Connecticut law. The conflicted roles played by the University's Office of General Counsel in this matter (explained further in Part III.C), and the application of the incorrect standard of proof (discussed in Part III.A), deprived the Harte Committee of the benefit of independent legal advice and thereby compromised, in my view fatally, its ability to fulfill the Committee's prescribed role as neutral fact finder under the Faculty Handbook, thereby drawing into question both those facts as to which the Committee expressed ambiguity and those facts found against me.

## B. Gender Discrimination

Notwithstanding the potentially compromised nature of the legal advice given the Harte Committee and the Committee's consequent application of the legally incorrect and unnecessarily high and grossly unfair standard of proof "beyond a reasonable doubt," the Harte Committee found unanimously that (1) I am the only woman ever appointed to a Professor in the Practice position in SOM (para. (1), p. 9); (2) "[w]omen are seriously under-represented" on the faculty of SOM (and more so than in other schools at Yale)" (para. (a), p. 10); (3) I "was exposed to instances of inappropriate comments and behaviors based on gender" (para. (2), p. 10); and (4) there "is evidence that a chilly atmosphere for women did exist at SOM in contexts in which Professor Bagley was involved" (para (b), p. 11). The Committee made these findings even though its "charge did not include investigating all instances of sexist comments or practices in SOM" (para. (2), p. 9). Indeed, the Committee noted: "In addition, some comments were made directly to the Committee as a whole during interviews characterizing Professor Bagley in a manner that may be deemed offensive to women." (Para. (2), p. 9.) Even though "[n]ot every Committee member viewed every comment that was discussed as offensive" (*id.*), the Committee's finding about the "chilly atmosphere for women" was unanimous. As a result of the SOM deans' decision to eliminate my role as co-instructor of State and Society, all five sections of the State and Society course being taught in the 2012-2013 academic year will be taught by males. These facts, taken alone, are sufficient to prove gender discrimination in violation of the University's policies and applicable federal and state law. They also provide ample evidence that the reason proffered by the SOM deans for the decision not to reappoint me, namely that there

---

[2] I obtained both sets of course ratings by accessing the Yale School of Management Portal, then clicking on the heading "Academics" then on "Course Evaluations").

[3] Professor Rae is co-teaching four sections of the course with Professor Ian Shapiro in the full-time MBA program in Spring 2013, and Senior Associate Dean and Senior Lecturer David Bach is teaching the Executive MBA section in Spring 2013. David Bach interviewed at SOM on May 7 and 8, 2012, and joined the administration and faculty as of September 1, 2012. According to the SOM Course Catalogue, the core courses in the full-time and Executive MBA programs are the same.

were no courses for me to teach, is pretextual and that intentional and illegal discrimination has occurred in violation of the University's policies and applicable federal and state law.

## C. Breach of Contract and the Duty of Good Faith and Fair Dealing, Possible Negligent Misrepresentation

The Harte Committee found that when I was recruited to the University by Dean Joel Podolny, he assured me that renewal of my appointment would be based on my own accomplishments (at least absent a wholesale change in the criteria for the rank of Professor in the Practice, which the Committee found did not occur). The Committee further found that I relied on those assurances to my detriment and to the University's benefit. Although the Committee found that the language in the Appointment Letter on the criteria for renewal was "ambiguous," had the Committee been advised that under Connecticut law any ambiguity must be construed against the drafter (in this case, the University), I am confident that the Committee would have found by a preponderance of the evidence that the University breached my employment contract when Dean Snyder failed to reappoint me. Moreover, even if my reappointment was contingent on factors other than my performance, which it was not, Dean Podolny had a duty to warn me that the language Deputy Dean Garstka inserted into my Appointment Letter to address this very issue did not protect me from non-renewal based on changes in programmatic need. The SOM deans had a further duty to alert me to any changes in the standards for renewal and to protect me therefrom. At a very minimum, failure to disclose this would constitute negligent misrepresentation and breach of the implied covenant of good faith and fair dealing imposed into every employment relationship under Connecticut law.[4]  Finally, the SOM deans' failure to engage me in any discussion of the alleged "public meltdown" of the State and Society course (1) deprived me of my contractual right to have a fair review of my work and (2) violated the implied covenant of good faith and fair dealing.

## D. Reconsideration of Certain Findings Against Me

It is with great reluctance that I request that you ask the Harte Committee to review and reconsider any findings in the Harte Report asserting ambiguity[5] or made against me[6] using the proper standard of proof, namely, proof by the preponderance of the evidence, and in light of their obligation to assess the credibility of witnesses, the information provided in this memorandum, and all applicable law. I cannot see an alternative to this at this point.

---

[4] *See, e.g.,* Magnan v. Anaconda Industries, Inc., 193 Conn. 558 (1984).
[5] They include, without limitation, the following: "The reasons for Professor Bagley's non-reappointment are not entirely clear." (Para. (11), p. 8.) "[W]e cannot conclude whether Yale met or failed to meet its contractual obligations to Professor Bagley" (para. (a), p. 8). "SOM decision-makers expressed some exasperation at Professor Bagley's request for consideration for tenure and for consideration for the Nierenberg Chair. It is impossible to discern whether the exasperation was gender-inflected and what role, if any, this played in the BPO decision not to reappoint." (Para. (8), p. 10.) "There is no conclusive evidence of how, if at all, the evidence of a [sic] chilly environment we did find contributed to Professor Bagley's non-reappointment, or how, if at all, gender discrimination was a factor in that non-reappointment." (Para. (e), p. 11.) Note that this last clause reflects a finding of gender discrimination because the Committee did not include the words "if any" after "gender discrimination."
[6] They include, without limitation, the following: "The Committee finds no evidence that Professor Bagley's denial of the Nierenberg Chair or of a tenured position was the result of gender discrimination." (Para. (d), p. 11.)

## II. Factual Findings by the Harte Committee Stipulated as True

### A. Findings

The Harte Committee found, and I am hereby willing to stipulate them as true, the following facts:

1. According to testimony before the Harte Committee or documents produced by the SOM Dean Snyder, "In 2011-12, none of the SOM leaders involved in Professor Bagley's reappointment process (Dean Snyder, Deputy Dean Metrick and Professor Paul Bracken, the chair of Professor Bagley's reappointment evaluation committee) reviewed or were aware of Professor Bagley's employment letter." (Para. (7), p. 7.) If true, this means that my employment terms had no bearing on their decision. (As explained in Part VI.G, there is conflicting evidence on this point.)

2. "[T]he BPO was not given a full account of the SOM's contractual obligations to Professor Bagley . . . " (para. (12) [second], p. 8).

3. "Considerable lack of clarity and transparency in appointment criteria and processes exist within SOM Faculty Handbook policies." (Para. (d), p. 4.) "What is clear is that a shift in standards [at SOM for Professor in the Practice] was not clearly articulated by the leadership of SOM or communicated to Professor Bagley prior to the decision on her reappointment." (Para. (5), p. 10.)

4. "[T]here is no doubt that Professor Bagley relied, to her detriment, on then-Dean Podolny's representations that her own accomplishments would be the basis for reappointment, absent a wholesale (and presumably, transparent) effort by the faculty to revise standards for all Professors in the Practice." (Para. (b), p. 8.) "Yale benefitted from Professor Bagley's reliance" and from "the ambiguity of the employment letter" (para. (c), p. 8). Moreover, "SOM's process failures compound the unfairness of construing the ambiguous employment letter to Professor Bagley's detriment" (para. (e), p. 8). I hereby submit that this finding of unfairness is alone sufficient to justify renewal without reference to the larger issues raised by the Harte Committee's findings.

5. Although the Committee stated that "[T]he reasons for Professor Bagley's non-reappointment are not entirely clear" (para. (11), p. 8.), presumably beyond a reasonable doubt, the Committee then listed as the first possible reason the alleged issues surrounding the State and Society course. (*Id.*) The Committee found, however, that "SOM had not initiated any systematic review either of the [State and Society] course as a whole or of the particular course taught by Professor Bagley and Professor Rae [that is, the Spring 2012 version of that course] prior to the May 7, 2012 BPO meeting" (para. (10), p. 7.).

6. Based on "the recommendation by the General Counsel," Dean Snyder and Deputy Dean Metrick decided "to terminate Professor Bagley's role in the State and Society course and to announce that termination to the BPO" (para. (9), p. 7), apparently at the very meeting at which the vote on my contract renewal was taken, without "communicat[ing] to the BPO the reasons for terminating Professor Bagley's role as co-teacher in the State and Society course" (para. (12), p. 8) or giving me an opportunity either to assert my contractual rights or "to defend, in a systematic way, [my] conduct amidst the [alleged] deterioration of the State and Society course"

(para. (12), p. 8). The decision to terminate my role in the State and Society course "without giving Professor Bagley or the BPO a clear account of the reasons" (para. (12), p. 8) "seems to have deprived Professor Bagley of the benefit of an unbiased and judicious process of review" (para. (8), p. 7).

7. The Committee members stated that they were "not aware of the reasoning for the recommendation by the General Counsel." (Para. (9), p. 7.) Thus, the SOM deans elected not to explain the General Counsel's reasoning to the Harte Committee in what I assume was an invocation of the attorney-client privilege even internally within the University's own review structure.

8. "Had Professor Bagley been able to assert her view of her contractual rights and to defend, in a systematic way, her conduct amidst the [alleged] deterioration of the State and Society course, she and the school's leaders might have come to a different and mutual understanding about the defensible contours of the rights granted by the employment agreement." (Para. (12) [sic], p. 8.)

9. I am the only female Professor in the Practice at Yale School of Management.

10. "[W]omen are underrepresented at the senior level in SOM both relative to men in SOM (over 90% of the senior faculty in SOM are male) and relative to the percentage of women at senior ranks in most other units of the university." (Para. (1), p. 9.) I would add that not one woman has been granted tenure at SOM since Fiona Scott-Morton was promoted to full professor in 2002.

11. "Professor Bagley was exposed to instances of inappropriate comments and behaviors based on gender." (Para. (2), p. 10.) Indeed, "some comments were made directly to the Committee as a whole during interviews characterizing Professor Bagley in a manner that may be deemed offensive to women." (Para. (2), p. 9.)

### III. The Applicable Burden of Proof and Production, and the Conflicted Roles Played by the University Office of General Counsel

The Harte Committee made the robust findings of fact in my favor set forth in Part II and elsewhere in the Harte Report notwithstanding what appears to be their application (through no fault of their own) of the incorrect standard of proof, namely, the requirement of proof beyond a reasonable doubt. For example, the Harte Report states in the penultimate paragraph on page 10: "Drawing conclusions beyond a reasonable doubt regarding the presence or absence of gender discrimination has not proved possible in this case." (Incidentally, this is the only reference to the applicable burden of proof in the Harte Report.) In addition, as detailed further in Part IV.B, there are other matters of law applicable to this matter that may not have been duly explained to the Harte Committee.

### A. The Applicable Burden of Proof Is Preponderance of the Evidence.

The Harte Report does not explain why the Harte Committee felt compelled to limit its conclusions to those facts proven beyond a reasonable doubt, which is the standard used only in criminal cases, instead of applying the standard applicable in civil cases involving employment contracts and discrimination, namely, proof by a preponderance of the evidence. The Harte Report identified Caroline Hendel of the University's Office of General Counsel as "Counsel to the Committee" (second full paragraph under "1. Committee Process," p. 1), suggesting that no independent outside counsel was retained to advise the Harte Committee in its work, including on the critical matter of the applicable standard of proof borne by the complainant.

Because the standard of proof applicable to claims of discrimination, breach of contract, and negligent misrepresentation is a question of law not fact, one must ask whether the standard of proof beyond a reasonable doubt and the perceived need for "conclusive" evidence (of which there was in actuality much based on the Committee's findings) of gender discrimination[7] derived from University Office of General Counsel, which advised both the SOM deans on the process to follow when presenting my appointment renewal to the BPO *and* the Harte Committee appointed to review the fairness of that *same* process. If so, the General Counsel's Office was in error.

In fact, the burden of proof in this matter should never have been at issue (nor could anyone have reasonably expected that it would be) given that (1) the law is so clear on the subject, and (2) the University entered into an agreement on June 11, 2012 with the Office for Civil Rights within the U.S. Department of Education ("OCR"), signed by University Vice President and General Counsel Dorothy Robinson, which recites that preponderance of the evidence is the standard applicable in internal University proceedings relating to sexual misconduct.[8] The definition of "sexual misconduct" posted on the Sexual Misconduct at Yale site (smr.yale.edu) includes

---

[7] *See, e.g.,* the following statement by the Committee: "There is no conclusive evidence of how, if at all, the evidence of a chilly environment [which] we did find contributed to Professor Bagley's non-reappointment, or how, if at all, gender discrimination was a factor in that non-reappointment." (Para. (f), p. 11.)

[8] Although the OCR agreement dealt primarily with the procedures for the University-Wide Committee on Sexual Misconduct, it would make no sense to require one level of proof in those proceedings and a much higher in other internal reviews where sexual misconduct is implicated. Indeed, as explained hereafter, it would be an independent Title IX violation if the University required proof of any type of discrimination barred by Title IX by a standard higher than proof by a preponderance of the evidence.

"sexual harassment," which the U.S. Supreme Court has defined to include creation of a hostile environment[9] and sexual stereotyping.[10]

The correct standard for claims under Title VII,[11] Title IX,[12] the Age Discrimination in Employment Act,[13] the Americans with Disabilities Act (ADA),[14] and the Connecticut analogues[15] is proof of discrimination "by a preponderance of the evidence." As the United States Supreme Court explained in *Reeves v. Sanderson Plumbing Products, Inc.*,[16] "[O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – [the plaintiff employee] must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"[17] If the fact finder finds, by the preponderance of the evidence, that the proffered reasons are a pretext, that finding alone is sufficient to prove intentional and illegal discrimination. In addition, the employee need not present direct evidence of discrimination: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."[18]

Title IX of the Education Improvements of 1972 requires schools "to provide equitable grievance procedures" for violations of the statutes under the jurisdiction of the OCR, including those prohibiting discrimination based on gender, age, or disability.[19] The OCR stated in its "Dear Colleague" Letter, dated April 4, 2012, dealing with sexual misconduct: "[I]n order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or

---

[9] Meritor Savings Bank v. Vinson, 477 U.S. 51 (1986).

[10] Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible Catch-22: out of a job if they behave aggressively and out of a job if they don't. Title VII lifts women out of this bind.")

[11] The Office for Civil Rights within the Department of Education ("OCR") stated in its "Dear Colleague" letter dated April 4, 2012 [hereinafter "OCR 'Dear Colleague' Letter"]: "The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII)," citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

[12] OCR "Dear Colleague" Letter, citing *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[13] *See, e.g.*, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

[14] *See, e.g.*, Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182 (1st Cir. 2011) (employee "may prove his case by presenting direct evidence of discrimination or he may prove it indirectly 'by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).'").

[15] *See, e.g.*, Pik-Kwik Stores, Inc. v. Commission on Human Rights and Opportunities, 170 Conn. 327 (1976) ("Although the language of the federal statute and that of the Connecticut statute differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 (which extended the provisions of the Fair Employment Practices Act to prohibit discrimination on the basis of sex) was to make the Connecticut statute coextensive with the federal.").

[16] 530 U.S. 133 (2000).

[17] *Id.* at 143 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[18] Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100 (2003) (internal quotation marks and citations omitted).

[19] OCR "Dear Colleague" Letter. As the OCR explained: "In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints." *Id.*

violence occurred)."[20] (As discussed further below, the University's policies and procedures for addressing sexual misconduct and its recent agreement with the OCR incorporate this standard.) The same reasoning applies to other types of gender discrimination as well as to age and disability discrimination.

The OCR has made it clear that procedures requiring the higher civil standard of "clear and convincing" evidence, i.e., proof that it is "highly probable or reasonably certain that the sexual harassment or violence occurred" are "inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX."[21] *A fortiori*, requiring proof beyond a reasonable doubt, which is an even higher standard than clear and convincing evidence, violates Title IX.

And as if these U.S. Supreme Court decisions and regulatory guidance from the OCR were not enough to resolve the matter of applicable standard of proof, the University entered into an agreement with the OCR, entitled "Voluntary Resolution Agreement Yale University (University) Complaint No. 01-11-2027" on June 11, 2012, that requires the University to apply the standard of proof by a preponderance of the evidence when deciding whether there has been sexual misconduct, which includes hostile environment and sexual harassment. So, the University itself has explicitly committed to require only proof by a preponderance of the evidence in cases involving sexual misconduct, the same standard the courts and regulators themselves apply.

The Harte Committee's application, through no fault of its own, of the wrong burden of proof fatally compromised the findings of the Committee that do not support the facts on which I offered proof. By contrast, the Committee's findings in my favor must stand because any fact proved "beyond a reasonable doubt" is, by definition, also proved by the lower standard of "preponderance of the evidence."

**B. The Burden of Production in Age Discrimination Cases Shifts Once the Complainant Introduces Evidence that She Was Replaced by Someone Substantially Younger.**

Moreover, with respect to the claim of age discrimination under the Age Discrimination in Employment Act and its Connecticut analogue, there appears to have been confusion regarding the shift in the burden of production that occurs once an employee has established a *prima facie* case. The Committee stated: "In general, according to the advice we were given, we understand that the replacement of an older teacher by a younger teacher does not in and of itself constitute evidence of age discrimination." (Para. (1), p. 12.) Yet, there is no evidence in the Harte Report that the General Counsel's office advised the Committee that the U.S. Supreme Court has made it clear that once an employee aged forty or older proves she (1) was qualified for the position at issue, (2) suffered an adverse employment action, and (3) was replaced by a substantially younger person, then the burden shifts to the employer to produce evidence to explain why its

---

[20] *Id. See also* OCR's Case Processing Manual, which is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.
[21] OCR "Dear Colleague" Letter.

decision was not age-based.[22] As with gender cases, once an employee establishes a prima facie case, a finding of pretext can be sufficient to prove illegal discrimination.

## C. The University's Office of General Counsel Had Conflicting Roles.

These clear errors in the burden of proof and production are compounded by the multiple roles that the Committee found the Office of General Counsel played when advising Dean Snyder and Deputy Dean Metrick on the process for presenting my case to the BPO (and, though not addressed by the Harte Committee, in advising the SOM deans, if they did at all, concerning my contractual rights). The potential conflicts described below deprived the Harte Committee of the benefit of independent legal advice outside of the University's Office of General Counsel and thereby compromised the Committee's ability to fulfill its prescribed role as neutral fact finder under the Faculty Handbook.

### 1. Potential Legal Conflict

There clearly appears to be a legal conflict of interest in the sense that the University Office of General Counsel (1) advised the Dean and Deputy Dean of SOM, who the Harte Committee found had engaged in conduct that "exposes the faculty and operations of SOM to the risk of charges of gender discrimination" (para. (f), p. 11), prior to the BPO vote and perhaps also in the period after the BPO vote on May 7 and Dean Snyder's non-renewal letter of May 24, and (2) advised the independent review committee charged with deciding whether Dean Snyder acted properly when he decided not to renew my appointment. Because all the lawyers in the Office of General Counsel report to Vice President and General Counsel Dorothy Robinson, it does not matter for this purpose which lawyer in the Office of General Counsel served as counsel of record to the Harte Committee or the SOM deans. Once the Harte Committee found evidence that the SOM deans had acted pursuant to advice from the General Counsel, independent counsel should have been retained to ensure that the Harte Committee was given independent and uncompromised legal advice.

### 2. Potential Personal Conflict Involving the Lawyer or Lawyers in the Yale Office of General Counsel Who Advised the SOM Deans on the BPO Vote and Quite Possibly on My Contract Rights

In addition to the legal conflict, one or more lawyers in the Office of General Counsel have a personal conflict because this appeal turns in substantial part on the propriety of the process used when the SOM deans presented my case to the BPO, which was, according to the Harte Report, followed at "the recommendation by the General Counsel" (para. (9), p. 7). If the nonrenewal decision at issue was wrongly made, then the legal advisor who recommended a particular course of action (here, the Office of General Counsel) could, depending upon the nature of the advice given, also be culpable. In short, the lawyers in the Office of General Counsel may well have a personal stake in the outcome of the Harte Committee review of Dean Snyder's decision not to reappoint me.

The proscription against "a man judging his own case" has existed since the earliest days of English common law. Here the University has set up a review process for a reason – to give an

---

[22] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

independent body, subservient to no one, the ability to ascertain the facts. That process is completely subverted when those who actively participated in the nonrenewal decision at issue also advised (or failed to advise) the review body on the applicable law, including not only the all-important standard for the burden of proof to be applied but also other critical legal matters, including, without limitation, the responsibility of the fact finder to assess the credibility of witnesses; the rule that discrimination can be proved solely by circumstantial evidence; the legal principle that ambiguous terms in a contract are to be construed against the drafter and that contracts should not be construed in such a manner as to make superfluous any provision thereof; the implied covenant of good faith and fair dealing applicable to all employment relationships under Connecticut law; the Connecticut standards for the power of an agent to bind a principal to a contract based on apparent authority;  the duty in Connecticut for a contracting party to disclose certain facts unknown to the other party to a contract and the negligent misrepresentation that can result from a failure to disclose; an employer's duty of supervision; under both Connecticut and federal law; and the federal and state laws and regulations governing sexual harassment, illegal sexual stereotyping, and other forms of discrimination.

**IV. The Harte Committee Should Have Been Advised of its Obligation to Assess the Credibility of the SOM Deans and One or More Witnesses Against Me.**

When ascertaining the facts and evaluating conflicting testimony, the fact finder, in this case, the Harte Committee, is responsible for assessing the credibility of the witnesses.[23] Taken alone, the inconsistencies between the course evaluations for the Spring 2012 State and Society course and the testimony to the Committee related to the course draw into question the credibility of much of the testimony by Professor Rae and one or more SOM deans. Because discrimination and certain other claims can be proved by circumstantial evidence, it is critical for the Harte Committee to be given an opportunity to reassess any factual findings for which they found ambiguous or conflicting evidence and any factual findings against me in light of a full, accurate, and complete articulation of their role as fact finder and all other applicable law.

For example, the Harte Report states: "Joint teaching reviews, we were told, were quite damaging" (para. (8), p. 7). Yet, as discussed in Part I, the course received the same ratings in both 2011 and 2012: a median of 3.6 and a median of 4.0, both on a scale of 1 to 5. This distortion of the truth (and other factual inconsistencies discussed in this memorandum) casts doubt on the credibility of the witnesses who testified on this issue and the SOM deans' purportedly "generous motivations" for not explaining to the BPO the reasons for terminating my role as co-teacher in the State and Society course (para. (12), p. 8). Because there was "some evidence that the SOM deans' understanding of the course's problems came primarily from reports provided by Professor Rae" (para. (8), p. 7), his credibility may be severely compromised.[24]

It is true that my mean instructor rating dropped from 4.1 (with a median of 4.0) in Spring 2011 to a mean of 3.5 in Spring 2012 (with a median of 4.0), but that is still well within the range of excellent performance by the other SOM professors. Moreover, the lower rating in Spring 2012 is, in my opinion, attributable in part to the "inappropriate comments and behaviors based on gender" to which the students and I were subjected in Spring 2012 (para. (2), p. 10) and the "chilling atmosphere related to [my] teaching" (para. (h), p. 11). The lower rating in Spring 2012 is also the direct result of Professor Rae's insistence that we eliminate my materials and sessions on healthcare reform, the global financial crisis, and intellectual property protection. These changes are apparent when one compares the draft syllabus dated February 24, 2012 (attached as

---

[23] *See, e.g.*, O'Connell v. O'Connell, 101 Conn. App. 516 (2007) (the trier of fact is responsible for assessing the credibility of witnesses).

[24] I had told Deputy Dean Metrick on February 27, 2012, about my concerns that my efforts to ensure that the State and Society materials were ready on time could interfere with the fairness of my review. He assured me in the email attached to my Initial Submission as Exhibit M: "I also stand ready to help if—once the semester begins—you need some intervention to help things work more smoothly." He further stated: "I also appreciate that this is a review year for you, and the dynamics of teaching and the review put you in a difficult situation. I appreciate knowing these dynamics, and I will make sure to minimize any effects on your case." (*Id.*) Thus, the SOM deans were on notice that disparaging comments from Professor Rae might not be credible. See Sangan v. Yale University, 2006 WL 2682240 (D. Conn. Sept. 15, 2006) (denial of motion by university to dismiss claims of intentional infliction of emotional distress, negligent supervision, and retaliatory discharge brought by an Indian female who alleged that her male supervisor had made false accusations of inferior job performance and harassed her based on gender). See also Craig v. Yale University School of Medicine, 838 F. Supp. 2d 4 (D. Conn. 2011) (holding that "an abuse of a hierarchical power relationship" could constitute sufficiently extreme and outrageous conduct to support a claim of intentional infliction of emotional distress against the employer).

Exhibit 4), with the syllabus that Professor Rae posted on classes v2 while I was on vacation in Puerto Rico (Exhibit 5). Professor Rae's instructor ratings for State and Society were 3.8 (with a median of 4.0) in both 2011 and 2012. Thus, to the extent that there was any "deterioration of the State and Society course" in Spring 2012 (para. 12, p. 8), it was, in my opinion, attributable to Professor Rae's insistence that we change the course content.

Furthermore, not one student made any mention in the written course comments to what is characterized in multiple places in the Harte Report as a "meltdown" of the course in Spring 2012 (*see, e.g.,* para. (8), p. 7). Had such a "public meltdown" occurred, surely at least one of the 150-plus students reporting would have mentioned it. Although several students noted that there appeared to be some tension between Professor Rae and me, that is not surprising given the reported "comments made to Professor Bagley, to other people involved in staffing the State and Society course, and to that class as a whole that a majority of the Committee thought may be deemed offensive to women." (Para. (2), p. 9.) Moreover, several students did voice concerns about Professor Rae's failure to post certain of his cases and assignments in a timely manner.

In 2013, all five sections of the State and Society course will be taught by males: Professor Rae is scheduled to co-teach four sections of State and Society in the full-time MBA Program with Professor Ian Shapiro. Senior Associate Dean and Senior Lecturer David Bach, who interviewed at SOM on May 7 and 8, 2012, joined the administration and faculty as of September 1, 2012, and is substantially younger than I am, is scheduled to teach State and Society in the Executive MBA Program in 2013. According to the SOM Course Catalogue, the core curriculum taught in the Executive MBA program, including State and Society, is the same as the core curriculum in the full-time MBA program.

## V. SOM Engaged in Illegal Gender Discrimination.

For the reasons stated above, the findings of fact in my favor are themselves more than sufficient to prove gender discrimination. For example, the Harte Report found beyond a reasonable doubt that "a chilly atmosphere for women did exist at SOM in contexts in which Professor Bagley was involved." (Para. (b), p. 11.) The alleged "failure" of State and Society is directly, and conclusively, belied by the student course evaluations. Moreover, the Harte Committee recognized that "the possibility remains open that the five-year reappointment of Professor Bagley was influenced by reactions to her gender in combination with aspects of her personal style and her requests for consideration of tenure, a chair, and for a longer-term reappointment." (Para. (g), p. 11.) Had the Harte Committee been advised more fully and accurately about the law applicable to this matter, been provided with all of the facts (including the teaching evaluations for State and Society and other core courses taught in the 2011-2012 academic year), and, as discussed in Part IV.A.2, been instructed regarding its obligation as the finder of fact to assess the credibility of witnesses, then I am confident that the Committee would have concluded that the reasons offered by the SOM deans for my non-reappointment were but a pretext and that the SOM deans, and thus the University, discriminated against me based on my gender in violation of Yale's own policies and applicable federal and state law. Indeed, the findings in the Harte Report, as supplemented by the incontrovertible evidence in this memorandum, are sufficient for you to reach those same conclusions.

## VI. Yale Breached My Employment Contract and the Implied Covenant of Good Faith and Fair Dealing.

The first paragraph of the Appointment Letter states: "It gives me great pleasure to confirm in writing that the Faculty of the School of Management has voted you an appointment as Professor in the Practice of Law and Management for a term of five years beginning July 1, 2008." The first sentence of the second paragraph, which was added at my express request, states: "As Professor in the Practice of Law and Management you will be a full-time, voting member of the faculty on all matters except tenure appointments." The third sentence of the third paragraph, which was also added at my express request, states: "As Professor in the Practice of Law and Management you will be eligible for the same benefits as other full-time members of the senior faculty."

Section XI of the Faculty Handbook clearly distinguishes between the rank of Professor in the Practice at SOM and the SOM adjunct ranks. I discuss the Faculty Handbook provisions in subpart C of this Part VI.

The University drafted both the Appointment Letter and the Faculty Handbook. Together, they comprise my contract of employment.[25] Under Connecticut law, a contract "must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so."[26]

### A. Dean Podolny Had the Authority to Grant Me the Right to Reappointment Based Solely on my Performance and to Grant Me the Right to Vote on all Matters Except Tenure Appointments.

Dean Podolny had actual authority to bind the University to a contract basing reappointment solely on the performance of the candidate (and, as discussed in detail in Appendix C, the voting rights set forth in the Appointment Letter). After reviewing relevant portions of the University's bylaws, "which were provided to us [the Committee] by Caroline Hendel" (para. (2), p. 5), the Faculty Handbook, and interviewing witnesses, the Harte Committee found: "At SOM, Practice appointments are not subject to Provostial approval, nor are letters of employment reviewed by the Provost's Office or General Counsel." (Para. (7), p. 3.) Moreover, although the BPO votes on the reappointment of Professors in the Practice and makes a recommendation to the Dean, "The vote is advisory only." (Para. (11), p. 3.) Although my appointment, like all faculty appointments, was subject to approval by Yale Corporation, the existence of that approval is uncontested.

Even if Dean Podolny did not have actual authority to make the commitments he did, he had apparent authority to do so. The University gave the SOM Dean plenary powers over appointments and reappointments to the rank of Professor in the Practice. It had become the

---

[25] In *Neiman v. Yale University*, 270 Conn. 244 (2004), the Connecticut Supreme Court held that a Yale faculty member was bound by the Faculty Handbook. If Yale were not also so bound, that contract would be illusory and hence unenforceable.

[26] Harbour Pointe, LLC v. Harbour Landing Condominium Association, Inc., 300 Conn. 254 (2011) (internal quotation marks and citations omitted). *See also* Ramirez v. Health Net of the Northeast, Inc., 285 Conn. 1, 14 (2008) ("Moreover, in construing contracts, we give effect to all the language included therein, as 'the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous.'") (internal citations omitted).

customary and usual (and transparent) practice for the Dean of SOM to treat Professors in the Practice as senior faculty for all purposes except voting on tenure cases. (*See, e.g.,* the email from Professor Sonnenfeld to me attached as Exhibit FF in my Initial Submission). The existence of apparent authority is "one of fact" to be determined based on two criteria: "First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority . . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action."[27] Both criteria are met in my case. In addition, because I relied on the provisions in the Appointment Letter and the Faculty Handbook to my detriment, the University is equitably estopped from claiming that these provisions are invalid.[28]

## B. Any Ambiguity in my Employment Contract Must Be Construed Against the University, which Further Reinforces my Case.

The Harte Committee found that "the language of the employment letter of April 8, 2008, is ambiguous" (para. (a), p. 8), but nonetheless concluded that it would be unfair to construe that language against me (para. (e), p. 8). The Connecticut Supreme Court has made it clear that any ambiguity in contractual language must be construed against the drafter,[29] in this case, Yale University. Accordingly, not only is it unfair but also it is *unlawful* to construe ambiguous language against me. Thus, contrary to the Committee's conclusion that "we cannot conclude whether Yale met or failed to meet its contractual obligations to Professor Bagley" (para (a), p. 8), the facts found by the Committee are sufficient to establish that the University did not meet its contractual obligations to me as a matter of law.

The contract required SOM to use its usual and customary process for reviewing Professors in the Practice for renewal, which Deputy Dean Metrick set forth in his email to me on October 19 2011: "[A] committee of faculty will review your accomplishments and will prepare a report on your case, which will then go before an SOM faculty vote." The clear antecedent of the word "which" is "a report on your case." Deviation from that usual and customary process violated my employment contract and the implied covenant of good faith and fair dealing applicable to every employment contract under Connecticut law. As noted earlier, it also constituted illegal disparate treatment based on gender.

My request for a copy of the report prepared by the Bracken Committee (the "Bracken Report") was denied but, as noted earlier, the Harte Committee found that the Bracken Report had examined my scholarship, teaching, and University service, that the review was positive, and that the Bracken Committee had unanimously recommended reappointment. Because the Bracken

---

[27] Yale University v. Out of the Box, LLC, 118 Conn. App. 800, 808 (2010) (citations and internal quotation marks omitted).

[28] *See, e.g.,* Johnnycake Mountain Associates v. Ochs, 104 Conn. App. 194 (2007); Hall-Brooke Foundation, Inc. v. City of Norwalk, 58 Conn. App. 340 (2000).

[29] *See, e.g.,* David M. Somers & Associates, P.C. Busch, 283 Conn. 396, 402-403 (2007) ("When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . .") (citations and internal quotation marks omitted). *See also* Cantonbury Heights Condominium Association, Inc. v. Local Land Development, LLC, 273 Conn. 724, 735 (2005) ("Where the language [in a contract] is unambiguous, we must give the contract effect according to its terms. . . . Where the language is ambiguous, however, we must construe those ambiguities against the drafter.") (citations omitted).

Report is central to this appeal, I respectfully request that you ask the Harte Committee to include, if it has not yet done so, a copy of the Bracken Report with its confidential recommendations to you.

Although the Harte Report found that SOM has used the rank of Professor in the Practice opportunistically,[30] it found that Stanley Garstka has been a Professor in the Practice since 1983, Roger Ibbotson since 1984, Jeffrey Garten since 1995, Jeffrey Sonnenfeld since 2004, Rakesh Mohan since 2010, and Thomas Kolditz since 2012 (para. (12), pp. 3-4). Thus, "With the exception of Professor Bagley and Professor Fabozzi, [who was appointed September 1, 2006 and terminated at some time before May 30, 2011] whose contract was not renewed, but was extended for two years, all the above have continued in their posts to the present." (*Id.*) When I asked Deputy Dean Metrick prior to the BPO vote on my case why Professor Fabozzi was not renewed, he told me that the decision not to renew was based on insufficient University service, a criterion that I indisputably met. (Given that I do not have access to the renewal review report in Professor Fabozzi's case and the SOM deans do, the burden should be on the SOM deans to share the Professor Fabozzi reappointment review report with the Committee.)

Thus, contrary to the statement in paragraph (10) on p. 3 of the Harte Report that "*[s]everal* Practice professors have been renewed multiple times" (emphasis added), in fact *every* SOM Practice professor who came up for renewal prior to my appointment in 2008 either was repeatedly renewed (in the case of Professor Garstka, more than five times) or had a term of more than five years. Thus, there was ample precedent for Dean Podolny and Deputy Dean Garstka to assure me that as long as I met the criteria of scholarship, teaching and University citizenship articulated in connection with my original appointment, my appointment would be renewed.

Moreover, the Harte Committee statement that "the purpose of these Practice positions is to infuse curricula with teaching by expert practitioners, often those in fields not currently covered by existing ladder faculty" (para. (6), p. 3) may be true elsewhere in the University, but it has historically not been the case at SOM. For example, Professor Garstka has taught accounting at SOM for almost thirty years even though there have been multiple ladder appointments in that period. Moreover, a number of Professors in the Practice, myself included, have taught in the core. While the Committee's characterization of the purpose of Practice appointments at SOM (which I assume came from the SOM deans) may fit many of the lecturers at SOM, it does not reflect the central teachings duties of many SOM Professors in the Practice (including the newly appointed Professor in the Practice of Leadership Tom Kolditz) or their scholarly accomplishments and the leadership positions played by persons holding that rank at SOM. For example, one Professor in the Practice, Jeffrey Garten, served as Dean; and another, Stanley Garstka, served as Acting Dean.

In any event, as noted above, the Review Committee found that the BPO did not change the standards for Professors in the Practice prior to the vote on my case. (I attended the part of the faculty meeting on May 7, 2012 at which the appointment of Tom Kolditz was discussed, and voted on that appointment, and there was no discussion in the appointment review committee

---

[30] *See, e.g.*, the statement by the Harte Committee in paragraph (5) on p. 3: "SOM Practice appointments often occur due to long-standing associations of the appointees with existing tenured faculty or deans on an opportunistic basis, rather than as the product of an open and competitive search."

report or at the meeting of any change to the SOM standards for the rank of Professor in the Practice.) Nor did the BPO engage in any systematic review of the content of the State and Society course. Even if the BPO had the right to change the standards or the course going forward, that would not relieve the University of its contractual obligations to me. This is similar to the case in which the Supreme Court held that even though a future Congress had the right to change the reserve requirements for banks, the U.S. Government still was liable for the payment of damages for the breach of contract occasioned by the change.[31] Similarly, a Dean can bind the University to a contract requiring the University to pay contract damages if the University later changes the standards for renewal.

## C. The Faculty Handbook Provisions Distinguishing Between SOM Professors in the Practice and SOM Adjuncts Further Support my Reading of my Employment Contract.

My interpretation of the Appointment Letter is further bolstered by the Faculty Handbook, which the Connecticut Supreme Courts held was part of a Yale faculty member's employment contract.[32] Section XI.C.2 of the Handbook provides: "Definitions of non-ladder ranks in the School of Management include those in the Faculty of Arts and Sciences (See Section IV.K.) The School [of Management] has the *additional non-ladder ranks* of professor in the practice and associate professor in the practice, as described below. For information on these and other non-ladder ranks, consult the Dean." (Emphasis added.) Thus, the FAS standards set forth in Section IV.K for the nonrenewal of non-ladder faculty apply to all non-ladder appointments at SOM *other than professors in the practice* with the same legal effect as if they were repeated verbatim in Section IX.C of the Handbook.

Section IV.K provides: "Appointments to the adjunct ranks . . . are renewable, depending upon the continued teaching needs of the department, the Provost's authorization for the appointment, and the performance of the individual." In sharp contrast, Section XI.C.3 of the Faculty Handbook provides that appointments to the rank of Professor in the Practice "may be made for terms of up to five years and may be renewed with no limit on the number of reappointments without involving the University in either the expectation or promise of tenure." Thus, the Harte Committee erred when it reasoned: "[S]ection IV.K, to which Professor Bagley appeals, comes from the section of the Handbook describing Adjunct positions in FAS generally and cannot be used as a basis for comparison between standards for the position of Professor in the Practice in SOM and those of Adjunct Lecturers in SOM." (Para. (2), p. 2.)

Like SOM, the School of Forestry and Environmental Studies has the rank of Professor in the Practice (para. (3), p. 2). Also like SOM, it provides that appointment to that rank does not create "the expectation or promise of tenure. However, *unlike SOM*, Section IX.E of the Faculty Handbook expressly states that for all FES term appointments, including Professors in the Practice at FES: "Reappointment is dependent on the needs of the School and the performance of the individual." (Faculty Handbook, Section IX.E.) Thus, the University clearly knew what language to use when conditioning reappointment on programmatic need. Its failure to use that language in the section dealing with SOM appointments precludes it from asserting that condition now.

---

[31] United States v. Winstar, 518 U.S. 839 (1996).

[32] Neiman v. Yale University, 270 Conn. 244 (2004).

This reading of my contractual rights is mandated by the standards the Connecticut Supreme Court has clearly articulated for the interpretation of contracts: "When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."[33] The court has reasoned that every provision of a contract "must be given operative effect because parties ordinarily do not insert meaningless provisions in their agreements."[34] Even when a contract includes general language that suggests one interpretation of the parties' rights, "that fact does not overcome strong evidence of a contrary intent in the more specific provision . . . ."[35] Thus, the more specific language setting different standards for SOM Professors in the Practice and other SOM non-ladder ranks controls this issue.

Moreover, as quoted above, the SOM portion of the Faculty Handbook further instructs readers to consult with the Dean concerning adjunct appointments. That is exactly what I did. As the Committee found (paras. (2) and (3), pp. 6-7, and para. (b), p. 8), Dean Podolny assured me that an appointment as Professor in the Practice was not an adjunct appointment and that, at least absent a wholesale revamping of the rank (see his email to me dated March 26, 2008, which is quoted in para. (2), p. 6 of the Harte Report), which the Harte Committee found did not occur, renewal would be based solely on my performance. After I requested further assurance on this very issue, Deputy Dean Garstka provided to me a revised appointment letter dated April 8, 2008, which added the language quoted in italics in the block quote on the bottom of p. 4 and the top of p. 5 of the Harte Report. That was the offer letter I accepted, not an earlier draft letter that did not contain that italicized language.

**D. SOM Had a Duty to Clarify any Ambiguity Concerning the Standards for Reappointment.**

Finally, even if programmatic need were in fact a precondition for my reappointment, which it was not, then Dean Podolny or Deputy Dean Garstka had a duty under Connecticut law to disclose that the language added by Deputy Dean Garstka to address this very issue after Dean Podolny sent me his email of March 26, 2008 (quoted in para. (2), p. 6) did not protect me from a decision not to reappoint based to a change in programmatic need. The Committee found, "Professor Bagley relied on her understanding of the employment letter when she agreed to move herself and her young son to New Haven and when she ceased pursuit of potential offers of tenured positions from smaller colleges in Boston. Professor Bagley made it clear to Dean Podolny that she was especially concerned about the continuity of her son's education. She did not want to move her son after a short period in New Haven." (Para. (4), p. 7.)

**E. There Has Been No Change in Programmatic Need.**

Moreover, here there is no question of programmatic need. The course I have taught since being appointed as Professor in the Practice of Law and Management—State and Society—continues to be taught at SOM. In addition, in his statements to the SOM Advisory Board and to the faculty

---

[33] Office of Labor Relations v. New England Health Care Employees Union, District 1199, AFL-CIO, 288 Conn. 223 (2008).

[34] Ceci v. National Indemnity Company, 225 Conn. 165, 175 (1993).

[35] Connecticut Light and Power Company v. Lighthouse Landings, Inc., 279 Conn. 90 (2006) ("Cf. Galvin v. Freedom of Information Commission, 201 Conn. 448, 456, 518 A.2d 64 (1986) ('where statutes contain specific and general references covering the same subject matter, the specific references prevail over the general').").

(which are quoted in Exhibit W of the Initial Submission), Dean Snyder has repeatedly expressed his commitment to keeping (if not expanding) education in business regulation and the law as an important part of the SOM MBA curriculum, as the AACSB accreditation rules require in any event. For example, the following: "Market economies dominate, yet governments play an increasingly larger role within them" (*Id.*). "The world's market-oriented economies are exhibiting more complexity *within* societies, with governments exerting more influence, and *across* societies. . . . The world needs leaders who understand these complexities at a significantly deeper level." (*Id.*) My SOM cases on BP in Russia, the energy crisis in South Africa, and the disputes with UAE and India over the BlackBerry encryption codes are but three examples of how my teaching materials address these very issues.

## F. The SOM Deans Violated my Voting Rights.

The Committee "read the language of the appointment letter [providing that I would be a full-time, voting member of the faculty on all matters except tenure appointments] to guarantee Professor Bagley only those voting rights consistent with the Professor in the Practice position." (Para. (1), p. 5.) In doing so, the Committee appears to have ignored the legal principle articulated by the Connecticut Supreme Court (of which it may have been unaware) that contractual provisions are not to be interpreted in such a manner as to render them superfluous.[36] This is especially the case when, as happened in my case, the language in question was added at the express request of the party it favored. To the extent that the alleged "meltdown" or "deterioration" of State and Society in Spring 2012, the future content of State and Society, or any other issues related to programmatic need were discussed at any meetings of the senior faculty from which I was wrongfully excluded, this was not only a breach of my contract in its own right but also compounded the wrongful conduct found by the Committee and discussed above. I address my voting rights in more detail in Appendix C.

## G. The SOM Deans Had Notice of My Contractual Rights.

Contrary to the assertion that neither Dean Snyder nor Deputy Dean Metrick had seen a copy of my Appointment Letter in the 2011-2012 period (para. (7), p. 7), I expressly referenced that letter in an email to Dean Snyder dated January 5, 2012, in which I stated: "I don't know what Roger [Ibbotson] and Jeff's [Sonnenfeld's] contracts provide, but my Professor in the Practice contract specifies that I will be treated as senior faculty for all purposes except voting on tenure cases." In response, Dean Snyder stated, "[W]e'll check." (Initial Submission, Exhibit S.) Because I was invited to attend the next meeting of full professors, I assumed that he did what he promised to do and had reviewed, or had someone else review, the Appointment Letter. It was only later that I discovered that the listserv for announcements of meetings of the full professors had been changed to delete the names of the Professors in the Practice, who were then put on a separate list. Since March 2012, virtually every meeting of the full faculty had been—in contravention of my contract rights—been converted into a meeting of just the BPO.

On multiple occasions prior to the BPO vote, I mentioned my appointment letter to Deputy Dean Metrick. Although he told me in March or April of 2012 that he had not seen a copy of my

---

[36] *See, e.g.,* Afkari-Ahmadi v. Fotovat-Ahmadi, 294 Conn. 384 (2009) ("in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous") (internal quotation marks and citations omitted).

appointment letter before he convened the Bracken Committee in the fall of 2011, he told me that he had subsequently procured a copy and read it.

## VII. Reservation of Rights

In light of the issue preservation holding in *Neiman v. Yale University*,[37] I hereby dispute any findings in the Harte Report that are contrary to what I alleged in the Initial Submission, my various other submissions to the Harte Committee, and this memorandum. This reservation of rights includes my claims for discrimination based on age and disability. (In *Neiman*, the Connecticut Supreme Court held that a plaintiff challenging Yale's failure to offer her a tenured appointment could not assert her claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation because she had not exhausted her remedies under the Yale Faculty Handbook.[38])

For example, and without limitation, given that the Harte Committee's found that the Office of General Counsel had advised the SOM deans on how to present the reappointment decision to the BPO, I must at least raise at this juncture the possibility, however remote, of certain personal conflicts potentially involving Ms. Sawyer, counsel to a panel of the University-Wide Committee on Sexual Misconduct on which I served (the "UWC Panel"), and Ms. Hendel, who is handling a legal claim against Yale University brought by the complainant in that same proceeding. (I know that you have seen the confidential report by the UWC Panel and trust that you are also aware of the legal action against the University, which Ms. Hendel described in a confidential email to the members of the UWC Panel. If you do not have a copy of her email, I can provide one upon request.)

During the UWC Panel hearing, I argued that the Office of General Counsel had a conflict because it was advising both the University and a panel charged with deciding, among other matters, whether the University had responded appropriately to alleged instances of sexual misconduct by a University employee. After I suggested that independent outside counsel should be retained to advise the Panel on certain matters of law and fact, UWC Secretary Brian Lizotte left the room to consult with Ms. Sawyer. Upon his return, he reported that she had acknowledged her conflict. I was also a primary drafter of the UWC Panel report and shepherded it through multiple rounds of comments from fellow panelists and Mr. Lizotte. I do not know the extent, if any, that Mr. Lizotte consulted with Ms. Sawyer before giving the members of the Panel feedback on the multiple drafts of the Panel report.

At this junction, I have no way of knowing whether, if at all, my service on the UWC Panel may have had any possible effect (conscious or unconscious) on the independent judgment of any member of the Office of General Counsel in connection with either the advice given the SOM deans or the Harte Committee. Depending on the extent, if any, that this may have occurred, this may constitute retaliation in violation of the Yale policies, Yale's agreement with the OCR, and federal and state law.

---

[37] 270 Conn. 244 (2004).
[38] The court explained that "these internal procedures do not preclude access to the courts should the grievant be dissatisfied with the ultimate result. They merely ensure that the grievant and the school have an opportunity to resolve the dispute before seeking redress in the courts, thereby conserving judicial resources." *Id.* at 256.

## VIII. Conclusion

The Harte Report is a stunning indictment of SOM from within the University itself by a very distinguished panel that acted, if anything, over-judiciously in the University's favor and in understated terms. The damning nature of their fact-findings is further confirmed by the fact that the Harte Committee was given the wrong burden-of-proof standard for making its assessment. Moreover, contrary to what the SOM deans, based primarily on representations from Professor Rae, stated about the alleged "failure" of the Spring 2012 State and Society course, the course evaluations were in fact positive. The SOM deans have not offered any credible evidence to support a nondiscriminatory explanation for their decision. Even if they had, my refutation of that explanation would have to meet only a preponderance-of-the-evidence standard.

While there was no failure of the State and Society course in the spring of 2012 (or at any other time after I joined the teaching team), the SOM deans announced to the BPO, apparently at the very meeting at which the vote on my renewal was taken, that I would no longer be teaching that course. They also asserted this alleged failure to the Harte Committee as a major ground for Dean Snyder's decision not to reappoint me. Yet, according to the Committee's own findings, the SOM deans took no steps to investigate the reasons for that alleged "failure" or to afford me even a simple opportunity to address that issue before either the BPO vote on May 7 or the final decision not to renew my appointment communicated by Dean Snyder in his letter to me dated May 24, 2012.

The Committee's findings alone give more than enough ground to support the conclusion that the reasons provided by the deans for my nonrenewal were, in fact, a pretext for gender-based discrimination in violation of Yale's own policies and applicable federal and state law. In particular, the Committee found ample evidence of facts constituting a hostile environment to women at SOM. It also recognized that "shifts in the criteria for positions as a result of a person's gender and behavior can occur, as noted in connection with the Price Waterhouse case raised by Professor Bagley and as documented in extensive work completed by Dr. Monica Biernat at the University of Kansas." (Para. (5), p. 10.) Had the Committee been fully and independently advised concerning the correct burden of proof and its responsibility to assess the credibility of witnesses and been given all the facts, I am confident that it would have found conclusively that illegal sexual stereotyping, a hostile environment to women at SOM, and other forms of gender discrimination were the real reasons for the decision not to reappoint me as Professor in the Practice of Law and Management.

Moreover, Yale breached both my explicitly stated contractual rights and the implied covenant of good faith and fair dealing. Dean Podolny had the authority to make the promises he made to induce me to come to Yale. In reliance on those promises, I moved my young son from our community near Boston; I did not pursue tenure opportunities in the Boston area; I devoted five years to developing materials for a course unique to Yale SOM; and I spent hundreds of hours developing and advocating for new Yale University-wide policies and procedures for dealing with sexual misconduct.

Even if a fact finder concluded (contrary to the evidence and applicable law) that Dean Podolny had neither actual nor apparent authority to bind the University to renewal based solely on my performance, then Yale still had an obligation to disclose to me the fact that the language added to the Appointment Letter to address this very concern did not protect me from non-renewal

based other factors. Otherwise, what Dean Podolny and Deputy Dean Garstka did tell me was materially misleading and constituted negligent misrepresentation under Connecticut law.[39]

In short, the fact findings by the Committee in my favor confirm gender discrimination and detrimental reliance on the promises made to me, and they should stand. Meanwhile, those findings that the Committee said it could not conclusively make beyond a reasonable doubt further support my position and could be established in my favor by applying the correct burden-of-proof standard and the correct applicable law. For example, the Committee found that the appointment letter was ambiguous. Had it construed that ambiguity against the drafter (Yale), then it follows that the University breached my employment contract. Similarly, if that ambiguity was not disclosed to me then there was negligent misrepresentation. Finally, the Committee should be asked to reconsider those findings that do not support my position utilizing the correct standard of proof by a preponderance of the evidence and in light of both all applicable law and the documents attached hereto.

It is with the greatest reluctance that I request that you ask the Harte Committee to review even this small subset of its findings. I have no desire to prolong this procedure any more than absolutely necessary. It has already taken a toll on both my fourteen-year-old son and me. Nor do I want to unnecessarily burden either you or the Committee. However, there appears to be no alternative way to obtain the full and complete report done under proper legal standards to which I am entitled under the Faculty Handbook.

Finally, I would respectfully request that you consider asking the Harte Committee to address issues respecting potential destruction or non-production of relevant documents, with the assistance of independent outside counsel. If any destruction or non-production occurred, it has seriously compromised this review process.

Respectfully submitted on December 17, 2012,


Constance E. Bagley
Professor in the Practice of Law and Management
Yale School of Management

---

[39] I am in no way impugning the integrity of either Dean Podolny or Deputy Dean Garstka. The courts have made it clear that a principal can be liable for negligent misrepresentation even when the agent did not knowingly mislead. *See, e.g.,* D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 206 (1987) (holding that "even an innocent misrepresentation of fact 'may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth'") (internal citations omitted).

Attachments:

Exhibit 1: SOM Summary Course Evaluations for the 2011-2012 Academic Year

Exhibit 2: Spring 2012 State and Society Course Evaluations (as attached to email from Ms. Hahn)

Exhibit 3: SOM Summary Course Evaluations for the 2010-2011 Academic Year

Exhibit 4: Draft State and Society Syllabus Dated February 24, 2012

Exhibit 5: State and Society Syllabus Posted by Professor Rae on Classes v2

## Appendix A: Brief Summary of My Scholarship, Teaching, and University Service

Although I have been advised that the Bracken Report describes my scholarship, teaching, and university service in detail, I provide a brief summary below.

### Scholarship

During my initial term at Yale, my publications included the *Academy of Management Review* article entitled "Winning Legally: The Value of Legal Astuteness," the *American Business Law Journal* article "What's Law Got to Do with It: Integrating Law and Strategy," the sixth and seventh editions of *Managers and the Legal Environment: Strategy for the 21st Century*, and the fourth edition of *The Entrepreneur's Guide to Business Law* as well as multiple Yale SOM cases and technical notes for the State and Society course. In 2010, I received an honorary doctorate in economics from Lund University. I was elected President of the Academy of Legal Studies in Business in August 2011 and served in that capacity for the full one-year term ending in August 2012.

### Teaching

I won the award for "Excellence in Teaching" in 2008. My teaching evaluations for all my courses, other than Spring 2012 State and Society, should be in the Bracken Report.

For example, in Fall 2011, I taught (as sole instructor) the elective Legal Aspects of Entrepreneurship. As reported on Exhibit 3, the mean instructor rating for Legal Aspects of Entrepreneurship was 4.9 (with a median of 5) and the mean course rating was 4.7 (with a median of 5). I discussed my Spring 2012 evaluations for State and Society in Part IV.

### University Service

I served as the co-chair of the Yale Women Faculty Forum Working Group on Sexual Misconduct and was the primary drafter of its report on sexual misconduct at Yale. I am a core member of the University-Wide Committee on Sexual Misconduct and have served on multiple UWC panels.

**Appendix B: Core Courses Taught in the 2011-2012 Academic Year with Lower Teaching Evaluations than Spring 2012 State and Society**

During the 2011-2012 academic year, a number of other core courses taught by full professors received lower ratings than State and Society. They included Integrated Leadership Perspective, taught by Professor Will Goetzmann, with a mean course rating of 3.1, a median course rating of 3.0, a mean instructor rating of 3.4, and median instructor rating of 4.0; Sourcing and Managing Funds, as taught by Deputy Dean Geert Rouwenhorst, with a mean course rating of 3.3, a median course rating of 3.0, a mean instructor rating of 3.3, and a median instructor rating of 3.0; Sourcing and Managing Funds, as taught by Professor Thomas, with a mean course rating of 3.3, a median course rating of 3.0, a mean instructor rating of 3.8, and a median instructor rating of 4.0; and Customer, as taught by Professor Sudhir, with a mean course rating of 3.1, a median course rating of 3.0, a mean instructor rating of 3.0, and a median instructor rating of 3.0.

**Appendix C: Analysis of the Breach of my Voting Rights**

The Appointment Letter expressly granted me the right to vote on all matters with the "*other full-time members of the senior faculty*" (Appointment Letter, emphasis added) other than tenure appointments. The Committee reasoned that this provision was invalid because it would give me superior rights to other Professors in the Practice. I must respectfully disagree. First, I should not be denied my contractual rights just because other Professors in the Practice may not have secured express contractual language on this point as a condition to joining the SOM faculty. Second, the SOM deans could have avoided affording me rights not shared by other Professors in the Practice by simply continuing the policy followed by Dean and Professor in the Practice Jeff Garten and Dean Podolny of giving all Professors in the Practice the right to vote at all meetings of the full professors other than the right to vote on tenure cases.

The Committee also questioned whether Dean Podolny had the actual authority to grant these voting rights under the University's bylaws. The Harte Report recites that Caroline Hendel provided "relevant portions" of the University bylaws to the Committee (para. (2), p. 2) and stated that they "entrust to the BPO 'matters relating to the educational policy and government of the school'" (para. (2), p. 5.).

I do not have a copy of the bylaws, but Section XI.B of the Faculty Handbook seems to contemplate a comparable role when it provides that the Board of Permanent Officers at SOM "participates in formulating educational policy and in recommending candidates for faculty appointments." Importantly, neither the quoted bylaw provision nor the Faculty Handbook states that the BPO has the *exclusive* right to set educational policy and recommend candidates. To the contrary, the Committee found: "The by-laws permit the BPO to refer to the faculty of the school 'any matters except recommendations for appointments of Permanent Officers and the assignment of Permanent Officers to the school." (Para. (2), p. 5.) My Appointment Letter does just that.

Nor is SOM unique in this regard. For example, the voting provisions applicable to FAS provide: "Consistent with department practices, faculty members in the adjunct, lector, and lecturer ranks may, within their own ranks, vote on appointments and promotions to ranks of the type they hold below or equivalent to their own, but they may not vote on reappointments to ranks equivalent to their own." (Section IV.I of the Faculty Handbook.) Similarly, Section XII.C of the Faculty Handbook states that the permanent officers of the Medical School "may invite other faculty to attend meetings of the Board and vote on appointments and promotion to ranks below or equal to their own. By longstanding policy, the Board of Permanent Officers has offered such rights to all faculty who hold the ranks of associate professor with tenure and clinical professor." Until Sharon Oster replaced Joel Podolny as SOM Dean, SOM Professors in the Practice were afforded the same voting rights given clinical professors at the Medical School, namely, the right to vote on all matters with the other senior faculty except on tenure cases. Thus, implicit in BPO approval of a candidate for Professor in the Practice was the grant of those voting rights. Finally, as with the renewal criteria, even if Dean Podolny did not have actual authority to give me the voting rights set forth in the Appointment Letter, he clearly had the apparent authority to do so.