### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSTANCE E. BAGLEY, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | C.A. No. 3:13-cv-01890 (CSH) |
| ) | |
| YALE UNIVERSITY, DOUGLAS ) | **LEAVE TO FILE GRANTED** |
| RAE, EDWARD SNYDER, AND ) | **AUGUST 26, 2014[1]** |
| ANDREW METRICK, Individually. ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff, Professor Constance E. Bagley, by and through her undersigned counsel, and pursuant to Rule 7 of the Federal Rules of Civil Procedure, hereby submits this Complaint and Demand for a Jury Trial against Defendants.  This action seeks damages as a result of Defendants' adverse, discriminatory, retaliatory, and tortious treatment of Plaintiff, including, but not limited to, Defendants' disparate and retaliatory treatment of Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), the Connecticut Fair Employment Practices Act, General Statutes §§ 46a-60 et seq. ("FEPA"), and Connecticut common law, contract and torts.

## PARTIES

1.  Plaintiff Constance E. Bagley (hereinafter, "Professor Bagley") is an individual who

---

[1] Pursuant to Court Order (Dkt. No. 123), the due date for this Amended Complaint was extended to April 3, 2015, or within ten (10) days after the deposition of Andrew Metrick, whichever was later.

currently resides at 20 Fox Den Way, Woodbridge, Connecticut.  She has resided there for the majority of the time relevant to this action.

2.   Defendant Yale University (hereinafter, "Yale") is a private degree granting institution located in New Haven, Connecticut.  Yale School of Management ("Yale SOM") is the graduate business school of Yale and is also located in New Haven, Connecticut.

3.   Defendant Douglas Rae (hereinafter, "Professor Rae") is the Richard S. Ely Professor of Management at  Yale SOM and Professor of Political Science at Yale.  He is a tenured full professor. He resides at 60 Lincoln Street, New Haven, Connecticut.

4.   Defendant Edward Snyder (hereinafter, "Dean Snyder") is the Dean of  Yale SOM and the William S. Beinecke Professor of Economics and Management at Yale SOM.  He resides at 340 Livingston Street, New Haven, Connecticut.

5.   Defendant Andrew Metrick (hereinafter, "Dean Metrick") is the Deputy Dean of Yale SOM and the Michael H. Jordan Professor of Finance and Management at YaleSOM.  He resides at 340 Ogden Street, New Haven, Connecticut.

## JURISDICTION AND VENUE

6.   The Plaintiff alleges violations of federal statutes, Title VII and the ADEA, as well as FEPA and Connecticut common law, contract and torts.  As this action arises under the laws of the United States, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over claims arising under state law.

7.   Plaintiff timely and dually filed a Charge of Discrimination pursuant to Title VII and the Connecticut Fair Employment Practices Act with the Connecticut Commission of Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC")

on March 4, 2013, in which she alleged with particularity her claims of gender and age discrimination against Yale University.

8.  Plaintiff filed an amended Charge of Discrimination with the CHRO and EEOC on August 15, 2013, in which she alleged further gender- and age-based discrimination and retaliation by Yale.

9.  Plaintiff received a Notice of Right to Sue from the CHRO on October 5, 2013.

10. Plaintiff filed an additional Charge of Discrimination Against Yale and Defendants Rae, Snyder, and Metrick on or about December 20, 2013, with a request that the CHRO immediately issue a right to sue letter so that all relevant facts and claims can be consolidated in this single action.

11. Plaintiff has exhausted all administrative remedies prior to initiating this lawsuit, including internal remedies available from Yale University.

12. Venue is appropriate in this District under 28 U.S.C. § 1391(b)(1) and (2) as the Defendants reside in this District, and substantially all of the actions and omissions committed by the Defendants which give rise to this Complaint occurred in this District.

13. This Court has personal jurisdiction over the Defendants because Defendants reside in this District and because substantially all of the actions giving rise to this Complaint occurred in this District, or had a substantial impact and have caused injury within this District.

14. The Parties are engaged in a real and justiciable controversy concerning the legality of the Defendants' actions described herein and seek the Court's intervention to resolve the dispute and declare the rights of the Parties.

## BACKGROUND FACTS

15. The Plaintiff, Professor Constance E. Bagley, brings this action for discrimination, retaliation, and other unlawful conduct against Yale University ("Yale"), Professor Douglas Rae

("Professor Rae"), Dean Edward Snyder ("Dean Snyder"), and Deputy Dean Andrew Metrick ("Dean Metrick"), individually.

16. Professor Bagley was invited to join the Yale School of Management ("Yale SOM") faculty in 2007, relocating herself and her young son from Massachusetts, seeking stability and a promotion to full professor and anticipating finalizing her professional career at Yale.

17. At the invitation of then-Yale SOM Dean Joel Podolny, Professor Bagley secured an appointment as a "Professor in the Practice" for an initial five-year term (ending on June 30, 2013), with the promise of a multi-year renewal, as long as her performance met expectations. As one tenured SOM professor told her, "to not get reappointed as a Professor in the Practice, you have to have really f-cked up and you haven't.  To the contrary, you have done well."

18. In fact, Professor Bagley did very well.  During her first four years at Yale, she co-developed "State and Society," a major core course for which she received excellent course reviews, and won the Excellence in Teaching Award.  She authored several publications published in nationally-recognized journals and magazines, in addition to co-authoring a new edition of a book on entrepreneurship that has been described by *Business Insider* as "perhaps the most useful business book you can ever read."

19. Along with her academic achievements, Professor Bagley was the primary architect of Yale University's new policies on sexual misconduct, she served as a core member of the University-Wide Committee for Sexual Misconduct, and she continued to publicly advocate for equal treatment of women at Yale and for an end to sexual misconduct, including the creation of a hostile environment.  Her contributions to the University and its students were significant.

20. Despite these achievements and accolades, the Yale SOM leadership, in decisions tainted by sexual bias and retaliation, refused to renew her appointment for another five or ten-year

term.  Professor Bagley became the object of gender stereotyping.  She didn't fit the Yale vision of the young male SOM professor, or the more passive subordinate female professor who would bend to their will.  Professor Bagley had the temerity to challenge gender biased decision-making and challenge the dominant, older male leadership.

21. The conclusion by the Yale SOM leadership that she should be forced out of Yale then went searching for a reason.  Professor Rae, a peer and colleague, told lies about her performance and capabilities out of discriminatory animus.  Dean Snyder and Dean Metrick further aided and abetted the discrimination by shifting standards for her review and ever changing the reasons for her non-renewal.

22. Professor Bagley was replaced by not one, but two younger, less experienced males— individuals Professor Rae and Dean Snyder could fully endorse as fitting the Yale model of male dominance.

23. Professor Bagley was undeterred.  She challenged the nonrenewal decision and raised concerns of bias.  She filed an internal grievance with the University and, indeed, her concerns were validated.  The initial committee appointed to review her internal grievance (the "Harte Committee") found that, not only had she relied to her detriment on the promises made at the time of hiring, but she had been subjected to "a chilly environment for women" and "inappropriate comments and behaviors based on gender."  Even comments made to the Harte Committee during interviews characterized her "in a manner that may be deemed offensive to women."

24. Having had the temerity to complain about gender stereotyping and discrimination, her situation at Yale only became worse.  Retaliation ensued.  For more than a year and a half, Professor Bagley has been forced to endure multiple and unusually lengthy and delayed

pretextual "review" processes.

25. As a result, despite the unanimous findings of two Yale SOM faculty review committees that Professor Bagley's teaching, scholarship and service clearly warranted renewal, and in the face of a blatant lack of due process, her contract was not renewed. She must depart the University by December 31, 2014, with her reputation in tatters, and, for both personal and professional reasons, making relocation to another academic institution virtually impossible.

## FACTUAL ALLEGATIONS

26. Constance E. Bagley is a sixty-one year old professor who holds a J.D., *magna cum laude*, from Harvard Law School and a Bachelor of Arts in Political Science, *with distinction and honors*, from Stanford University.

27. Professor Bagley has taught numerous courses in business administration, law, management, and government at several institutions, including Stanford, Harvard, and Yale.

28. Prior to becoming a full-time academic, Professor Bagley was a partner in the law firm of Bingham McCutchen, where she specialized in corporate governance, entrepreneurship, securities, and mergers and acquisitions.

29. Professor Bagley currently serves as Professor in the Practice of Law and Management ("Professor in the Practice") at the Yale School of Management ("Yale SOM") in New Haven, Connecticut, where she has worked since 2007.  At Yale SOM a Professor in the Practice is distinct from a lecturer or other adjunct faculty rank.  Professor Bagley is also a Senior Research Scholar at the Yale Law School.

30. Professor Bagley is the only woman ever appointed to the rank of Professor in the Practice at Yale SOM.

31. Professor Bagley was recruited to Yale in 2007 by Joel Podolny ("Dean Podolny"), who

at that time was the Dean of the SOM, for a one-year appointment as a visiting Associate Professor.

32. In April 2008, Professor Bagley accepted an employment contract with Yale SOM as a Professor in the Practice for an initial five-year appointment, commencing on July 1, 2008, and ending on June 30, 2013, with the opportunity for multi-year renewals.  The terms of her appointment were negotiated directly with Dean Podolny.

33. Professor Bagley's offer letter stated that she would be reviewed in the fourth year of her appointment for continuation as a Professor in the Practice.  Although omitted in the first draft of the letter, at the request of Professor Bagley, the final draft of the letter added language drafted by Yale stating that the "review will be similar in process and use similar criteria to those of the review which lead to this current appointment."

34. At the time of her appointment, Professor Bagley was assured that reappointment for an additional five- or ten-year term would be based solely on her performance.  "Programmatic need" was not a condition for renewal of a Professor in the Practice at Yale SOM.  In contrast, "programmatic need" is expressly referenced in the section of the Yale Faculty Handbook concerning lecturers and other adjuncts at Yale SOM (not Professors in the Practice), as well as the sections concerning appointments as both adjuncts and Professors in the Practice at other Yale professional schools (not SOM), such as the School of Forestry and Environmental Studies. A copy of the Yale Faculty Handbook was incorporated by reference into the revised offer letter sent to Professor Bagley.

35. The section of the Yale Faculty Handbook relating to Professors in the Practice at Yale SOM—particularly when viewed in light of the sections concerning renewal of other faculty ranks at both the SOM and the other graduate and professional schools at Yale—makes clear that

the SOM Dean, Dean Podolny, had actual and apparent authority to make reappointment contingent solely on individual performance.

36. Had the Yale SOM leadership ever indicated to Professor Bagley that reappointment was contingent on anything other than her personal performance, she would never have accepted Yale's offer for a position with only an initial five-year term.

37. At no point prior to the evening of May 7, 2012, when Dean Snyder told her that the tenured faculty had recommended that her appointment  should not be renewed because there were "no courses for [her] to teach," did Yale inform Professor Bagley of any change in the performance standard for her renewal,  or of any additional conditions for reappointment.

38. At the time she was appointed, it was represented to Professor Bagley that in Yale SOM's history, there had never been a Professor in the Practice whose appointment had not been renewed.

39. Professor Bagley's employment letter also stated that she would be a "full-time voting member of the faculty on all matters except tenure appointments" and that she was "eligible for the same benefits as other full-time members of the senior faculty."  Professor Bagley was given the rank of full professor and, in essence, nearly the same status as a tenured professor.

40. In reliance on these representations by Yale and its agents, Professor Bagley moved with her young son from Newton, Massachusetts, to Woodbridge, Connecticut.  Before moving, she expressly communicated to Yale and its agents the requirement (both for professional and personal reasons) that she was only interested in an employment situation that offered both a long-term commitment and senior status in order for her to forego other employment opportunities she had been considering at the time she was recruited by Yale; she was so assured.

41. Professor Bagley's teaching, scholarship, and service to Yale have been exemplary over

the course of her employment at the SOM.

42. In 2009, Professor Bagley won the School of Management Award for Excellence in Teaching in the full-time MBA Program.  She won the Executive MBA Excellence in Teaching Award in 2013.

43. One of Professor Bagley's greatest accomplishments has been her leading role in developing and co-teaching a "core" course called "State and Society."  She co-taught this course for five years with Professor Rae.  She also developed and successfully taught "Legal Aspects of Entrepreneurship" as well as "Law for Executives" in the Executive MBA Program, for which she won the teaching award in 2013.

44. Professor Bagley has published in top management and law journals and is the author of the leading treatise in her field.  Lund University recognized her pioneering work with an honorary doctorate in economics in 2011.

45. Professor Bagley's book, *The Entrepreneur's Guide to Business Law*, was recently selected as one of the "25 Books Every Entrepreneur Should Read" by *Business Insider* and deemed by one leading entrepreneur as "perhaps the most useful business book you can ever read."

46.  Among other service to Yale, Professor Bagley served as co-chair of the Yale University Women Faculty Forum Working Group on Sexual Misconduct.  She was the primary architect of Yale's new policy on reporting, investigating, and sanctioning sexual assault, sexual harassment, and other forms of sexual misconduct by faculty, staff, and students and serves as a core member of the University-Wide Committee on Sexual Misconduct (UWC).

47. As part of her work on the UWC, Professor Bagley and others participate in adjudication proceedings involving women at Yale who have complained of sexual misconduct by one or

more Yale employees. A finding for the complainant in any such case exposes the University to potential vicarious liability, thereby creating a potential conflict of interest for the attorney from the Yale Office of General Counsel advising an adjudicatory panel on both procedure and applicable law. Professor Bagley suggested that outside counsel be retained in such a case, but that request was denied.

48. In the spring of 2012, Professor Bagley raised directly with the Chair of the UWC, Michael Della Rocca, her concern that her advocacy on behalf of women at Yale would negatively impact her re-appointment and her belief that the gender-based animus she faced was retaliatory for her advocacy of positions that did not conform to the wishes of the Yale Office of General Counsel. The Chair took no action in response.

49. In June of 2012, the Office for Civil Rights ("OCR") completed a two-year investigation into Yale's compliance with various provisions of Title IX, with a specific focus on the handling of complaints of a hostile environment, sexual harassment, sexual assault, and other forms of sexual misconduct. In response, Yale Vice President and General Counsel Dorothy Robinson signed a consent decree that binds Yale University to the terms of the decree.

50. In February 2012, Dean Metrick informed Professor Bagley that joint teaching assignments in "core" courses, like State and Society, would be largely eliminated. This surprising decision would put in jeopardy the co-teaching arrangement she had with Professor Rae in the teaching of State and Society. In this same conversation, Dean Metrick acknowledged the difficulties Professor Bagley had raised about Professor Rae. Not only did Professor Rae fail to timely respond to Professor Bagley about important course issues, but he also frequently publicly mocked and demeaned her as a woman, as she was not bending sufficiently to what was expected to be stereotypical female behavior.

51. In February 2012, Dean Metrick offered to remove Professor Rae from teaching the course, but Professor Bagley declined in an attempt at maintaining collegiality and respect. Dean Metrick promised to work with "them" on helping the course run more smoothly. This did not happen, despite Dean Metrick being on notice that Professor Rae appeared to harbor gender animus toward Professor Bagley.

52. In or around 2012, Professor Rae also began to make derogatory comments about Professor Bagley, overstate and elevate his own contributions, and work to replace her ideas and course materials with his own.

53. Over the course of co-teaching the State and Society course in spring 2012, Professor Rae made several gendered comments in Professor Bagley's presence, including mocking a woman's voice, and he treated her (by his demeanor, tone, and words) with open hostility and disrespect both inside and outside the classroom.

54. By way of example only, notwithstanding repeated written and oral requests to provide advance copies of his slides and teaching plans so Professor Bagley could better coordinate co-teaching, Professor Rae would consume a class session and ignore Professor Bagley or block her access to the table with her copy of the teaching case and notes. He also unilaterally changed the State and Society syllabus at the last minute.

55. In written course evaluations, a student reported that Professor Rae had stated in front of the entire first-year class that he had good hearing except when it came to the "shrill, high-pitched voice" of his wife. The student was clearly offended, commenting, "[W]e are not in the 1950s teaching to an exclusively male audience anymore, come on Rae."

56. An administrative assistant, Camille Costelli, overhead Professor Rae in 2011 threatening to "blackball" Professor Bagley.

57. Professor Rae literally slammed his office door in Professor Bagley's face in front of his assistant while she was attempting to discuss his decision to post the final examination for State and Society online before reviewing it with her, as she had considerable substantive and teaching responsibilities for the course.

58. In April 2012, Professor Bagley asked Dean Snyder to consider her for a promotion to an endowed tenured professorship, the Nierenberg Chair of Corporate Governance.  As part of that process, she asked to meet with Professor Rae, who chaired the search committee for the Nierenberg Chair, about her candidacy.  He never responded to her requests for a meeting, and upon information and belief, blocked consideration of her as a potential candidate.

59. Professor Bagley's request for consideration of the Nierenberg Chair was also met with angry rejection by Dean Snyder.  On April 16, 2012, Dean Snyder surprisingly threatened Professor Bagley by telling her he would bring in someone who would "dominate" her if she continued to pursue the Chair.  By this she understood the successful candidate would be male, and that her candidacy was being rejected based on her gender.  To date, the Nierenberg Chair remains unfilled, and Professor Bagley's application is dormant.

60.  Professor Ruth Aguilera of the University of Illinois also applied for the Nierenberg Chair but was not selected for the position despite her excellent qualifications.  Before applying for the Chair herself, Professor Bagley advocated for Professor Aguilera to Professor Rae and others and, when Professor Aguilera was not selected, openly questioned the search committee's decision, and the degree to which gender bias played a role.

61. Pursuant to Professor Bagley's initial contract, and Yale SOM policies, Dean Metrick notified her on October 19, 2011, that a committee chaired by Professor Paul Bracken (the "Bracken Committee") would review her "accomplishments" and prepare a report on her case,

which would then be voted on by the Yale SOM senior faculty.  There was no mention, at this time, or at any time before May 7, 2012, that any factor other than her "accomplishments" would be considered in the reappointment process.

62. The Bracken Committee unanimously recommended reappointment based on its positive assessment of her scholarship, teaching, and service to Yale.

63. Prior to the initial Yale SOM faculty vote on May 7, 2012 (and after Dean Snyder threatened her if she pursued the Nierenberg Chair), Professor Bagley asked Dean Snyder if she could be considered for tenure. He told her that he was unwilling to create a tenure line in legal studies and that she would have to work with Dean Metrick to craft an arrangement within the confines of the rank of Professor in the Practice. Dean Snyder also told her that he was unwilling to grant her the voting rights she had secured as part of her original contract.

64.  Less than three weeks before the adverse faculty vote, Dean Metrick falsely assured Professor Bagley that "of course" her contract would be renewed for at least five years, sufficient time for her teenage son to graduate from high school.

65.  In an email dated May 2, 2012 and sent to various Deans and an administrative assistant, Professor Rae wrote that he wanted to  "clarify factual issues from the recent past."  He then went on to set out circumstances where, according to his rendition of events, Professor Bagley did not attend classes in the course they co-taught, State & Society, sometimes offering excuses in advance and other times simply not showing up.  The description was of a teacher inattentive to her classroom.

66.  Rae's statements about Prof. Bagley were false and were motivated, on information and belief, by Rae's desire to harm Professor Bagley's reputation and to remove her (not him) from teaching the State & Society course, something he cynically hoped would cause her harm, by

setting the stage for her non-renewal, as it did.

67.   In her negotiations with Dean Metrick, she asked to be considered for a ten-year contract, as opposed to the standard five-year contract, that Dean Podolny had indicated would be an option if the first four years "went as expected."  After consulting with Dean Snyder, Dean Metrick informed Professor Bagley on May 5, 2012, that the BPO would vote first  on reappointment for five years, then, if that was vote was favorable, consider recommending a ten-year term. This was the first time anyone in the Yale leadership had ever questioned the certainty of her reappointment for at least five additional years.

68.   At a meeting on May 7, 2012, the recommendation of the Bracken Committee was submitted for approval to Yale SOM's Board of Permanent Officers ("BPO"), which consists of Yale SOM tenured faculty.

69.   Upon information and belief, Professor Rae participated in the discussion of the positive recommendation of the Bracken Committee, and he falsely suggested to members of the BPO (before or during that meeting) that there were deficiencies in Professor Bagley's teaching of the State and Society course with him.

70.   Upon information and belief, during or before the discussion of Professor Bagley's case at the BPO meeting, certain senior faculty expressed their belief that she had been too "aggressive" in applying for the Nierenberg Chair and for seeking tenure or a ten-year contract renewal.

71.   Inexplicably, on May 24, 2012, Dean Snyder wrote to formally inform Professor Bagley that the BPO had voted against her renewed appointment as a Professor in the Practice and that—although the BPO vote is merely advisory and he, as Yale SOM Dean, has final authority to renew a Professor in the Practice appointment—he had decided not to renew her contract for

another five-year term.  This decision for non-renewal contradicted the unanimous favorable

recommendation for renewal from the Bracken Committee.  Moreover, Professor Bagley had

never been advised of any deficiencies in her teaching, scholarship, or commitment to Yale

before the vote.   Indeed, Dean Snyder had told her on May 7, 2012 that the review of her work

was "positive."

72.   The pretexual explanation Dean Snyder gave Professor Bagley for the non-renewal of her

contract was that there were "no courses for [her] to teach."  Apparently, this was the result of

Professor Rae soliciting a younger male, Professor Ian Shapiro ("Professor Shapiro"), to co-teach

State and Society with him.  Professor Shapiro was not only a younger male, but he did not have

the experience and expertise that Professor Bagley clearly brought to the course.  Subsequently,

another younger male, Senior Lecturer David Bach ("Senior Lecturer Bach"), was selected to

teach State and Society in the Executive MBA Program; Bach also did not have the experience

and expertise that Professor Bagley brought to teaching the course. On information and belief,

Senior Lecturer Bach was interviewing at Yale SOM the same day the BPO voted not to renew

Professor Bagley's appointment.

73.   On June 19, 2012, Professor Bagley filed a formal complaint of discrimination pursuant

to the Yale University Faculty Handbook requesting a provostial review of Dean Snyder's

decision not to renew her contract.  The complaint was addressed to then-Provost and now-

President of Yale, Peter Salovey ("President Salovey") and alleged, among other claims, gender

bias, failure to follow Yale's own reappointment procedures, and violation of the terms of her

contract.

74.   Professor Bagley's June 19, 2012, complaint stated, in part: "The real reason for the

nonrenewal of my appointment is gender bias, including sexual stereotyping, in violation of

15

Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and applicable Connecticut state law."

75.   After she learned that Senior Lecturer Bach, who joined the Yale SOM faculty as of September 1, 2012, would be teaching State and Society in the Executive MBA Program, she amended her complaint in October 2012 to add a claim of age discrimination.

76.   In response to her internal complaint, President Salovey appointed yet another committee (the "Harte Committee") to investigate and draft a report concerning the decision not to reappoint her (the "Harte Report" or "the Report").  The Yale Faculty Handbook provides that Yale is bound by the findings of facts of a provostial review committee.

77.   The Harte Committee, including Committee Chair Verity Harte, conducted several interviews with faculty members and deans as part of its review of and deliberations on Professor Bagley's concerns about the treatment she faced.  The Harte Committee interviewed Professor Rae on October 10, 2012, during which time Professor Rae informed the Committee that Professor Bagley was "delusional."

78.   The Harte Committee prepared two reports, dated November 28, 2012 ("Harte Report") and March 3, 2013 ("Revised Harte Report"), which were both submitted for review to President Salovey.  In neither the report by the Bracken Committee, nor the Revised Harte Report, was there any hint that Professor Bagley's non-renewal related to her performance as required by her contract.  The criteria being applied to Professor Bagley shifted yet again, inconsistent and contradictory and struggling for justification.

79.   Despite application of an improperly high standard of proof (beyond a reasonable doubt), the Harte Committee concluded, *inter alia*, that Yale SOM had violated promises made to induce Professor Bagley to accept Yale SOM's offer of employment—particularly with respect to the

standards by which she would be evaluated for renewal—on which she reasonably relied in

accepting the five-year appointment.  The Report stated: "Had Professor Bagley been able to

assert her view of her contractual rights and to defend, in a systematic way, her conduct amidst

the [alleged] deterioration of the State and Society course, she and the school's leaders might

have come to a different and mutual understanding about the defensible contours of the rights

granted by the employment agreement."

80.   The Harte Committee suggested that the language drafted by Yale in Professor Bagley's

employment letter regarding standards for reappointment was "ambiguous."  However, it also

found that an email from Dean Podolny to Professor Bagley before that language was added

suggested that "absent such a full re-evaluation of the Professor in the Practice position,

Professor Bagley would be reappointed on the same quality and pace of scholarship, teaching

and citizenship demonstrated at the initial appointment in 2008." The Harte Committee found

that there was no "full re-evaluation of the Professor in the Practice position" before the May 7,

2012 BPO vote on Professor Bagley's reappointment.

81.   The Harte Report further found that Professor Bagley had been subjected to a hostile

environment at Yale SOM and that there had been "inappropriate comments and behaviors based

on gender," "a chilly environment for women" in contexts involving Professor Bagley, and

comments made to the Committee during interviews characterizing her "in a manner that may be

deemed offensive to women."

82.   The Harte Report concluded that Professor Bagley's non-renewal may have been

"influenced by reactions to her gender in combination with aspects of her personal style and her

requests for consideration of tenure, a chair, and for a longer-term appointment"—in other

words, gender stereotyping and retaliation for having the temerity to complain about

discrimination and aggressively pursue her career options.

83.   The Harte Report also indicated that one or more members of the BPO either stated or were advised that Professor Bagley had been responsible for a "meltdown" in the State and Society course.  Upon information and belief, Professor Rae used this term, among others, to falsely convey to the SOM Deans that she was at fault for any alleged—though false—problems with the course.  Professor Rae's discriminatory animus and retaliatory conduct were embedded in the BPO's consideration of Professor Bagley.

84.   The Harte Report also stated that the "lack of transparency in appointment and reappointment criteria . . . may disadvantage faculty who face reappointment."  Despite her requests, Professor Bagley has been denied access to any of the actual Yale SOM faculty reports reviewing the issue of her reappointment.

85.   The Harte Report further concluded that the decision by the SOM Deans to terminate her role in State and Society and to announce that termination to the BPO *immediately before* they voted on her renewal "seems to have deprived her of the benefit of an unbiased and judicious process of review."

86.   The Yale SOM Deans terminated Professor Bagley's role teaching State and Society despite the fact that her reviews for the 2012 teaching of the course were at least as strong as the ratings and evaluations received by multiple male SOM professors teaching other "core" courses. Upon information and belief, these other male professors' teaching abilities were not challenged the way Professor Bagley was unfairly challenged.  Although available, the spring 2012 State and Society course ratings were not presented to the BPO before the vote on her reappointment.

87.   On December 17, 2012, in accordance with Yale's internal review procedures, Professor Bagley submitted a response to the Harte Report, raising again numerous errors of law and fact,

including the false claim that the State and Society course had been a failure, and indicating that she had been treated differently from her male peers.

88.   After Professor Bagley again raised concerns about disparate and discriminatory treatment and provided the Harte Committee with a copy of the 2012 State and Society course evaluations, a revised version of the Harte Report ("Revised Harte Report") was released. It deleted the challenged false statements from the initial report.  The Revised Harte Report further indicated that the alleged cause of the concerns about State and Society had not been considered by SOM Deans before removing her from the course or before the BPO vote, and that her course reviews had not been made available to the BPO before the vote—resulting in a "variation in SOM's procedures."

89.   Although Dean Snyder had previously indicated that Professor Bagley's appointment had not been renewed because there were "no courses for [her] to teach," the Revised Harte Report now added—in the world of ever-shifting expectations and pretextual reasons—that there had been a "curricular decision about the future of the course."  Notwithstanding her clear voting rights and status as a full professor, at no time was Professor Bagley made privy to such a decision or offered an opportunity to weigh in on the subject.

90.   In April 2013, AACSB International, the primary accrediting body for graduate and undergraduate business schools, including Yale SOM, amended its accreditation requirements to expressly require coverage of legal and regulatory issues.

91.   Contrary to the assertion that the decision not to reappoint Professor Bagley resulted from a curricular shift, Professors Rae and Shapiro taught State and Society in Spring 2013 to the full-time MBA students—in substantially the same form and with almost all the same topics as when Professor Bagley had co-developed and taught it in prior years.  Senior Lecturer Bach, a newly

hired young male, taught the course to the Executive MBA students.  Professor Bagley was replaced in teaching a core course that was substantially similar to the course she co-developed and co-taught after being recruited to join the Yale SOM faculty, by younger males with no comparative experience or expertise.

92.   The 2013 syllabus for State and Society added sessions back into the course on topics Professor Bagley had previously selected and co-authored; it also included four cases she had co-authored; and it deleted cases Professor Rae had forced her to include the previous year, thus modeling the 2013 version of the course more around Professor Bagley's original work.

93.   Professor Shapiro received substantially lower ratings from students for his teaching of State and Society in 2013 than Professor Bagley has ever received, to no consequence.

94.   Although not permitted to teach State and Society to Yale MBA students, Professor Bagley was asked by the Yale SOM leadership to teach the course in Summer 2013 to prospective students in SOM's pre-MBA program.  She also successfully taught in SOM executive programs for Latin American lawyers, a group of Chinese managers, and members of the American Institute for Graphic Artists.

95.   Professor Bagley's evaluations confirmed she suffers from no lack of competence, and exceeds by any measure the "performance" criteria for continued employment as set forth in her original contract.

96.   On April 4, 2013, Professor Bagley received a letter from President Salovey concluding that—based on the Revised Harte Report and input from Deans Snyder and Metrick—the standards used to review her reappointment were not made sufficiently clear to her, and that the alleged issues involved with her teaching of State and Society required further review.  This would be the fourth attempt to rationalize Professor Bagley's fate at Yale SOM, shifting yet

again the pretextual criteria.  Moreover, President Salovey ordered the BPO to review her case "anew" after a Yale SOM faculty review committee articulated the standards for reappointment as a Professor in the Practice at the SOM and explained how they applied in her case.

97.  In June 2013, Dean Metrick advised Professor Bagley that a review committee would, in accordance with the decision of April 4, 2013 by Peter Salovey (who assumed his new position as President of Yale University on July 1, 2013), review Professor Bagley's reappointment decision and articulate the standards that should apply when reviewing Professors in the Practice. This represented the further introduction of criteria inconsistent with, and contrary to, the terms of Professor Bagley's contract.

98.  This three-member committee (the "Pinker Committee") was chaired by Edieal J. Pinker ("Professor Pinker"), a recently hired Professor of Operations Research at Yale SOM who had little or no background on Professor Bagley's employment, her contract, the discriminatory and retaliatory events that had already unfolded, or the reappointment standards applied to the other (all male) Professors in the Practice.  The Pinker Committee's Report (the "Pinker Report") was submitted to the BPO for consideration and another vote.

99.  Despite President Salovey's decision requiring "investigation" of the Spring 2012 teaching of State and Society, Professor Bagley was informed on May 7, 2013, that she would not be permitted to teach State and Society in the 2013-2014 academic year.  The course would again be taught by Professors Rae and by her replacements, two younger, less experienced males, Professor Shapiro and Senior Lecturer Bach. No explanation was given for her removal from the core course she had played a significant role in developing and successfully teaching.

100. At a general faculty meeting in September 2013, Dean Metrick remarked that Yale SOM "didn't get our man" for the Nierenberg Chair, a reference to a male candidate.  Despite her

competitive candidacy and qualifications, Professor Bagley was not fairly considered for the position and the position remains unfilled.

101. Although Professor Bagley has not been permitted to review the Pinker Report because it has been deemed "confidential," she was informed by Deputy Provost Stephanie Spangler, M.D., that the Pinker Committee, like the Bracken Committee, had found her teaching, scholarship, and citizenship to be exemplary. Despite multiple efforts to conjure reasons for the refusal to renew her contract, none could be found.

102. Undeterred, and despite the findings of the Pinker Committee, on October 21, 2013, the BPO again voted against renewal of Professor Bagley's contract as a Professor in the Practice. Dean Metrick informed her of the negative vote that evening and the decision was communicated to Professor Bagley in a letter from Dean Snyder on November 7, 2013, in which he stated his decision to follow the BPO's recommendation not to renew her appointment.

103. The review process by the Pinker Committee and the BPO vote were again tainted by discriminatory animus and retaliation by Professor Rae and the Yale SOM leadership, aided and abetted by Dean Snyder and Dean Metrick, and by total disregard for her contractual rights.

104. The charge to the Pinker Committee provided by Dean Metrick was inconsistent with the terms of Professor Bagley's employment contract from Dean Podolny. Additionally, upon information and belief, the Yale SOM leadership intentionally did not provide the Pinker Committee or the BPO with copies of the Harte Report, the Revised Harte Report, Professor Bagley's employment contract, or other materials that would be critical to their analysis, all in an attempt to manipulate the desired outcome.

105. The Pinker Committee devised yet again a new set of standards for renewal of Professors in the Practice: (1) teaching; (2) writing; (3) engagement and service; (4) need – defined as

"experience and expertise that the school views as essential but currently lacks"; and (5) reputation.

106. Not only did the Pinker Committee devise new standards for renewal, but the BPO actually voted on these new standards *immediately before* they voted not to renew Professor Bagley's appointment.  Yet again, Professor Bagley was denied the fair application of the standards set forth in her contract and in Yale's policies and procedures.

107. Because by all measures Professor Bagley met even the "new" standards established by the Pinker Committee, to accomplish the goal of refusing to renew her contract, Dean Metrick asserted another pretextual reason: the BPO found that there was no "need" for her at the SOM. This was despite the fact that she has been teaching a full course load and that "programmatic need" was neither a condition for renewal as outlined by the Dean upon hiring nor a standard provided in the Yale Faculty Handbook.

108. Dean Metrick told Professor Bagley, however, that "need" is a discretionary factor left for consideration by the BPO.  He further stated that although the Pinker Committee did not consider how the "need" factor applied to Professor Bagley—notwithstanding the President's instruction relating thereto—he could apply such a condition in his discretionary decision-making role.  This decision was in retaliation for Professor Bagley's requests for promotions and her refusal to submit to the repeated gender based and retaliatory "reviews"—all searching for pretextual reasons to justify a foregone conclusion.

109. Along with and even aside from State and Society, there is a full complement of courses Professor Bagley can teach, including "Managing Legal and Regulatory Complexity," a new course she will be teaching in Spring 2014.

110. In early September 2013, Dean Snyder announced the opening of a Non-Ladder

Entrepreneurship position at the SOM.  Although Professor Bagley requested a meeting to discuss her candidacy for this position on September 28, 2013, Dean Metrick postponed this meeting to the day *after* the BPO vote on her renewal was scheduled.  She was not permitted to meet with him, and the chair of the entrepreneurship search committee, until October 29, 2013, at which time she was informed that the search committee would begin reviewing applications two days later, on October 31, 2013.  Her ability to apply had been effectively manipulated in the hope of foreclosing her application.  Although she has applied for this position, to date, she has not been selected for this position, and has been deprived of a fair opportunity to be considered.

111. Professor Bagley's contract with Yale SOM expires on December 31, 2014.  Yale SOM was obligated to extend her contact until this date due to its own delay in reviewing Professor Bagley's reappointment in accordance with the terms of her contract and the provisions of the Yale Faculty Handbook.

112. A culture exists within Yale in which strong, assertive and professionally accomplished women who are not stereotypically female in their appearance, behavior and attitudes are viewed negatively because they do not meet certain gender expectations by the dominant male leadership.

113. More than 90% of the tenured faculty at Yale SOM  are male, and not a single woman has been granted tenure at Yale SOM since 2002. According to the most recent study by the Yale Women's Faculty Forum, no school at Yale has such a low percentage of senior women.

114. No senior female faculty members at Yale SOM sit on any SOM faculty committees.

115. Professor Bagley was not asked to serve on a panel as a member of the University-Wide Committee on Sexual Misconduct for a period of almost a year.  She has not been asked to serve on one case involving a Yale faculty member or employee since filing her request for provostial

review of the non-renewal decision.

116. Although her contract stated that she would be a "full-time voting member of the faculty on all matters except tenure appointments," she has been denied a seat at meetings of full professors at which critical curricular decisions have been made, including those which could have impacted her own position at Yale.

117. When, in April 2012, Professor Bagley reiterated to Dean Snyder her concerns and questions about Yale SOM's ongoing failure to honor her contractual voting rights, Dean Snyder commented in a sarcastic and dismissive tone, "Yes, I remember your raising your hand about that."

118. Dean Metrick then proceeded to vitiate Professor Bagley's voting rights when, at the May 7, 2012 meeting (before Professor Bagley had left and they considered her case), Dean Snyder announced that, per the suggestion of Dean Metrick, they were expanding the "appointments committee," for which only BPO members are eligible, to include curriculum and strategy. Professor Bagley would now be excluded from voting on decisions involving SOM curriculum and strategy, contrary to the terms and conditions of her contract.

119. Upon information and belief, Professor Bagley's Yale e-mail account and Google e-mail account were hacked by University administration in or around November 2013 and certain e-mail exchanges have been viewed by SOM administration, in potential violation of her privacy, University protocol, attorney-client privilege and patient-physician privilege.  This also resulted in multiple delayed communications, making it much more difficult for Professor Bagley to complete her work in a timely manner.

120. Professor Bagley has faced ongoing discrimination and harassment by Yale because of her gender, her failure to conform to gender stereotypes, her age, and her complaints regarding

discrimination.

121. Professor Bagley has also faced ongoing retaliation by Yale after filing her internal grievance with the University, and subsequently her complaints with the Connecticut Commission on Human Rights and Opportunities and EEOC.

122. Professor Bagley has been treated differently in the terms and conditions of her employment than similarly situated males, and her performance has not been evaluated on the same basis and with the same criteria as her male colleagues, including, without limitation, male Professors in the Practice at Yale SOM.

123. Professor Bagley's contract has not been renewed based on pretextual reasons and in direct breach of her original employment contract and Yale's own policies and procedures.

124. On November 13, 2013, Stephanie S. Spangler, M.D., the Deputy Provost for Health Affairs and Academic Integrity, confirmed that Yale offers no further means to challenge Yale SOM's decision not to reappoint her as a Professor in the Practice.  Provost Ben Polack confirmed this in an email to Professor Bagley dated December 2, 2013.

125. As a result of the Defendants' wrongful conduct, Professor Bagley has suffered and will continue to suffer significant damages, including but not limited to lost income, emotional distress, consequential damages and an enduring harm to her reputation and career.

## <u>COUNT ONE</u>
### <u>(GENDER DISCRIMINATION UNDER TITLE VII -YALE)</u>

126.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

127.  Title VII makes it unlawful for an employer to discriminate against an employee based on that person's gender. 42 U.S.C. §2000e-2.

128.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was because of her gender in violation of Title VII.

26

129.  Yale's alleged bases for its adverse and disparate treatment of Plaintiff are pretextual and were asserted only to cover up the discriminatory nature of its conduct.

130.  Even if Yale could assert a legitimate reason for its adverse and disparate treatment of Plaintiff, which reason it did/does not have, Plaintiff's gender was also a motivating factor in the adverse and disparate treatment to which she was subjected.

131.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

132.  As a result of Yale's discriminatory conduct, and discriminatory termination of Plaintiff, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering, and loss of dignity damages.

<u>COUNT TWO</u>
**(GENDER DISCRIMINATION UNDER CONNECTICUT FEPA–YALE)**

133.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

134.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(1), makes it unlawful for an employer "to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex."

135.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was because of her gender in violation of § 46a-60(a)(1) of the Connecticut Fair Employment Practices Act.

136.  Yale's alleged bases for its adverse and disparate treatment of Plaintiff are pretextual and were asserted only to cover up the discriminatory nature of its conduct.

137.  Even if Yale could assert a legitimate reason for its adverse and disparate treatment of Plaintiff, which reason it did/does not have, Plaintiff's gender was also a motivating factor in the

adverse and disparate treatment to which she was subjected.

138.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

139.  As a result of Yale's discriminatory conduct, and discriminatory termination of Plaintiff, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering and loss of dignity damages.

**COUNT THREE**
**(AGE DISCRIMINATION UNDER THE ADEA - YALE)**

140.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

141.  The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq. (ADEA), makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a).

142.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was because of her age in violation of the ADEA.

143.  Yale's alleged bases for its adverse and disparate treatment of Plaintiff are pretextual and were asserted only to cover up the discriminatory nature of its conduct.

144.  Even if Yale could assert a legitimate reason for its adverse and disparate treatment of Plaintiff, which reason it did/does not have, Plaintiff's age was also a motivating factor in the adverse and disparate treatment to which she was subjected.

145.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

28

146.  As a result of Yale's discriminatory conduct, and discriminatory termination of Plaintiff, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering, and loss of dignity damages.

<u>**COUNT FOUR**</u>
**(AGE DISCRIMINATION - CONNECTICUT FEPA–YALE)**

147.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

148.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(1), makes it unlawful for an employer "to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age."

149.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was because of her age in violation of § 46a-60(a)(1) of the Connecticut Fair Employment Practices Act.

150.  Yale's alleged bases for its adverse and disparate treatment of Plaintiff are pretextual and were asserted only to cover up the discriminatory nature of its conduct.

151.  Even if Yale could assert a legitimate reason for its adverse and disparate treatment of Plaintiff, which reason it did/does not have, Plaintiff's age was also a motivating factor in the adverse and disparate treatment to which she was subjected.

152.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

153.  As a result of Yale's discriminatory conduct, and discriminatory termination of Plaintiff, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering, and loss of dignity damages.

## COUNT FIVE
## (RETALIATION UNDER TITLE VII - YALE)

154.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

155.  Title VII makes it unlawful for an employer to retaliate against an employee for having opposed forbidden practices under Title VII. 42 U.S.C. §2000e-3.

156.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under Title VII.

157.  Yale's alleged bases for its retaliatory treatment of Plaintiff are pretextual and were asserted only to cover up the retaliatory nature of its conduct.

158.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

159.  As a result of Yale's retaliatory conduct, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering, and loss of dignity damages.

## COUNT SIX
## (RETALIATION UNDER THE ADEA - YALE)

160.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

161.  The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq. (ADEA), makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA.  *See* 29 U.S.C. § 623(d).

162.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under the ADEA.

163.  Yale's alleged bases for its retaliatory treatment of Plaintiff are pretextual and were asserted only to cover up the retaliatory nature of its conduct.

164.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

165.  As a result of Yale's retaliatory conduct, Plaintiff has suffered and will continue to suffer significant financial and economic damages due to loss of compensation and professional opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and suffering, and loss of dignity damages.

## COUNT SEVEN
## (RETALIATION UNDER CONNECTICUT FEPA–ALL DEFENDANTS)

166.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

167.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(4), makes it unlawful for "any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84."

168.  Yale's adverse and disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under § 46a-60(a)(4) of the Connecticut Fair Employment Practices Act.

169.  Yale's alleged bases for its retaliatory treatment of Plaintiff are pretextual and were asserted only to cover up the retaliatory nature of its conduct.

170.  Yale's conduct has been intentional, willful, malicious, reckless and conducted in callous disregard to Professor Bagley's rights, entitling her to punitive damages.

171.  As a result of Yale's retaliatory conduct, Plaintiff has suffered and will continue to suffer

31

significant financial and economic damages due to loss of compensation and professional

opportunities. Plaintiff has also suffered and will continue to suffer emotional anguish, pain and

suffering, and loss of dignity damages.

### COUNT EIGHT
### (BREACH OF CONTRACT - YALE)

172.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

173.  Yale extended an offer of employment to Professor Bagley and made express written and

oral representations with respect thereto as specifically set forth above.

174.  Professor Bagley accepted Yale's offer and agreed to provide services in return.

175.  Yale and Professor Bagley accordingly entered into an express written contract

concerning the terms and conditions of her employment.  These terms were set forth in both the

written offer letter signed on behalf of Yale SOM by Deputy Dean Stanley Garstka and in the

Yale Faculty Handbook (both attached hereto).

176.  The contract between Professor Bagley and Yale prohibits the parties from breaching that

contract by engaging in any activity or conduct which would prevent the other party from

receiving the benefits of the contract.

177.  Professor Bagley fully performed her obligations required by this contractual obligation,

except to the extent waived, excused or made impossible by Yale's breach of the contract.

178.  Defendant Yale breached its express contract through its intentional, discriminatory,

retaliatory and tortious acts.

179.  As a direct and proximate result of Yale's breach of the  express contract of employment,

Professor Bagley suffered and will continue to suffer damages including but not limited to loss

of earnings, lost benefits, loss of reputation, loss of professional opportunities, and other

economic and noneconomic damages.

**COUNT TEN**
**(PROMISSORY ESTOPPEL – YALE)**

180. Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

181. At the time of her appointment, Yale promised Professor Bagley, in her contract, in the Faculty Handbook, and in oral discussions, that the standards for her reappointment as a Professor in the Practice at Yale SOM after her first five-year term would be performance-based.

182.  In making this promises, Yale knew or should have known that Professor Bagley would rely on its promise.

183. Professor Bagley reasonably relied, to her detriment, on Yale's promise in accepting its offer of employment as a Professor in the Practice.

184. Yale breached its promise to Professor Bagley by changing the standards upon which she would be renewed after Professor Bagley had accepted its offer of employment.

185. As a result of her reasonable reliance on Yale's promise to her, Professor Bagley suffered and will continue to suffer damages including but not limited to loss of earnings, lost benefits, loss of reputation, loss of professional opportunities, and other economic and noneconomic damages.

**COUNT ELEVEN**
**(NEGLIGENT/INNOCENT MISREPRESENTATION – YALE)**

186.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

187.  At the time of her appointment, Yale represented to Professor Bagley, in her contract, in the Faculty Handbook, and in oral discussions, that the standards for her reappointment as a Professor in the Practice at Yale SOM after her first five-year term would be performance-based. Yale made no representation to Professor Bagley at this time that her reappointment would in any way be contingent upon "need," or other shifting criteria.

188.  Yale's representations to Professor Bagley were made to induce Professor Bagley to forego opportunities at other institutions and provide Yale SOM with her services.

189.  Yale had a duty to know, and the means of knowing, what representations were made to Professor Bagley, in her contract, the Yale Faculty Handbook, and otherwise.

190.  Yale also had a duty to ensure and the means of ensuring that the representations made to Professor Bagley about the terms of her reappointment, as set forth in her contract and in the Yale Faculty Handbook, were true and complete.

191.  To the extent, if at all, that factors other than individual performance applied to decisions to renew a Professor in the Practice at Yale SOM, Yale had a duty to disclose such factors to Professor Bagley at the time of her appointment.

192.  Professor Bagley justifiably relied upon the information provided by Yale in accepting her offer of employment as a Professor in the Practice.

193.  As a direct and proximate result of Yale's assertion in its decision to terminate Professor Bagley of factors not disclosed to Professor Bagley, namely "need," she suffered and will continue to suffer damages including but not limited to loss of earnings, lost benefits, loss of reputation, loss of professional opportunities, and other economic and noneconomic damages.

## COUNT TWELVE
### (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS AND/OR CONTRACTUAL RELATIONS – RAE)

194.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

195.  During times relevant to this action, Professor Bagley has enjoyed advantageous and/or contractual relationships with various entities, including, *inter alia,* Yale.

196.  By his above described conduct, *inter alia,* Professor Rae has intentionally and unjustifiably, and with malice, interfered with Professor Bagley's advantageous and/or

contractual relations.

197.  At the times Professor Rae intentionally and unjustifiably interfered with Professor Bagley's advantageous and/or contractual relations, he was acting beyond the scope of his employment with Yale.

198.  Professor Rae's intentional interference with Professor Bagley's relationships with Yale has caused Professor Bagley to suffer, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

## COUNT THIRTEEN
### (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS AND/OR CONTRACTUAL RELATIONS – SNYDER)

199.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

200.  During times relevant to this action, Professor Bagley has enjoyed advantageous and/or contractual relationships with various entities, including, *inter alia,* Yale.

201.   By his above described conduct, *inter alia,* Dean Snyder has intentionally and unjustifiably, and with malice, interfered with Professor Bagley's advantageous and/or contractual relations.

202.  At the times Dean Snyder intentionally and unjustifiably interfered with Professor Bagley's advantageous and/or contractual relations, he was acting beyond the scope of his employment with Yale.

203.  Dean Snyder's intentional interference with Professor Bagley's relationships with Yale has caused Professor Bagley to suffer, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

## COUNT FOURTEEN
## (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS AND/OR CONTRACTUAL RELATIONS – METRICK)

204.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

205.  During times relevant to this action, Professor Bagley has enjoyed advantageous and/or contractual relationships with various entities, including, *inter alia,* Yale.

206.   By his above described conduct, *inter alia,* Dean Metrick has intentionally and unjustifiably, and with malice, interfered with Professor Bagley's advantageous and/or contractual relations.

207.  At the times Dean Metrick intentionally and unjustifiably interfered with Professor Bagley's advantageous and/or contractual relations, he was acting beyond the scope of his employment with Yale.

208.  Dean Metrick's intentional interference with Professor Bagley's relationships with Yale has caused Professor Bagley to suffer, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

## COUNT FIFTEEN
## (AIDING AND ABETTING DISCRIMINATION UNDER CONNECTICUT FEPA § 46a-60(a)(5) – SNYDER)

209.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

210.  Yale discriminated against Professor Bagley because of her age and gender in violation of §46a-60(a)(1) of the Connecticut Fair Employment Practices Act.

211.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(5), makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."

36

212.  Dean Snyder knew of Yale's discriminatory employment practices, but despite such knowledge, he knowingly and intentionally aided, abetted, compelled and coerced Yale to engage in such conduct.

213.  As a direct result of Dean Snyder aiding and abetting Yale's discriminatory treatment of Professor Bagley, Professor Bagley has suffered, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

**COUNT SIXTEEN**
**(AIDING AND ABETTING DISCRIMINATION UNDER CONNECTICUT**
**FEPA § 46a-60(a)(5) – METRICK)**

214.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

215.  Yale discriminated against Professor Bagley because of her age and gender in violation of §46a-60(a)(1) of the Connecticut Fair Employment Practices Act.

216.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(5), makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."

217.  Dean Metrick knew of Yale's discriminatory employment practices, but despite such knowledge, he knowingly and intentionally aided, abetted, compelled and coerced Yale to engage in such conduct.

218.  As a direct result of Dean Metrick aiding and abetting Yale's discriminatory treatment of Professor Bagley, Professor Bagley has suffered, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

## COUNT SEVENTEEN
## (AIDING AND ABETTING DISCRIMINATION UNDER CONNECTICUT FEPA § 46a-60(a)(5) – RAE)

219.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

220.  Yale discriminated against Professor Bagley because of her age and gender in violation of §46a-60(a)(1) of the Connecticut Fair Employment Practices Act.

221.  The Connecticut Fair Employment Practices Act, § 46a-60(a)(5), makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."

222.  Professor Rae knew of Yale's discriminatory employment practices, but despite such knowledge, he knowingly and intentionally aided, abetted, compelled and coerced Yale to engage in such conduct.

223.  As a direct result of Professor Rae's aiding and abetting Yale's discriminatory treatment of Professor Bagley, Professor Bagley has suffered, and will continue to cause her to suffer, damages, including but not limited to, loss of earnings, loss of reputation, loss of professional opportunities, and emotional distress.

## COUNT EIGHTEEN
## (DEFAMATION – RAE)

224.  Plaintiff repeats the allegations of paragraphs 1-125 as fully stated herein.

225.  Professor Rae, acting beyond the scope of his employment with Yale, made false factual statements about Professor Bagley, including without limitation, telling the deans that she was inattentive and lazy with respect to her duties for State & Society and telling the Harte Committee members that she is "delusional."

226.  Professor Rae published his accusations about Professor Bagley to third parties, including without limitation, to Yale faculty members and deans.

227.  The statements about Professor Bagley were false.

228.  Professor Rae either knew of the statements' falsity, acted with reckless disregard as to their falsity, and/or was negligent in making such false statements.

229.  Professor Rae's false statements about Professor Bagley were defamatory, malicious, and done with intent to harm her reputation, lower her in the estimation of the academic community, and inhibit her renewal as a Professor in the Practice.

230.  Professor Rae's false statements of fact caused Professor Bagley to suffer, and will continue to cause her to suffer, damages, including, but not limited to, loss of earnings and benefits, harm to reputation, loss of professional opportunities, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Constance E. Bagley demands the following relief against Defendants as to all of the Counts:

A.      Money damages for actual damages that she proves at trial to have suffered as a result of the Defendants' conduct, including, but not limited to, compensatory damages, back pay and loss of future earnings, harm to reputation, damages for emotional distress and mental suffering, consequential damages, and additional liquidated damages and punitive damages.

B.      An award of attorney's fees, court costs and expenses incurred by Professor Bagley in bringing this action.

C.      Temporarily and permanently enjoining Yale University as set forth in 42 U.S.C. §2000e-2 ("Title VII") from discriminating and retaliating on the basis of age and gender.

D.      An award of all such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL MATTERS SO TRIABLE.**

Respectfully Submitted,
Constance E. Bagley
BY HER ATTORNEYS,

s/ Michael J. Rose
Michael J. Rose, Esq.
mrose@rosekallor.com
Rose Kallor, LLP
750 Main Street, Suite 606
Hartford, CT  06103
860-748-4660

s/ Laura R. Studen
Laura R. Studen, Esq.
lstuden@burnslev.com
Ellen J. Zucker, Esq.
ezucker@burnslev.com
Emily J. Nelson, Esq.
enelson@burnslev.com
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
617-345-3000

April 3, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 3rd day of April, 2015, a copy of the foregoing was electronically filed and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.

/s/ Emily J. Nelson
Emily J. Nelson

4847-2993-9746.1

41