## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| _____ | ) | |
| CONSTANCE E. BAGLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 3:13-CV-1890 (CSH) |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY, DOUGLAS | ) | |
| RAE, EDWARD SNYDER, and | ) | **APRIL 27, 2015** |
| ANDREW METRICK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### RULING ON DEFENDANTS' MOTION FOR PROTECTIVE ORDER
### [DOC. 108]

**HAIGHT, Senior District Judge:**

Plaintiff Constance E. Bagley has filed this action against Yale University ("Yale" or "the University") and three members of the faculty of the Yale School of Management ("SOM"). Bagley's principal claim is that she was wrongfully terminated from her employment as a professor on the SOM faculty. The facts and circumstances of the case are fully stated in the Court's decisions granting in part and denying in part Defendants' motion to dismiss the complaint, 42 F.Supp.3d 332 (D.Conn. 2014), and denying Plaintiff's motion for a preliminary injunction, 2014 WL 7370021 (D.Conn. Dec. 29, 2014), familiarity with which is assumed. The pre-trial discovery process, now going forward, has generated a number of disputes. This Ruling resolves one of them.

### I

The dispute in question has to do with the discovery of electronically stored information Plaintiff has requested from Defendants. The Defendants have produced some information

1

responsive to Plaintiff's request, but now move for a protective order relieving them of further production.  Plaintiff opposes that motion.

By the year 2006, technology had brought the world so far from chisels, styli, tablets, scrolls, paper, books, and filing cabinets that the standing committee charged with maintaining the Federal Rules of Civil Procedure felt it necessary to "address issues raised by difficulties in locating, retrieving, and providing discovery of some electronically stored information."  I have quoted the Advisory Committee's Notes to the 2006 Amendment,  introducing an addition to the discovery Rules.  New Rule 26(b)(2)(B), Fed. R. Civ. P., captioned "Specific Limitations on Electronically Stored Information," provides:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

A Rule such as this, allowing a showing of "undue burden or cost" to "nonetheless" be overcome by a showing of "good cause," is an invitation to litigation which the trial bar has accepted. Numerous district court decisions deal with the fact-intensive question of whether or not to compel discovery of electronically stored information.  Neither the briefs of counsel in the case at bar nor the Court's research disclose a Second Circuit case analyzing at length the proper practice under Rule 26(b)(2)(B).

The Advisory Committee's Notes say that under Rule 26(b)(2)(B), "a responding party should produce electronically stored information that is relevant, not privileged, and reasonably accessible,

2

subject to the (b)(2)(C) limitations that apply to all discovery."  Rule 26(b)(2)(B) thus echoes the overarching provision in Rule 26(b)(1) that "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  The limitations of Rule 26(b)(2)(C), explicitly incorporated by reference in Rule 26(b)(2)(B), provide *inter alia* that "the court must limit the frequency or extent of discovery" if the court determines that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  The drafters worded Rule 26(b)(2)(B) in such a way as to make these Rule 26(b)(2)(C) limitations applicable specifically to a requesting party's effort to show "good cause" for the discovery of electronically stored information which would otherwise expose the responding party to undue burden or cost.

Typically, a party requesting discovery of electronically stored information (hereinafter "ESI") begins the process by identifying certain "custodians" who are thought to possess or control documents containing certain designated "search terms."  In the vernacular, the first of these exercises answers the question "Who's probably got the stuff I want?" and the second answers the question "What stuff do I want?"  A recipe for a massive and contentious adventure in ESI discovery would read: "Select a large and complex institution which generates vast quantities of documents; blend as many custodians as come to mind with  a full page of search terms; flavor with animosity, resentment, suspicion and ill will; add a sauce of  skillful advocacy; stir, cover, set over high heat, and bring to boil.  Serves a district court 2-6 motions to compel discovery or for protection from it."[1]

---

[1]  The recipe in Part I of the text is  a  work of  fiction,  intended to introduce the untutored reader to the world of ESI discovery litigation.  Any resemblance to a living institution or individual is coincidental.  The facts pertinent to the case at bar are recounted in Part II.

## II

The factual accounts recited in this Ruling are derived primarily from the briefs of counsel on this motion, which describe the nature and extent of, and the partial responses to, Plaintiff's requested ESI discovery. Those accounts are not always consistent, as will appear from the ensuing discussion.

The Plaintiff in the case, Professor Bagley, requested ESI discovery from the University and three Yale SOM professors (two of them deans). According to Defendants' Main Brief [Doc. 108] at 3, Plaintiff's request identified 24 individual Yale custodians: the three individual Defendants, and 21 other individuals, who appear to be University officers or employees of varying rank or station. Plaintiff also designated 23 separate search terms. Defendants' Main Brief [Doc. 108-1], at 3.

Defendants' responsive process began when University staff or attorneys *commandeered* – a more appropriate word than *seized* – the computer of each of the named custodians. The process of ESI identification and production then "required the application of keyword searches to the computers of these custodians, extracting the documents containing any of those keywords, and then reading every single document extracted to determine whether it is responsive to any of the plaintiff's production requests and further to determine whether the document is privileged." Defendants' Reply Brief [Doc. 124], at 2-3. This labor was performed by Yale in-house paralegals and lawyers, and a third-party vendor the University retained for the project.

Defendants say in their Main Brief at 3: "Owing to the number of custodians, the search terms used, the very general nature of many of these terms, and the fact that many of the terms are not specific to this case, this search, as Defendants expected, produced an enormous amount of data." Doc. 108-1, at 3. Defendants' tone is somewhat aggrieved, but their expectation was sound enough.

4

According to the Defendants' briefs, University staff charged with the task began by examining the computers of seven of the 24 "custodians" designated by Plaintiff's request.  These seven custodians included the three named individual Defendants (Dean Edward Snyder, Dean Andrew Metrick, and Professor Douglas Rae), and four additional individuals (Senior Associate Dean David Bach, Deputy Provost Stephanie Spangler, Professor Michael Della Rocca, and Deputy Dean Stanley Garstka). That initial search, of the computers of those seven custodians, produced in the aggregate about "20.8 gigabytes of data, divided into 37,991 separate files." *Id.*  A "gigabyte," in computer parlance, is the equivalent of over 100,000 pages of e-mails.  In consequence, the initial search focusing on seven custodians produced the equivalent of more than 2,000,000 pages of material.  *Id*.

On July 30, 2014, counsel for Defendants made their first production of ESI to counsel for Plaintiff.  That production took the form of a letter, Ex. A to Defendants' Main Brief, which enclosed "three DVD's of electronic documents gathered from the computers of Andrew Metrick, Edward Snyder and Douglas Rae." Doc. 108-2 (Ex. A), para. 1.  Counsel's forwarding letter stated further: "This search identified many e-mail messages to and from students in the State & Society course that were unrelated to any issue in this lawsuit and which have not been produced." *Id*.  "State & Society" is the name of an SOM core curriculum course that Professor Bagley taught together with Defendant Professor Rae.

According to Defendants' Main Brief at 4, this initial production, limited to the computers of Metrick, Snyder and Rae:

> required paralegals and lawyers to review approximately 13,393
> files, totaling 4.5 gigabytes, or the equivalent of about 450,000 pages
> of emails.  Only 6% of this data was responsive to Plaintiff's
> discovery request: about 300 megabytes, or about 29,300 pages of

emails.[2]  In excess of 95% of this information, while responsive to the ESI request, has absolutely nothing to do with any of the issues in this case.  Thus, defendants' lawyers and paralegals reviewed approximately 450,000 pages of material in order to produce less than 1,500 pages of information which have any relationship whatsoever to this dispute; and the majority of the 1,500 pages are only marginally relevant.

Doc. 108-1, at 4.

Plaintiff is not bound by the views of Defendants or their counsel with respect to what material is responsive to discovery requests or relevant to the underlying issues.  However, this account of the manner in which partial production was made, which Plaintiff does not appear to dispute, is probative of the complexity and magnitude of the undertaking.

Following that initial production with respect to Snyder, Metrick and Rae, the University produced to Plaintiff's counsel "responsive documents from its review of the ESI" of five additional custodians:  Professor Della Rocca and Dean Bach (previously identified as among the first seven custodians whose computers were reviewed) and former Yale President Richard Levin, present Yale President and former Provost Peter Salovey, and Professor Geert Rouwenhorst (making their first named appearances on the stage of this motion).  *Id.*  According to Defendants' Main Brief at 4, processing the ESI of those five additional custodians "required the review of approximately another 11,000 files, totaling 7.38 gigabytes of information, or the equivalent of about 738,000 pages of emails.  Again, the end result of this review was that only a small percentage of data was responsive to the plaintiff's discovery requests: about 696 megabytes.  As with the other searches, most of this

---

[2]    In computer parlance, a "megabyte" is smaller than a "gigabyte."  One online authority states that a *megabyte* is the equivalent of "873 pages of plaintext (1,200 characters)" and a *gigabyte* is the equivalent of  "894,784 pages of plaintext."  www.ComputerHope.com (visited April 21, 2015).

information is not relevant to the present dispute." *Id.*

Defendants sum up the result of the ESI discovery they have produced to Plaintiff to date in these terms: "In other words, of the 11.88 gigabytes of information[3] (which is the equivalent of more than 1 million pages of email files) that has so far been reviewed by the defendant, only about 8% of that information has been responsive and non-privileged.  Furthermore, only a small percentage of those documents that are responsive and non-privileged actually have any relevance to the issues in this lawsuit." *Id.*, at 4-5.

In their Main Brief at 6, Defendants undertook to describe what they regarded as an unacceptable state of affairs.  Defendants there say: " Yet to be reviewed are the files of 16 additional custodians identified by the plaintiff, totaling more than 43,000 separate files." *Id.*, at 6.  Defendants assert on this motion that on the basis of the present record, "the review of these remaining documents will amount to nothing more than a waste of time and money.  This Court should therefore enter a protective order relieving the defendant[s] from performing the requested ESI review." *Id.*  Stated somewhat differently, Defendants' Notice of Motion [Doc. 108] prays for a "protective order relieving them of the obligation to continue their review of the electronically stored information of twenty-four custodians."  Presumably, Defendants' intended purpose was to be relieved of their perceived obligation to review the ESI of 16 then-unreviewed additional custodians, to whose existence the Main Brief made reference.  In support of that objective, Defendants' Main Brief estimated that the "more than 43,000 separate files" generated by the "16 additional custodians" would require 716 hours to "complete this review," at a cost to Yale of "about $179,000," a cost

---

[3]   11.88 gigabytes  is the total of 4.5 gigabytes (produced by review of the computers of Defendant custodians Snyder, Metrick and Rae) and 7.38 gigabytes (produced by review of the computers of the additional five custodians named in text).

estimate that "does not include the coats associated with Yale's in-house lawyers and paralegals, nor does it include the cost of the third-party vendor, Ricoh, retained by Yale to host the data and produce responsive documents in the format required by plaintiff's counsel."  Main Brief at 6.

### III

Amid the lingering reverberations of the quoted broadsides loosed in Defendants' Main Brief, the Plaintiff's Brief in Opposition to the present motion [Doc. 113] ("P. Opp. Br.") came as something of a surprise.  Plaintiff seems to be saying in the her Opposition Brief that her requests for ESI  discovery have not been as broad or demanding as Defendants' brief asserts, and that the remaining production required to comply with the actual requests made is not as onerous as Defendants portray it to be: an exaggerated portrayal, Plaintiff contends, which Defendants proclaim in an effort to justify an unjustifiable protection order which, if granted, would wrongfully deprive Plaintiff of legitimate discovery.

Plaintiff begins her exposition of what she regards as the real, rather than exaggerated, world of ESI discovery in the case at bar by submitting Exhibit A ("Ex. A") together with her opposing brief.  Ex. A is a stream of e-mails counsel exchanged during July 2014 in an effort to shape and facilitate Plaintiff's ESI discovery, which everyone realized would play a central role in the pre-trial process.  Trial courts encourage and expect that sort of cooperation among counsel.  "Of course, the best solution in the entire area of electronic discovery is cooperation among counsel."  *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (Peck, *M.J.*).  In the case at bar, counsel for Bagley and for the Defendants sensibly sought to agree upon identifying the "custodians" whose computers would be reviewed for ESI, and also to agree upon the "search terms" that would inform and direct those reviews.  "Ideally, the parties should agree on the

8

search methods, including search terms or concepts." *Saliga v. Chemtura Corp.*, No. 3:12-cv-832 (RNC), 2013 WL 6182227, at *3 (D.Conn. Nov. 25, 2013) (Martinez, *M.J.*) (citing and quoting *The Sedona Principles*, a recognized scholarly compendium of principles regarding discovery of ESI).

It came to pass that during these discussions between counsel, a one-page document emerged which is dated July 22, 2014 and captioned "Revised Set of Search Terms for Yale Document Production." On the present motion, this single sheet is Doc. 113-1, page 7 of 8. The left-hand column is captioned "Individual Custodian's Email In Box/Sent Items or, if former employees, archived files." Ten names are listed in that column: Rae, Snyder, Metrick, former Dean Joel Podolny, Ian Shapiro, Bach, Ben Polack, Spangler, Garstka, and Salovey.[4] These are the custodians identified by this document as those individuals from whom Plaintiff is requesting whatever relevant ESI may exist. The center column, captioned "Date Range," originally specified "01/01/2006 - Present," but was subsequently changed to begin in 2007. The right-hand column is captioned "Words and phrases to run across this collection" and lists the search terms to be used in reviewing the designated custodians' computer files.

This "Set of Search Terms for Yale Document Production," coupled with the list of ten individuals identified as "Sources" and "Custodians," is dated, as I have said, July 22, 2014. The record on this motion indicates that these designations of custodians and search terms were results of negotiations between counsel for the parties. Counsel for Defendants would seem to have accepted them for the purpose of getting ESI discovery under way. I am told, and accept, that the University articulated and reserved objections to a number of custodians and/or search items on the

---

[4] Full names are given with respect to individuals not previously referred to in this Ruling.

9

ground of irrelevance of responsive information to the issues.  However,  that line of objection goes to admissibility of the material in question at trial, a different question from that posed by the present motion, which is concerned only with the structure and mechanics of ESI discovery.  In their present motion, the Defendants contend that these boundaries of ESI discovery – custodians and search terms – are too broad and the burden of complying with them is too onerous.  The motion was filed on February 19, 2015.  So far as the present record reveals, between July 22, 2014 (when Defendants' counsel seemingly accepted the identification of ten custodians and the search terms governing the search) and February 19, 2015 (when counsel filed the present motion), Defendants went ahead with the production called for by Plaintiff's requests.  During that period, Defendants did not suggest to the Court that they needed to be protected from compliance with discovery boundaries to which counsel had apparently agreed.

Defendants may seek to explain that chronology by contending that it was not until the parties had some experience with the designated custodians and search terms that the futility of the exercise and the burdens of compliance became sufficiently apparent to Defendants to complain of them.  I will consider such factors in Point IV, *infra*, but consider now the scope of ESI discovery that must still be accomplished if Defendants' motion for a protective order fails.

As we have seen in Point II, Defendants' Main Brief conjured up the horrid vision of a future in which 16 of 24 identified custodians stand in line, clutching in the aggregate "more than 43,000 separate files," each e-mail or other document in each file requiring review by University staff or lawyers to determine if it is non-privileged and responsive to Plaintiff's discovery requests.  One thinks of the line of future uncrowned kings whose apparitions terrified Macbeth.  But Plaintiff's Opposition Brief dismisses this vision as the stuff of nightmare, not of reality:

> Defendants['] assertion that they had to search the hard drives of twenty-four custodians is overstated and it[s] recitation of search terms is factually inaccurate given that Yale appears to be relying on outdated search terms lists.  First, the Plaintiff's revised search term list did *not* ask Yale to search the inboxes of twenty-four custodians.  <u>See</u> <u>Exhibit A</u>. In fact, the list only requested the "Individual Custodian's Email Inbox/Sent Items or, if former employees, archived files" of 10 individuals: Rae, Snyder, Metrick, Podolny, Shapiro, Bach, Polack, Spangler, Garstka and Salovey.  The other individual names cited by the Defendants are either not on the revised list or are all terms to be searched *within the 10 individual e-mail accounts,* specifically Michael Della Rocca, Margaret Clark, Edieal Pinker, Anne Alstott, Ian Ayers, Paul Bracken, and Verity Harte.  Secondly, several terms cited by the [sic] Yale, <u>see</u> Motion, p. 3., are from an outdated list superseded by an updated list in which the Plaintiff agreed to delete terms.

P. Opp. Br., at 3 (emphases in original).

It is noted, *supra* at 5-6, that of the 10 individual custodians whose "Email Inbox/Sent Items" Plaintiff has included in her revised request list, Defendants have already completed the reviews and made full ESI production to Plaintiff's counsel with respect to at least five of them: Rae, Snyder, Metrick, Bach and Salovey.  If the briefs on this motion are correct, and I understand them correctly, it follows that Plaintiff is still requesting, and at most the University must still review the ESI on the computers of the other 5 individuals on Plaintiff's revised request list: Podolny, Shapiro, Polack, Spangler, and Garstka.  Whether, in the circumstances of the case, Defendants are entitled to a protective order relieving them of the obligation to respond with respect to those individuals is considered *infra*.

## IV

Defendants'  Reply Brief [Doc. 124] retreats from the apocalyptic picture painted by their Main Brief.  Defendants now say, Doc. 124 at 2, that "the defendants have now produced the ESI

11

of six of the ten custodians identified by the plaintiff.  (See Docket No. 113, Exhibit A.)"   This statement evidences the parties' present agreement that Plaintiff seeks the ESI of *ten,* and only ten, custodians: those listed on Exhibit A.  While the earlier briefs of counsel appear to identify five of those ten custodians whose ESI have been produced, Defendants' Reply Brief says there are six custodians in that category.  Accepting the accuracy of that declaration, the bottom line is that Defendants have yet to produce the ESI of four of the ten listed custodians.  Defendants' Reply Brief presses their motion for a protective order as to those four custodians.  Defendants frame their present argument in this fashion:

> While there may have been a misunderstanding as to the number of custodians that the plaintiff identified, this does not change the fact that the results obtained through the keyword searches performed to date do not justify the time and expense that has been required to perform this search. Nearly twelve gigabytes of information have been reviewed so far by the defendants and only .95 gigabytes of this information has been responsive and non-privileged. This is a yield of less than 8%, with a much smaller percentage of documents that have actually been of significance to the lawsuit. In other words, the effort that has been required to perform the ESI review to date has not been time well spent. With 40% of the ESI production yet to be completed, the defendants should not be required to complete this inefficient and wasteful endeavor.

Doc. 124, at 4-5.[5]

The relief Defendants seek is a ruling by the Court that "the defendants are no longer required to perform a keyword search and review of ESI of any additional custodians.  If the plaintiff requires any additional discovery, it should be requested through a conventional discovery request." Reply Brief [Doc. 124], at 5.

_____

[5] Counsel's remark that "40% of the ESI production" is "yet to be completed" confirms that of the ten custodians identified on Exhibit A to Plaintiff's brief, the ESI of six has been produced.

**V**

On the facts and in the circumstances of this case, the Court declines to exercise its discretion in favor of the Defendants.  The Defendants' motion for a protective order will be denied.

To structure the challenging world of discovery of electronically stored information, Rule 26(b)(2)(B) fashions a two-stage inquiry.  On a motion to compel discovery or for a protective order, a trial judge must ask (1):  Has the party resisting discovery shown that the information in question is "not *reasonably* accessible because of *undue* cost" ? (emphases added), and (2):  Nonetheless, has the party requesting discovery shown "good cause" for that discovery?  On the present motion for a protective order, Yale and the individual Defendants, who resist discovery, bear the burden of persuasion on the first question. Bagley, who requests discovery, bears the burden of persuasion on the second.

Whether the Defendants at bar have carried the first burden is not free from question.  The emphasized adjectives in the quotation from the Rule are important.   Yale can – indeed, it has  – shown that the custodians' responsive ESI is not *readily* accessible.  That is not the test.  The question is whether this information is not *reasonably* accessible:  a condition that necessarily implies some degree of effort in accessing the information.  So long as that creature of the common law, the *reasonable man*,[6] paces the corridors of our jurisprudence, surrounding circumstances matter.  In the case at bar, the custodians' electronically stored information in its raw form was *immediately* accessible to Yale:   all the University had to do was tell a professor or a dean to hand over his or her computer.  But Bagley's objective is to discover, and Defendants' obligation is to produce, non-privileged information relevant to the issues:  Yale must review the custodians' ESI

---

[6]  The phrase is not gender neutral because that is not the way Lord Coke spoke.

13

and winnow it down.  That process takes time and effort; time and effort can be expensive; and the Rule measures the phrase "not reasonably accessible" by whether it exposes the responding party to "undue cost."  Not *some* cost: *undue* cost, an adjective *Black's Law Dictionary* (10th ed. 2014 at 1759) defines as "excessive or unwarranted."

 Prior to making this motion, Yale had reviewed the ESI of a number of custodians and produced the fruits of those labors to counsel for Bagley.  Now, seeking protection from – which in practical terms means cessation of – any further ESI discovery, the University describes in vivid, near-accusatory prose the considerable amount of time and treasure it has already expended responding to Bagley's ESI discovery requests: an exercise which, in Yale's non-objective and non-binding evaluation, has unearthed no or very little information relevant to the lawsuit.  Yale's position is that given those circumstances, it should not be required to review any additional ESI with a view toward producing any additional information in discovery.  The contention is reminiscent of a beleaguered prizefighter's memorable utterance some years ago: "No mas!"  Is the University entitled to that relief?   Whether the cost of additional ESI discovery warrants condemnation of the total as *undue*, thereby rendering the requested information *not reasonably accessible* to Yale, presents a legitimate issue and, in my view, a close question.

Assuming without deciding that Yale prevails on this first question, its motion for a protective order fails nonetheless, because Bagley succeeds on the second question.  She has shown good cause for obtaining discovery of the ESI amassed by the four (or five) remaining requested custodians whose reviewed information has not yet been produced to Plaintiff's counsel.

The parties take understandably different positions on the existence *vel non* of "good cause" for further ESI discovery.  The difference is explained by their contrasting views of the case.  From

the University's perspective, this is an uncomplicated case.  Bagley agreed to employment by Yale as an SOM professor for a five-year term.  Renewal of that employment, in Yale's discretion, was possible but not guaranteed.  Bagley taught at the SOM for the five-year term.  Yale chose not to renew her appointment.  Everyone moves on.  End of case.  No or very little discovery required: certainly, not vast quantities of electronically stored information.  From Bagley's perspective, Yale's decision not to renew her appointment is only the beginning of the case.  That decision, Bagley contends, was tainted by violations of federal anti-discrimination statutes, as well as principles of state and common law.  Such violations are provable and often proved by circumstantial evidence, giving rise to a legitimate need for relatively wide-ranging and nuanced discovery.

In the totality of circumstances displayed by the case at bar, I think it would be an abuse of discretion to cut off Plaintiff's discovery of Defendants' electronically stored information at this stage of the litigation.  Plaintiff's reduction of custodians, from the original 24 targeted by Defendants' furiously worded Main Brief to the present ten, can be interpreted as a good-faith effort by Plaintiff to keep the ESI discovery within permissible bounds.  Plaintiff's counsel say in their Opposing Brief [Doc. 113] at 2: "Ironically, this last production includes some of the most relevant documents produced to date."  While relevance, like beauty, often lies in the eyes of the beholder, and Defendants' counsel may not share the impressions of their adversaries, I take the quoted remark to be a representation by an officer of the Court with respect to the value and timing of certain evidence which has come to light during this discovery process.  The sense of irritated resignation conveyed by the familiar aphorism – "it's like looking for a needle in a haystack" – does not exclude the possibility that there may actually be a needle (or two or three) somewhere in the haystack, and sharp needles at that.  Plaintiff is presumptively entitled to search for them.

15

Plaintiff's federal discrimination and retaliation claims survived Defendants' motion to dismiss.  They retain their viability as claims, at least for the present.  We are concerned, for the present, with discovery, not with the merits of the claims.  Rule 26(b)(1) entitles Plaintiff to discovery of matter relevant to those claims.  I conclude that Plaintiff is entitled to receive, and Defendants are obligated to produce, the fruits of Defendants' completion of the reviewed ESI derived from the remaining custodians.  That continued discovery does not yet violate the limitations imposed by Rule 26(b)(2)(C).

This analysis assumes that I have correctly interpreted the scope of Plaintiff's remaining ESI discovery requests, and that such requests will not be materially changed or increased as ESI discovery goes forward.  Should those assumptions prove to be incorrect, the Defendants' motion for a protective order may be revisited.

## VI

For the foregoing reasons, Defendants' motion for a protective order [Doc. 108] is DENIED.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        April 27, 2015


                                           */s/Charles S.Haight, Jr.*
                                           CHARLES S. HAIGHT, JR.
                                           Senior United States District Judge

16