# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

)
CONSTANCE E. BAGLEY,          )
                      )
      Plaintiff,     )
                      )     Civil Action No.
                      )     3:13-cv-01890 (CSH)
     v.                )
                      )
YALE UNIVERSITY, DOUGLAS RAE,   )
EDWARD SNYDER, and ANDREW    )     **DECEMBER 14, 2015**
METRICK, Individually,      )
                      )
      Defendants.    )

_____)

## RULING ON PLAINTIFF'S MOTION TO COMPEL
## DEFENDANT YALE UNIVERSITY TO PRODUCE DOCUMENTS

**HAIGHT, Senior District Judge:**

The case is before the Court on the contested motion of Plaintiff Bagley to compel Defendants (collectively "Yale") to make discovery. Familiarity with the Court's prior decisions is assumed: particularly the November 9, 2015 Ruling [Doc. 156] ("the November 9 Ruling") describing some of the circumstances which give rise to the present motion. This Ruling resolves Plaintiff's motion to compel [Doc. 135].

## I

To recapitulate: the November 9 Ruling noted that an issue "lying at the heart of Plaintiff's motion to compel discovery is the proper scope of pre-trial discovery Bagley is entitled to receive from Yale with respect to other non-tenured SOM [Yale School of Management] professors who, unlike Bagley, *were* appointed or reappointed to the faculty." Doc. 156, at 1-2.

1

That issue turns in significant measure upon the proper identification of individuals who may be characterized as "comparators" to Bagley, and consequently subject to *persona*-directed discovery of considerable depth. Yale contends that the record shows Bagley has no comparators, and is therefore not entitled to any discovery of this nature. Bagley characterizes 11 individuals as comparators for one purpose or another, and demands discovery with respect to each of them. Yale responds in the alternative that even if Bagley is entitled to some such discovery with respect to some individuals, her demands are excessive.

## II

In April 2008, Yale hired Bagley as a "Professor in the Practice" ("PiP") on the Yale SOM faculty, for a period of five years, commencing on July 1, 2008 and ending on June 30, 2013. Bagley's full title was "Professor in the Practice of Law and Management." The parties did not sign a formal contract. The pertinent writing takes the form of a letter dated April 8, 2008 signed by SOM Deputy Dean Stanley J. Garstka and addressed to Bagley. The purpose of Dean Garstka's letter was "to confirm in writing that the Faculty of the School of Management has voted you an appointment as Professor in the Practice of Law and Management for a term of five years beginning July 1, 2008." Doc. 62-5. The letter goes on to say:

> Under our rules governing such appointments you will be reviewed in the fourth year of this appointment for continuation as a Professor in the Practice of Law and Management. The review will be similar in process and use similar criteria to those of the review which led to this current appointment.

*Id.*, at 1.

Following this appointment, Professor Bagley taught a number of courses at Yale SOM, principally what her first amended complaint ("FAC") [Doc. 129] at ¶ 43 refers to as "a 'core' course

called 'State and Society.'" According to that operative pleading, in October 2011 the SOM faculty, under the direction of Deputy Dean Andrew Metrick, began an evaluation of Bagley's performance within the context of her possible reappointment as a PiP when her five-year appointment expired in June 2013. After somewhat complicated and prolonged events that need not be recounted here, on November 7, 2013 SOM Dean and co-defendant Edward Snyder advised Bagley by letter that he would follow the recommendation of the faculty Board of Permanent Officers ("BPO") not to renew her appointment.

In November and December, 2013, the Yale Deputy Provost and then Provost confirmed to Bagley by letter and e-mail that "Yale offers no further means to challenge Yale SOM's decision not to reappoint her as a Professor in the Practice." Doc. 129 (FAC), ¶ 124. Bagley's employment on the SOM faculty terminated on December 31, 2014. This action followed. The present dispute about discovery is generated by those counts in the FAC that charge Yale's refusal to reappoint Bagley violated federal anti-discrimination statutes, including Title VII. The November 9 Ruling noted at page 2: "The precise question presented is whether a particular individual is a 'comparator,' as that term has come to be used in Title VII anti-discrimination jurisprudence."

Bagley has identified 11 purported comparators. Eight individuals were appointed or reappointed as PiPs at the Yale SOM at times Bagley contends are pertinent to her own situation. The other three were not PiPs, but were preferred over Bagley for SOM teaching or related positions for which she had applied.

It seems only natural that Bagley, who alleges Yale's refusal to reappoint her as an SOM Professor in the Practice was discriminatory, would select as comparators individuals who Yale reappointed or appointed SOM Professors in the Practice at or near the same time Yale declined to

reappoint her to that position.  The Second Circuit instructs us that an individual is a comparator of a discrimination plaintiff if that other individual one and the plaintiff are "similarly situated in all material respects."  To be a comparator for the purpose of this analysis, the other individual "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Hall*, 263 F.3d 49, 54 (2d Cir. 2001).  Thus the bar is set relatively low.  And one wonders where Bagley is to find such individual comparators, if not in the ranks  of the same faculty in which she taught, where colleagues received Yale reappointments at a time when Yale refused to reappoint her.

Nonetheless, Yale argues in its most recent brief [Doc. 158] at 3: "The record of this case establishes beyond any doubt that the eight PiPs are not similarly situated to the plaintiff."  This is a startling and counterintuitive assertion.  If one accepts Yale's proposition – that Bagley cannot find individuals "similarly situated" to her in the same faculty seeking the same academic position as she – then it would seem to follow that Bagley cannot find a legally sufficient comparator anywhere within the greater Yale community.  Surely the recent appointments of a University president, deans of the Schools of Law and Medicine and Yale College, or a head football coach would not suffice.  A ruling to the effect that as a matter of law Bagley cannot identify a comparator would lead inevitably to a motion by Yale for summary judgment dismissing the discrimination claims.

That ruling would be appropriate only if the circumstances compel it.  They do not.  I need not extend this discussion because there is no substance to Yale's argument on the point.  The only support for Yale's contention that "the eight PiPs are not similarly situated to the plaintiff" appears in the brief at 3-4:

> The reappointment of a PiP is voted on by the BPO, and this
> recommendation is then considered by the Dean.  Since 1999 alone,
> there have been 50 different members of the BPO.  Since 1983, there
> have been nine different Deans.  In other words, the decision makers
> involved in the reappointment of the plaintiff are not the same as
> those who considered the reappointment of the other eight PiPs.

Doc. 158, at 3-4 (citations omitted).

These changes in the SOM ranks over time are neither surprising nor dispositive of the

comparator question.  It is inherent in the nature of Yale, and in the human spirit itself, that changes

occur, sometimes, one hopes, for the better.  University presidents, deans, professors, and football

coaches come and go.  The same flow and ebb of humanity is visible in all enduring institutions,

such as the Church and the Judiciary, to name two not frequently paired.  The bishops and chief

judges of today pass from the scene and find their places in the archives of tomorrow.

Bagley's charge against Yale is in essence one of disparate treatment – that is, in responding

to her request for reappointment as a PiP, Yale treated Bagley "less favorably than a similarly

situated employee outside [her] protected group [gender and age]," such conduct being "a recognized

method of raising an inference of discrimination for purposes of making out a *prima facie* case."

*Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (citation and internal quotation marks

omitted, material in brackets supplied).  The Second Circuit continued in *Mandell*: "A plaintiff

relying on disparate treatment evidence must show she was similarly situated in all material respects

to the individuals with whom she seeks to compare herself.  Ordinarily, the question whether two

employees are similarly situated is a question of fact for the jury."  *Id*. (citations and internal

quotation marks omitted).

A case may present itself where the lack of similarity is so pronounced that the trial judge

rejects a proposed comparator as a matter of law.  However, a difference in supervisors does not have

that preclusive effect.  In *Berube v. Great Atlantic & Pacific Tea Company, Inc.,* 348 F. App'x 684,

686-687 (2d Cir. 2009), the Second Circuit said that "the fact that Berube had a different supervisor

from the employees he cites as comparators does not appear sufficient in itself to preclude Berube

from showing that he was subject to the same workplace standards and disciplinary procedures . .

. . We cannot say as a matter of law that the employees Berube cites were not similarly situated in

terms of workplace standards and disciplinary procedures."  The A & P supervisors in *Berube* are

the functional equivalents of the SOM faculty members and deans who recommend or reject non-

tenured teachers for appointment or reappointment as Professors in the Practice.  In the present case,

counsel Yale may, if so advised, call these differences in identity among the ranks of the BPO or the

deans to the attention of the jury as an element to be considered on the issue of whether a particular

individual is similarly situated to Bagley, but contrary to Yale's contention, such differences do not

establish as a matter of law that the eight identified PiPs are *not* similarly situated to Bagley.  There

is, in short, no substance to Yale's broadly drawn contention that none of these PiPs can as a matter

of law be regarded as a comparator to Bagley.

Applying these Second Circuit decisions to the case at bar, it is readily apparent that the

closest comparators to Bagley are those Yale SOM PiPs who applied for and received

*reappointment* to the faculty at the time when Bagley was applying for and being refused

*reappointment*.  The unmistakable gravamen of Bagley's lengthy and frequently conclusory amended

complaint is that Yale wrongfully discriminated against her by deciding not to reappoint her as a PiP.

The complaint is stated more broadly.  Each discrimination count refers to "Yale's adverse and

disparate treatment of Plaintiff, as set forth above," *e.g.*, FAC ¶ 128, in Count One (alleging gender

discrimination in violation of Title VII); and all counts are prefaced by an allegation in ¶ 112 that runs like a *leitmotiv* through the pleading: "A culture exists within Yale in which strong, assertive and professionally accomplished women who are not stereotypically female in their appearance, behavior and attitudes are viewed negatively because they do not meet certain gender expectations by the dominant male leadership." However, one cannot understand Bagley to be casting herself as a victim of Yale's toxic culture in 2008, when the University appointed her to a five-year term as an SOM Professor in the Practice. It is fair to assume that Bagley regarded that appointment as an appropriate and deserved recognition by Yale of her strengths and skills as a lawyer, academic and teacher (at another institution to the north of New Haven) in a specialized field.

On Bagley's theory of the case, the misogynistic, chauvinistic and deplorable culture existing at Yale which she condemns manifested itself after she arrived at Yale, joined the SOM faculty, and taught her assigned courses with outstanding success. Yale's toxic culture had nothing to do with Bagley's initial appointment to the SOM faculty: *au contraire*. The effect of that deplorable culture was to deny Bagley *reappointment* to the faculty. The record shows that other PiPs were granted reappointment at the time Bagley was refused reappointment. It is those individuals who are the closest comparators to Bagley's situation.

In identifying Bagley's comparators on the Yale SOM faculty, it is appropriate to distinguish between those Professors in the Practice who, during Bagley's time on the faculty, initially applied to obtain that position and those who reapplied to retain it. The inherent differences in the processes of appointment and reappointment are apparent: The first process asks: "Does Yale want to hire this individual for the faculty?" The second asks: "Does Yale want to keep this individual on the faculty?" It is the difference, fundamental in human affairs, between the unknown and the known.

The report of an SOM faculty review committee headed by Professor Edieal Pinker, appointed by then-Provost Salovey to consider Bagley's situation, draws specific distinctions between the "Appointments" of new PiPs, Pinker Report ¶ V.c., and the "Evaluation for Renewal" of employed PiPs, ¶ V.d.  Doc. 153-1, at 93.  The Pinker Report describes separately "the appointment of a PiP" and "renewals of PiPs."  "Ideally the appointment of a PiP," the Report declares, "should be the result of SOM deans in agreement with the BPO identifying a need for a PiP to fill a role at the school," followed by "a search for someone whose experiences and skill set fit that need and who has shown superior teaching ability and some combination of impactful writing and significant professional accomplishment in the area of need."  In an immediately following and separate section captioned "Evaluation for Renewal," the Pinker Report says:

> Historically renewals of PiPs have involved a subcommittee of faculty evaluating the performance of the individual and creating a report that documents their assessment.  This report and the case are then discussed by the BPO to reach a decision.  As in the case of reviews of ladder faculty this report is a starting point for the discussion and the recommendation in the report is only a recommendation to the BPO not a decision.  From our review of available documents we find that while the appointments typically refer to the needs of the school, the reappointment reviews have focused on teaching, publication, and service to the school.

*Id.*[1]

---

[1] The Pinker Committee, according to the preamble to its Report, was charged by then Provost (now Yale President) Salovey to "review and articulate the standards that apply to the Professor in the Practice rank generally, and how those general standards apply in this case." Doc. 153-1, at 88.  Immediately following the language from the Report quoted in text, the Committee expanded somewhat upon its brief and included an opinion on what the PiP standards for renewal *should be*, as opposed to what they *are*.  The Pinker Report at 6 expresses an element of disagreement with the SOM reappointment reviews' emphasis upon "teaching, publication and service to the school." *Id.*, at 93.  The Pinker Report argues that "[performing well on teaching, writing, and service is in effect a necessary but not sufficient condition for renewal," and an "important part of the evaluation for renewal should be an assessment of the continuing need for the

The manifest and readily understandable differences in the appointment and reappointment processes for Yale SOM PiPs lead me to the conclusion that only PiPs who applied (as did Bagley) for reappointment at some time during Bagley's service on the faculty may be regarded as comparators to Bagley, for the purpose of Bagley's making out a *prima facie* case that Yale's refusal to reappoint her was tainted by discrimination.  Individuals applying to be appointed PiPs in the first place,  as well as individuals who were never PiPs but obtained other SOM positions Bagley also sought, cannot be said to be "similarly situated in all *material* respects" to Bagley, as that phrase is used in the Second Circuit cases.

It follows that Bagley is entitled to full discovery (within permissible boundaries) with respect to these comparators, in aid of Bagley's effort to show a *prima facie* case of discrimination. Counsel will have no difficulty identifying which of the eight PiPs designated by Bagley were granted reappointment by Yale during the time of Bagley's employment.  In Bagley's most recent submission [brief, Doc. 159] at 4, counsel pose these trenchant rhetorical questions: "What were the discussions of the BPO relating to these other candidates?  What would the notes taken by BPO members tell us? What would the communications among the Deans and other senior administrators suggest about their traditional involvement in matters related to the reappointment of PiPs?" Counsel return to that theme at page 8 of the brief, which notes the undisputed fact that the BPO made recommendations "on appointment matters concerning all of the PiPs," and goes on to assert that the BPO's

particular position at SOM." *Id.*  While this opinion is from a distinguished source and forcefully expressed, it is not probative of the actual reappointment standards in effect at the times pertinent to Bagley's case.

> real role is at issue, and discovery as to the depth of its deliberations
> and the involvement of the administration in such deliberations is
> critical here.  Notes regarding the BPO's consideration of the
> *reappointment* of PiPs is central here, and such notes,
> contemporaneously taken in the normal course, therefore, are the best
> source for information concerning its past deliberations and
> recommendations.  Its materials, including notes, minutes,
> correspondence, and ballots, are well within the parameters of
> reasonable discovery in this case.

*Id.*, at 8 (emphasis added, as reflective of counsel's sensible awareness that the true comparators in

the case are those Professors in the Practice who sought and obtained *reappointment* to the SOM

faculty during the time Bagley was on the faculty and ultimately denied reappointment).

These passages from Bagley's latest brief accurately describe documents relating to the

reappointment of SOM PiPs which Yale is obligated to produce in discovery.  The record suggests

that some documents falling within this category may have been previously produced with respect

to certain individuals, but the indicated discovery must be complete.

An alternative source of discoverable documents is found in the Pinker Report, which recites

at 5 that to prepare the report "the committee reviewed documentation of the previous PiP

evaluations and appointments (or offers of appointments) of Ibbotson, Garstka, Sonnenfeld, Garten,

Fabozzi, Bagley, Mester, Kolditz, and Mohan." Doc. 153-1, at 92.  Counsel can identify those

individuals who (in addition to Bagley herself) fall within the universe of comparators I will call

"reappointment professors."  As to each such individual, Yale must disclose to Bagley the entire

"documentation" that the Pinker Committee amassed and reviewed.

### III

What of those individuals Bagley characterizes as *comparators* who are not *reappointment*

*professors*?  For the reasons stated, they are not comparators Bagley may use for the purpose of

10

establishing a *prima facie* case of discrimination.  However, if Bagley makes out that *prima facie* claim, the circumstances surrounding these additional individuals may be a source of admissible evidence with respect to a related but separate element of a Title VII discrimination claim: whether Yale's professed reason for denying Bagley reappointment is pretextual.

Bagley's Title VII discrimination claims "are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Mandell*, 316 F.3d at 377 (lateral citation omitted).   That framework is now familiar:  "In a disparate treatment suit the plaintiff is required to establish a *prima facie* case of discrimination; if she succeeds, the university is called upon to give a non-discriminatory reason for failing to give her tenure; and, when the university has come forward with such a reason, the burden then rests with the plaintiff to prove discrimination. *Namenwirth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 769 F.2d 1235, 1240 (7th Cir. 1985)(citing *McDonnell*, 411 U.S. at 807), *cert. denied*, 474 U.S. 1061 (1986).

Applying these principles to the case at bar: If  Bagley, with the aid of discovery into the circumstances of the comparator - reappointment professors, raises a legitimate inference that Yale discriminated against her in the reappointment context, she will have made out a *prima facie* case. Yale must then articulate a nondiscriminatory reason for declining to reappoint Bagley as a Professor in the Practice at the School of Management.   "An employer's explanation of its legitimate nondiscriminatory reasons must be clear and specific."  *Mandell*, 316 F.3d at 381 (citation and internal quotation marks omitted).  If Yale comes forward with such a benign reason, expressed with sufficient clarity, "the burden shifts back to [Bagley] to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination." *Mandell*, at 381. "She may attack the motive advanced by the university in one of two ways: she may try to show that the

motive is not worthy of belief; or she may try to show that in fact some other motive explains the university's action better than the motive offered." *Namenwirth*, 769 F.2d at 1240.

In the parlance of Title VII jurisprudence, a discrimination plaintiff attempts to satisfy the third-stage *McDonnell* burden by proving that her employer's articulated non-invidious reason was *pretextual*. Not infrequently, the evidence a plaintiff offers to make that showing is *comparative* in nature. In *Namenwirth*, the Seventh Circuit noted that "[to prove the proffered motive is not worthy of belief, evidence of a comparative sort is appropriate . . . . Obviously comparative evidence is relevant in determining whether a motive is pretextual." 769 F.2d at 1240.

To that common-sense proposition, one must add the qualification that to be relevant at trial, the plaintiff's comparative evidence must have a propensity to show that the defendant's proffered nondiscriminatory reason is not worthy of belief, which is to say, the proffered reason is pretextual. The test for relevance is stated in Rule 401 of the Federal Rules of Evidence. Rule 401 provides that "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." That definition of relevant evidence is followed by the terse provision in Rule 402: "Irrelevant evidence is not admissible." On a trial of Bagley's discrimination claim against Yale, the factual issue of whether the non-invidious reason Yale stated for not reappointing Bagley to the SOM faculty was genuinely felt, or was instead a pretext for discrimination, is of critical consequence in determining the action. Bagley contends that Yale's stated reason or reasons were pretextual. Evidence offered by Bagley with respect to other individuals or positions would be relevant and admissible at trial only to the extent that the evidence has "any tendency" to make it "more probable" that Yale's stated reason *for deciding not to reappoint Bagley* was pretextual.

12

Measured by that standard, Bagley's proposed non-reappointment comparators are an eclectic group. Some individuals are Professors in the Practice who were appointed to that position (as opposed to being reappointed). Bagley also includes in her group of suggested comparators Ian Shapiro, David Bach, and Kyle Jensen, none of whom were PiPs. Shapiro replaced Bagley in teaching the State and Society course she had co-taught at the SOM with Professor Rae. Bach replaced Bagley in teaching the course in a pre-MBA program the SOM offered. Bagley's counsel states in a brief [Doc. 153] at 8 that Kyle Jensen "is a non-tenured lecturer who was hired as a Director of Entrepreneurship at the SOM, a position for which Professor Bagley applied and was overlooked, despite her qualifications." On this motion to compel, Bagley seeks discovery of documents having to do with these individuals and these events.

There are varying degrees of difficulty in discerning the relevance of these events to the issue of whether Yale's stated reason for not reappointing Bagley as a PiP was a pretext, designed to conceal discrimination. The relevance of information Bagley seeks to discover to that particular issue is central to the permissible scope of discovery. Amendments to Rule 26(b)(1) of the Federal Rules of Civil Procedure became effective on December 1, 2015. Rule 26(b)(1), captioned "Scope [of Discovery] in General," provides : "Parties may obtain discovery regarding any nonprivileged matter that is *relevant to any party's claim or defense* and proportional to the needs of the case . . ." (emphasis added). . [2]  In *State Farm Mutual Automobile Insurance Co. v. Fayda*, No. 14 Civ. 9792, 2015 WL 7871037 (S.D.N.Y. Dec. 12, 2015), Magistrate Judge Francis, having reviewed the 2015 amendments to the Rule and the advisory committee notes concerning them, stated: "Relevance is

---

[2]  The 2015 amendments to Rule 12(b)(1) have not been formally published. They are accessible online at WestlawNext (visited December 14, 2015).

still to be construed broadly to encompass any matter that bears on, or that reasonably could lead to

other matter that could bear on any party's claim or defense." 2015 WL 7871037, at *2 (citation and

internal quotation marks omitted). Judge Francis added that "[t]he burden of demonstrating

relevance remains on the party seeking discovery," while "the party resisting discovery has the

burden of showing undue burden or expense." *Id*. For those propositions, Judge Francis cited and

quoted *Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York*, 284 F.R.D.

132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to

justify curtailing discovery.").

Lastly, Judge Francis noted that under the 2015 amendments to Rule 26(b)(1), "information

still 'need not be admissible in evidence to be discoverable.'" *Id*. (quoting the Rule). The advisory

committee notes to the 2015 amendments observe that "[t]he former provision for discovery of

relevant but inadmissible information that appears 'reasonably calculated to lead to the discovery of

admissible evidence' is also deleted."[3]   The "reasonably calculated" phrase had become

problematical, and "[t]he 2000 amendments sought to prevent such misuse by adding the word

'Relevant' at the beginning of the sentence, making clear that 'relevant' means within the scope of

discovery as defined in this subdivision." Fed. R. Civ. P. 26(b)(1) advisory comm. nn. The advisory

committee notes to the 2015 amendments state:

> The "reasonably calculated" phrase has continued to create problems,
> however, and is removed by these amendments.  It is replaced by the
> direct statement that "Information within this scope of discovery need
> not be admissible in evidence to be discoverable."  Discovery of
> nonprivileged information not admissible in evidence remains

---

[3]   The advisory committee notes to the 2015 amendments are accessible online at
law.cornell.edu/rules (visited December 14, 2015), as well as on LEXIS and Westlaw, following the
text of the Rule.

available so long as it is otherwise within the scope of discovery.

*Id.*

The last-quoted sentence in the advisory committee's notes echoes the provision with which the amended Rule begins, that to fall within the scope of permissible discovery, information must be "relevant to any party's claim or defense."  In order to be "relevant" for Civil Rule 26 discovery purposes, information and evidentiary material must be "relevant" as defined in Rule of Evidence 401.  No other definition of Rule 26 relevance is suggested or discernible.

To reiterate, the pertinent issue in the case at bar arises from Bagley's claim that whatever reasons Yale gave for refusing to reappoint her, those reasons were pretextual, fashioned to conceal Yale's true (and illicit) discriminatory reason.  Further analysis of this issue, in response to Bagley's motion to compel discovery, is hindered by the fact that the present record does not sufficiently reveal the reason or reasons Yale gave and presumably still gives for its decision not to reappoint Bagley.  Bagley's FAC contains detailed  descriptions of purportedly conflicting reasons various deans and faculty review committees gave her from time to time to explain her non-reappointment, a cacophony of inconsistent explanations Bagley stresses as indications of pretext.   But these allegations are in large part argumentative and conclusory.  Yale's only formal declarations in the record to date appear in its answer to Bagley's initial complaint [Doc. 61], which recites at ¶ 18 that "defendants admit that Professor Bagley did well at the Yale School of Management until the spring semester of 2012," an ominous indication of gathering storm clouds reiterated in ¶ 43 ("[Plaintiff played a leading and mostly successful role in the State and Society course until the spring of 2012.") and again in ¶ 83 and ¶ 96 ("the Yale SOM Deans decided not to have the plaintiff teach the State and Society course after the spring 2012 semester" and informed plaintiff that "she would not be

scheduled to teach the State and Society course for the 2013-2014 academic year."). That initial responsive pleading does not describe the Dean's reasons for that adverse employment decision. Yale has yet to answer Bagley's amended complaint. The Pinker Report contains some indications of the troubles afflicting the 2012 spring semester presentation of the State and Society course, apparently caused and fueled by increasing friction between Bagley and Professor Rae, the co-teacher. However, the Pinker Report is an advisory report to the faculty BOP, which in turn recommends reappointments to the Dean; its contents cannot be regarded as a definitive statement of the reasons for the Dean's subsequent decision not to reappoint Bagley.

## IV

After careful consideration, I conclude that the proper way to resolve the parties' present dispute about the scope of discovery is to require Yale to assume (of course without conceding) that Bagley has satisfied the first stage of the *McDonnell* framework and made out a *prima facie* case of discrimination with respect to Yale's decision to deny her reappointment. On that assumption, the case arrives at the second *McDonnell* stage, and Yale is required to articulate in clear and specific language its explanation of legitimate nondiscriminatory reasons for this employment decision. Yale's explanation should take the form of an Offer of Proof. It is only when the record is thus expanded that the Court will be able to determine the proper boundaries of the discovery Bagley seeks to compel.[4] The Court cannot decide whether information is relevant to Bagley's claim that Yale's reason was pretextual without first knowing what that reason was.

---

[4] By directing this exercise, the Court intimates no view as to whether Bagley has or will be able to satisfy the first *McDonnell* stage by making out a *prima facie* case of discrimination. That will depend upon the fruits of future discovery.

There is no reason to delay the completion of discovery with respect to those obvious comparators, the reappointment professors.  To recapitulate, they are the individuals who (a) were Professors in the Practice on the faculty of the Yale School of Management during the period 2008-2013 and (b) during that period, applied for reappointment to that rank and position.

With respect to each such individual, Yale must produce for discovery all documents generated by or relating to the application for reappointment.  This discovery includes the records of faculty review procedures such as the BOP, and communications to or from a dean of the SOM or other Yale administrator,  if such documents refer to or relate in any way to the reappointment of the individual concerned.  To that extent, Bagley's motion to compel discovery is GRANTED. That discovery must be made as promptly as the circumstances allow.

Plaintiff's motion to compel discovery in other respects is DENIED on the present record, WITHOUT PREJUDICE to renewal if further circumstances arise, following submission by Yale of the Offer of Proof directed by this Ruling.

Moreover, no present need or value is presently discernible with respect to production of the personnel files of the individuals in question.  Discovery of those files will not be compelled on the present record.  There is thus no occasion for an inspection of documents by the Court *in camera*.

Yale is directed to file and serve the Offer of Proof described *supra* not later than **December 29, 2015.**

## V

For the foregoing reasons, Plaintiff's Motion to Compel Discovery [Doc. 135] is GRANTED IN PART and DENIED IN PART.

Discovery will go forward in manners consistent with this Ruling.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         December 14, 2015

                                        /s/Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge