### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

_____

|  |  |  |
|---|---|---|
| CONSTANCE E. BAGLEY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:13-cv-01890 |
| | ) | |
| YALE UNIVERSITY, DOUGLAS | ) | |
| RAE, EDWARD SNYDER, AND | ) | |
| ANDREW METRICK, Individually. | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S REPLY IN SUPPORT OF HER OMNIBUS MOTION

Plaintiff Constance E. Bagley ("Plaintiff" or "Professor Bagley") submits this Reply in support of her Omnibus Motion for an order requiring Yale to provide discovery, issuing sanctions against Yale for its failure to comply with discovery orders and failure to preserve relevant evidence, and scheduling a trial date. For the reasons stated herein, as well as in her Memorandum in Support of her Omnibus Motion, Professor Bagley respectfully requests that the Court grant her Motion.

### 1.  Expansion of the Temporal Scope of Comparator Discovery is Warranted Here

In their Opposition to Professor Bagley's Omnibus Motion, the Defendants argue that Professor Bagley should be denied comparator discovery for any additional time beyond 2013 because it is "too remote to be considered relevant." See Defs' Opp. at 5. The Defendants argument should fail, because it is inconsistent with the language of the Court's December 14, 2015 and December 28, 2015 rulings and relevant federal case law.

The Court's December 14, 2015 and December 28, 2015 rulings, read in conjunction, make clear that the Court selected 2008 – 2013 as the timeframe for comparator discovery because that

was the period which the Court identified as Professor Bagley's term as a Professor in the

Practice.  In the December 14, 2015 Ruling, the Court wrote: "In April 2008, Yale hired Bagley as

a 'Professor in the Practice' ("PIP") on the Yale SOM faculty, for a period of five years,

commencing on July 1, 2008 and ending June 30, 2013...."[I]n October 2011 the SOM faculty,

under the direction of Deputy Dean Andrew Metrick, began an evaluation of Bagley's

performance within the context of her possible reappointment as a PiP when her five-year

appointment expired in June 2013." See Doc. #160, at 2, 3.  In its December 28, 2014 Ruling on

Professor Bagley's Motion for Clarification, the Court made clear that:

> The December 14 Ruling directs the specified discovery with respect to the specified
> individuals during the period 2008-2013 *because that is the period of time Bagley held the*
> *rank and position of Professor in the Practice*.  Bagley received that appointment in the
> form of Dean Garstka's April 8, 2008 letter to Bagley, confirming "that the Faculty of the
> School of Management has voted you an appointment as Professor in the Practice of Law
> and Management for a term of five years beginning July 1, 2008."  Doc. #162, at 2, 4.
> (emphasis added)

The Court then declined to extend the discovery period back to 2007, without addressing

Professor Bagley's status in 2014.  Neither of the Court's Rulings reflects a finding that it would

be unreasonable or unduly burdensome to allow comparator discovery through December 31,

2014, the actual date through which Professor Bagley "held the rank and position of Professor in

the Practice."  Thus, Professor Bagley's good faith request that the Court redefine the scope of its

ruling, for purposes of clarity and consistency, is not improper.

Moreover, given the circumstances of this case, Professor Bagley's request for

reappointment files beyond 2013 is not improper.  Although the Defendants argue that the period

after Professor Bagley was informed her reappointment was renewed is "too remote," several

federal courts analyzing discovery requests in the context of discrimination cases have recognized

otherwise and have allowed plaintiffs discovery for reasonable periods of time after their

2

employment is terminated.  See, e.g., Bujnicki v. Am. Paving & Excavating, No. 99-CV-0646S(SR), 2004 WL 1071736 (W.D.N.Y. Feb. 25, 2004); E.E.O.C. v. Autozone, Inc., 258 F. Supp. 2d 822 (W.D. Tenn. Mar. 31, 2003) (noting that "[c]ourts typically will permit discovery in employment discrimination cases to cover a reasonable number of years before and after the alleged discrimination," and allowing discovery of comparator data up to two years after the intervener's last allegation of discrimination); Craig v. Exxon Corp., No. 97 C 8936, 1998 WL 850812 (N.D. Ill. Dec. 2, 1998) (requiring production of documents and information dated after plaintiff's termination and up through a date shortly before the defendants' discovery responses were filed); Bonner v. Guccione, No. 94CIV7735, 1996 WL 221587 (S.D.N.Y. May 1, 1996) (imposing a cut off of approximately two years after plaintiff's termination because limiting plaintiff to the period of her employment "would unduly restrict plaintiff's search for …evidence tending to show a pattern and practice of discrimination"); Hicks v. Arthur, 159 F.R.D. 468 (E.D. Pa. 1995); Milner v. Nat'l Sch. of Health Tech., 73 F.R.D. 628, 632 (E.D. Pa. 1977) (Evidence running forward from the date of discharge also would be relevant to rebut the defense that the plaintiff was discharged for cause by showing … that the defense is … a pretext").[1]

For example, in Bujnicki, a Title VII plaintiff who alleged that she was treated differently from similarly situated males, subjected to a hostile work environment, and retaliated against for opposing unlawful discrimination was permitted discovery of the personnel files of other employees who performed similar duties, who participated in the same training program, or who were minorities.  2004 WL 1071736.  Specifically, the court allowed discovery for a period of two years before and two years after the plaintiff's claim of discrimination.  See id. at *3.  In doing so, the court acknowledged that discovery concerning the period after the discriminatory conduct at

---

[1] Also relevant here, in Milner, the court stated: "it cannot be said that discovery embracing a period of six and one-half years is objectionable for burdensomeness, especially where, as here, the defendants claim much of the requested information does not even exist."  73 F.R.D. at 632.

issue and after a plaintiff claims discrimination is, in fact, relevant to the plaintiff's claim of disparate treatment.  Id.

A similar conclusion is warranted here.  The documents Professor Bagley seeks concerning reappointments dated after 2013 are relevant to the question of whether the Defendants' proffered explanation for Yale's decision to deny her reappointment (as set forth in their Offer of Proof [Doc. #163] is pretextual.  See Craig, 1998 WL 850812, at *3 (finding that post-termination discovery was reasonable because, "if one day (or one month or one year) after Plaintiff's termination a non-pregnant employee of the Defendants had the same or worse attendance record as Plaintiff but was not discharged, that information could be relevant to the question of pretext").[2]  These materials shed light on the process involved in the decision to deny Bagley's reappointment, as well as the intent behind actions taken with respect to her reappointment.[3]  As such, the Defendants should be required to produce complete sets of reappointment materials for comparators who came up for reappointment or were reappointed from 2013 onward.

## 2.  Reappointment Materials Post-Dating Professor Bagley's Employment As a Professor in the Practice Are Also Relevant to Plaintiff's Contract-Related Claims

In their Offer of Proof, the Defendants take the position that "the criteria for reappointment of PiP's are: scholarship, teaching, service to the University and need for the position."  Doc. #163, at ¶11.  Despite the fact that programmatic need was not included in the reappointment criteria set forth in her offer letter and contract, the Defendants have taken the position that it was factored into the decision to deny Professor Bagley's reappointment.  After

---

[2] See also Bulwer v. Mount Auburn Hospital, 473 Mass. 673 (2016) (a defendant's failure to follow established procedures or criteria may support an inference of intentional discrimination).  While Bulwer is not binding, the court's analysis of the parties' respective burdens and the categories of evidence available to plaintiffs seeking establish pretext within the context of the "McDonnell Douglas" framework is instructive.  A courtesy copy of the decision is provided as Exhibit A for the Court's convenience.

[3] Certain comparator documents are also relevant to the dispute concerning the interpretation of the terms of Professor Bagley's employment contract.

Professor Bagley's reappointment was denied, Yale amended its Faculty Handbook to include need as one of the criteria for reappointment. Accordingly, reappointment documents that post-date Professor Bagley's termination are probative of the definition of and standard for "need," as the Defendants claim that term has been used in the context of PiP appointments. The Defendants should, therefore, be required to produce the documents.

### 3. The Defendants Have Not Produced Every Document Responsive to the Court's December 14, 2015 Ruling

In their Opposition, the Defendants argue that they "have produced every responsive document in full compliance with the Court's Ruling."[4] That is simply not the case.

On March 23, 2016, the Defendants produced a set of documents in response to the Court's December 14, 2015 Ruling.[5] The production included a draft report and e-mail correspondence concerning the reappointment of Professor Frank Fabozzi, as well as copies of two e-mails concerning Professor Bagley's reappointment. One e-mail, dated July 16, 2013 and titled "Re: Bagley review committee," was sent from Kendra Mulligan (an administrative assistant) to Professor Edieal Pinker in connection with the Pinker Committee's charge for its report on Professor Bagley's reappointment review. That e-mail attaches eight documents from prior PiP reviews. Yet, prior to producing the e-mail, the Defendants removed the attachments concerning Jeffrey Garten, Jeffrey Sonnenfeld, Loretta Mester, Rakesh Mohan, Roger Ibbotson, Stanley Garstka, and Thomas Kolditz. The attachments had been requested by the Pinker Committee as part of its review of Professor Bagley's reappointment and were undoubtedly part of responsive e-mail correspondence concerning her review. On March 23rd, the same day the Defendants' served their production, Professor Bagley's counsel contacted the Defendants'

---

[4] It should be noted that the Defendants fail to identify the individuals from whom they requested relevant information, and also fail to specify when –aside from May 2013- a preservation notice circulated.

[5] Many of the documents had already been produced.

counsel to request a complete copy of the attachments.  The Defendants have refused to produce the documents.

The Court's December 14, 2015 Ruling requires immediate production of all documents and communications generated by, relating, or referring in any way to the reappointment of Professors in the Practice who applied for or were granted reappointment during Professor Bagley's tenure as a Professor in the Practice.  Professor Bagley's reappointment is not an exception.  Moreover, Professor Bagley is and has been entitled to documents and communications linked directly to her review, which are part of the personnel files the Defendants were ordered to produce at the outset of discovery.  Therefore, the Defendants should be ordered to immediately produce complete copies of the attachment to the July 16, 2013 e-mail from Kendra Mulligan to Professor Edieal Pinker.

### 4.  The Defendants' Description of Their Preservation Efforts Is Inadequate

In their Opposition, the Defendants argue that they "diligently conducted an exhaustive search and … provided every responsive document in full compliance with the Court's Ruling." While the Defendants explain, in general terms, the steps they took to search for responsive documents, the Defendants' Opposition lacks the detail necessary for a determination that the Defendants have, in fact, met their obligations.

The Defendants state that they "identified individuals who may have relevant information…then contacted individuals who were thought to possibly have information…" However, the Defendants do not specify who those individuals are.[6]  Furthermore, while the Defendants acknowledge that "Yale did not issue a litigation hold as of April 2, 2012," they do

---

[6] For example, it is unclear whether the Defendants sought responsive information from the secretary of the Yale Corporation, which has final authority with respect to management of the University, including appointments.

not specify when employees were instructed to preserve relevant documents.[7]  Professor Bagley,

therefore, requests that the Court order the Defendants to provide proof of their preservation

efforts, including the specific date on which a litigation hold or preservation notice was put into

place, a complete list of every individual to whom the notice was delivered, and a list of

individuals from whom the Defendants requested information responsive to the Court's December

14, 2015 Ruling.  See, e.g., Murray v. Coleman, No. 08-CV-6383, 2012 WL 4026665, at *2

(W.D. N.Y. Sept. 12, 2012) (requiring a detailed affidavit to aid the court in determining whether

the defendants met their discovery obligations).

 An order requiring specific proof of the Defendants' efforts to preserve evidence and

comply with their discovery obligations is warranted here where the Defendants have produced

such a limited number of documents concerning the reappointments of comparators, including

those whose reappointments were reviewed relatively recently.  The Defendants, knowing that

proof of Professor Bagley's case depends to a great measure on information and materials related

to other reappointments, have intentionally failed to produce documents that obviously existed at

some time, but that are no longer available.[8]  The Defendants' conduct directly implicates Fed. R.

---

[7] The Defendants suggest that the e-mail from Sheril Frano does not support a conclusion that a document preservation notice was not circulated until May 8, 2013.  See Defs.' Opp. at 15.  However, the Defendants do not even attempt to show otherwise.  Ms. Frano, as former Executive Assistant to Defendant Snyder, former Dean Podolny, and former SOM Dean Sharon Oster, worked for and had access to correspondence and files of an individually named defendant to this action, the Dean who negotiated the employment agreement at issue in Professor Bagley's case, and a former Dean who voted on Professor Bagley's reappointment as well as the reappointment of comparators.  At least one other Administrative Assistant, Bonnie Blake, received the notice on the same day.

[8] The Defendants have engaged in a pattern of similar conduct throughout discovery.  For example, in February 2015, the Defendants attempted to limit Professor Bagley's discovery concerning President Salovey by misrepresenting to the Court the nature and extent of his involvement in the specific acts at issue in Professor Bagley's complaint.  See Doc. #109, at 2 ("President Salovey's involvement in the events at issue in this litigation was very limited.").  Yet, President Salovey's own deposition testimony, documents produced in discovery, and even Yale's Offer of Proof make clear that President Salovey's role was not so limited.  Also in February 2015, the Defendants asked this Court to relieve the defendants of their obligation to continue ESI review, arguing that review of additional documents would be a waste of time and money.  See Doc. #108-1.  Such an order would have deprived Professor Bagley of key documents and correspondence that the Defendants knew could be used in litigation.

Civ. P. 37(e), which recognizes that sanctions are warranted where, as here, a party "acted with the intent to deprive another party of the information's use in litigation."

### 5. Information Related to Other Complaints of Discrimination and Retaliation Is Relevant and Within the Scope of Reasonable Discovery

The Defendants argue that Professor Bagley is not entitled to discovery of information regarding Jeannette Gorgas' employment because she is not "similarly situated" to Professor Bagley.  See Defs.' Opp. at 20.  The Defendants also argue that other complaints of discrimination at Yale will not produce information relevant to the decision to deny Professor Bagley's reappointment.  See Defs.' Opp. at 26.  Both arguments miss the mark.

Professor Bagley does not seek discovery concerning Ms. Gorgas as a comparator. Rather, as explained more fully in Professor Bagley's Omnibus Motion, she seeks information concerning Ms. Gorgas' transfer and departure from the SOM, as well as data and information concerning other complaints of discrimination and retaliation, because both may provide circumstantial evidence Professor Bagley can use to show that the decision to deny her reappointment and other wrongful action taken against her was a "cover up" for discrimination and retaliation.[9]  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973); Stratton v. Edison Co., No. 05 Civ. 2868, 2006 WL 3155786, at *5 (S.D.N.Y. 2006); see also Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987) (evidence of a discriminatory atmosphere "may not be conclusive proof of discrimination," but "does tend to add 'color' to the employer's

---

[9] In their Opposition, the Defendants minimize the role high level administrators for the University, such as Deputy Provost Frances Rosenbluth, played in the incidents that gave rise to Professor Bagley's complaint in an attempt to narrow the scope of discovery Professor Bagley may seek.  See Defs' Opp. at 26 ("Deputy Provost Rosenbluth merely provided the plaintiff with informal guidance.").  However, during his deposition, President Peter Salovey testified that he not only asked Deputy Provost Rosenbluth to counsel Professor Bagley while he oversaw her grievance process (see Exhibit 26 to Memo. in Support of Pl.'s Omnibus Motion, Salovey Depo. Transcript, at p. 117), but also entrusted her, in her capacity as deputy provost, with responsibility for overseeing safeguards in Professor Bagley's review process to ensure fairness.  See Exhibit B, Excerpt of Salovey Depo. Transcript, at p. 242). President Salovey ultimately ignored his own provostial committee's concerns regarding the lack of fairness inherent in a second BPO review.

decision making process and to the influences behind the actions taken with respect to the

individual plaintiff").  Professor Bagley's requests for these documents and information should,

therefore, be granted.

## CONCLUSION

For the foregoing reasons, Professor Bagley respectfully requests that the Court grant her

Omnibus Motion.

Constance E. Bagley
BY HER ATTORNEYS,

/s/ Laura R. Studen
Laura R. Studen, Esq.
lstuden@burnslev.com
Ellen Zucker, Esq.
ezucker@burnslev.com
Carla A. Reeves, Esq.
creeves@burnslev.com
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110
617-345-3000

April 6, 2016

## CERTIFICATE OF SERVICE

I, Carla A. Reeves, hereby certify that on April 6, 2016, a copy of the foregoing was filed
electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be
sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable
to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing
through the court's CM/ECF System.

/s/ Carla A. Reeves

# EXHIBIT A

NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and
bound volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11875

       BERNARD E. BULWER  vs.  MOUNT AUBURN HOSPITAL & others.[1]



       Middlesex.    November 3, 2015. - February 29, 2016.

     Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk,
                              JJ.


Hospital, Appointment to staff.  Anti-Discrimination Law, Race,
     Employment.  Employment, Discrimination.  Contract,
     Employment, With hospital, Performance and breach.
     Practice, Civil, Summary judgment.



       Civil action commenced in the Superior Court Department on
February 22, 2008.

       The case was heard by S. Jane Haggerty, J., on a motion for
summary judgment.

       After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


       Robert R. Hamel, Jr. (Megan E. Kures with him) for the
defendants.
       Denzil D. McKenzie (James E. Clancy, IV, with him) for the
plaintiff.
       James A.W. Shaw, for Massachusetts Employment Lawyers
Association, amicus curiae, submitted a brief.

---

       [1] Eric Flint, Ricardo Wellisch, and Lori Balestrero.

LENK, J.   Massachusetts law prohibits employers from discriminating against their employees on the basis of, among other things, race or national origin.  See G. L. c. 151B, § 4. Because direct proof of such discrimination is rarely available, employees filing claims under G. L. c. 151B, § 4, are permitted to prove discrimination without direct evidence of discriminatory intent, by relying on evidence that their employers gave a "false reason,"[2] or pretext, for terminating their employment.  In this case, we address whether the plaintiff has produced sufficient evidence of pretext to survive his former employer's motion for summary judgment.  In doing so, we clarify the evidentiary burdens each party faces after one party has moved for summary judgment.  We address, in particular, three concerns:  whether the evidence on which an employee relies to survive a defendant's motion for summary judgment need show not only that the defendant's stated reason was false, but also that it concealed a discriminatory purpose; whether it is the plaintiff's burden to persuade the motion judge based on that evidence that there is an issue of material fact appropriate for trial; and, finally, whether, in discerning

---

[2] A "false reason" is one that is not the real reason for terminating an individual's employment, regardless whether the false reason is factually accurate.  See Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001) (Lipchitz); Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 139 (1976).

the existence of an issue of material fact, the motion judge may weigh or otherwise evaluate the evidence.

The plaintiff, Bernard E. Bulwer, is a black male of African descent who is originally from the Central American country of Belize.  The plaintiff has a medical degree from the University of the West Indies, and practiced medicine outside the United States until 2002, when he came to this country.  In order to become certified to practice medicine in the United States, he was required to complete a residency program here. During the first year of his residency at the defendant Mount Auburn Hospital (hospital), the plaintiff received diametrically opposing reviews from supervising physicians, some laudatory and others deeply critical, after which the hospital terminated his employment.  The plaintiff filed a ten-count complaint in the Superior Court against the hospital and three physicians who supervised his work, asserting, among other things, employment discrimination under G. L. c. 151B, § 4, and breach of contract.[3] Concluding that the plaintiff had not produced sufficient evidence of the defendants' discriminatory intent, a Superior Court judge allowed the defendants' motion for summary judgment

---

[3] The plaintiff also alleged retaliation in violation of G. L. c. 151B, § 4; breach of a health insurance obligation in violation of G. L. c. 175, § 110D; defamation; intentional infliction of emotional distress; negligent infliction of emotional distress; and three counts of tortious interference with a contractual relationship.

on all claims.  The plaintiff appealed, and a divided Appeals
Court reversed the judgment as to the discrimination and breach
of contract claims, while affirming the decision on all of the
other claims.  We allowed the defendants' application for
further appellate review, limited to the claims for
discrimination under G. L. c. 151B, § 4, and breach of contract.
We conclude that the defendants were not entitled to summary
judgment and that the plaintiff has presented evidence
sufficient to allow a jury to hear his claims.

1.  Background.  We summarize facts drawn from the summary
judgment record, reserving certain details for later discussion.
See LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 318
(2012) (LeBlanc).  The plaintiff, in addition to his medical
degree, has postgraduate training in a number of fields,
including cardiovascular disease.  He practiced medicine in
Trinidad, Belize, and the United Kingdom from 1989 through 2002.
In 2002, the plaintiff came to the United States as a research
associate and fellow in a subresidency cardiology program at
another hospital in Boston, where he worked until 2005.

In the spring of 2005, hoping to obtain a medical license
to practice in the United States, the plaintiff contacted the
defendant Dr. Eric Flint, director of the internal medicine
residency program at the hospital.  In June, 2005, after an
interview with Flint, the plaintiff was offered a residency at

the hospital.  Because of delays in the processing of his visa, he began his residency in September, 2005, two months later than the other residents in his cohort.

In August, 2005, the plaintiff signed the hospital's standard medical resident agreement (agreement), setting forth the terms and conditions of his employment.  The agreement was for a one-year term, renewable for an additional two years upon satisfactory completion of the first-year program.

The agreement stated that the hospital and its residency program would comply with the requirements promulgated by the national Accreditation Council for Graduate Medical Education (ACGME).  ACGME requires, among other things, that member programs not discriminate against residents on grounds including race and national origin.  It also requires that programs provide residents with written procedures that must be followed in the event a program seeks "academic or other disciplinary action" against a resident.

The hospital's written procedures state that, should a resident's supervisors decide to terminate a resident's employment, a resident has the right to convene an ad hoc committee[4] consisting of the heads of various departments, the resident at issue, and another resident to be chosen by mutual

---

[4] The hospital's rules refer to this committee variously as the "ad hoc committee," the "due process committee," and the "ad hoc due process committee."

agreement.  Such a committee would then be empowered to conduct
an independent review of the employment decisions made by the
resident's supervisors.  The procedures provide further that

> "[t]he resident is assured of the fundamental aspects of a
> fair hearing including written statement of the specific
> issues from the Department Chair, at least [five] days
> notice of the Due Process Committee meeting, the
> opportunity to be present and to rebut the evidence, and
> the opportunity to present any other information.

> ". . .

> "All matters upon which any decision is based must be
> introduced into evidence at the proceeding before the Ad
> Hoc Due Process Committee in the presence of the resident."

Residents may then appeal the committee's decision to the
"President of the Medical Staff."

After signing the agreement, the plaintiff began his
residency in September, 2005.  The first-year program consisted
of twelve one-month rotations in a number of different
"services" throughout the hospital.  The plaintiff's performance
was to be evaluated by attending physicians and resident
supervisors in each of the services where he worked.  The
evaluating physicians were to fill out evaluation forms, which
called for numerical ratings of various aspects of the
plaintiff's performance, as well as for written comments.  These
evaluations in turn would be given to the clinical competence
committee (CCC), a panel of thirteen physicians who met
regularly to discuss the progress of all of the residents.  The

plaintiff was also assigned a mentor, the defendant Dr. Lori Balestrero.

The plaintiff's first rotation in September was in the hospital's emergency department.  The plaintiff received strongly positive evaluations in that department.  Two physicians rated him as "outstanding," and five others rated him "above average."  They described him as knowledgeable, mature, and pleasant to work with.  Dr. Gary Setnik, head of the emergency department, provided a more lengthy written evaluation:

"Dr. Bulwer is universally held in high regard by the staff I polled and by myself.  He has been totally reliable, coming in early, and staying late on most shifts.  He aggressively works to see as many patients as possible.  His presentations are complete, his management plans appropriate, and his procedural skills very good."

The next month, the plaintiff rotated into the medical intensive care unit (MICU).  There, he received mixed evaluations.  In an October, 2005, electronic mail message to a colleague, Dr. Soon-Il Song wrote positively that

> "[the plaintiff] had procedural skills and knowledge base
> well above someone at an intern level.  He also was
> pleasant to work with.  He had a good sense of his own
> limitations, and asked questions often in order to clarify
> issues.  I think his ability to gather information in
> history taking was quite good and thorough.  Above all, he
> maintained composure and a good attitude, despite the fact

that we had an especially difficult night of no sleep and challenging patients requiring multiple attending input in the middle of the night."

Other physicians, however, viewed the plaintiff's performance negatively.  One wrote that the plaintiff "[m]ade drastic and potentially dangerous/life threatening decisions about [patient] care [without] consulting [the] attending [physician]. . . . [He is] [t]oo confident for his own good and [the patient's] own good without showing any proof of capability to perform at the level of an intern or resident yet."  Another commented that the plaintiff was "eager to learn" but that "[h]e does not seem to be aware of his responsibilities as an intern despite being told them repeatedly."  In response, the plaintiff sent an electronic mail message to Flint stating that he did not believe these negative reviews were objective, and asking Flint to obtain evaluations from four named physicians with whom the plaintiff had seen patients.  Flint did not do so.

Setnik reported that both he and other members of his department received harsh comments from members of the MICU staff for his positive evaluations of the plaintiff.  He described this as "[a]n experience that I hadn't previously had at Mount Auburn."

In November, 2005, Balestrero, the plaintiff's mentor, met with the plaintiff to discuss the negative feedback.  The plaintiff told her that he thought the negative impressions were

inaccurate.  Balestrero then met with the CCC to discuss ways in which the plaintiff could improve.  Following this meeting, Balestrero presented the plaintiff with a plan for improvement that she had developed together with the CCC.  The plan included a provision for weekly meetings with Balestrero and a follow-up meeting, to be held after evaluations from the December rotation were received, with the plaintiff, Balestrero, and a CCC representative.  Neither the weekly meetings nor the follow-up meeting took place.[5]

During November and December of 2005, the plaintiff was assigned a "wards" rotation in which he provided general internal medicine care for patients who had been admitted to the hospital.  The three evaluations from that rotation that appear in the record were positive, with one evaluator noting "much improvement," and another stating that the plaintiff was "[o]verall . . . pretty good."  The third evaluator assigned a passing grade, but stated that the plaintiff needed improvement in "practice-based learning," professionalism, and organization of notes charting patients' progress.

In January, 2006, the plaintiff rotated into the cardiology department.  He received three evaluations of his work on that

---

[5] The plaintiff states that these meetings did not occur because of Balestrero's schedule, while the defendants contend that it was the plaintiff's schedule that prevented the meetings from taking place.

service.  One rated him as failing in five of six competencies, but another gave him high marks in all competencies, and the third described his presentations as "very commendable" and his knowledge as "excellent."  In mid-January, 2006, the plaintiff met with Balestrero, who told him that he had received positive evaluations and that "the past [was] behind [him]."

In February, 2006, the plaintiff rotated again into the wards service.  One evaluator there rated him positively, while the other, Dr. Erica Bial, wrote a lengthy and negative evaluation in which she described her experience with the plaintiff as "horrendous."  She stated that "[t]here is no aspect of the central competencies in which [the plaintiff] is even modestly competent."  She described him as "less-than-fully-honest" and as having "a difficult time being appropriate with . . . women in the professional environment," and recommended that the plaintiff be expelled from the residency program.  During this period, Bial "berated" the plaintiff publicly in a manner that a witness, Song, described as not "appropriate," and as unprecedented in his experience with Bial. Song also reported that Bial spoke negatively to other residents about the plaintiff, outside of the plaintiff's presence.

In March, 2006, the CCC discussed the plaintiff's mixed evaluations.  On April 5, 2006, the CCC sent the plaintiff a letter stating that it would not renew his contract because of

concerns about his ability to analyze complex information, his inability to "build effective therapeutic relationships," and his difficulty presenting information to other members of his teams.  The letter stated also that the plaintiff could finish his first year of residency, working until the end of his contract term in August, 2006.  The letter was signed by Flint and by the defendant Dr. Ricardo Wellisch, chair of the CCC.

The plaintiff invoked his right to convene an ad hoc committee pursuant to the hospital's "due process" policy. Although the committee consisted of most of the individuals specified in that written policy, no resident was seated on it, as required by the policy.  Further, of the committee's three meetings, the plaintiff was invited to attend only the first one, which took place on April 24, 2006.  At that first meeting, as well as at the second, on May 2, 2006, the committee heard testimony from physicians who had previously evaluated the plaintiff during his rotations.  The transcripts of these meetings do not reflect discussion of the possibility that the plaintiff's contract would be terminated immediately, and the plaintiff did not receive any notice to that effect.[6]  He requested that the committee forward to him any materials

---

[6] The record does not contain a transcript of the third meeting on May 9, 2006, at which the committee apparently deliberated and reached a decision.

considered during the meetings he did not attend; those requests were not answered.

On May 9, 2006, the committee sent a letter to Dr. Stephen Zinner, chair of the department of medicine, stating that it would affirm the decision of the CCC not to renew the plaintiff's contract.  On May 17, 2006, Zinner informed the plaintiff verbally that, because of "serious additional concerns" for "patient safety" that had arisen "in the past [three] weeks," the plaintiff would "be immediately relieved of his responsibilities."

The plaintiff sent a letter dated May 18, 2006, to the president and chief executive officer of the hospital stating his desire to appeal, as provided in the due process policy, from the committee's decision not to renew his contract and to terminate his employment immediately.  The president responded with a certified letter, return receipt requested, saying that she would convene such a committee.  The plaintiff did not retrieve the letter from the postal service, which attempted delivery three times, and did not pursue the appeal.

In August, 2006, the plaintiff filed a charge of discrimination against the hospital with the Massachusetts Commission Against Discrimination.  In February, 2008, the plaintiff filed his complaint in the Superior Court, naming the hospital, Balestrero, Flint, and Wellisch as defendants.  During

discovery, depositions were taken of various doctors who had worked with the plaintiff, including Dr. Ramona Dvorak, an African-American internist and psychiatrist formerly employed at the hospital, who described what she believed to have been incidents of racism she experienced during her employment. Following discovery, in December, 2010, the defendants sought summary judgment on all counts; in June, 2011, their motion was allowed.

2.  <u>Discussion</u>.  The plaintiff contends that the motion judge erred in allowing the defendants' motion for summary judgment on his claim for employment discrimination on the basis of his race and national origin, in violation of G. L. c. 151B, § 4, and on his breach of contract claim based on his termination in violation of the procedures set forth in the medical resident agreement.  The plaintiff maintains that there were disputed issues of material fact as to both claims, and the matter should proceed to trial.

a.  <u>Standard of review</u>.  A motion for summary judgment under Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002), is appropriate where "the moving party . . . 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law' based on the undisputed facts." <u>Premier Capital, LLC</u> v. <u>KMZ, Inc</u>., 464 Mass. 467, 474 (2013), quoting Mass. R. Civ.

P. 56 (c).  "In reviewing the . . . grant of a motion for
summary judgment, we conduct a de novo examination of the
evidence in the summary judgment record . . . and view the
evidence in the light most favorable to the part[y] opposing
summary judgment" (citation omitted)," LeBlanc, supra at 318,
"drawing all reasonable inferences in [the nonmoving party's]
favor."  Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38
(2005) (Sullivan).

     b.  Discrimination claim.  i.  Evidentiary burdens.
General Laws c. 151B, § 4, provides that "[i]t shall be an
unlawful practice . . . [f]or an employer . . . because of the
race, color, . . . [or] national origin . . . of any
individual . . . to discharge from employment such individual or
to discriminate against such individual in compensation or in
terms, conditions or privileges of employment."  In order to
prevail at trial, an employee bringing a complaint under G. L.
c. 151B, § 4, must demonstrate four things:  that he or she is a
member of a protected class; that he or she was subject to an
adverse employment action; that the employer bore
"discriminatory animus" in taking that action; and that that
animus was the reason for the action (causation).  See Lipchitz
v. Raytheon Co., 434 Mass. 493, 502 (2001) (Lipchitz).  The
question here is whether the plaintiff provided evidence from
which a reasonable jury could infer the presence of the latter

two elements, i.e., that the defendants bore discriminatory animus and that the animus was the reason the defendants terminated the plaintiff's employment.

In the pretrial context, an employee asserting a discrimination claim under G. L. c. 151B, § 4, may survive a motion for summary judgment by providing "[d]irect evidence of [the] elements" of discriminatory animus and causation. Sullivan, supra at 39.  Because such direct evidence "rarely exists," however, an employee plaintiff may also survive such a motion by providing "indirect or circumstantial evidence [of discriminatory animus and causation] using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–805 (1973) (McDonnell Douglas)."  Sullivan, supra at 39-40.

"In the first stage [of this paradigm], the plaintiff has the burden to show . . . a prima facie case of discrimination." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995) (Blare).  To do so, a plaintiff must provide "evidence that:  (1) he [or she] is a member of a class protected by G. L. c. 151B; (2) he [or she] performed his [or her] job at an acceptable level; [and] (3) he [or she] was terminated."  Id.  "In the second stage, the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment]

decision." Id. In the third stage, the burden of production[7]
shifts back to the plaintiff employee, requiring the employee to
provide evidence that "the employer's articulated justification
[for the termination] is not true but a pretext." Id. at 443.

The defendants contend that, at this third stage, the
plaintiff must present evidence that the "[hospital]'s reason
for termination constituted a pretext concealing a
discriminatory purpose" (emphasis supplied). Bulwer v. Mount
Auburn Hosp., 86 Mass. App. Ct. 316, 347 (2014) (Sikora, J.,
dissenting) (Bulwer). See id. at 355 (Sikora, J., dissenting)
(taking position that claim fails because plaintiff did not show
"invidious intent"). This formulation, however, overstates the
plaintiff's burden at the summary judgment stage because
"Massachusetts is a pretext only jurisdiction." Blare, supra at
443. See Abramian v. President & Fellows of Harvard College,
432 Mass. 107, 114-115 (2000). As we explained in Lipchitz,
supra at 500-501:

> "The phrase 'pretext for discrimination' implies that
> the plaintiff must prove not only that a reason given by
> the employer for the adverse decision was false, but that
> the reason was given to cover a discriminatory animus. Our

---

[7] The "burden of production" refers to "a party's obligation
to come forward with evidence to support its claim." Director,
Office of Workers' Compensation Programs, Dep't of Labor v.
Greenwich Collieries, 512 U.S. 267, 272 (1994) (Greenwich).
This is distinct from the burden of persuasion, often called the
"burden of proof," which refers to "the notion that if the
evidence is evenly balanced, the party that bears the burden of
persuasion must lose." Id.

decisions do not require this. . . .  If the employee were
able to prove by direct evidence that discriminatory animus
motivated the decision, [he] would not have to rely on the
indirect method of proving animus by disproving at least
one of the employer's articulated, nondiscriminatory
reasons" (citations omitted).

To survive a motion for summary judgment, the plaintiff

need only present evidence from which a reasonable jury could

infer that "the respondent's facially proper reasons given for

its action against him were not the real reasons for that

action." Wheelock College v. Massachusetts Comm'n Against

Discrimination, 371 Mass. 130, 139 (1976) (Wheelock College).

The case can then proceed to trial, at which point, "if the fact

finder is persuaded that one or more of the employer's reasons

is false, it may (but need not) infer that the employer is

covering up a discriminatory intent, motive or state of mind."[8]

Lipchitz, supra at 501.  In other words, a fact finder at trial

may infer that, "[c]ombined with establishment of a prima facie

case . . . , a showing of pretext eliminates any legitimate

---

[8] While Lipchitz, supra, involved a motion for judgment
notwithstanding the verdict, see Mass. R. Civ. P. 50 (b), as
amended, 428 Mass. 1402 (1998), rather than a motion for summary
judgment, "[t]he standard for obtaining a judgment
notwithstanding a verdict in Massachusetts is the same as the
summary judgment standard." Sarro v. Philip Morris USA Inc.,
857 F. Supp. 2d 182, 189 (D. Mass. 2012).  See Cahaly v.
Benistar Prop. Exch. Trust Co., 451 Mass. 343, 350 (2008), cert.
denied, 555 U.S. 1047 (2008), quoting Phelan v. May Dep't Stores
Co., 443 Mass. 52, 55 (2004) ("We ask whether, construing the
evidence most favorably to the plaintiff, and 'without weighing
the credibility of the witnesses or otherwise considering the
weight of the evidence, the jury reasonably could have returned
a verdict for the plaintiff'").

explanation for the adverse hiring decision and warrants a determination that the plaintiff was the victim of unlawful discrimination."[9]  Blare, supra at 446.

The defendants also argue that, at this third stage, the burden of persuasion is on the "the plaintiff . . . to demonstrate that there is a genuine issue of material fact whether the defendants' proffered reason is a pretext" (emphasis in original).[10]  Bulwer, supra at 347 (Sikora, J., dissenting). See id. at 348 (Sikora, J., dissenting) ("plaintiff must substantiate a genuine issue of" material fact).  While the plaintiff does bear "the burden of producing evidence" that the employer's reasons are pretextual, see Matthews v. Ocean Spray

---

[9] We nonetheless reiterate that, at trial,

"[p]ermitting the fact finder to infer discriminatory animus from proof that the employer has advanced a false reason does not . . . eliminate the plaintiff's burden to prove this essential element. . . .  Stated differently, the 'indirect evidence' moniker derives from the type of evidence (pretext) that may establish one or both statutory elements (discriminatory animus and causation)" (citation omitted).

Lipchitz, supra at 502.

[10] This burden is described as requiring the plaintiff to demonstrate that the "the employer's articulated reason lack[s] reasonable support in evidence or is . . . wholly disbelievable."  Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 347 (2014) (Bulwer) (Sikora, J., dissenting), quoting Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986) (Lewis).  This language, drawn from Lewis, supra, described the plaintiff's burden at trial and not, as here, at summary judgment.  See id. at 765 ("judge found [after bench trial] . . . that the plaintiff failed to prove pretext").

<u>Cranberries, Inc</u>., 426 Mass. 122, 127 (1997) (<u>Matthews</u>), the burden of persuasion at summary judgment remains with the defendants, who, "as the moving part[ies], 'ha[ve] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [they] would not have the burden on an issue if the case were to go to trial.'" <u>Sullivan</u>, <u>supra</u> at 39, quoting <u>Matthews</u>, <u>supra</u>.

ii. <u>Questions of material fact</u>.  In opposing the defendants' motion for summary judgment, the plaintiff relies on indirect evidence of discrimination, which we analyze using the <u>McDonnell Douglas</u> three-stage paradigm.  The defendants concede, with regard to the first stage, that the plaintiff has satisfied his obligation to make out a prima facie case of discrimination.[11]  With regard to the second stage, the defendants assert that the plaintiff's employment was terminated based on his poor performance evaluations, included in the record, that express doubts about his abilities and raise concerns for patient safety.  This satisfies the defendants' obligation to produce both "lawful . . . reasons for [their] employment decision" and "credible evidence to show that

---

[11] The defendants' concession that the plaintiff "could establish a prima facie case" is "for summary judgment purposes only."

the . . . reasons advanced were the real reasons."[12]  See Blare,
supra at 442, quoting Wheelock College, supra at 138.  We
therefore move to the third stage, and consider whether the
plaintiff has provided evidence sufficient to allow a reasonable
jury to infer that "the employer's articulated justification is
not true but a pretext."  Blare, supra at 443.

We begin by reciting more specifically the reasons provided
by the hospital for terminating the plaintiff's employment.  In
April, 2006, Wellisch and Flint sent a letter to the plaintiff
citing his "inability to adequately analyze clinical data in
complex cases," "inability to consistently build effective
therapeutic relationships," and "inability to gain insight into
feedback that is offered."  In May, 2006, Zinner decided to
terminate the plaintiff's employment immediately due to asserted
"additional clinical errors, failures to document or comply with
our clearly stated expectations about chart notes, and failures
to call for appropriate help with severely ill patients."

The record contains at least five categories of evidence
from which a jury might infer that these stated reasons were not
the real reasons that the plaintiff's employment was terminated.
When "taken as a whole rather than viewed in isolation," such

---

[12] As the Appeals Court noted, the plaintiff "does not
seriously argue that the hospital failed to meet its non-onerous
burden of articulating a legitimate reason for his termination."
Bulwer, supra at 329-330.

evidence could lead a rational jury to conclude that the reasons for the plaintiff's discharge were pretextual.  See Dorman v. Norton Co., 64 Mass. App. Ct. 1, 9-10 (2005).

First, while the record plainly contains negative evaluations tending to support the aforementioned criticisms, the record also contains numerous evaluations inconsistent with these criticisms.  See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380 (10th Cir. 1994) (reversing summary judgment for employer where conflicting evaluations raised fact questions about true reasons for adverse employment action).  See also Bonefont-Igaravidez v. International Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011), quoting Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662-663 (1st Cir. 2010) ("pretext can be established by showing . . . 'weaknesses [or] implausibilities . . . in the employer's offered reasons'"); 59 Causes of Action 2d, Cause of Action under Age Discrimination in Employment Act § 24 (2013) ("evidence of satisfactory or superior performance evaluations . . . may tend to show . . . the illegitimate nature of the defendant's articulated reason").

For example, some evaluators wrote of the plaintiff's "excellent" "ability to interpret and analyze clinical data, and formulat[e] a plan of management," even as the plaintiff was dismissed ostensibly because he could not "adequately analyze clinical data in complex cases."  Similarly, some evaluators

praised the plaintiff's "progress notes" as "very detailed and informative," "very thorough," and "generally well thought out," while others criticized him for "fail[ing] to document or comply with . . . expectations about chart notes."  Moreover, evaluations noting that "several patients have commented on [the plaintiff's] thoroughness and humanistic qualities" and that "patients' family members told [the evaluator] several times how helpful he had been during an emotionally difficult time" are in some tension with the view that the plaintiff evinced an "inability to consistently build effective therapeutic relationships."  The record also contains evaluations noting that the plaintiff "had a good sense of his own limitations" and that he took "in feedback well."[13]  These disparate evaluations prompted the chair of the ad hoc committee to note that "it is

_____

[13] Two other points along these lines are noteworthy. First, the plaintiff received contradictory advice from evaluators.  While one evaluator criticized him for making "drastic" decisions on his own, another suggested, only one month earlier, that the plaintiff "work on his independence and self-initiative, mainly in terms of seeing patients primarily on his own and getting out of a 'shadowing' mode."  Second, a letter from the hospital to the Board of Registration in Medicine, sent pursuant to G. L. c. 111, § 53B, explained that the plaintiff's employment had been terminated immediately because he "[f]ail[ed] to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities."  The plaintiff himself was told, however, that the immediate termination was not because of delays in his progress, but rather because of an immediate "risk to patient safety."  Although these statements might be reconcilable, a jury could find in them inconsistency suggestive of the pretextual nature of the proffered reasons.

interesting how one set of behaviors can elicit such different perception."

There is, secondly, evidence that the plaintiff was treated differently from similarly situated interns who are not black. See Matthews, supra at 129 ("The most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently").  For example, Song named two foreign interns (one white and one apparently Asian) who experienced "similar issues" but who, unlike the plaintiff, "were given opportunities to remediate or repeat rotations."[14] The plaintiff identified a third.[15]  The suggestion that the plaintiff was treated differently from these individuals based on his race also finds support in Setnik's statement that "[i]t is hard to understand the underlying basis for [the negative] perceptions of [the plaintiff's] work."

---

[14] The defendants argue that Dr. Soon-Il Song's testimony is "inadmissible as opinion testimony."  We discern no basis for this argument, given that Song can testify about the treatment of these two interns from "personal knowledge." See Mass. G. Evid. § 602 (2016) (witness may testify if he or she "has personal knowledge of the matter"; evidence of that knowledge "may consist of the witness's own testimony").

[15] There was only one other intern not promoted from among the first-year residents in the plaintiff's cohort; that individual was black and from Uganda. He was forced to leave the residency program when, following a poor evaluation from the hospital, his medical license was not renewed.

Third, Dvorak, an African-American internist and psychiatrist, described three separate instances of Caucasian doctors whose deficient performances she and other staff members noticed and brought to the attention of hospital administrators, but who were not subject to disciplinary action until months or years after the complaints were made -- and then only because of pressure from patients and other hospitals.  Dvorak also noted an incident in which she found "white supremacist" literature in the break room.  Although she told administrators "how upsetting [this] was, particularly [to her] as a[n] African-American," she maintains that the administrators rejected requests to discipline employees who displayed such literature in the workplace.[16]

Fourth, a reasonable jury could interpret a number of comments by the plaintiff's evaluators and supervisors as reflecting "[s]tereotypical thinking . . . categorizing people on the basis of broad generalizations."  Lipchitz, supra at 503

---

[16] The defendants contend that the entirety of Dr. Ramona Dvorak's testimony is inadmissible because it is "opinion testimony."  To the extent that Dvorak points to specific incidents and individuals of which she had personal knowledge, however, we discern no basis on which to exclude it.  See Mass. G. Evid. § 602.  That being said, the admissibility of any proffered evidence at trial is for the judge to determine.  See Commonwealth v. Drayton, 473 Mass. 23, 38 (2015) ("In identifying these elements that arguably may support" plaintiff's case, "we do not in any way suggest that the [evidence] ultimately is admissible").  See also Commonwealth v. Alcide, 472 Mass. 150, 162 n.14 (2015).

n.16.  Although such statements in isolation would not be
adequate to support a finding of discrimination, when considered
with evidence of disparate or unfair treatment in the evaluation
process, they may lend support to such a finding.  See Conway v.
Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987) ("While
evidence of a discriminatory atmosphere may not be conclusive
proof of discrimination against an individual plaintiff, such
evidence does tend to add 'color' to the employer's
decisionmaking processes and to the influences behind the
actions taken with respect to the individual plaintiff").

    For instance, one evaluator criticized the plaintiff for
being "too confident for his own good."  Another said that
someone in the plaintiff's position as an "intern is not
supposed to be smart" and "[t]hat is why all of this [criticism]
is happening."  Yet another, Bial, stated that the plaintiff was
"the least respectful person with whom [she had] ever worked"
and that he "has no capacity whatsoever for self-assessment."
Bial also spoke negatively to other residents and interns about
the plaintiff outside of the plaintiff's presence and "berated
him" publicly in a manner that a witness identified as both not
"appropriate" and unprecedented in his experience with Bial.
Additionally, in informing the plaintiff of the decision not to
promote him, Zinner noted that the plaintiff "is not well suited
for a career in internal medicine in this country."  These kinds

of comments can, of course, admit of different interpretations
by a jury, including ones reflecting only untainted professional
judgment.  One interpretation that a jury could make of such
comments, however, is that, combined with Bial's behavior, they
reflect a subconscious sense that the plaintiff, as a black man
and a foreigner, did not "know his place."[17]  See Ash v. Tyson
Foods, Inc., 546 U.S. 454, 456 (2006) (judgment as matter of law
for employer inappropriate where employer used ambiguous term
that, though "not always . . . evidence of racial animus," is
not "always benign").

   Fifth, there is evidence that the defendants did not follow
their written procedures in deciding to terminate the

---

   [17] In addition to these comments, which were made by the
plaintiff's evaluators, some comments made during a meeting of
the ad hoc committee might suggest that the plaintiff was
evaluated critically in part because of his race.  Specifically,
the doctors compared the plaintiff to a trainee from fifteen
years earlier, whom they identified as a "woman of color from
Washington" and who, like the plaintiff, had difficulty with
"interpersonal skills, communication skills, [and]
professionalism."  They said that this trainee "would have
flunked on a number of those [more subjective] competencies" in
which the plaintiff was deficient, despite the fact that she had
no deficiencies in "intelligence and IQ."  A jury might see
these comments as reflecting a tendency to evaluate black
trainees unfavorably in subjective areas like interpersonal
communication, even when those trainees perform well in
objectively measurable areas like intelligence and medical
knowledge.  See Douglas v. J.C. Penney Co., 474 F.3d 10, 14
(2007) (evidence of racial animus inferred from "disparities in
subjective performance evaluations between employees of
different races" when those subjective evaluations "did not
correlate with the individualized objective performance factors
for those employees").

plaintiff's employment.  A "'failure to follow established procedures or criteria' . . . [may] support a reasonable inference of intentional discrimination." Nesbitt v. Holder, 966 F. Supp. 2d 52, 56 (D.D.C. 2013), quoting Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).  See 1 A. Larson, Employment Discrimination § 8.04, at 8-81 to 8-82 (rev. ed. 2015) ("pretext can be shown by demonstrating . . . irregularities in . . . the procedures for discharge").

Here, the defendants departed from their written due process policy by failing to include a resident on the ad hoc committee, by not allowing the plaintiff to attend two of the three meetings of that committee, and by failing to heed the plaintiff's request for materials from those meetings.  The defendants further departed from this policy when they immediately terminated the plaintiff's employment without having informed him, either before or after the ad hoc committee meeting, that this step was being considered.

The defendants argue that these five categories of evidence do not suffice to raise a question of material fact.  They note that, even if all of the inferences drawn by the plaintiff from the above evidence were reasonable, the ad hoc committee conducted "an expanded review" of the CCC's decision to terminate his employment and "concluded that the [plaintiff's] deficiencies remained serious." Bulwer, supra at 355 (Sikora,

J., dissenting).  A "third [party]'s independent decision to take adverse action," they argue, "breaks the causal connection between [any] retaliatory or discriminatory animus [harbored by the plaintiff's evaluators] and the adverse action."  Mole v. University of Mass., 442 Mass. 582, 598 (2004).  This argument is unavailing.

In addition to input from the plaintiff, the ad hoc committee based its conclusions on the evaluations relied on by the CCC, as well as on testimony from the physicians who wrote those evaluations and on statements and memoranda from the CCC itself.  Where "the decision makers relied on the recommendations of supervisors [whose motives have been impugned], the motives of the supervisors should be treated as the motives for the decision. . . .  An employer [may not] insulate its decision by interposing an intermediate level of persons in the hierarchy of decision, and asserting that the ultimate decision makers acted only on recommendation" (citation omitted).  Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 569-570 (1981).  See Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 83 (1st Cir. 2004) ("liability can attach if neutral decision makers, when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus").

The defendants also argue, in essence, that criticisms of the plaintiff's performance, even if harsh, are best read to reflect "professional" judgment rather than racial animus. Bulwer, supra at 350 (Sikora, J., dissenting).  Even assuming the defendants are correct such that they could prevail on this point at trial, at the summary judgment stage "a court does not resolve issues of material fact, assess credibility, or weigh evidence."  Kernan v. Morse, 69 Mass. App. Ct. 378, 382 (2007). The question of whose interpretation of the evidence is more believable, "raised by the [parties'] conflicting evidence as to the defendant[s'] motive, is not for a court to decide on the basis of [briefs and transcripts], but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses."[18]  Lipchitz, supra at 499, quoting Blare, supra at 445.

---

[18] Our decision in Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34 (2005), is not to the contrary.  In affirming summary judgment for the employer, we noted that the plaintiff there essentially conceded that the adverse employment action was motivated by her supervisor's perception of her performance as poor, as evidenced by the fact that she "[did] not challenge whether [the defendant] truly believed that her mishandling" of certain matters warranted her discharge.  Id. at 57 (plaintiff did not present any "evidence . . . that [the defendant] selected her for layoff for any reason other than her own performance" and "[t]here [was] ample, uncontroverted evidence that the negative impression [plaintiff's supervisors] had formed of [plaintiff]'s abilities was a primary reason she was selected for layoff").

In this regard, summary judgment remains "a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question" (citations omitted).[19]  Blare, supra at 439.  A defendant's motive "is elusive and rarely is established by other than circumstantial evidence," therefore "requir[ing] [a] jury to weigh the credibility of conflicting explanations of the adverse hiring decision." [20]  Id. at 439-440.

c.  Breach of contract claim.  To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a

---

[19] Because the plaintiff questions the legitimacy of his employer's motive in terminating his employment, "[t]his is a disparate treatment case[,] not a disparate impact case."  See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 n.3 (1995).  See also Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 384-385 (1993).

[20] See Clermont and Schwab, Employment Discrimination Plaintiffs in Federal Court:  From Bad to Worse?, 3 Harv. L. & Pol'y Rev. 103, 128 (2009) ("pretrial adjudication particularly disfavors employment discrimination plaintiffs").  See also Donald and Pardue, Bringing Back Reasonable Inferences:  A Short, Simple Suggestion for Addressing Some Problems at the Intersection of Employment Discrimination and Summary Judgment, 57 N.Y.L. Sch. L. Rev. 749, 752 (2012-2013) ("Federal Judicial Center has noted that '[s]ummary judgment motions by defendants are more common in [employment discrimination] cases [than in other civil actions], are more likely to be granted, and [are] more likely to terminate the litigation'").

result.  <u>Singarella</u> v. <u>Boston</u>, 342 Mass. 385, 387 (1961).  At issue here is the fourth element, i.e., whether the defendants committed a breach of the contract embodied in the medical resident agreement.

The plaintiff maintains that the defendants committed such a breach in five ways:  by failing to comply with the ACGME's nondiscrimination policy; by failing to include a resident on the ad hoc committee as required by the hospital's written procedures; by failing to advise the plaintiff, in advance, of certain items to be discussed by the ad hoc committee; by failing to provide him with the resources and supervision necessary to perform his job; and by failing to offer him an opportunity to appeal from the decision of the ad hoc committee.[21]  To prevail on a motion for summary judgment on these claims, the defendants must demonstrate that "there are no material facts in dispute."  <u>Somerset Sav. Bank</u> v. <u>Chicago Title Ins. Co</u>., 420 Mass. 422, 426 (1995).

---

[21] Although the complaint contained a general breach of contract claim, the motion judge declined to address directly any of these particular assertions because the specific grounds mentioned were first identified in the plaintiff's opposition to the summary judgment motion.  In its de novo review, the Appeals Court nonetheless addressed these claims, see <u>Bulwer</u>, <u>supra</u> at 333-334, apparently concluding that they were properly before the motion judge.  The Appeals Court noted, however, that the evidence does not support the plaintiff's contention that the defendants failed to offer him an opportunity to appeal from the ad hoc committee's decision.  See <u>Bulwer</u>, <u>supra</u> at 334 n.16.  We do not disagree.

With regard to the first allegation, the defendants were bound by the ACGME's nondiscrimination policy prohibiting discrimination based on race or national origin.  This policy was incorporated by reference in the medical resident agreement. See Chicopee Concrete Serv., Inc. v. Hart Eng'g Co., 398 Mass. 476, 478 (1986) ("incorporation by a clearly stated general reference will suffice").  Whether the defendants violated this policy requires analysis of much the same evidence noted in our discussion of the plaintiff's discrimination claim.  For similar reasons, we conclude that the defendants have failed to establish the absence of any issue of material fact with regard to the assertion of a violation of the ACGME's nondiscrimination policy.

Turning to the second allegation -- failure to include a resident on the ad hoc committee -- it is undisputed that the ad hoc committee did not include a resident.  The inclusion of a resident was required by the hospital's grievance policy, which the hospital was to follow under the terms of the ACGME requirements and thereby under the medical resident agreement as well.  Although the defendants claim that the plaintiff was not harmed by this failure to comply with the medical resident agreement, that is a question of fact for the jury.

It is also undisputed that the plaintiff was not invited to the latter two meetings of the ad hoc committee and that the

defendants failed to notify the plaintiff, in advance of those meetings, that they were considering immediately terminating his employment.  There is also no indication in the record that the plaintiff was ever given any information about "additional" concerns cited by the committee regarding patient safety notwithstanding the plaintiff's request for pertinent information.  The hospital's grievance policy, however, requires that a resident receive from the department chair in advance of the meeting a "written statement of the specific issues [to be discussed at the meeting]."[22]  Although the defendants gave the plaintiff an opportunity to submit written rebuttal evidence, a reasonable jury could find that this was not equivalent to an opportunity to participate fully in the initial proceedings. They could also find that the plaintiff's lack of notice and diminished participation in the meetings reduced the effectiveness of his participation in those meetings and, accordingly, affected the outcome of the committee's deliberations.

The plaintiff contends further that the defendants failed to provide him, as required by the ACGME, with the "appropriate supervision" and "resources" necessary to perform his work.  In

---

[22] The policy also requires that all bases for the committee's decision "be introduced into evidence at the proceeding" and, more generally, that the resident will receive "a fair hearing."

this regard, the plaintiff has proffered evidence that his mentor did not hold weekly meetings with him as outlined in his remediation plan.  More generally, he points to evidence, detailed earlier, that he was not offered the same remediation opportunities as similarly situated peers, which could be construed as a failure to provide "appropriate supervision."[23]

3.  <u>Conclusion</u>.  The judgments in favor of the defendants on the plaintiff's claims for employment discrimination under G. L. c. 151B, § 4, and breach of contract are vacated and set aside.  The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.

---

[23] A jury could find that the plaintiff's lack of familiarity with hospital procedures, mentioned by Song in his deposition, could have resulted from the absence of close mentoring or supervision.

# EXHIBIT B

Case 3:13-cv-01890-CSH   Document 179   Filed 04/06/16   Page 46 of 46

PETER SALOVEY                                                    July 20, 2015
BAGLEY vs. YALE UNIVERSITY                                        241–244

Page 241

1    A.  I do disagree.  With all due respect to
2 Professor Alstott and to the committee, I do disagree.
3 I disagree for two reasons.
4         Reason one is I have seen this work and I
5 have -- you know, I am thinking of a very particular
6 case where a negative tenure decision was reversed.
7    Q.  Well, let me ask you:  Was that a gender
8 discrimination case?
9    A.  You asked me this before and I said I don't
10 remember.  There were definitely issues of was a fair
11 hearing -- did the person get fair consideration.
12       The other is I don't see an alternative that
13 is superior.  What I see is either an individual
14 administrator's overreaching or less experienced, less
15 expert faculty members deliberating about somebody
16 else's school -- about the composition of faculty at
17 somebody else's school or department.
18       I never said I thought our process -- the
19 process that I selected was perfect or flawless, but I
20 don't see it -- I don't see an alternative that is
21 superior to it.
22    Q.  How about the then provost of the university
23 going to the then president of the university who had
24 the power to appoint a professor in the practice for
25 16 years, Sonnenfeld, and saying to the president,

Page 242

1 appoint Bagley for five years to a professor in the
2 practice.  It's the only fair outcome.
3    A.  My understanding is the president did not
4 appoint Professor Sonnenfeld.  What the president did
5 is waive the usual maximum of five years and then
6 allow the dean of the School of Management and the
7 permanent officers of the School of Management to
8 appoint Sonnenfeld.  I think there is a very big
9 difference between those two.  Very big.
10    Q.  How about putting some safeguards in that
11 process where there is some very close supervision of
12 the process that you sent back to the School of
13 Management?
14    A.  I think there was oversight from the
15 provost's office.
16    Q.  Who?  Rosenbluth?
17    A.  Yes.
18    Q.  You know Dean Snyder didn't go to the second
19 vote of the BP?
20    A.  I learned that later.
21    Q.  Surprising?
22    A.  I'm not surprised.  I would prefer that all
23 faculty who have voting rights on any significant
24 appointment be present at the faculty meeting when
25 that vote is taken.

Page 243

1    Q.  So how was the BPO to know about that serious
2 conversation you had with Dean Snyder regarding the
3 Harte report findings and recommendations if he never
4 went in front of the BPO and told them?
5    A.  I presume he communicated it to the BPO in
6 some other way.  I can only assume that.
7       MS. STUDEN:  Okay, I'm going to suspend your
8 deposition.
9       THE WITNESS:  Okay.
10       MS. STUDEN:  There are documents that we keep
11 getting trickling in.  For example, after a
12 couple of depositions we got the e-mails between
13 Rosenbluth and Shapiro with X's and O's on them
14 and I love yous.  So that was after we did those
15 depositions.
16       So we are still getting documents.  And I may
17 get more documents that I -- or issues may come
18 up that I want to talk to you about.  I can say
19 that I'm technically limited to 7 hours.  We are
20 probably close to 5.5 hours or something like
21 that.  So if I'm going to go over my 7-hour mark,
22 I'm sure that these fine lawyers will object and
23 I will have to get the judge to give me more
24 time.
25       But I don't know where it's going, so I'm

Page 244

1 going to suspend it for now.
2       THE WITNESS:  Okay.
3       MR. NOONAN:  And I would object to any
4 resumption.  But we just make these comments at
5 the end.
6       MS. STUDEN:  We have been doing this on every
7 deposition.
8       THE WITNESS:  Okay.
9       (Whereupon, at 3:57 p.m., the taking of the
10 deposition concluded.)
11            * * * * * * *

