## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONSTANCE E. BAGLEY,

    Plaintiff,

 v.

YALE UNIVERSITY, DOUGLAS RAE,
EDWARD SNYDER, and ANDREW
METRICK, individually,

    Defendants.

Civil Action No.
3:13 - CV - 1890 (CSH)

JUNE 15, 2016

## RULING ON PLAINTIFF'S OMNIBUS MOTION CONCERNING
## DISCOVERY AND RELATED ISSUES

**HAIGHT, Senior District Judge:**

Plaintiff has filed an Omnibus Motion [Doc. 172] which requests an order granting seven separate forms of relief, most related to pretrial discovery and related issues. Defendants oppose these requests almost in their entirety. The issues have been thoroughly briefed by counsel. This Ruling resolves them.

The Ruling's discussion follows the order of the numbered paragraphs in the Omnibus Motion, which arrange and set forth Plaintiff's requests and demands. References to "Yale" refer to the University as an institution, or on occasion, it is a collective reference to all the Defendants.

**(1) and (2). Time Limit for Discovery Concerning Comparators;  Identity of Comparators**

In a prior Ruling on discovery issues, reported at 2015 WL 8750901 (D.Conn. Dec. 14, 2015), the Court directed documentary discovery "with respect to those obvious comparators, the reappointment professors," a group the Ruling defined as "the individuals who (a) were Professors

in the Practice on the faculty of the Yale School of Management during the period 2008-2013 and (b) during that period, applied for reappointment to that rank and position." *Id*., at *9.  In response to the request of Plaintiff's counsel for a clarification, the Court's Ruling on December 28, 2015 directed production of "the specified documents generated by SOM Professors in the Practice applying for or receiving reappointment at any time during the years of 2008 though 2013."  Doc. 162, at 4.

Plaintiff's present Omnibus Motion, in its first two numbered paragraphs, asks that the termination date for comparator discovery be extended beyond 2013.  Doc. 172, at   ¶¶ 1-2.  Paragraph 1 asks for documents "generated by or relating to applications for reappointment and reappointments" of all SOM PiPs "whose reappointment process was either initiated or voted upon at any time during Professor Bagley's employment as a PIP, concluding in 2014."  Paragraph 2 asks for discovery "of comparator documents on all SOM PiPs whose  reappointment process was initiated in 2014 and voted upon during 2015, and for all PiPs whose reappointment was voted on in 2015, in 2016, and thereafter, up to the date of trial."

To the extent that Plaintiff intends by these requests to expand the universe of "obvious comparators" beyond the temporal boundary of 2013 and into 2014, the application is without merit and will be rejected.

As the discussion in the Court's earlier opinion, 2015 WL 8750901, makes clear, the phrase "obvious comparators" is intended to refer to faculty members with whom Bagley "was similarly situated in all material respects," the requisite characteristic for a comparator in this sort of discrimination case. *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  Before the year 2014 began, Yale had given Bagley final and unequivocal notice that her faculty employment

was terminated.  The earlier opinions recite that Bagley's appointment as a PiP began on July 1, 2008 and terminated on July 1, 2013.  Dean Snyder sent Bagley a letter dated May 24, 2012, stating that she would not be reappointed.  Following an internal SOM review, Snyder wrote Bagley a second letter, dated November 7, 2013, adhering to that decision.  Further, "[i]n November 2013, Yale advised Bagley that there were no remaining avenues of internal review by which she could challenge the SOM's decision not to renew her faculty contract." 2014 WL 7370021, at *2.  Bagley filed her complaint in this Court on December 20, 2013.

Owing to the time consumed and efforts expended during Bagley's internal challenges to Yale's refusal to reappoint her, Bagley's employment was extended, for purposes of salary and benefits, through December 31, 2014.  However, her ability to identify a faculty colleague "similarly situated in all material respects" came to an end not later than November 2013.  It is one thing to be among several Professors in the Practice at the Yale School of Management applying for and hoping to receive reappointment: "Similarly situated" in rank on the faculty, sharing the "material respect" of hope that springs eternal in the human spirit – in this instance, for reappointment to a valued position.  It is quite another thing to be in Bagley's situation as 2014 began: Her extended faculty employment beyond 2013 the bureaucratic and joyless by-product of rejection and contention,  her hope for reappointment dashed.  While Bagley was still listed as employed by Yale in 2014, during that year one can identify "obvious comparators" to her on the SOM faculty only by exalting form over substance.  I adhere to the view that the universe of "obvious comparators" to Bagley is confined to the years 2008 - 2013.

However, that does not end the present inquiry.  The Court's December 2015 Ruling observed that once a discrimination case reaches the stage where the plaintiff must show that her employer's

"proffered motive" for its adverse decision "is not worthy of belief," then "evidence of a comparative sort is appropriate . . . . Obviously, comparative evidence is relevant in determining whether a motive is pretextual." 2015 WL 8750901, at *6 (citation omitted). On this theory of comparative evidence, a comparator is another employee to whom the circumstances of the "proffered motive" applied  but was treated more favorably than the plaintiff, thereby supporting the inference that *vis-à-vis* the plaintiff the proffered motive was pretextual.  Conceptually, that sort of comparator might not be found within the ranks of the reappointment PIPs I have characterized as "obvious comparators." One may think of these additional individuals as "potential" or "unrevealed" comparators.

Further analysis of that issue  in the prior opinion was not possible because, at that time, "the present record does not sufficiently reveal the reason or reasons Yale gave and presumably still gives for its decision not to reappoint Bagley."  2015 WL 8750901, at *8. In consequence, the Ruling directed Yale "to articulate in clear and specific language its explanation of legitimate nondiscriminatory reasons" for its employment decision not to reappoint Bagley, an expansion of the record necessary to enable the Court "to determine the proper boundaries  of the discovery Bagley seeks to compel," given the reality that the Court "cannot decide whether information is relevant to Bagley's claim that Yale's reason was pretextual without first knowing what that reason was." *Id.*

The Court directed Yale to make its explanation in the form of an Offer of Proof, which would constitute its "proffered motive," in the parlance of Title VII case law.  Doc. 160.  Yale complied by filing an eleven-page, twelve-paragraph document [Doc. 163].  The document is captioned "Defendants' Offer of Proof," filed on behalf of Yale and the three individual Defendants (Rae, Snyder and Metrick), and recites at page 1 that the document is submitted "in order to

4

articulate their explanation of the legitimate and nondiscriminatory reasons for the decision to not renew the plaintiff's appointment  as a Professor in the Practice." Doc. 163, at 1.

The Offer of Proof begins with a factual summary of the negotiations in 2007 and 2008 between Professor Bagley, then on the faculty of the Harvard School of Business, and then-Yale SOM Dean Podolny, which resulted in Yale's offer and Bagley's acceptance of a five-year term on the SOM faculty as a Professor in the Practice, the highest rank at SOM given to "non-ladder" faculty, a phrase I take to mean a teacher who at the time is neither seeking nor hoping for tenure. In 2008 the Board of Permanent Officers ("BPO") of the SOM, consisting of the School's tenured faculty members, voted in favor of Bagley's appointment.  *Id.,* ¶¶ 1-3.[1]  Bagley began teaching at Yale in 2008.

In September 2011 SOM Dean Snyder (who had succeeded Podolny) appointed a faculty committee to review Bagley's reappointment as a PiP, for which she had applied.  According to the Offer of Proof, "[t]he criteria for the reappointment of PiPs are: scholarship, teaching, service to the University and need for the position." ¶ 11.  On April 2, 2012, the reappointment committee delivered a report which was "favorable to [Bagley] in the areas of teaching, scholarship and service to the University," but "did not address the issue of continued need for [Bagley] on the faculty, since that is an issue which is left to the BPO on a reappointment vote."  ¶ 4.  At a meeting on May 7, 2012, the majority of the BPO voted against Bagley's reappointment: nine faculty members against, six members in favor, three members abstaining.  Dean Snyder stated that he would accept the BPO vote (which is regarded as a faculty recommendation, not binding on the Dean), and Bagley would not be reappointed.  ¶¶ 5-6.

_____

[1]  Subsequent references marked "¶" are to the Defendants' Offer of Proof, Doc. 163.

Following Bagley's administrative objections and the protocol-required involvement of then-Yale Provost (now President) Peter Salovey, the BPO met again on October 21, 2013 to consider the renewal of Bagley's five-year appointment. Reappointment was again disapproved by a majority: sixteen faculty members against, two members in favor, two members abstaining. Dean Snyder again accepted that recommendation. ¶¶ 9-10.

The Offer of Proof states that "[t]here was no single reason for members of the BPO to vote as they did"; "faculty members were not required to provide a reason for their positions"; and "[t]here were a number of reasons for individual members of the faculty to vote as they did, and not all faculty members agreed on all those reasons." ¶ 11. Notwithstanding those disclaimers, paragraph 11 of the Offer of Proof recites a number of reasons why faculty members voted against Bagley's reappointment. Certain specific comments are ascribed to "[so]me faculty members"; others are ascribed to five named Professors: Rae, Nalebuff, Bracken, Chevalier, and Oster.[2] *Id.* I will summarize those reasons (without intimating any view as to whether they are sound or justified):

* SOM should not have a full-time SOM faculty member teaching a course on Law and Management, as Bagley, a lawyer and former partner of a California law firm, had been doing as a PiP (co-teaching with Rae a course called "State & Society"). Legal perspectives required by business school students could be better furnished by a closer relationship with Yale Law School, or through elective courses taught by practicing lawyers.

* SOM should not have a full-time faculty member teaching in the area of Law and Management, such as the State & Society course or any other course, because "the focus on American legal process was not as important as when Dean Podolny served as the Dean," and

---

[2] Professor Douglas Rae is a named Defendant in this action.

6

Bagley's initial appointment should be viewed as an experiment which had failed, which should not be continued.

* After a satisfactory start, Bagley's dedication to the School and the course she co-taught with Rae had waned, she began to miss State & Society course class sessions, she steered the course towards an excessively legalistic approach (as opposed to a balance between legal and political science concepts), and acted unprofessionally in allowing her teaching relationship with Rae to deteriorate to the extent that it impacted negatively upon students in the course.

* There were serious concerns about the rigor and accuracy of Bagley's scholarship, which spilled over into her teaching, and made her a less desirable faculty member for SOM.

* Negative evaluations of Bagley by students among the more than 300 who had taken the State & Society course in the spring of 2012 indicated that the course had drifted away from its origins in a way not for the best of the School, and Bagley had acted unprofessionally in permitting the deterioration of her relationship with Rae to destroy the course for the students.[3]

The consequence of prior proceedings in this litigation is that Yale is committed to the reasons stated in its Offer of Proof as the "proffered motive" for its decision to deny Bagley reappointment.  For purposes of delineating the proper boundaries of discovery, the subject of this Ruling, the salient feature of that proffered motive is that each of its components relates solely to perceived deficiencies in Bagley's performance as a teacher and scholar, viewed within the somewhat

---

[3]  The Offer of Proof, as part of ¶ 7, reproduces four full pages of students' comments that are said to have come from "the most recent course evaluations relating to the spring 2012 State & Society course."  The quoted students' evaluations, uniformly negative and often vividly expressed, about the manner in which Bagley conducted the course, were presumably selected by defense counsel for inclusion in the Offer of Proof from a larger and more varied collection of student evaluations.

broader context of the questioned  desirability of having *any* full-time SOM faculty member teach the kind of subject Bagley taught during her initial appointment.

In these particular circumstances, it is difficult, no matter how one defines a "comparator," to discern a ground for compelling discovery with respect to a PiP whose reappointment experiences (application for reappointment or deliberation and decision on the application) took place after 2013, the year when Yale's denial of Bagley's reappointment application became final under the University's protocols and Yale terminated her employment.

Bagley's reply brief [Doc. 179] states at 2 that "several federal courts analyzing discovery requests in the context of discrimination cases have . . . allowed plaintiffs discovery for reasonable periods of time after their employment is terminated."  The two cases the brief relies on most prominently, *Bujnicki v. American Paving and Excavating, Inc.*, No. 99-CV-0646S, 2004 WL 1071736 (W.D.N.Y. Feb. 25, 2004), and *Craig v. Exxon Corp.*, No. 97 C 8936, 1998 WL 850812 (N.D. Ill. Dec. 2, 1998), are readily distinguishable from the instant case.

In *Bujnicki*, the Title VII plaintiff, the sole woman in a laborer training group established by the defendant paving company, alleged that she had been subjected to discriminatory treatment because she was a woman.  The alleged disparate treatment consisted of a series of disagreeable and humiliating actions by a job supervisor.  *See* n.4, *infra*.  Plaintiff's unhappy and contentious employment with the paving company lasted only six weeks in 1998.  She left the company in September of that year, allegedly having become ill as a result of the harsh and discriminatory treatment to which she was subjected.  The decision Bagley's brief cites is that of the magistrate judge supervising discovery in *Bujnicki*, who *inter alia* directed the company to produce the personnel records of any employee who participated in the trainee program or was a minority

8

"between September of 1996 and September of 2000."  2004 WL 1071736, at *3.  The magistrate judge reasoned that the limitation of disclosure of records of individuals "who fall within these categories of employees to a period of two years preceding plaintiff's claims of discrimination and two years subsequent to plaintiff's claims of discrimination is more than sufficient for plaintiff to discover information relevant to her claim of disparate treatment."  *Id.*[4]

*Craig* is a decision by the magistrate judge supervising discovery in a case where the plaintiff claimed that "she was terminated from employment because of her pregnancy and/or because she would soon have needed a leave of absence."  1998 WL 850812, at *1.  Plaintiff was terminated by Exxon, her employer, in September 1996.  Disputes arose about time limitations on discovery plaintiff demanded with respect to the defendant employer's treatment of other employees.  The magistrate judge, rejecting defendant's contention that no discovery should be allowed for the time subsequent to plaintiff's termination, reasoned that "the post-termination discovery sought is reasonably calculated to lead to discovery of admissible evidence.  For example, if one day (or one month or one year) after Plaintiff's termination a non-pregnant employee of the Defendants had the same or worse attendance record as Plaintiff but was not discharged, that information could be relevant to the question of pretext."  *Id.*, at *3 (footnote omitted).

---

[4]  Several months later, District Judge Skretny filed a separate opinion in *Bujnicki*, granting in part and denying in part the defendant company's motion for summary judgment.  In connection with the discovery issue discussed in text, Judge Skretny denied summary judgment to the paving company.  The evidence in the record, he said, "could support a finding that male crew members were not subjected to being called names that they found offensive, were not required to get the crew coffee in the mornings, were not leered at in a sexual manner, were not denied the opportunity to take breaks, and were not made to perform jobs that they were not hired to perform."  2004 WL 1071674, at *7 (docket citations omitted).  "As such, this Court finds that a reasonable jury could determine that Defendants' treatment of Plaintiff occurred under circumstances giving rise to an inference of unlawful discrimination."  *Id.*

The inherent nature and boundaries of cases like *Bujnicki* and *Craig* are quite different from those of the case at bar. The lone woman in a work gang complains that she was treated unfairly by being denied breaks, made to go out for coffee, and leered at. Another woman complains that she was treated unfairly by being discharged because she was pregnant. I do not mean to denigrate the gravity of those plaintiffs' charges or the wrongfulness of their employers' conduct if proven. However, the cases depend upon the evaluation of uncomplicated employer conduct in a relatively simple workplace, where comparators are easily identified and the factual issues are straightforward. The case at bar takes us from those everyday workplaces into the rarefied world of university academia, where the granting or denial of faculty appointments results from the interaction of subtle and nuanced institutional needs and personal qualifications, upon whose proper resolution tenured professors and ensconced deans may disagree (as demonstrated by the divided tenured faculty votes on Bagley's reappointment).

Given these contrasting considerations, it does not follow from granting the plaintiffs in *Bujnicki* and *Craig* discovery about other employees for some time after plaintiffs' termination that Professor Bagley is entitled to discovery about other PiPs after her denial of reappointment. The surrounding facts are too different. The appraisal of each faculty appointment applicant is of necessity so personalized that it argues against a broad-form enlargement of the time for discovery.

The briefs for Yale on the present motion remind me more than once that my earlier decisions drew the ending line for discovery in this area at the year 2013. Nonetheless, Yale's main brief [Doc. 176] says at 6: "If the court is *inclined* to allow any additional comparator discovery, however, it should be limited to the reappointment reviews of Professors Jeffrey Garten and Jeffrey Sonnenfeld, which were voted on in 2015." While trial judges should not indulge personal *inclinations* in

deciding their cases, the adjective is not entirely inappropriate when one reflects that the fashioning

of limits for discovery is entrusted to the judge's sound discretion.   In the case at bar, Yale's

agreement to full discovery of the post-2013 Garten and Sonnenfeld reappointments to the SOM

faculty satisfies its obligations under the discovery rules on this particular aspect of the case.

It remains to discuss under this heading additional bases for discovery Bagley puts forward

in her Omnibus Motion at 3, where she says that

> because her claims in this action are not limited to discrimination and
> retaliation, but also include breach of contract, interference, and
> misrepresentation based on Yale's failure to apply the standards set
> forth in her offer letter to her reappointment, Professor Bagley should
> also be allowed discovery concerning any SOM PiPs who are
> reviewed for or receive reappointment up to the date of trial.

Doc. 172, at 6.  Bagley's reply brief argues at 4-5 that "reappointment materials post-dating Professor

Bagley's employment as a Professor in the Practice are also relevant to Plaintiff's contract-related

claims." Doc. 179, at 4-5.   I understand the phrase "contract-related claims" to mean the previously

identified claims for "interference" and "misrepresentation" as companions to the breach of contract

claim.    Plaintiff proffers these additional claims – breach of contract, interference and

misrepresentation – as  justifications, alternative to her discrimination and retaliation claims, for

discovery into the appointment or reappointment of other SOM professors, after Bagley was

terminated and up to the time of trial.

Bagley's breach of contract claim cannot form the basis for such discovery. Her claim for

breach of contract, against Yale only, is pleaded as Count Eight in the First Amended Complaint

[Doc. 129].  That count alleges that Yale extended an offer of employment to Bagley, ¶ 173; Bagley

accepted Yale's offer, ¶ 174; and "Yale and Professor Bagley accordingly entered into an express

written contract concerning the terms and conditions of her employment" and "[t]hese terms were set forth in both the written offer letter signed on behalf of Yale SOM by Deputy Dean Stanley Garstka and in the Yale Faculty Handbook." ¶ 175.

The "written offer letter" referred to in these allegations is a two-page letter dated April 8, 2008 (which was preceded by negotiations between Bagley and Dean Podolny). The letter is on SOM stationery, signed by Deputy Dean Garstka and addressed to Bagley. The complaint's reference in Count Eight to the Yale Faculty Handbook in Count Eight apparently depends upon an earlier allegation in ¶ 34 of the complaint that "[a] copy of the Yale Faculty Handbook was incorporated by reference in the revised offer letter sent to Professor Bagley." The April 8, 2008 letter [Doc. 62-5] does not refer explicitly or by name to the Faculty Handbook. Presumably the complaint relies upon the following statements in the letter: "Under our rules governing such appointments you will be reviewed in the fourth year of this appointment for continuation as a Professor in the Practice of Law and Management. The review will be similar in process and use similar criteria to those of the review which led to this current appointment." Doc. 62-5, ¶ 1.

Plaintiff's reasoning on this point is not entirely clear. I will assume for this discussion that, as Plaintiff's reply brief states, Yale amended the Faculty Handbook, after Bagley was denied reappointment, to add a programmatic need as a new criterion for reappointment: "new" in the sense that programmatic need was *not* a reappointment criterion when Bagley and Yale entered into their contract for Bagley's appointment in 2008. [5]

---

[5] Bagley's apparent contention, that Yale did not proclaim programmatic need to be a reappointment criterion until after her application was denied, seems to be controverted by Yale's Offer of Proof [Doc. 163], which in ¶ 11 says that the report of the Bracken Committee (an SOM faculty committee which initially recommended Bagley's reappointment) "was favorable to the plaintiff in the areas of teaching, scholarship and service to the University. The report did not

Count Eight of the complaint concludes by alleging at ¶ 178: "Defendant Yale breached its express contract through its intentional, discriminatory, retaliatory and tortious acts."

That "express contract" is the April 8, 2008 letter from SOM Dean Garstka to Bagley, containing the terms and conditions to which Bagley agreed.[6]  The contract says what it says: no more, no less.  Neither piety, nor wit, nor tears, [nor advocacy] can "cancel half a line" or "wash out a word of it," *The Rubaiat of Omar Khayyam,* st. 71; nor can they add a word to it.  *Black's Law Dictionary* (10th ed. 2014) at 225 defines "breach of contract" as:" Violation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance," and adds: "It is a rule, generally accepted, that when a promisor fails in any respect to carry out an existing duty calling for a present, immediate performance *under a contract*, he is guilty of a breach of contract which furnishes a basis for a cause of action of some sort." (emphasis added, citation omitted).  To succeed on her breach of contract claim, Bagley must show that Yale failed to perform a promise it made to Bagley in the express contract.  That issue will be decided by the interaction between Bagley and Yale at the pertinent times, within the particular context of Bagley's application for reappointment to the SOM faculty, all viewed in the light of the

---

address the issue of continued need for the plaintiff on the faculty, since that is an issue which is left to the BPO on a reappointment vote."  Whatever the Faculty Handbook may or may not say, this account suggests that programmatic need for a particular professor was a recognized criterion for reappointment at the time of Bagley's application, rather than fashioned by Yale after her application was denied; and a number of tenured professors state that they voted against Bagley's reappointment precisely because the SOM 's curriculum did not require her teaching services.  These observations are not intended to intimate any view of the Court on merits issues; this Ruling is addressed solely to the proper scope of Plaintiff's pre-trial discovery.

[6]  For the purpose of this analysis, I assume without presently deciding that, as Bagley contends, the April 8 2008 letter incorporated by reference the Yale Faculty Handbook, so that the Handbook became part of the contract.

terms and conditions of the contract between Bagley and Yale.

If the Yale Faculty Handbook was a part of Bagley's contract with Yale, through incorporation by reference or *ex proprio vigore*, then one must conjure with the contention in Bagley's reply brief that "reappointment materials post-dating Professor Bagley's employment as a Professor in the Practice are also relevant to Plaintiff's contract-related claims." Doc. 179, at 4. That submission focuses particularly upon the statement in Yale's Offer of Proof, Doc. 163 at ¶ 11, that "[t]he criteria for reappointment of PiP's are: scholarship, teaching, service to the University and need for the position." Bagley's theory of the case is that "programmatic need was not included in the reappointment criteria set forth in her offer letter and contract," and "[a]fter Professor Bagley's reappointment was denied, Yale amended its Faculty Handbook to include need as one of the criteria for reappointment." Doc. 179, at 4-5. In these circumstances, Plaintiff's reply brief contends, "reappointment documents that post-date Professor Bagley's termination are probative of the definition and standard for 'need,' as the Defendants claim that term has been used in the context of PiP appointments." *Id.,* at 5.

This reasoning does not lay the foundation for the requested further discovery. On the breach of contract claim, the question is whether Yale amended, structured or manipulated the criteria for SOM faculty reappointment in a manner that violated a promise Yale made to Bagley in the contract between them. Yale's conduct with respect to other contracts for the appointment or reappointment of other individuals at later times is not a potential source of evidence relevant to Bagley's claim that Yale breached its contract with *her.*

Bagley's reply brief also refers to the "contract-related" tort claims of "interference" and "misrepresentation." These generic terms find particular expression in Counts Eleven through

Fourteen of the First Amended Complaint.  Count Eleven, against Defendant Yale alone, is captioned "negligent/innocent misrepresentation" and purports to allege Yale committed both of these related but separate torts.  The count focuses upon Yale's alleged representations to Bagley that the standards for her reappointment "would be performance-based," with no representation that "her reappointment would in any way be contingent upon 'need,' or other shifting *criteria*,"  Doc. 129, ¶ 187, and alleges that Bagley was damaged by Yale's decision to terminate Bagley because of "factors not disclosed to Professor Bagley, namely, 'need.'" *Id.,* ¶ 193.

Under Connecticut law, the elements of a cause of action for innocent misrepresentation are "(1) a representation of material fact, (2) made for the purpose of inducing the [transaction in suit], (3) the representation is untrue, and (4) there is justifiable reliance on the representation by the defendant and (5) damages." *Little Mountains Enters., Inc. v. Groom*, 141 Conn. App. 804, 810 n. 4 (2013) (citation omitted).

An action for negligent misrepresentation, one step further along the scale of increased wickedness, "requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Coopola Constr. Co., Inc. v. Hoffman Enters. Ltd. Partnership*, 134 Conn. App. 203, 210 n. 4 (2012) (citation omitted).

It is readily apparent that Bagley's misrepresentation claims against Yale depend solely and entirely upon the facts and circumstances surrounding her contract with Yale and the particular manner of its termination.  Discovery with respect to other contracts involving other individuals after Yale terminated Bagley will not be allowed, because those facts are neither relevant to nor admissible in the case in suit, and are unlikely to lead to relevant and admissible evidence.

Counts Twelve, Thirteen and Fourteen allege claims for tortious interference "with advantageous and/or contractual relations."  They are against, respectively, Professor Rae (cast by Bagley in the role of a principal villain and architect of her denial of reappointment), Dean Snyder, and Deputy Dean Metrick.  Each count alleges that Bagley enjoyed "advantageous and/or contractual relationships with . . . Yale," Doc. 129, ¶¶ 195, 200, and 205, and that the individual in question (Rae, Snyder or Metrick) "intentionally and unjustifiably, and with malice, interfered with Professor Bagley's advantageous and/or contractual relations."  *Id.,* ¶¶ 196, 201, and 206.

Connecticut recognizes a cause of action for tortious interference with contract rights.[7]  "The essential elements of such a claim include . . . the existence of a contractual or beneficial relationship and that the [defendant], knowing of that relationship, intentionally sought to interfere with it; and, as a result, the plaintiff claimed to have suffered actual loss. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification."  *Landmark Inv. Grp., LLC v. Calso Constr. And Dev. Co.,* 141 Conn. App. 40, 50-51 (2013)(citation omitted).

As for a claim for tortious interference with non-contractual business expectancies, the elements are:  "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  *Am. Diamond Exch., Inc. v. Alpert*, 302 Conn. 494, 510 (2011) (citation omitted).  "[N]ot every act that disturbs a business expectancy is actionable.  A claim is made out only when the interference resulting in injury to another is wrongful

---

[7] Connecticut case law draws a distinction between tortious interference with contract rights and with non-contractual business expectancies.

by some measure beyond the fact of the interference itself. . . . [Plaintiff] must prove that . . . the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." *IN Energy Solutions, Inc. v. Realgy, LLC,* 114 Conn. App. 262, 272 (2009) (internal quotation marks and brackets omitted).

It follows that, under Connecticut law, in order for Bagley to establish a claim for the tort of interference against any one of the three individual defendants, she must prove that the individual acted with malice or its legal equivalent, in furtherance of the intent to deny Bagley reappointment. Bagley is not without sources of discovery of evidence relevant to that proposition. Rae, Snyder and Metrick have been deposed at length, or presumably will be. Assuming, as seems likely, that none of these individuals has acknowledged he acted maliciously *vis-à-vis* Bagley, a defendant's malice toward Bagley can nonetheless be inferred from his differing treatment of a similarly situated applicant for appointment or reappointment as an SOM PiP.

The inquiry is akin to the identification and treatment of comparators in connection with Plaintiff's separately pleaded claims for discrimination. In aid of those claims, Bagley has obtained discovery with respect to the comparators identified in the Court's prior rulings, whose ranks are swelled by Yale's agreement to the addition of Professors Garten and Sonnenfeld in response to the present motion. Bagley can therefore avail herself of a considerable body of discovered evidence about Yale's treatment at the relevant times of other applicants for reappointment as a PiP, from which, if the evidence is there, Bagley can ask a trial jury to infer an individual defendant's malice toward her from the defendant's differing treatment of others. But I conclude that, as with the discrimination claims, Plaintiff has not made a persuasive argument for compelling discovery with respect to additional post-termination PiP applicants, in aid of her claim that the denial of her

reappointment in 2013 was caused or contributed to by a defendant's malice.[8]

For the foregoing reasons, the discovery Yale must make with respect to the reappointment of SOM Professors in the Practice is limited to those comparators identified in earlier Rulings, to whom Professors Garten and Sonnenfeld are added as the result of this Ruling. To the extent that Plaintiff's Omnibus Motion seeks discovery with respect to other individuals, it is DENIED.

**(3).    Personnel Files**

In ¶ 3 of the Omnibus Motion, Plaintiff requests "discovery of the personnel files of all persons identified" in ¶¶ 1 and 2. Doc. 172, at 1. Since Plaintiff's requests in those paragraphs for discovery into the reappointment of additional persons are denied in Point I, the request for personnel files of those persons is DENIED AS MOOT.

As for comparators previously identified by earlier Rulings, the Court adheres to its prior conclusion that production of their personnel files will not be compelled. *See* 2015 WL 8750901, at *9. Plaintiff's renewed motion to obtain discovery of them is DENIED.

**(4).    The Subpoena Served upon Sheril Frano  (and Related Matters)**

Paragraph 4 of Plaintiff's Omnibus Motion introduces the tangled affair of a subpoena *duces*

---

[8]  As noted in text, Bagley seeks to compel discovery "concerning any SOM PiPs who are reviewed for or receive reappointment *up to the date of trial*." Doc. 172, at 6 (emphasis added). No trial date has been set. The case has been protracted by elaborate and energetically litigated motion practice and extensive (and disputed) discovery; Professor Bagley was only recently deposed by Defendants, following the Court's denial of Plaintiff's motion to preclude the deposition. Bagley's unresolved claim that Yale responded wrongfully to her reappointment application stalks through the University battlements. If on account of Bagley's claim the Court directs Yale to make discovery with respect to future faculty applications, her claim could have an unsettling and distracting effect upon future applications and their evaluation. Yale could perhaps be motivated to fashion its resolution of a future application in a manner that supports, or at least does not prejudice, the positions it takes in this case. A discovery order with the potential of creating such an effect would be an abuse of discretion.

*tecum* counsel for Bagley served upon an individual named Sheril Frano.

The paragraph begins with a request that Yale be required to produce "all documents provided by non-party employee Sheril Frano (who declined representation by Yale's counsel), including those currently withheld on the basis of the Connecticut Personnel Files Act and any the Defendants' counsel seeks to withhold on the basis of the attorney-client privilege . . . " Doc. 172, at 2.   If the demand stopped there, one would suppose that it was generated by a separate, free-standing and discrete provision by one Sheril Frano to Defendants of certain documents, while others were withheld.   However, ¶ 4 goes on to demand, immediately following what I have quoted: "as well as any other documents and communications concerning formal or informal complaints of discrimination or retaliation against Yale or the individual defendants from 2008 through the present." *Id.*   If one gives those words their plain meaning, they vastly expand the requested discovery.   That request is no longer confined to documents Sheril Frano provided or withheld. Production is also demanded of documents concerning all discrimination or retaliation complaints over the past eight years made by anyone against "Yale" [presumably any of  the University's colleges, graduate schools, divisions and departments] or any of the three individual Defendants.

The terse phrasing of ¶ 4 does not reveal the relevant circumstances.   Plaintiff's brief in support of her Omnibus Motion [Doc. 172] undertakes to do so at pages 12-19.   We learn that "Sheril Frano is a current Yale employee" who served as Executive Assistant to then Dean Podolny, Dean Sharon Oster (2008-2011), and present Dean Snyder.  Brief, at 13. Counsel for Bagley served a subpoena *duces tecum* on Frano on September 10, 2015.   The requested material included "documents, notes, and communications concerning Professor Bagley's appointment as a PiP, standards for reappointment of PiPs, and adverse employment action Yale reportedly took against

19

Jeanette Gorgas, a woman who served as Senior Associate Dean of the MBA Program while Professor Bagley was employed as a PiP." *Id.*

Jeanette Gorgas attracted Professor Bagley's attention because Gorgas's responsibilities at SOM "included recruitment, admissions, career development, student services, and academic advising." Brief [Doc. 172], at 14.  In January 2012, Bagley expressed concern to Gorgas "about the SOM's evaluation of minority candidates." *Id.*  Bagley "questioned the SOM's rejection of a particular candidate, a black woman with a strong academic and professional record, and the SOM's attitude toward diversity recruiting in general." *Id.*  According to Bagley's brief: "Ms. Gorgas agreed that changes needed to be made, and indicated that she would work to attract more minority candidates." *Id.*  Two months later, Bagley's brief continues, Dean Snyder moved Gorgas to a less responsible SOM position.  *Id.*  In October 2012, Snyder announced that Gorgas was leaving the SOM.  *Id.*

Bagley's brief goes on to say at 14-15: "Professor Bagley has reason to believe that the adverse action the SOM, and particularly Defendant Dean Snyder, took against Ms. Gorgas was motivated, at least in part, by gender discrimination and possible retaliation."  Bagley contends on this motion to compel that documents in Frano's files relating to the Gorgas matter are discoverable because Bagley "has a legitimate need for documents that bear directly on her claims of discrimination and retaliation." *Id.*, at 17.  That need is present because "other evidence, including the employer's practices with respect to the employment of other members of a protected class, may also be used to show that purportedly valid reasons asserted for an employment decision were, in fact, a 'cover up' for discrimination," and "[s]imilar options are available to plaintiffs seeking to meet their burden of proof on claims of retaliation."  *Id.* (citations omitted).

Bagley's core contention is that "as part of her retaliation claim, [Bagley] will show a causal connection between the protected activity in which she engaged and the adverse action the Defendants took against her";  "[s]he is entitled to an opportunity to do so indirectly, through circumstantial evidence, such as instances where similar disparate treatment was visited on fellow employees who engaged in similar conduct"; and in consequence, Bagley "should be allowed the discovery she has sought concerning Ms. Gorgas, as well as all documents and communications she previously requested concerning any  formal and informal complaints made against the Defendants by other employees."  *Id.*, at 18 (citations and internal quotation marks omitted).  Bagley's theory of discovery, if sound, would require Yale to produce the Gorgas documents contained in the Frano files, and in addition, to conduct a search for and produce documents relating to any discrimination or retaliation complaints made by any other employees during the past eight years (2008-2016) against Defendant Yale or any of the three individual SOM faculty members.

The Defendants resist this additional discovery.  The briefs of counsel discuss at length (1) whether Mr. Noonan, trial counsel for Yale, is entitled to interpose an objection to production of the contents of Ms. Frano's subpoenaed files, since Frano is not a party to the action and Mr. Noonan does not represent her personally; and (2) whether production of the requested documents is precluded because they constitute "personnel files" of the individuals concerned.  These satellite questions do not arise, and the Court need not address them, if it appears on the present record that the requested documents are not subject to pre-trial discovery in any event.  Accordingly, I turn to that threshold question.

Bagley's discovery demands paint with a broad brush.  In essence, her theory is that since she is asserting a retaliation claim against Yale, she is entitled to discovery with respect to any and all

retaliation claims made by other individuals against Yale, or Rae, Snyder, or Metrick from 2008 to the present day.  This unabashed assertion of discovery entitlement disregards the core requirement of relevance.  Discovery under the Federal Rules of Civil Procedure is a conditional and carefully circumscribed process.  Rule 26(b)(1), as amended effective on December 1, 2015, provides: "Parties may obtain discovery regarding any nonprivileged matter that is *relevant to any party's claim or defense* and proportional to the needs of the case . . . " (emphasis added).  As I had occasion to note in a prior opinion in this case: "[t]he burden of demonstrating relevance remains on the party seeking discovery."  2015 WL 8750901, at *7.

It follows that analysis of the propriety of requested discovery requires one to ask: Is the discovery *relevant* to a party's *claim* or *defense*?  Which claim?  Which defense?  At this stage of the litigation, one looks to the parties' pleadings for their claims or defenses.  Bagley's claims are stated in her First Amended Complaint.  Yale's defenses are stated in its Offer of Proof (mandated by the Court in order to flesh out the answer to the complaint).

I begin the analysis of relevance with a consideration of Bagley's claim that she was the victim of wrongful retaliation.  Plaintiff's First Amended Complaint (hereafter "FAC") contains three counts captioned "Retaliation."  These are:

    *  Count Five  –  "Retaliation Under Title VII – Yale."

    *  Count Six:  –   "Retaliation Under the ADEA  – Yale."

    *  Count Seven – "Retaliation Under Connecticut FEPA – All Defendants."

The allegations under these heading are conclusory.  Count Five alleges that "Yale's adverse and disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under Title VII."  Doc. 129, ¶ 156.  Count Six alleges that "Yale's adverse and

disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under the ADEA." *Id.*, ¶ 162.  Count Seven alleges that "Yale's adverse and disparate treatment of Plaintiff, as set forth above, was in retaliation for Plaintiff having opposed forbidden practices under § 46a-60(a)(4) of the Connecticut Fair Employment Practices Act." *Id.*, ¶ 168.  The phrase "as set forth above" in each of these counts is an incorporation by reference of the allegations in ¶¶ 15-125 of the FAC.  These paragraphs constitute a comprehensive 23-page recitation of the many grievances Professor Bagley has amassed  as the result of her treatment by Yale and the three SOM deans.  Some of these allegations are well pleaded; others are conclusory or argumentative.  It is fair to assume that this pleading, filed on April 3, 2015, describes and characterizes each act by any Defendant that Plaintiff believes wronged her.

The FAC alleges that "on May 24, 2012, Dean Snyder wrote to formally inform Professor Bagley that the BPO had voted against her renewed appointment as a Professor in the Practice," and "he had decided not to renew her contract for another five-year term." *Id.*, ¶ 71.  "Professor Bagley was undeterred.  She challenged the nonrenewal decision and raised concerns of bias.  She filed an internal grievance with the University." *Id.*, ¶ 23.  Specifically: "On June 19, 2012, Professor Bagley filed a formal complaint of discrimination pursuant to the Yale University Faculty Handbook requesting a provostial review of Dean Snyder's decision not to renew her contract." *Id.*, ¶ 73.  That complaint, addressed to then-Provost Salovey, "alleged, among other claims,  gender bias, failure to follow Yale's own reappointment procedures, and violation of the terms of her contract." *Id.* Bagley's June 19, 2012 complaint to Salovey stated: "The real reason for the nonrenewal of my appointment is gender bias, including sexual stereotyping, in violation of Yale's policies, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and applicable

Connecticut state law." *Id.*, ¶ 74.

Bagley's internal grievance in June 2012 availed her nothing. The FAC alleges: "Having had the temerity to complain about gender stereotyping and discrimination, her situation at Yale only became worse. *Retaliation ensued*. For more than a year and a half, Professor Bagley has been forced to endure multiple and unusually lengthy and delayed pretextual 'review' processes." ¶ 24 (emphasis added).

The FAC at ¶¶ 120-121 sums up the claims Bagley asserts against Yale:

> 120. Professor Bagley has faced ongoing discrimination and harassment by Yale because of her gender, her failure to conform to gender stereotypes, her age, and her complaints regarding discrimination.

> 121. Professor Bagley has also faced ongoing *retaliation* by Yale *after filing her internal grievance* with the University, and *subsequently her complaints* with the Connecticut Commission on Human Rights and Opportunities and EEOC.

(emphases added).

The quoted allegations reveal the essence and extent of Bagley's retaliation claim against Yale. She claims that after she filed her internal grievance with the University, "retaliation ensued," which took the form of "multiple and unusually lengthy and delayed pretextual 'review' processes." While the noun "retaliation," the verb "retaliate" and the adjective "retaliatory" are scattered throughout Bagley's 40-page FAC, their focus is upon the SOM faculty review and evaluation process which resulted in the denial of her application for reappointment and termination of her employment. A typical phrasing of the retaliation claim appears in ¶ 108 of the FAC, where Bagley complains of Dean Metrick's decision during the reappointment process "that 'need' is a discretionary factor left for consideration by the BPO," and alleges: "This decision was in retaliation for Professor

Bagley's requests for promotions and her refusal to submit to the repeated gender based and retaliatory 'reviews' – all searching for pretextual reasons to justify a foregone conclusion."

If the Yale SOM deans were irritated by Bagley's requests, criticisms and internal grievance, and responded in the bad-faith, mean-spirited manner the complaint alleges, one would have no difficulty in characterizing Yale's conduct as wrongful retaliation. That is the retaliation charge Bagley levels against Yale and the academic deans acting in the University's name.

The truth of that retaliation claim, it is important to note, is not the issue at this discovery stage. The present issue is whether, with Rule 26(b)(1) as a condition to discovery, the contents of the Frano file and what they may reveal about the termination of Jeanette Gorgas's SOM employment are relevant to the particular claim of retaliation that Bagley makes against Yale.

The test for relevance is stated in Rule 401 of the Federal Rules of Evidence: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." In an earlier opinion in the case at bar, I had occasion to say: "In order to be 'relevant' for Civil Rule 26 discovery purposes, information and evidentiary material must be 'relevant' as defined in Rule of Evidence 401. No other definition of Rule 26 relevance is suggested or discernible." 2015 WL 8750901, at *8. To be *discoverable*, Rule 26 requires that the requested evidence must be "relevant to any party's claim or defense."

Applying those criteria to the present disputes, I conclude that the documents Bagley requests from the Frano files which relate to Gorgas are discoverable because they are conceptually relevant to Bagley's retaliation claim. The request, ¶ 8 in the subpoena *duces tecum*, is for "[a]ny and all documents, communications and notes concerning or relating to Jeannette Gorgas, former senior

25

associate dean, regarding her transfer and ultimate termination from Yale." Doc. 185-1, at 23. The brief for Bagley on this motion contains assertions which are sufficient to identify the termination of Gorgas's employment by Yale as potentially relevant to Bagley's claim that retaliation was a cause of *her* termination by Yale. Bagley and Gorgas worked at the SOM at the same time; Defendant Snyder was the Dean; Bagley alleges that she voiced to Gorgas criticisms of Yale's evaluation of minority candidates; Gorgas agreed and "indicated she would work to attract more minority candidates"; shortly thereafter, Snyder transferred Gorgas to a less prominent position and later announced Gorgas was leaving SOM. Doc. 172, at 17.

Bagley's brief asserts that "Professor Bagley has reason to believe that the adverse action the SOM, and particularly Defendant Dean Snyder, took against Ms. Gorgas was motivated, at least in part, by gender discrimination and *possible retaliation*." *Id.*, at 17-18 (emphasis added). This is something less than a ringing accusation that Gorgas was the victim of wrongful retaliation by Snyder or Yale, and the discussion appears only in Bagley's brief, there being no comparable factual allegations in the First Amended Complaint. Nonetheless, I construe the discussion in Bagley's brief as representations by her attorneys, as officers of the Court, that there is evidence to support the theory that Yale's termination of Gorgas's employment was in retaliation for Gorgas's conduct which irritated a dean, and was similar to conduct by Bagley preceding her termination. Bagley's theory – it is at present no more than that – is sufficiently specific and plausible to support the conclusion, which I reach, that the requested evidence from the Frano file about Gorgas is relevant to Bagley's claim that Yale retaliated against her. The time frame is the same; the same dean is involved. The evidence relating to Gorgas is accordingly relevant under Rule of Evidence 401 and discoverable under Civil Rule 26.

That aspect of Bagley's request for discovery is GRANTED.

There are some satellite issues about the contents of Frano's files.  The briefs for Yale argue that, with respect to documents pertinent to Gorgas's change of title and eventual departure from Yale's employ, discovery may be withheld on the basis of the Connecticut Personnel Files Act, Conn. Gen. Stat. § 31-128f.  *See* Doc. 176, at 21.  Yale also contends that production of other contents of Frano's files is precluded by the attorney-client privilege.  *Id.*, at 21-22.  Bagley responds that Yale is not in a position to make either of these arguments, because her demand for production of Frano's files took the form of a subpoena *duces tecum* accompanying her deposition, rather than a demand under the discovery rules, and Frano was not represented by Yale's counsel at the time of her deposition.

Bagley's contention is an unpersuasive exaltation of form over substance.  When Frano was deposed, she was an employee of Yale, and the matters and documents in her files were generated in the course of the University's business.  Trial counsel for Yale have the standing, and one could argue the responsibility, to voice and preserve on the record objections to discovery based upon recognized privileges or public statutes.

It is not clear from the most recent submissions if the withholding of any documents because of the attorney-client privilege is presently disputed.  If there are disputes of that nature, Yale's counsel are directed to submit the documents in question for *in camera* review.

As for "personnel files," no present need for them is discernible, a relevant factor since "[t]he disclosure of such information must be carefully tailored to a legitimate and demonstrated need for such information in any given case."  *Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, No.93-0300272S,  1994 Conn. Super. LEXIS 3144, at *6 (Conn. Super. Ct. Dec. 8, 1994) (citation and

internal quotation marks omitted).  If Bagley wishes to press for discovery of personnel files, the rule is that "[i]n resolving requests for disclosure, routine access to personnel files is not to be had. Requests for information should be specific and should set forth the issue in the case to which the personnel information sought will relate."  *Id.*, at *7.  If such a request is made, I will consider the documents *in camera*.

The Court's discussion thus far under this heading relates to Bagley's claim against Yale for retaliation, which for the reasons stated justifies the holding that the documents in question are discoverable.  For the sake of completeness, I now also hold that the documents in the Frano files pertaining to Gorgas are not discoverable within the context of Bagley's other core claim against Yale, that of discrimination.

Bagley's discrimination claim is one of disparate treatment.  Whatever happened to Gorgas's employment is of no relevance to whatever happened to Bagley's employment because the two individuals are entirely dissimilar in the material respects associated with discrimination claims.  The analysis need not be extended.  Bagley was a member of the SOM faculty, a Professor in the Practice seeking reappointment.  Gorgas was a non-academic lay administrator, who was not on the faculty and not seeking appointment to it.  Gorgas was not a "comparator" of Bagley for disparate treatment discrimination purposes, however that term is defined, and her employment status at Yale is not relevant to that of Bagley.[9]

---

[9]  Bagley says in her Reply Brief [Doc. 179] at 8 that she "does not seek discovery concerning Ms. Gorgas as a comparator," but as an individual whose "transfer and departure from the SOM" may provide "circumstantial evidence Professor Bagley can use to show that the decision to deny her reappointment and other wrongful action taken against her was a 'cover up' for discrimination and retaliation."  As for Bagley's claim against Yale for discrimination, that is a distinction without a difference.  Because their employment situations were so dissimilar, what happened to Gorgas does not furnish Bagley with evidence, circumstantial or otherwise, that Yale submitted Bagley to

There is an additional issue posed by § 4 of Bagley's Omnibus Motion.  That paragraph follows her requests for discovery of the Frano and Gorgas documents with this sweeping demand: "as well as any other documents and communications concerning formal or informal complaints of discrimination or retaliation against Yale or the individual defendants from 2008 through the present."

The discovery rules do not require Yale to engage in the time-consuming and expensive effort that would be required to respond to that far-reaching and generally phrased request.  The request is untethered from descriptions or specifications of the circumstances of "formal or informal complaints of discrimination or retaliation against Yale or the individual defendants."  Bagley simply wants Yale to locate them all by searching the records of the entire University over eight years and produce whatever it finds to Bagley.  The briefs for Bagley do not demonstrate the actual or potential relevance of the requested generalized information to the core issue in this case: whether Yale's termination of Bagley's employment constituted wrongful discrimination or retaliation by Yale against her.

Bagley clearly hopes that by casting so wide a net into the vast sea and trawling for eight years, she will haul up on deck one or more specimens bearing some resemblance to the circumstances of the case at bar.  Jeanette Gorgas is such a specimen: that is why Bagley is entitled to discovery about her, in aid of Bagley's claim of retaliation.  However, this additional request exemplifies the sort of fishing expedition courts do not favor when asked to compel discovery.  *See, e.g., Khan v. Abercrombie & Fitch*, 201 F.3d 431, 431 (2d Cir. 1999) ("Because appellant's broad

---

disparate *discriminatory* treatment.  For the reasons stated in text, what happened to Gorgas is discoverable by Bagley in the context of Bagley's claim against Yale for *retaliation*.

discovery request for all complaints of discrimination against Abercrombie & Fitch nationally for the preceding ten years was not reasonably calculated to elicit admissible evidence and would have imposed greater costs on appellee than benefit to appellant's case, *see* Fed. R. Civ. P. 26(b), the magistrate judge was well within her discretion in denying the request.")

That aspect of Bagley's motion for discovery is DENIED.

**(5).    Yale's May 15, 2013 Report of the 2012-2013 Sexual Climate Assessment and Related Matters**

The fifth paragraph of Plaintiff's Omnibus Motion requests Yale "to produce data used as a basis for Yale's May 15, 2013 Report of the 2012-2013 Sexual Climate Assessment, and all supplementary publications or updates." Plaintiff also requests production of "the Report of the 2014 Diversity Summit at Yale, including all notes, all drafts of the reports, and all documents provided to program participants."

Yale's Main Brief [Doc. 176] says that its May 15, 2013 Report of the 2012-2013 Campus Sexual Climate Assessment was created pursuant to Title IX of the federal civil rights act.[10]  Yale's brief continues:

> This assessment helped Yale to gauge its students' understanding of the resources available to them relating to sexual misconduct, and also helped Yale to better understand its students' concerns and opinions regarding sexual misconduct and the sexual climate at the campus. . . . [T]he focus of the assessment is *student views and perceptions* relating to the campus sexual climate.  The report does not concern the experiences of faculty members as it relates to the sexual climate or sexual misconduct at Yale . . .

---

[10]    The FAC alleges at ¶ 49 that in June of 2012, the Office of Civil Rights of the U.S. Department of Education "completed a two-year investigation into Yale's compliance with various provisions of Title IX, with a specific focus on the handling of complaints of a hostile environment, sexual harassment, sexual assault, and other forms of sexual misconduct."  It appears that Yale's May 15, 2013 Report was generated by that federal investigation.

Doc. 176, at 28, 31, 32 (emphasis in original).

The May 15, 2013 Report itself is available to the public on line, and Bagley may extract from it anything in the text relevant to her claims against Yale. But Bagley is not content with that. Her motion seeks discovery of "data used as a basis" for the Report, together with "notes, all drafts of the reports, and all documents provided to program participants."

Bagley does not accept Yale's characterization of the Report as limited to students' views and perceptions. Bagley's Main Brief [Doc. 172] at 20 quotes contemporaneous University communications to the effect that, in preparing the assessment, all Yale faculty and staff were asked to "share their insights, experiences, and suggestions on the campus climate," and to give their "impressions of the sexual climate in their schools/departments and the University more generally," a phrase Yale construed broadly as capturing "not only incidents of misconduct but also the dynamics within the professional, educational and social contexts in which those incidents occur." Participants in the assessment were encouraged to "think about patterns of behavior, casual comments, formal expectations, and attitudes" in departments, schools, and offices throughout the University. *Id.*

In support of this discovery motion, Bagley's brief [Doc. 172] asserts at 20-21: "The information Professor Bagley seeks concerning the sexual climate assessment bears directly on her discrimination and retaliation claims, and particularly on her allegation that '[a] culture exists within Yale in which strong, assertive and professionally accomplished women who are not stereotypically female in their appearance, behavior and attitudes are viewed negatively because they do not meet

certain gender expectations by the dominant male leadership.'" (quoting ¶ 122 of the FAC).[11]  This discovery is crucial, Bagley contends, because "[t]he data related to Yale's 2012-2013 Sexual Climate Assessment is Professor Bagley's only source for comprehensive evidence reflecting observations of the climate for women at Yale during the time[-]frame in which she was denied reappointment for pretextual reasons."  Doc. 172, at 22.

It is apparent that Bagley is requesting production of a very considerable body of documents.  Bagley says she is entitled to examine all of them, as they comprise the "only source for comprehensive evidence reflecting observations of the climate for women at Yale."  Yale says Bagley is not entitled to discover any of these documents, for two reasons: They are irrelevant to the issues in the case at bar; or alternatively, they are protected from discovery by the common-law privilege for self-critical analysis.  Judge Wood considered the privilege for "self-critical analysis" in *Flynn v. Goldman, Sachs &Co.*, No. 91 Civ. 0035, 1993 WL 362380 (S.D.N.Y. Sept. 16, 1993). District Judge Walker (as he then was)  referred to the concept as the "self-evaluative privilege." *Lasky v. Am. Broad. Cos. Inc.*, No. 83 Civ. 7438, 1986 WL 9223, at *1 (S.D.N.Y. Aug. 13, 1986). The phrases are synonymous.  Indeed, Judge Wood used them both in the same sentence in *Flynn*, 1993 WL 362380, at *1: "Courts have recognized a common-law privilege for self-critical analysis where 'an intrusion into the self-evaluative analyses of an institution would have an adverse effect on the [evaluative] process, with a net detriment to a cognizable public interest." (citing and quoting *Cobb v. Rockefeller Univ.*, No. 90 Civ. 6516 (PKL), 1991 WL 222125, *1 (S.D.N.Y. Oct. 24, 1991)).

---

[11]  That is a recurring theme in the First Amended Complaint.  Paragraph 20 alleges that Bagley was denied reappointment because she "became the object of gender stereotyping. She didn't fit the Yale vision of the young male SOM professor, or the more passive subordinate female professor who would bend to their will.  Professor Bagley had the temerity to challenge gender biased decision-making and challenge the dominant, older male leadership."

I will use both phrases.

In the case at bar, I am presented with a not uncommon discovery dispute. Many documents exist. One party claims the right to examine them all. The other party claims the right to withhold them all. A court frequently concludes that each party is partially right and partially wrong. I reach that conclusion in this case.

As for the relevance of the sought-after documents to the issues created by Bagley's claims against Yale, it is readily apparent that much of the material generated by the May 15, 2013 Report of the 2012-2013 Sexual Climate Assessment is entirely irrelevant. While Bagley demonstrates that the Assessment involved inquiries to, and presumably responses by, a broad spectrum of the University community, it is apparent that the principal focus of the exercise was upon the views and perceptions of *students*. That is not surprising. It would appear that Yale undertook the Sexual Climate Assessment because the Department of Education targeted Yale with a Title IX investigation into the welfare and treatment of students.[12] The Court may also judicially notice the extensive press coverage given at that time to reports of ungallant – to put it mildly – comments and songs addressed by members of male undergraduate fraternities to women students.

---

[12] The federal agency's intervention under Title IX was noted recently by *The New York Times* issue of June 10, 2016 at page B10, reporting on a complaint filed by Jack Montague, the former Yale College basketball captain, against Yale, alleging that Yale acted wrongfully in expelling him for sexual misconduct with another student. The article states: "The subject of campus sexual assault received new national prominence five years ago when the Department of Education's Office of Civil Rights highlighted the applicability of Title IX, the federal law mandating gender equity in higher education, to sexual violence." *The Yale Daily News* issue of June 9. 2016, reporting on the Montague lawsuit, describes a letter the Education Department promulgated in 2011 "which instructs educational institutions receiving federal financial aid to take 'immediate action' to stop sexual harassment and violence." The fair inference, which I draw, is that Yale devoted resources and effort to its 2012-2013 Sexual Climate Assessment because of these Title IX intercessions by the Department of Education, prompted by its concern about assaults on students.

If, as seems apparent, the principal concern leading to the Title IX investigation and Yale's Sexual Climate Assessment was the creation or existence of a toxic culture of sexual abuse, harassment and assault *within the student body* of Yale, then much of the Assessment data has no relevance to the claim Bagley asserts against Yale. Bagley complains of a toxic culture which, within the University's academic community, and particularly at the School of Management, allowed a dominant, older male leadership to prefer young male professors, prefer passive subordinate female professors who bend to the leadership's will, and reject strong, assertive, professionally accomplished women who have the courage to voice institutional criticisms and do not meet male leadership expectations of appearance, behavior and attitude. About that particular culture, deleterious as it may be in the groves of academe, Yale students have no concern.

Yale students – undergraduate and at the graduate schools – have concerns aplenty. They sing "Bright college years, with pleasures rife," but the line could accurately conclude with "and sometimes strife." Students worry about their education and place in the educational process, making friends and joining activities, how to live best in the present moment, where they are going in the future, and who to ask to share that future with them. Deans of graduate schools do not worry about those things (at least not nearly as much). Students do not worry about the complexities, subtleties, politics and maneuvering of faculty appointments, promotion and tenure. We are speaking of different generations, inhabiting different worlds, with different hopes and fears.

There is every reason to suppose that the data generated by student participants in the Campus Sexual Climate Assessment describe their conditions, perceptions and experiences in campus locations – residential colleges, dining halls, classrooms, study halls, auditoria (for the singers and musicians), Yale Dramat (for the actors), Yale Daily News (for budding journalists) –

34

to cite only a few examples of the myriad settings for learning and growth in a co-educational university.  There is no reason to suppose that the student data says anything about whether the academic culture for faculty and deans that Bagley describes in her complaint existed or adversely affected her.

It follows that data and related paperwork created by the participation of students in the creation of the Assessment have no discernible relevance to the claims and defenses in the case at bar.  To the extent that Plaintiff's present motion seeks to compel discovery of that material, it is DENIED.

I reach a different conclusion with respect to Assessment data and documents generated by Yale faculty members or academic administrators that may be probative of whether or not the particular culture complained of by Bagley existed.  Such evidence would be relevant to the issues being litigated, and Bagley is entitled to discovery in that area.  The material amassed during the Assessment may or may not contain such evidence, but Bagley is entitled to make the claim that the culture she describes existed and harmed her,  and to request  discovery in an effort to prove that claim,  so long as her request complies with the discovery rules.  To that extent, Bagley's request for discovery is GRANTED.

I reject Yale's second basis for withholding the Assessment material: that the material is protected from discovery by the self-evaluative privilege.  Rule 501 of the Federal Rules of Evidence leaves the existence of privileges to "[t]he common law – as interpreted by United States courts in the light of reason and experience."  A privilege for self-evaluative or self-critical analysis has been considered by a number of federal district courts.  Their decisions are not uniform and cannot be wholly reconciled.  The parties have not cited, and my research has not disclosed, Supreme Court

or Second Circuit authority addressing the subject directly. "This particular privilege has led a checkered existence in the federal courts." *Wimer v. Sealand Service, Inc.*, No. 96 CIV. 8730, 1997 WL 375661, at *1 (S.D.N.Y. July 3, 1997) (Dolinger, *M.J.*). "Neither the Supreme Court nor the Second Circuit has settled the question of whether the self-critical analysis privilege should be recognized as a matter of federal law." *Mitchell v. Fishbein*, 227 F.R.D. 239, 251 (S.D.N.Y. 2005) (Gorenstein, *M.J.*).

District courts that recognize the privilege apply it in a limited and restricted manner. In *Lasky*, 1986 WL 9223 at *2, Judge Walker said that the "basic purpose underlying the privilege" was "to encourage self-improvement through unchilled self-analysis and evaluation . . . However, the privilege is not without its limitations. It only applies to the analysis or evaluation itself, and not to the facts which are analyzed. Moreover, it must be balanced against the societal interest in discovery as it contributes to the full and fair adjudication of the issues invoked in litigation." Magistrate Judge Dolinger summed up these considerations in *Wimer*, 1997 WL 375661 at *1:

> To the extent recognized, the underlying principle is that if a party has conducted a confidential analysis of its own performance in a matter implicating a substantial public interest, with a view towards correction of errors, the disclosure of that analysis in the context of litigation may deter the party from conducting such a candid review in the future. In such circumstances, the court may relieve the party of its obligation to provide the purely analytical material, absent a showing of need by the other side, in order to encourage continued candid self-evaluations.

(citations omitted). These guidelines seem to me to be well considered.

Applying these principles to the case at bar, I conclude that Yale cannot invoke the self-critical or self-evaluative analysis privilege as a bar to otherwise permissible discovery of Assessment documents.

In *Flynn v. Goldman, Sachs & Co.*, No. 91 Civ. 0035 (KMW), 1993 WL 362380 (S.D.N.Y. Sept. 16, 1993), Judge Wood applied the self-critical analysis privilege in a gender discrimination suit where the defendant employer sought to protect from discovery reports generated by a company called "Catalyst," which "is a not-for-profit organization that studies the barriers to the equal and fair employment of women." 1993 WL 362380, at *1. "Catalyst works with businesses to identify and eliminate those barriers." *Id.* The plaintiff sought discovery of "confidential interviews by Catalyst of defendant's employees and the presentation of reports to defendant summarizing the results of Catalyst's research." *Id.* Defendant argued, in invoking the self-critical analysis privilege, that "disclosing the documents would seriously harm it and would reduce the likelihood that employers will voluntarily seek such critical analyses from Catalyst or similar consulting firms." *Id.* Judge Wood accepted that argument. She reasoned that

> employers would be highly reluctant to retain an organization such as Catalyst and to cede to it *carte blanche* in choosing whom to interview and how to present its research. Few, if any, companies would risk commissioning a candid Catalyst report if these reports could later be used against the company in litigation. The goal of eliminating any barriers to the full participation of women in the highest levels of corporate America is well served by encouraging such self-critical assessments . . .

1993 WL 362380, at *2.

The defendant employer in *Flynn* who voluntarily, and apparently out of the goodness of its institutional heart *desired,* a self-critical assessment and retained an expert to perform it, bears little or no resemblance to Yale, the defendant employer in the discrimination suit at bar. Yale conducted its 2012-2013 sexual climate self-assessment after it found itself staring at the twin barrels of a Title IX investigatory shotgun, held in the steady hand of the Office of Civil Rights of the United States

37

Department of Education, which had fixed its unblinking gaze upon Yale (and other universities) as the result of growing concern about sexual assaults on campus. The circumstances surrounding the two assessments are so different that I conclude without difficulty that the self-critical (or self-evaluative) privilege applies to an employer in a case like *Flynn*, but not to Yale in the case at bar. That is an appropriately selective application of the privilege. "Inasmuch as testimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence, any such privilege must be strictly construed." *Univ. of Pennsylvania v. EEOC,* 493 U.S. 182, 189 (1990) (citations, internal quotation marks, and punctuation omitted).

In consequence, the sole remaining question on this aspect of the case is the one previously noted: Whether the Yale assessment contains documents from sensible sources that are relevant to the particular theory of faculty discrimination Bagley alleges in her pleading. Such material is discoverable, for the reasons stated.

If Plaintiff plans to pursue this possible source of information, counsel must cooperate with each other in an effort to ascertain if, and to what extent, that material exists. To that end, counsel for Bagley are directed to send to counsel for Yale a specific description of the kinds and contents of documents they are looking for, which are discoverable in compliance with this Ruling. That should prove useful, since the descriptions contained in Plaintiff's briefs and other submissions are broad and general. Counsel for Yale would then be under the obligation to examine the Sexual Climate Assessment documents and set aside those which are responsive to Bagley's particularized requests. If Yale has no objection to the production of those set-aside documents, they should be given to counsel for Bagley (perhaps after redacting the names of individual sources identified in the documents). If Yale objects to production, counsel should state the objection in writing and the

Court will examine the documents in question *in camera*. If counsel for Bagley are not satisfied with counsel for Yale conducting this initial selection, then counsel for Yale must make all of the Assessment documents available in New Haven for inspection (not copying) by counsel for Bagley, in the presence of counsel for Yale. Counsel for Bagley may designate which documents they contend are discoverable under this Ruling. Any disputes will be resolved by the Court after an *in camera* inspection.

A final issue on this aspect of the case: The fifth paragraph of Plaintiff's Omnibus Motion [Doc. 172], in addition to requesting production of "Yale's May 15, 2013 Report of the 2012-2013 Sexual Climate Assessment" and related documents, also requests "the Report of the 2014 Diversity Summit at Yale" and related documents. The briefs of counsel on this motion do not discuss the "2014 Diversity Summit" or its Report, and the present record does not explain its nature or purpose. For the sake of moving the case forward, I direct that the production of the Diversity Summit Report and its accompanying documents be made in accordance with the holdings on relevance made in this Ruling with respect to the Sexual Climate Assessment. If either party objects to that resolution of this particular material, further written motion papers must be submitted.

**(6).    Sanction Requests**

The sixth paragraph of Plaintiff's Omnibus Motion asks the Court to issue "appropriate sanctions under Fed. R. Civ. P. 37 against Yale for its failure to obey the Court's order to provide comparator discovery and its failure to take reasonable steps to preserve relevant documents and electronically stored information."

Rule 37(b) provides that a district court may impose a sanction on a party for "failure to comply with a court order." That discretionary power "may include" one of a number of options.

39

Rule 37(b)(2)(A).  Rule 37(e) provides that a district court may impose one of a number of specified sanctions on a party for "failure to preserve electronically stored information."  Whether a sanction should be imposed at all, and if so the form it should take, are questions that are vested in the sound discretion of the district judge.

On the present motion, Bagley contends that Yale failed under Rule 37(b) and Rule 37(e). The latter violation leads Bagley to assert a claim for spoliation of evidence, a transgression which if proved subjects the violator to an additional assortment of discretionary sanctions.  Yale disputes all these contentions.  The issues have been elaborately briefed.

As to Yale's first asserted failure, Bagley's Main Brief [Doc. 172] says accurately at 3: "On December 14, 2015, the Court ordered Yale to promptly produce for discovery all documents generated in or relating to the reappointments of SOM PiPs who applied for or received reappointment from 2008-2013."  Yale has produced some responsive documents.  Bagley says that they are so sparse that Yale must be withholding others, in violation of the order.  Yale responds in its Main Brief [Doc. 176] at 8 that "three PiPs were reappointed within the 2008 through 2013 time frame designated by the Court: Roger Ibbotson (2008), Stanley Garstka (2008), and Frank Fabozzi (2010)," and that, with respect to those three: "The defendants have produced every responsive document and simply cannot produce documents that do not exist."  Bagley's reply to *that* disclaimer points out that Bagley herself had applied for reappointment during the pertinent period, and Yale had failed to produce attachments concerning certain SOM faculty members in an e-mail "sent from Kendra Mulligan (an administrative assistant) to Professor Edieal Pinker in connection with the Pinker Committee's charge for its report on Professor Bagley's reappointment review."  Reply Brief [Doc. 179], at 5.

The dispute over Yale's compliance with the Court's December 14, 2015 Ruling seems to come down to this e-mail. I conclude that Bagley has the better of the argument, and direct Yale to make discovery of the e-mail in question, together with a full set of attachments. This order for discovery says nothing about whether information concerning certain faculty members would be admissible at trial, on a theory that they are comparators or any other basis. Yale's initial withholding of these attachments, while not sustainable, was not unreasonable, and cannot support the imposition of a Rule 37(b) sanction.

Bagley's spoliation claim is also prompted by what she perceives to be the paucity of Yale's document production to date. In spoliation claims, it is pertinent to ascertain, *inter alia*, the date when a party's duty to preserve evidence attached, and the date or dates when the party took steps to preserve that evidence. In the case at bar, it is common ground that at some time or times Yale issued "litigation holds" to various University branches and offices in respect of Bagley's claims, but the particulars are not clear from the present record. Bagley includes in her Reply Brief at 7 the request that the Court order Defendants "to provide proof of their preservation efforts, including the specific date on which a litigation hold or preservation notice was put into place, a complete list of every individual to whom the notice was delivered, and a list of individuals from whom the Defendants requested information responsive to the Court's December 14, 2015 Ruling." That is a reasonable request in the circumstances. Complying with it will not be prejudicial or unduly burdensome to Yale. The quoted request is GRANTED; compliance is to be accomplished not later than June 30, 2016. Decision on Plaintiff's underlying spoliation motion is RESERVED..

**(7).   Trial Date Request**

Plaintiff's final request in her Omnibus Motion is that the Court schedule "a trial date for the

earliest possible date when all parties and their counsel are available."  The basis for that request appears in Bagley's Main Brief [doc. 172] at 23: "In the absence of a scheduling order, the Defendants will continue to delay resolution of this case, at Professor Bagley's considerable and unnecessary expense."

Professor Bagley's discontent with the amount of time that has elapsed since she filed her original complaint is entirely understandable in human terms.  However, in legal terms, by which trial litigants, lawyers and judges "live, and move, and have our being,"[13] it is inaccurate to suggest that the Defendants' determination "to delay resolution of the case" is the cause of that passage of time.  This is a complex and nuanced case which has been energetically litigated by able counsel who ask or give no quarter.  The Court has been obliged to issue Rulings, of considerable but unavoidable length, which granted in part and denied in part Defendants' motion to dismiss the initial complaint, and then denied Plaintiff's motion for a preliminary injunction (the latter after a week-long evidentiary hearing).  Elaborate pre-trial discovery and related issues have been contentious and the subject of additional motions and Rulings.  Plaintiff has contributed to, and consequently extended, that contest.  The Court has been required to deal with Plaintiff's repeated (and unsuccessful) efforts to enlarge the 2013 cut-off date for comparators; reduce certain of Plaintiff's excessive discovery demands; consider (and deny) Plaintiff's motion to preclude Defendants from taking her deposition; and adjudicate Plaintiff's requests for further discovery (some of which are granted in this Ruling, to be complied with in the future).  I respect the spirit with which Bagley's counsel says Yale's counsel could have performed certain discovery tasks more quickly.  But my impression of this difficult and demanding case is that neither party has wrongfully delayed its progress.  Rather, the

---

[13]  Acts 17:28.

42

case has progressed in the manner and with the expense that the nature of the claims and the justice of the cause require.

Since the discovery procedures are ongoing, with the potential at least for further motion practice, it would not be appropriate to schedule a trial date at this time. All discovery by all parties must first be completed. Counsel will then be required to prepare and submit a Joint Trial Memorandum in accordance with Local Civil Rule 16(b) and this Court's Standing Order Regarding Trial Memoranda in Civil Cases (amended December 31, 2013). The Joint Trial Memorandum will be due not later than thirty (30) days after counsel for all parties state in writing that all discovery has been completed. When the Joint Trial Memorandum has been filed and approved by the Court, the case may be assigned a trial date, subject to the resolution of any *in limine* motions or other legal questions prior to the selection of a jury.

**(8). Conclusion**

For the foregoing reasons, Plaintiff's Omnibus Motion [Doc. 172] is GRANTED IN PART AND DENIED IN PART.

It is SO ORDERED.

Dated:  New Haven, Connecticut
          June 15, 2016

/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge

43