## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONSTANCE E. BAGLEY,

              Plaintiff,

  v.

YALE UNIVERSITY, DOUGLAS RAE,
EDWARD SNYDER, and ANDREW
METRICK, individually,

              Defendants.

Civil Action No.
3:13 - CV - 1890 (CSH)

DECEMBER 22, 2016

### RULING ON PLAINTIFF'S MOTION TO COMPEL

**HAIGHT, Senior District Judge:**

The rekindled pretrial struggle in this case, taking the form of yet another motion by Plaintiff Bagley [Doc. 190] to compel Defendant Yale University to make discovery, focuses upon "litigation hold notices" Yale sent to 65 individuals. Yale opposes the motion in its entirety. This Ruling resolves it.

As the relationship between Professor Bagley and the leaders of the Yale School of Management ("SOM") deteriorated from academic collegiality to bitter recrimination, a time came when Yale thought it advisable to send what it called a "document preservation notice" to a sizable number of individual members of the greater Yale community. The Ruling refers to this document as a "litigation hold notice," a preferable phrase coined by trial lawyers and judges, preferable because it more accurately reflects the purpose of the exercise.

The universe of recipients of Yale's notice in this case was not limited to those who (meaning no disrespect) may be referred to as the "usual suspects": SOM deans and faculty involved in the

1

ultimate decision not to reappoint Bagley or inquiries into that refusal, then-provost Salovey, and certain others.  Yale painted with a broad brush and adopted a course of wide  dissemination.  An in-house attorney addressed an e-mail dated May 8, 2013 to "Dear Colleagues" (Ex. F to Plaintiff's present motion, Doc. 191-1) which began:

> As you may know, Professor Connie Bagley has brought a complaint against Yale alleging employment discrimination on the basis of her gender, disability and age.  As a result, all members of the Yale faculty and staff who have information in their possession or control relating or referring in any way to Professor Bagley, her employment and teaching at SOM, or the circumstances relating to the non-renewal of her faculty appointment (collectively "this Matter") have a legal obligation to preserve that information.  The law imposes this obligation to prevent the loss of potential evidence during litigation.  You must preserve and retain, and not alter, delete, remove, discard or destroy, directly or indirectly, any information concerning this Matter.   Failure to preserve information could seriously undermine Yale's legal position and lead to legal sanctions.

The e-mail I have quoted was signed by Jonathan E. Clune, senior associate general counsel of Yale University, in the office of the vice-president and general counsel.  Doc. 191-1, at 13.  The notice defines the documents to be preserved broadly – "The term 'information' should be construed very broadly to include any communication in any medium, including hardcopy and electronic documents, schedule entries, e-mail, photographs, voice mail, and information stored on a smart phone or PDA"  – and gives recipients detailed instructions about how all this material is to be preserved.  *Id.*, at 12-13.  The notice concludes with this direction:

> Attached to this e-mail is a brief form requesting information on the computer or computers that you believe contain information on this Matter.  **Please fill out the form and e-mail it back to me. . . . Please confirm by return e-mail that you have read and understood the instructions above and attach the completed survey form.**

*Id.,* at 13 (emphases in original).

Exhibit A to Doc. 191-1 lists the names of the recipients of Yale's litigation hold notices and the dates on which the notice was sent to each. The exhibit lists 65 individual recipients. Doc. 191-1, at 1-2. I conclude from the evidence in the record, and the absence of any contrary proof, that Mr. Clune sent to each recipient a notice in the form submitted as Ex. F. Based on Ex. A, the dates on which notices were sent and the number of recipients for each date may be summarized as follows:

* March 1, 2013      ( 9)
* March 13, 2013     ( 3)
* April 30, 2013     ( 2)
* May 8, 2013        (17)
* January 2, 2014    ( 3)
* January 7, 2014    (27)
* February 26, 2014  ( 3)
* August 7, 2014     ( 1)

Mr. Clune's litigation hold notices stressed that a recipient's failure to preserve pertinent documents could "lead to legal sanctions" against Yale. Clune was concerned about a possible sanction against Yale for *spoliation* of evidence. While Clune's notices did not use the term, "spoliation" is a cardinal litigation vice, known by that name to trial lawyers and judges, perhaps unfamiliar to academics unable to claim either of those distinctions. Clune's notices made manifest his concern that a trial court might sanction Yale for spoliation of evidence relevant to the University SOM's decision not to reappoint Bagley to its faculty.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A district court has broad discretionary authority to impose sanctions if spoliation of evidence occurs. That authority stems

from two possible sources.  First, if the spoliating party has violated a court order, the court may impose sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, *see West,* 167 F.3d at 779.  Second, "[e]ven without a discovery order, a district court may impose sanctions for spoliation" as part of its "inherent power to control litigation," *id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991)).  However, a district court's discretion is informed by the Second Circuit's instruction that any sanction "should be designed to (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 779.

For a time, the Second Circuit rule was that in order to obtain a spoliation sanction, the movant had to show that "the records were destroyed with a culpable mind" on the part of the spoliator, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002), an opprobrium that could include negligence, *id.* at 108, such as a failure to issue a litigation hold notice after the possibility of future litigation became reasonably foreseeable. [1]  Effective December 1, 2015, Fed. R. Civ. P. 37(e)(2) was amended with respect to the obligations of parties to preserve electronically stored information ("ESI").  That Rule now provides that an adverse inference is warranted only when the court finds that a spoliating party "acted with the intent to deprive another party of the information's use in the litigation."  The Advisory Commitee's note recites that the 2015 amendment "rejects cases such as *Residential Funding Co. v. DeGeorge Financial Corp.,* 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of

---

[1] *See Residential Funding,* 306 F.3d at 107 (citation and internal quotation marks omitted), & 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence").

4

negligence or gross negligence."

In *Thomas v. Butkiewicus*, No. 3:13-cv-747, 2016 WL 1718368, at *7 (D. Conn. April 29, 2016), Chief Judge Hall said that "the new Rule 37(e) overrules Second Circuit precedent on the question of what state of mind is sufficiently culpable to warrant an adverse inference when electronically stored evidence is missing." Two additional factors should be noted.

First, in *Thomas,* Judge Hall also concluded that "it would be unjust to utilize the new Rule 37(e) in this proceeding,"and decided instead to "apply the traditional standard for assessing the need for spoliation sanctions in this case," where the action "was filed more than two-and-a-half years before the change to Rule 37(e) took effect." *Id.*, at *8. Judge Bolden reached the same conclusion in *Learning Care Group, Inc. v. Armetta*, 315 F.R.D. 433, 440 (D. Conn. 2016): "Here, the Court finds that applying the new rules to this motion would be neither just nor practicable, because the parties first raised this issue in September 2015, prior to the application of the new rules."

Second, new Rule 37(e)(2) applies by its own terms only to "electronically stored information that should have been preserved in the anticipation or conduct of litigation" and is lost. The amended rule would seem not to apply at all to more old-fashioned documentary evidence.

These reflections about amended Rule 37(e)(2) need not play a part in the Court's resolution of the present motion, in which Bagley seeks discovery in aid of a possible spoliation motion she has not yet made. The present question for decision is whether it is fair to give Bagley the additional discovery she requests, or deny it entirely, as Yale asks the Court to do.

When a litigation hold notice becomes the subject of a trial judge's opinion, it is invariably because one party is charging or contemplating charging another party with spoliation of evidence. The present motion is illustrative. Bagley seeks further discovery with respect to the litigation hold

notices Yale issued.  She ends her brief by saying: "Professor Bagley further reserves her right to request at the time of trial that the Court issue a directed verdict or provide the jury with a series of adverse inference instructions  (that the evidence would have been unfavorable to the Defendants) for its spoliation of evidence that was reasonably foreseeable [by those to whom the notice was delivered] to be  relevant in this litigation." Doc. 191, at 12.

Counsel for Bagley first raised the possibility of a spoliation claim in the context of the Court's "Omnibus Ruling" [Doc. 187], filed on June 15, 2016, by which the Court intended (or *hoped*, to use a more accurate verb, a hope that has now been dashed) to resolve all discovery disputes cluttering the path to trial readiness.  At pages 40 and 41 of that prior Ruling, I noted that perceptions by Bagley's counsel that Yale had failed to make required discovery "leads Bagley to assert a claim for spoliation of evidence, a transgression which if proved subjects the violator to an additional assortment of discretionary sanctions." Doc. 187, at 40.  The then existing record showed that Yale had issued some litigation holds "to various University branches and offices in respect of Bagley's claims, but the particulars are not clear from the present record."  *Id.*, at 41.  In that circumstance, Bagley included in her reply brief on the earlier motion a request that the Court order Defendants "to provide proof of their preservation efforts, including the specific date on which a litigation hold or preservation notice was put into place," and "a complete list of every individual to whom the notice was delivered." Doc. 179, at 7.  I concluded that those requests by Plaintiff were reasonable in the circumstances, and would not be prejudicial or unduly burdensome to Yale.  The Omnibus Ruling directed Yale to comply with the requests.  Yale's compliance takes the form of the submissions which include Ex. A and Ex. F on the present motion, quoted *supra*.

The present motion arises because Plaintiff's counsel is not satisfied with the current extent

of Yale's production on this issue.  Plaintiff's present Notice of Motion to Compel Production

requests that

> the Court order the Defendants to produce copies of the actual
> litigation hold notices, together with the completed document
> preservation computer survey forms that were required to be returned
> to the Office of General Counsel by each Litigation Hold Recipient.
> In addition, Plaintiff requests the Defendants produce an affidavit
> detailing the retention and production for all non-ESI documents
> collected from each of the Litigation hold Recipients.

Doc. 190, at 1.

It is not entirely clear whether these most recent requests add to the requests Plaintiff made

at the time of the prior Omnibus Ruling, or simply restate and clarify those earlier requests.  I need

not pursue the question because the distinction is not material to the question of how the present

motion should be decided.

Yale resists the present motion by contending that the litigation hold notices sent by Yale

house counsel to the 65 recipients are immune from discovery because they are privileged, either

by the attorney-client privilege or under the attorney's work product doctrine.  Yale argues further

that while privilege may on occasion be denied to such notices, that denial is justified only when the

party seeking discovery has first shown by convincing proof that spoliation in fact occurred, a

showing Yale says Bagley has failed to make in this case.

Yale's brief cites some district court decisions that proof of spoliation must precede any

production of litigation hold notices to an adverse party.  *See, e.g., Mcdevitt v. Verizon Servs. Corp.*,

No. 14-4125, 2016 WL 1072903, at *2 (E.D.Pa. Feb. 22, 2016) ("Therefore, if Defendant produces

evidence to substantiate its claim of spoliation, it would be entitled to receive copies of any litigation

hold letters.").  The existence of such a hard and fast rule in this Circuit may be doubted given recent

case law finding that "circumstantial evidence [of spoliation, such as manipulation of emails] may be accorded equal weight with direct evidence," *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016) (citing *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir.1992)).

Moreover, district courts in this circuit recognize that a party's duty to preserve evidence goes beyond the sending of a litigation hold notice to the individual in possession or control of evidence. In *Stimson v. City of New York*, No. 10 Civ. 4228, 2016 WL 54684 (S.D.N.Y. Jan. 5, 2016), a class of individuals alleged they were issued summons without probable cause by officers of the New York Police Department.  Plaintiffs moved for sanctions for spoliation of evidence by the NYPD and the City.  The issuance and disposition of summonses generated considerable paperwork plaintiffs sought to discover.    Judge Sweet,  granting plaintiffs a limited adverse inference, observed:

> The City did not issue any litigation hold until August 8, 2013, more than three years after the filing of the Complaint in this case.  A preservation notice to NYPD members of service was distributed via a FINEST message on August 20, 2013, which was to be read to all commands.  The evidence indicates that the litigation hold was not effectively communicated, and none of the officers who were named in the City's initial disclosures acknowledged receiving it.

2016 WL 54684, at *2 (citations to record omitted).  Judge Sweet disregarded the City's argument that the plaintiffs' discovery demands were excessive.  On the spoliation issue, he held:

> While the Plaintiffs have made overbroad discovery requests before, the reasonableness or unreasonableness of one party's demands does not determine the scope of the other party's obligation to preserve documents. The Plaintiffs' putative overbroad demands do not excuse the City's *failure to issue a litigation hold*, to *properly supervise its implementation*, or to *suspend document  retention policies* that would foreseeably lead to the spoliation of evidence.

*Id*. at *4-5 (emphases added) (citation omitted).  The emphasized phrases make it plain that a party's

issuance of a litigation hold notice does not put an end to the party's obligation to preserve evidence; it is, rather, the first in a series of related steps necessary to ensure that preservation.  As Magistrate Judge Francis aptly observed in *Mastr Adjustable Rate Mortgages Trust 2006 v. UBS Real Estate Securities Inc.*, 295 F.R.D. 77, 85 (S.D.N.Y. 2013): "A litigation hold is not, alone, sufficient; instead compliance must be monitored."

In spoliation cases involving litigation hold notices, one can discern from Second Circuit and district court opinions a number of decisive questions:

1.   When did a party's duty to preserve evidence arise?

2.   Did the party issue a litigation hold notice in order to preserve evidence?

3.   When did the party issue a litigation hold notice, in relation to the date its duty to preserve the evidence arose?

4.   What did the litigation hold notice say?

5.   What did recipients of the litigation hold notice do or say, in response to or as result of, the notice?

6.   After receiving recipients' responses to the litigation hold notice, what further action, if any, did the party giving the notice take to preserve the evidence?

Questions 2 through 6 are entirely fact-specific to a given case.  Question 1 is a mixed question of law and fact, whose legal element the Second Circuit defined in *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001): "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."

In the case at bar, I am unable to accept Yale's argument that the litigation hold notices it issued about Bagley and the recipients' responses to the notices are immune from discovery because

(in the absence of proof that spoliation had in fact occurred) such documents "are subject to the attorney-client and to work product privileges," Defendants' Brief [Doc. 192], at 3. That contention is something of a stretch. "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."[2] *In Re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Chief Judge Jacobs added in *Erie* that in each case "[w]e consider whether the predominant purpose of the communication is to render or solicit legal advice," since "we think the predominant-purpose rule is the correct one." 473 F.3d at 420, n.7. Assuming that all of Clune's litigation hold notices were sent to employees of Yale, Clune was in effect communicating with his client. However, the predominant purpose of that communication was to give recipients forceful *instructions* about what they must do, rather than *advice* about what they might do.[3]

As for the work product doctrine, it "is not actually a privilege, but rather a qualified immunity from discovery," codified in Fed. R. Civ. P. Rule 26(b)(3), whose purpose "is to protect an attorney's mental processes so that the attorney can analyze and prepare for the client's case without interference from an opponent." 6 *Moore's Federal Practice,* § 26.70[1] (Matthew Bender

---

[2] *See also Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (for attorney-client privilege to apply, "communications between a client and its attorney" must "in fact" be "kept confidential" and "the purpose of the communications must be solely for the obtaining or providing of legal advice).

[3] The Court also notes that to the extent that Yale's litigation hold notices included the text of the exemplar provided to Plaintiff as "document preservation notices," that text has already been revealed publicly in this case, so that secrecy or privilege relating to that language was destroyed or waived. *See* Doc. 191-1, Ex. F.

3d ed.).[4]  That purpose is not implicated by the present exercise.

Even assuming, contrary to these considerations, that Bagley must make some showing of spoliation to obtain discovery of these documents, the record is sufficient on that issue.  I return to the first pertinent question: When did Yale's duty to preserve evidence about the circumstances of Bagley's denial of reappointment arise?

Events of chronological significance are recounted in the Court's decision denying Defendants' motion to dismiss Bagley's complaint.  *See* 42 F. Supp. 3d 332, 337-39 (Aug. 26, 2014).  On May 7, 2012, the Yale SOM BPO voted against Bagley's reappointment.  On May 24, 2012, SOM Dean Snyder advised Bagley by letter of that adverse vote and that he had decided not to renew her contract.  Bagley responded on June 19, 2012, by filing an internal complaint of discrimination with Yale, addressed to then Provost Salovey.  Salovey appointed an SOM faculty committee to investigate and draft a report concerning the Yale SOM decision not to reappoint Bagley.  That report was issued on November 28, 2012 and revised on March 3, 2013.  Salovey ordered the SOM faculty to conduct a further review.  In June 2013, Dean Metrick advised Bagley of that new committee's formation.  On October 21, 2013, the BPO again voted not to renew Bagley's contract.  Dean Snyder advised Bagley in a letter dated November 7, 2013 that her contract would not be renewed.

On March 4, 2013, Bagley had filed a complaint with the Connecticut Commission on

---

[4]  Fed. R. Civ. P. 26 (b)(3) of Civil Procedure protects from disclosure those materials which reveal "the mental impressions, conclusions, opinions, or legal theories of a party's attorney."  *See also In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993) ("At its core, the work product doctrine *shelters the mental processes* of the attorney, providing a privileged area within which he can analyze and prepare his client's case.") (quoting  *United States v. Nobles*, 422 U.S. 225, 238 (1975)) (emphasis added).

11

Human Rights and Opportunities, "CHRO." She stated in that complaint that in connection with her denial of reappointment, Yale had discriminated against her, basing that belief on "sex," "female," "physical disability," and "previously opposed discriminatory conduct." Bagley filed a second CHRO complaint against Yale on December 20, 2013. On that date she also commenced this action by filing her complaint in this Court. Since that time, the litigation in this Court has been brisk.

When, during the course of this melancholy chain of events, should Yale have known that evidence pertinent to Bagley's reappointment might be relevant to future litigation? That is a crucial question in spoliation analysis. A state of reasonable anticipation clearly antedates the actual filing of a complaint; in *Fujitsu*, 247 F.3d at 436, the Second Circuit was careful to couple actual present and possible future litigation as catalysts of equal strength for the preservation of evidence.

Bagley has not yet formally moved for spoliation sanctions, and so the question is not yet before me for decision, but some preliminary, non-binding observations may be made. The record previously made in the case shows that Bagley's personal distress and institutional disapproval and distrust grew throughout the winter and spring of 2012 (the last year of her five-year appointment), so that when on May 24, 2012, Dean Snyder told Bagley that she would not be reappointed, it would not be irrational to suppose that Bagley might soon transform herself from disheartened academic to vengeful litigant. In fact, Bagley filed an internal discrimination complaint against Yale during the following month of June 2012 (which had the effect of bringing Provost Salovey out of the wings and onto the stage).

Moreover, there is an earlier indication of Bagley's thoughts turning toward the courthouse. Exhibit B to Bagley's present motion, Doc. 191-1, consists of an e-mail exchange between Deputy Provost Frances Rosenbluth and Provost Salovey in April 2012. The evidence shows that Bagley

12

had been consulting with Rosenbluth about her application for SOM faculty reappointment.  On April 28, 2012, at 4:51 p.m., Rosenbluth e-mailed Salovey: "Ted Snyder and Andrew Metrick are not sure about wanting to renew Connie Bagley as Professor in the Practice, and she is getting panicky."  Salovey replied at 4:55 p.m.: "Is there a problem?"  Rosenbluth answered at 4:56 p.m.: "Long story short, there wasn't until she started worrying *and threatening legal action*.  Now they think she's a little off kilter."  Doc. 191-1, Ex. B (emphasis added).  The present record does not show when Bagley began making audible references to possible "legal action," to the discomfiture of her colleagues, but such muttered threats clearly occurred by April 2012, if not earlier.

It is in these circumstances that Yale's first batch of litigation hold notices were sent to the first nine recipients on March 1, *2013*: at least eleven months after Bagley began "threatening legal action," ten months after Snyder told Bagley she would not be reappointed, and nine months after she lodged her first internal discrimination claim with the University (which ultimately rejected the claim).  Those initial nine recipients included the most prominent figures in the evolving controversy over Bagley's reappointment: Deans Snyder and Metrick, Professors Rae and Harte.  Three more individuals received notices on March 13, 2013 and two more on April 30, 2013: those five individuals played parts of some centrality in the case.  On May 8, 2013, 17 more individuals received notices; they were on the periphery of the controversy.  Yale issued litigation hold notices to the remaining 34 recipients in four separate batches during the months of January, February and August, *2014*; Bagley had filed this action against Yale on December 20, 2013.

What happened in this case is that Yale identified 65 individuals who might have evidence relevant to Bagley's denial of reappointment, and issued them litigation hold notices in eight separate batches, a process that took a considerable amount of time.  The first nine notices were sent nine

13

months after Snyder told Bagley she would not be reappointed.  The last was sent eight months after

Bagley filed this action.  To characterize the pace of this notification process as culpable or even

negligent would be premature on the present record, but it is fair to say that it was leisurely, to an

extent making it impossible to dismiss as frivolous Bagley's suggestion that she might move for a

spoliation sanction.  The six questions outlined *supra* arise in this case, and the factors pertinent to

resolving them include an unreasonable delay in issuing the notices and a subsequent failure to

implement and monitor the recipients' responses.  Judge Sweet said in *Stimson* that the Second

Circuit has left open "the question of whether a sufficiently indefensible failure to issue a litigation

hold could justify an adverse inference on its own," and an additional factor would be "the failure

to properly implement the litigation hold even after it was issued."  2016 WL 54684, at *6.  These

are legitimate questions in the case at bar.  Bagley is entitled to discovery with respect to them.[5]

Therefore I conclude that in the circumstances of this case, Bagley's "Motion to Compel"

[Doc. 190] is GRANTED.  Bagley  is entitled to examine the litigation hold notices issued by Yale,

and the responsive survey forms that notice recipients returned to Yale.  These documents bear

directly upon the questions courts identify as dispositive in spoliation cases.  Bagley is entitled to

discovery in these areas, in order to discern the merit or lack of merit of a formal claim for spoliation

claim.  To the extent that Yale objects to production of these documents on the grounds of privilege

---

[5]  Courts have recognized the need for plaintiffs to obtain information relating to litigation
hold notices, such as whether a notice was actually issued and what steps were thereafter taken to
collect and preserve relevant documents and data.  *See, e.g., In re eBay Seller Antitrust Litig.*, No.
C 07 01882 JF (RS), 2007 WL 2852364, at *2 (N.D. Cal. Oct. 2, 2007) (regardless of whether
litigation hold notices may have contained some material protected under attorney client privilege
and/or work product doctrine, court held "plaintiffs [were] entitled to know what kinds and
categories of ESI [defendant's] employees were instructed to preserve and collect, and what specific
actions they were instructed to undertake to that end").

or the work product doctrine, the objections are OVERRULED.

For the same reasons, Bagley is also entitled to an affidavit from a Yale officer or employee (*not* a notice recipient or recipients) which describes what non-ESI documents Yale received from notice recipients and what was done with them.  On a spoliation claim, Bagley will ultimately bear the burden of showing that pertinent evidence was destroyed or rendered unavailable.  This discovery may cast light on that disputed issue.  Yale may prefer not to have to produce that information; Yale's counsel miss no opportunity to remind the Court how much discovery effort the case has previously required.  However, requiring this additional production, or a further deposition in case of need, is in keeping with a governing objective of the Federal Rules of Civil Procedure: "By requiring disclosure of all relevant information, the discovery rules allow ultimate resolution of disputed issues to be based on full and accurate understanding of true facts."  6 *Moore's Federal Practice* § 26.02 (Matthew Bender 3d ed.).[6]

The foregoing is SO ORDERED.

Dated:  New Haven, Connecticut
             December 22, 2016


                                                            /s/Charles S. Haight, Jr.
                                                            CHARLES S. HAIGHT, JR.
                                                            Senior United States District Judge

---

[6]  While Yale may not welcome the measurement of its obligations in the case at bar by these principles, it is worth recalling that the treatise's principal initial author, James Wm. Moore, was a towering figure on the faculty of Yale Law School.  In his preface to the first edition (1938), Professor Moore referred to his effort "at all times to accord to the Rules the interpretation which is most likely to attain the general objective of the new practice: the settlement of litigation on the merits."  That is the interpretation this Ruling attempts to adopt.